IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CR. NO. 2:21cR49-MHT-JTA |
| | ) [18 U.S.C. § 371; |
| WILLIAM LEE HOLLADAY, III | ) 18 U.S.C. § 1343; |
| a/k/a "Trey," | ) 18 U.S.C. § 1028A(a)(1); |
| DEBORAH IRBY HOLLADAY | ) 18 U.S.C. § 2] |
| a/k/a "Deb," | ) |
| WILLIAM RICHARD CARTER, JR. | ) |
| a/k/a "Rick," | ) |
| GREGORY EARL CORKREN | ) |
| a/k/a "Greg," | ) |
| DAVID WEBB TUTT, and | ) |
| THOMAS MICHAEL SISK | ) |
| a/k/a "Tom," | ) INDICTMENT |

The Grand Jury charges:

# I.  INTRODUCTION

## A.  The Defendants

1.      From in or about July of 2013 and continuing until on or about October 31, 2020,

Defendant WILLIAM LEE HOLLADAY, III a/k/a "Trey" (hereinafter, "TREY HOLLADAY")

was the superintendent of the Athens, Alabama City School District.  Before assuming this

position, TREY HOLLADAY worked as an athletics coach, teacher, and administrator for

various public school districts in Alabama.  At all times material to this indictment, TREY

HOLLADAY was married to DEBORAH IRBY HOLLADAY.



3.      From in or about August of 2015 and continuing to the present, Defendant
WILLIAM RICHARD CARTER, JR. a/k/a "Rick" (hereinafter, "CARTER") was an employee
of the Athens City School District. From on or about August 17, 2015 and continuing until on or
about October 15, 2015, CARTER was a technology teacher at Athens Renaissance School.
From on or about October 15, 2015 and continuing until on or about June 28, 2016, CARTER
was the coordinator of virtual programs for the Athens City School District. From on or about
June 28, 2016 and continuing until on or about July 20, 2017, CARTER was the director of
innovative programs for the Athens City School District. From on or about July 20, 2017 and
continuing until an unknown date, CARTER was the executive director of innovative programs
for the Athens City School District. In this position, CARTER's duties included overseeing
innovative programs and charter school authorization. During his time working for the Athens
City School District, CARTER also held the positions of: (1) interim principal of Athens Middle
School; (2) principal of Athens High School; and (3) executive director of planning.

4.      At all times material to this indictment, Defendant GREGORY EARL
CORKREN a/k/a "Greg" (hereinafter, "CORKREN") was a resident of Tuscaloosa County,
Alabama and was a retired public educator. CORKREN retired in or about 2015. Before
retiring, CORKREN held various positions, including teacher, athletics coach, and administrator,
for various public school districts in Alabama. CORKREN was a longtime friend of TREY
HOLLADAY.

5.      At all times material to this indictment, Defendant DAVID WEBB TUTT
(hereinafter, "TUTT") was a resident of Marengo County, Alabama. During his professional
career, TUTT held various positions, including football coach at Marengo Academy in Linden,
Alabama. TUTT was a longtime friend of TREY HOLLADAY.

2

6.    At all times material to this indictment, Defendant THOMAS MICHAEL SISK

a/k/a "Tom" (hereinafter, "SISK") was the superintendent of the Limestone County, Alabama

School District.

**B.    Relevant Public School Districts and Schools**

**1.    Athens City Schools**

7.    At all times material to this indictment, the Athens City School District

(hereinafter, "ACS") was a Kindergarten through 12th grade (hereinafter, "K-12") public school

district serving Athens.

8.    On or about May 15, 2014, the ACS board of education adopted Policy JBCB, the

"Non-Resident Student Admissions - Policy." This policy gave the ACS superintendent and the

ACS board of education the authority to accept an application for enrollment from a non-resident

student. Subject to limited exceptions, the policy required ACS to charge tuition in the amount

of $1,200 per year to any non-resident student admitted under the policy. Policy JBCB was in

effect during all times relevant to this indictment.

9.    From on or about January 20, 2016 and continuing to the present, ACS was a

"public charter school authorizer." As such, ACS had authority to approve or deny applications

by groups seeking to form charter schools within the geographic boundaries of ACS.

10.    From in or about the fall of 2016 and continuing to the present, the Athens

Renaissance School (hereinafter, "Athens Renaissance") was a virtual and blended K-12 public

school operated by ACS. Before becoming a standalone school, from on or about an unknown

date until in or about the fall of 2016, Athens Renaissance was a virtual education program of

Athens High School. During all times material to this indictment, Athens Renaissance offered

"blended" and "virtual" education models. Students enrolled in a blended education model

3

attended physical Athens Renaissance campuses approximately two days per week (or on an as-needed basis) and, on other days, attended school virtually using an online learning management system. Students enrolled in a virtual education model did not attend an Athens Renaissance campus and instead attended school exclusively through an online learning management system.

11.     A "learning management system" is a software application used for the administration, documentation, tracking, reporting, and delivery of virtual educational courses. Learning management systems are often developed by third-party corporations and sold to school systems for use in virtual schools or programs.

12.     During the period relevant to this indictment, Athens Renaissance used several learning management systems. Among the learning management systems used by Athens Renaissance was Odysseyware. Unlike some learning management systems, Odysseyware did not provide live instructors. Rather, it provided only written and prerecorded content and assessment tools. Accordingly, users of Odysseyware were required to employ instructors and administrators to oversee Odysseyware-based courses.

13.     On or about June 11, 2015, the ACS board of education adopted Policy ILB. Policy ILB governed the operation of Athens Renaissance. Policy ILB provided, in part, that "[Athens Renaissance] courses and programs are free for enrolled full-time students meeting the residency requirements of Policy JBC, and available for a non-resident student tuition fee for enrolled full-time, non-resident students who meet Policy JBCB eligibility requirements and Athens City Schools [ACS] enrollment procedures." Policy ILB also permitted students to be "guest" enrolled in Athens Renaissance. Guest-enrolled students would take a limited number of virtual courses through Athens Renaissance and otherwise remain enrolled in another public,

4

private, or home school. Policy ILB required guest enrollees to "pay a fee relative to the number of courses they take." Policy ILB was in effect at all times material to this indictment.

14.    On or about June 11, 2015, the ACS board of education also adopted the Addendum to Policy ILB. The Addendum to Policy ILB, in pertinent part, defined what constituted a "full-time" student of Athens Renaissance: "Full-time students are required to take, at minimum, six (6) credits per year at either the traditional or accelerated pace." The Addendum to Policy ILB also required Athens Renaissance to identify truant students. The policy stated that a virtual student was considered truant when he or she was more than 15 percent off pace in one or more of his or her classes. When a student became truant, the Athens Renaissance principal was to "send official notification to the student and parent(s)/guardian(s) notifying all parties that the student is truant and in violation of Alabama's Compulsory School Attendance Law."

**2.    Limestone County Schools**

5

16.     At all times material to this indictment, the Limestone County School District (hereinafter, "LCS") was a K-12 public school district headquartered in Athens and serving students in Limestone County, Alabama.

17.     During the 2016–2017 school year, LCS operated a virtual education program, the Limestone County Virtual School. Limestone County Virtual School was not a separate school recognized by the Alabama State Department of Education. Instead, it was a program that provided virtual education courses to students of brick-and-mortar schools operated by LCS.

18.     During the 2016–2017 school year, LCS delivered virtual education courses to Limestone County Virtual School students using the learning management system, Odysseyware. LCS did not, however, have any license to use Odysseyware. Rather, students of Limestone County Virtual School took Odysseyware courses using a license paid for by ACS.

6

## C. Relevant Private Schools

22.    At all times material to this indictment, Marengo Academy was a K-12 private
school located in Linden. Marengo Academy required students to pay tuition.

23.    At all times material to this indictment, Jackson Academy was a K-12 private
school located in Jackson, Alabama. Jackson Academy required students to pay tuition.

24.    At all times material to this indictment, Pickens Academy was a K-12 private
school located in Carrollton, Alabama. Pickens Academy required students to pay tuition.

25.    At all times material to this indictment, the Lakeside School was a K-12 private
school located in Eufaula, Alabama. The Lakeside School required students to pay tuition.

26.    At all times material to this indictment, Southern Academy was a K-12 private
school located in Greensboro, Alabama. Southern Academy required students to pay tuition.

27.    At all times material to this indictment, Monroe Academy was a K-12 private
school located in Monroeville, Alabama. Monroe Academy required students to pay tuition.

28.    At all times material to this indictment, Meadowview Christian School was a K-
12 private school located in Selma, Alabama. Meadowview Christian School required students
to pay tuition.

30.    At all times material to this indictment, Marion Academy was a K-12 private
school located in Marion, Alabama. Marion Academy required students to pay tuition.

7

## D.   Relevant Corporations

32.    From on or about February 25, 2016 and continuing through the present, Educational Opportunities and Management, LLC (hereinafter, "Ed Op") was a limited liability corporation registered with the Alabama Secretary of State. At all times material to this indictment, the sole member of Ed Op was CORKREN.

33.    From on or about February 22, 2017 until on or about July 24, 2018, Tutt Educational Services, LLC (hereinafter, "Tutt Educational") was a limited liability corporation registered with the Alabama Secretary of State. At all times material to this indictment, the sole member of Tutt Educational was TUTT. On or about July 24, 2018, TUTT filed articles of amendment with the Alabama Secretary of State changing the name of Tutt Educational to "Tutt Consulting Services, LLC." On or about September 20, 2019, TUTT filed documents with the Alabama Secretary of State dissolving the renamed corporation.

34.    From on or about November 22, 2016 until on or about December 19, 2018, Sage Professional Development, LLC (hereinafter, "Sage") was a limited liability corporation registered with the Alabama Secretary of State. At all times material to this indictment, the sole member of Sage was DEBORAH HOLLADAY.

**E.    The Alabama State Department of Education**

36.    The Alabama State Department of Education (hereinafter, "ASDE") is a state

agency that oversaw all K-12 public school districts operating within Alabama. At all times

material to this indictment, the ASDE was headquartered in Montgomery, Alabama, within the

Middle District of Alabama. The state board of education governed the ASDE. The state board

of education selected a state superintendent of education who administered the ASDE. The

deputy state superintendent of education for the division of administrative and financial services

oversaw the state's allocation of funds to public school districts.

**F.    Statewide Public Education Funding in Alabama**

37.    At all times material to this indictment, Alabama K-12 public school districts

received funding from both local and statewide tax revenues. Statewide funding came

predominately from the Education Trust Fund, an account administered by the state

comptroller's office, located in Montgomery. To receive funding from the Education Trust

Fund, a school district was required to participate in the Foundation Program. The ASDE

administers the Foundation Program.

38.    At all times material to this indictment, as the head of the ASDE, the state

superintendent of education was responsible for determining the amount of Foundation Program

funding each local school district was entitled to receive. The state superintendent made these

determinations using a formula set forth in state regulations. Generally, this formula linked each

district's Foundation Program allocation to its "average daily membership." Average daily

membership referred to the average number of students enrolled in a school district during the 20

school days immediately following Labor Day. In most cases, the higher a district's average

daily membership, the higher its Foundation Program allocation would be. During the relevant

9

period, the Foundation Program formula resulted in a school district receiving between $5,500 and $7,000 per year for each whole student in its average daily membership.

39.     At all times material to this indictment, the state comptroller issued Foundation Program payments through electronic transfers. The state comptroller did so at the direction of the state superintendent of education.

40.     At all times material to this indictment, Foundation Program payments were made monthly and were made "in arrears." This meant that the average daily membership of a district during the 20-day period following Labor Day of Year X was used to determine the Foundation Program allocation that was paid to the district beginning on October 1 of Year X+1. That Foundation Program allocation was then paid in monthly installments from October of Year X+1 through September of Year X+2.

41.     At all times material to this indictment, to provide funding to districts who experienced sudden growth, the state superintendent of education also directed the state comptroller to issue to qualifying districts "Current Units" payments. Current Units payments were calculated by subtracting the previous year's average daily membership from the current year's average daily membership. The difference was then entered into a formula that determines a district's Current Units payments. Current Units payments were issued, in most cases, in or around December and June of the school year in which the average daily membership was calculated.

## G.     Alabama Virtual Education Law

42.     In or about April of 2015, the governor of Alabama signed into law Act No. 2015-89. The act dealt with virtual education offerings in Alabama public schools. Section 1 provided, "Before the 2016-2017 school year, each local board of education shall adopt a policy

10

providing, at a minimum, a virtual education option for eligible students in grades nine to 12, inclusive, beginning with that school year." The act went on to state that "[t]he policy shall offer students in grades nine to 12, inclusive, an online pathway for earning a high school diploma and, at a minimum, shall include all of the following: (1) The scope and delivery of virtual options. (2) Student eligibility criteria for initial and continuing participation in the virtual program. (3) Specific requirements for monitoring performance and testing protocol consistent with this act. (4) Attendance requirements, if any."

43.     Section 2(a) provided, "A full-time student enrolled in a virtual program shall be enrolled and counted in the average daily membership of the local school, participate in state testing and accountability requirements through the local school system, and, upon satisfying the graduation requirements of the local board of education, receive a diploma from the local school system."

## H.     Statewide Education Data Management

44.     At all times material to this indictment, K-12 public school districts in Alabama inputted student information into a computer-based education data management program. Each school district used the same program; however, each district maintained its own database within the program. The ASDE was able to access each district's student information management database.

45.     At all times material to this indictment, among the types of data in each district's program for each student enrolled in the district were: (1) schools attended and dates of attendance; (2) course schedules; (3) instructors; (4) grades earned in all classes; (5) attendance records; (6) standardized test scores; and (7) personal identifying information.

11

46.     At all times material to this indictment, because all public school districts in
Alabama use the same student information management program, a student could only be
enrolled in one district's database at any time. If a student already enrolled in one district's
database attempted to enroll in a new district, the new district's database would send a
notification to the old district and prevent enrollment in the new district.

47.     At all times material to this indictment, each year, following the 20-day period
after Labor Day, officials with the ASDE accessed each district's student information
management database and extracted information about each student enrolled in the district. The
ASDE official used wire communication in interstate commerce to extract this data. ASDE
officials then use the extracted data to calculate each district's average daily membership. Each
district's superintendent was responsible for ensuring the accuracy of the enrollment information
for his or her district.

48.     At all times material to this indictment, private school students were not included
in any student information management database accessible to the ASDE.

## II. BACKGROUND EVENTS

### A.     ACS's Flexibility Waiver

49.     On or about June 16, 2015, TREY HOLLADAY, on behalf of ACS, sent an
application to the ASDE for a "flexibility contract." A flexibility contract is entered into
between the ASDE and a school district and allows the school district to obtain programmatic or
budgetary flexibility regarding specified statutes or regulations in order to meet some innovative
plan.

50.     The request submitted by TREY HOLLADAY sought flexibility regarding
various state statutes and regulations in order to implement Athens Renaissance as a virtual

12

education option. In support of the request, ACS submitted Policy ILB and the Addendum to Policy ILB, recounted above.

51.     On or about September 3, 2015, while the application for the flexibility waiver was pending before the state superintendent of education, TREY HOLLADAY sent a letter to the state superintendent. The letter stated that, per TREY HOLLADAY's understanding, "Full-time students participating in the virtual option at the Renaissance School are enrolled as full-time students in the [ACS] system, in the same manner as traditional students." TREY HOLLADAY added that he hoped that Athens Renaissance would attract "home school students, private school students, and other non-traditional students that have abandoned public education for various reasons, and to enroll or 'recover' them as full-time students in our school system." TREY HOLLADAY informed the superintendent that ACS was "enrolling non-traditional students (who are not otherwise enrolled as public school students) from both our district and from across the State as full-time students in our school system (limited, of course, by our own logistical considerations, such as capacity)." The memorandum also mentioned guest-enrolled students, stating that such students would take a few courses with ACS but would remain enrolled in their schools. Guest-enrolled students would, according to TREY HOLLADAY, pay fees to ACS for taking courses through Athens Renaissance. TREY HOLLADAY acknowledged that ACS would not include guest-enrolled students "in our school system's average daily membership."

52.     On or about November 5, 2015, the state superintendent of education informed ACS, through a letter to TREY HOLLADAY, that the ASDE had approved the flexibility contract. The letter contained a list of "advisements and reminders." The attached list stated: "Concerning [ACS's] request to allow [ACS] to offer one or more traditional, online, or blended

13

courses to students enrolled in other public or non-public schools (or students that are home schooled) as 'guest students' (or transient students) for a fee, without enrolling them as students in the [ACS] (and thus, not receiving accompanying public funding for such students): No Foundation Program units are earned."

**B.    ACS's Fall 2015 Agreement with Marengo Academy**

53.    While the flexibility contract was pending, in or about September of 2015, TREY HOLLADAY came into contact with the administration of Marengo Academy. During discussions, TREY HOLLADAY suggested that Marengo Academy allow ACS to enroll Marengo Academy students in Athens Renaissance. TREY HOLLADAY offered Marengo Academy: (1) laptop computers; and (2) access to online courses through various learning management systems. In exchange, Marengo Academy would be required to provide ACS student identifying information, transcripts, and grades. At TREY HOLLADAY's direction, ACS officials would then use that information to enroll Marengo Academy students in Athens Renaissance and thus make it appear that the Marengo Academy students were full-time ACS non-resident virtual students.

54.    Marengo Academy accepted the offer from TREY HOLLADAY. Accordingly, in or about the fall of 2015, Marengo Academy officials provided student information to ACS officials. ACS officials then, acting at TREY HOLLADAY's direction, used that information to enroll the Marengo Academy students into ACS's student information management database. By doing so, the ACS officials made it appear that the Marengo Academy students were full-time non-resident virtual students of ACS.

55.    In fact, during the 2015–2016 school year, the Marengo Academy students were, at all times, full-time students of Marengo Academy. In most instances, tuition was paid to

14

Marengo Academy for the students to attend. On normal school days, the students reported to the brick-and-mortar campus of Marengo Academy in Linden. The students received instruction from teachers employed by Marengo Academy.

56. In contrast, no tuition was paid to ACS for the Marengo Academy students. The students did not report to any campus of Athens Renaissance or any other ACS school. The students were not full-time students of Athens Renaissance or any other ACS school.

57. Because the Marengo Academy students were listed in ACS's student information management database, the ASDE counted the Marengo Academy students when determining ACS's fall 2015 average daily membership. This resulted in an increased average daily membership for ACS when compared to its fall 2014 average daily membership.

## C.   March 2016 Meeting with ASDE Officials

58. On or about March 2, 2016, TREY HOLLADAY attended a meeting in Montgomery at the ASDE office. There, he met with the state superintendent of education, the deputy state superintendent of education for the division of administrative and financial services, and others. An attorney for the ACS board of education also attended the meeting. During the meeting, the attendees discussed ACS's practice of enrolling private school students in Athens Renaissance and then counting those students in ACS's average daily membership. The deputy state superintendent of education for the division of administrative and financial services raised concerns about this practice. In response, TREY HOLLADAY and the ACS board of education attorney agreed to discontinue the practice of associating with private schools. During the meeting, the state superintendent also advised TREY HOLLADAY that ACS should refrain from enrolling in Athens Renaissance full-time virtual students who did not reside within approximately 100 miles of Athens.

15

59.     Following this meeting, on or about March 7, 2016, the ACS board of education attorney sent an email message to the deputy state superintendent of education for the division of administrative and financial services. In that message, the ACS board of education attorney noted that, during the March 2 meeting, the participants "discussed the students who are enrolled full-time in Athens City but who also attend Marengo Academy in some capacity." The attorney then wrote that, in light of the ASDE officials' concerns about ACS's enrollment of these students, ACS was "willing to 'pull back' with respect to this issue." As such, the attorney stated that ACS would "not enroll any full-time student into its Renaissance School unless that student first presents papers showing that, if he/she was enrolled in any public or private school, that he/she has *withdrawn* from such school."

## III. THE CHARGES

### COUNT 1
(Conspiracy)

60.     The factual allegations contained in each of the foregoing paragraphs of this indictment are hereby realleged and incorporated herein as if copied verbatim.

61.     Beginning in or about February of 2016 and continuing until in or about August of 2018, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendants,

> WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
> DEBORAH IRBY HOLLADAY a/k/a "Deb,"
> WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"
> GREGORY EARL CORKREN a/k/a "Greg,"
> DAVID WEBB TUTT, and
> THOMAS MICHAEL SISK a/k/a "Tom,"

16

as well as others, both known and unknown, did knowingly and intentionally conspire, combine, and agree with themselves and others to commit offenses against the United States, in violation of Title 18, United States Code, Section 371.

## OBJECTS OF THE CONSPIRACY

62.   It was an object of the conspiracy to knowingly and willfully execute and attempt to execute a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing that scheme, transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

63.   It was an object of the conspiracy to execute and attempt to execute a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing that scheme, utilize the United States mail and private and commercial interstate carriers, in violation of Title 18, United States Code, Section 1341.

## PURPOSE OF THE CONSPIRACY

64.   It was a purpose of the conspiracy for ACS, LCS,          to obtain greater state funding allocations through the Foundation Program than they would otherwise have been entitled to by purporting to enroll into their respective virtual schools students who were in fact full-time students of brick-and-mortar private schools and who were not taking even close to what could be considered full course loads through a virtual education program.  ACS would then use, directly and indirectly, portions of the excess money to fund the completion of capital projects, including, the new campus of Athens High School.

17

65.    It was a purpose of the conspiracy for TREY HOLLADAY, DEBORAH

HOLLADAY, CARTER, CORKREN, TUTT, and SISK to obtain, directly and indirectly, for

their own personal use, portions of the increased revenue generated for ACS, LCS, ▮▮▮ by

the fraudulent enrollment of private school students in the ACS, LCS, ▮▮▮ virtual schools.

## MANNER AND MEANS

It was part of the conspiracy that:

### A.    2016–2017 School Year

#### 1.    TREY HOLLADAY's Recruitment of CORKREN and the Formation of Ed Op

66.    In or about February of 2016, TREY HOLLADAY met with CORKREN.  During

the meeting and subsequent conversations, TREY HOLLADAY asked CORKREN to: (1) form a

limited liability corporation; (2) through the corporation, contract with ACS; (3) pursuant to that

contract, contact private schools and offer incentives to encourage the private schools to permit

ACS to enroll the private school students in Athens Renaissance; and (4) through the

corporation, receive payments from ACS.

67.    On or about February 25, 2016, CORKREN filed with the Alabama Secretary of

State documents creating Ed Op.  Ed Op was the corporation through which CORKREN would

do the things suggested by TREY HOLLADAY.

68.    On or about April 22, 2016, ACS and Ed Op entered into a "SERVICES

AGREEMENT."  TREY HOLLADAY executed the contract for ACS; CORKREN executed the

contract for Ed Op.  The term of the contract was to run from May 1, 2016 through June 30,

2017.  The preamble of the contract stated: "There are anticipated to be a significant number of

[Athens Renaissance] full-time and guest enrollment students in the Marengo County, Alabama

area . . . during the 2016-17 school year" and "ACS seeks assistance with respect to the logistics

18

and administrative issues presented by serving the Students." The contract obligated Ed Op to fulfill various responsibilities related to the students it would serve. For doing so, ACS agreed to pay Ed Op a fee of $45 per month per student serviced. The fee was to be paid monthly in arrears, with the first payment due on June 1, 2016 and the last payment due on July 1, 2017.

69.     At some point thereafter, TREY HOLLADAY approached CORKREN and instructed CORKREN that CORKREN should give to TREY HOLLADAY a portion of the profits Ed Op would earn through any contract it entered into with ACS. TREY HOLLADAY directed CORKREN to make payments to him in cash.

## 2.     Recruitment of Private Schools and ACS Digital Showcase

70.     During in or about February, March, and April of 2016, TREY HOLLADAY and CARTER worked to recruit private schools to provide student information that could be used to enroll private school students in Athens Renaissance. They did so by offering the schools: (1) access to Odysseyware; (2) laptop computers; (3) increased internet capabilities; (4) standardized testing; and (5) monetary payments. In exchange, TREY HOLLADAY and CARTER asked the school officials to provide ACS (though Ed Op, the intermediary) with: (1) student and parent identifying information; (2) academic transcripts; and (3) at the end of each semester, copies of the students' report cards.

71.     On or about May 2 and May 3, 2016, ACS hosted a "Digital Learning Showcase." TREY HOLLADAY, CARTER, and CORKREN attended this event. Representatives of Jackson Academy, Pickens Academy, the Lakeside School, and Southern Academy attended the event. ACS, directly or indirectly, paid for lodging and meals for these private school representatives. During the event, TREY HOLLADAY encouraged private school representatives to associate with ACS in exchange for various benefits.

19

72.     Thereafter, representatives from each of the above-described four private schools accepted the above-described benefits and, in exchange, provided student information to CORKREN. CORKREN then relayed that information to ACS officials. The private school students were then fraudulently enrolled as full-time Athens Renaissance virtual students for the 2016–2017 school year. Additionally, in or about the summer of 2016, representatives from Marengo Academy, yet again, also agreed to and did provide student information to ACS for the 2016–2017 school year.

73.     TREY HOLLADAY, CARTER, and CORKREN then began to use a code to refer to the private schools providing student information to be used for fraudulent enrollment. They referred to Marengo Academy as "EO1." Jackson Academy was "EO2." Pickens Academy was "EO3." The Lakeside School was "EO4." Southern Academy was "EO5."

### 3.     Enrollment of Private School Students in Athens Renaissance

74.     In or about June of 2016, ACS hosted a "Digital Instruction and Planning" training session in Athens. DEBORAH HOLLADAY presented at this session. Teachers from the following private schools attended the session: Jackson Academy, the Lakeside School, and Marengo Academy. During the session, the private school teachers learned about using Odysseyware.

75.     In or about July of 2016, ACS hosted a second "Digital Instruction and Planning" training session in Athens. Teachers from the following private schools attended the session: Jackson Academy, Pickens Academy, Marengo Academy, and Southern Academy. During the session, the private school teachers learned about using Odysseyware.

76.     In or about the summer of 2016, CORKREN visited the various campuses of the private schools that had agreed to provide student information to ACS. On some occasions, he

delivered laptop computers to the schools. These laptop computers were purchased with ACS funds. Some bore ACS property inventory stickers. Specifically, in or about August and September of 2016, CORKREN made the following computer deliveries at the direction of TREY HOLLADAY: (1) CORKREN delivered approximately 40 laptop computers to Pickens Academy; (2) CORKREN delivered approximately 50 laptop computers to Jackson Academy; (3) CORKREN delivered approximately 45 laptop computers to Southern Academy; and (4) CORKREN delivered approximately 50 laptop computers to the Lakeside School.

77.     On or about an unknown date, CORKREN delivered laptop computers to Monroe Academy. These laptop computers were the property of LCS.

78.     In or about the summer of 2016, CORKREN received from officials of the participating private schools completed "Athens City Schools Virtual/Non-Resident Enrollment Forms." Each enrollment form purported to be a document enrolling a particular student in Athens Renaissance. Each enrollment form contained for the subject student: the student's name, the parent or guardian's name, the student's address, the student's grade during the 2016–2017 school year, the student's date of birth, and the student's school.

79.     Each form also contained the following release:

I understand, agree, and request that teachers and administrators at the Athens Renaissance School (as well as instructors and administrators of Ed-Op, Inc.) may provide information concerning any and all educational records of the student named above (including transcript information, class information and grades, disciplinary information, etc.) with all instructors, administrators, employees, and agents related to Ed-Op. I understand that this information may be used by such instructors, administrators, employees, and agents for, among other things, reviewing and discussing (i) the appropriate coursework and schedule, (ii) the performance and progress, and (iii) the grades and credits, of the student with respect to his/her classes with the virtual education program of the Athens Renaissance School.

I understand that I may revoke this Consent upon providing written notice to the Athens Renaissance School (or that the student may revoke this Consent after

reaching the age of 18), but that until such revocation is made, this Consent will remain in effect and the student's educational records will continue to be provided for the purpose stated above.

80.     At the bottom of each form was a line for a signature of a

"GUARDIAN/AUTHORIZED OFFICIAL." During in or about the summer of 2016,

CORKREN advised the private school headmasters or employees that they could sign the forms on behalf of their students. CORKREN gave this instruction to the private school officials because TREY HOLLADAY told him that the private school headmasters could sign the forms.

81.     During in or about the summer of 2016: (1) the headmaster of Jackson Academy signed enrollment forms for Jackson Academy students; (2) the assistant headmaster of Pickens Academy signed enrollment forms for Pickens Academy students; and (3) the headmaster of the Lakeside School signed enrollment forms for Lakeside School students. Parents or guardians (other than those who happened to be the headmaster or assistant headmaster of a school), did not sign the enrollment forms and did not otherwise consent to the transfer of their children's identifying information to ACS.

82.     By in or about August of 2016, CORKREN had collected Athens City Schools Virtual/Non-Resident Enrollment Forms pertaining to almost all of the private school students enrolled at the five participating private schools. CORKREN delivered these forms to ACS officials for those officials to use to enroll the students in Athens Renaissance.

83.     Some students of the Lakeside School resided in Georgia. Additionally, some students of Pickens Academy resided in Mississippi. TREY HOLLADAY instructed CORKREN to have the headmasters of the private schools create false Alabama addresses for the out-of-state students of the Lakeside School and Pickens Academy.

84. On or about August 30, 2016, CARTER sent an email message to CORKREN. The subject of the message was "Final To-Do List." In the message, CARTER wrote: "*Address Change on the out of state addresses[.]" Later that day, CARTER sent an email message to two Athens Renaissance employees. In that message, CARTER wrote, "Mr. Corkren will also send us our new addresses for our EO students with out of state addresses."

85. Thereafter, CORKREN created false Alabama addresses for the out-of-state students. He did so by identifying vacant residential addresses in Alabama on real estate websites, including Realtor.com. CORKREN used the vacant addresses as the false addresses for the out-of-state students. CORKREN sent these false addresses to CARTER. CARTER then caused ACS officials to enter the false addresses into ACS's student information management database as though the students resided at the false addresses.

86. Also during in or about the summer of 2016, CORKREN presented to officials at participating private schools what purported to be Alabama Independent School Association (hereinafter, "AISA") "Verification Release Forms." These forms were not legitimate AISA forms. Rather, they contained, at the top, the misappropriated header of AISA. CORKREN asked the private school officials to complete a Verification Release Form for each of their students.

87. The Verification Release Forms purported to authorize the release of information about the subject student to the registrar of Athens Renaissance. Each form required the person completing the form to state the "Purpose of Verification." On most of the forms, "UN-ENROLLMENT" was indicated. At the bottom of each form, the "HEAD OF SCHOOL OR REGISTRAR" was required to sign thus giving "consent for the named school above to release

23

the requested information." The Verification Release Forms did not have any space for a parent or guardian signature.

88.     By in or about August of 2016, CORKREN had collected Verification Release Forms signed by private school officials for many of the students to be enrolled from the participating private schools. Parents or guardians, subject to few exceptions, did not sign the release forms. CORKREN delivered these forms to ACS officials. The ACS officials kept each form in an ACS file as supposed proof that the subject student had un-enrolled from a private school before enrolling in Athens Renaissance.

89.     As TREY HOLLADAY, CARTER, and CORKREN then knew, the students named in the ACS enrollment and verification release forms and the parents of those students: (1) did not intend to enroll as full-time public school students for the 2016–2017 school year; and (2) did not intend to un-enroll from their respective private schools for the 2016–2017 school year.

90.     Also during in or about the summer of 2016, CORKREN received from officials of the participating private schools academic records related to the private schools' students. CORKREN delivered these records to ACS officials. ACS officials used the academic records to enroll the private school students in Athens Renaissance.

91.     Some schools, including Southern Academy and Marengo Academy, did not provide academic records until the spring of 2017. Upon receiving those records in the spring of 2017, CORKREN sent the records to CARTER.

**4.     ACS's "Linden Hub"**

92.     As noted, during the March of 2016 meeting, TREY HOLLADAY pledged that Athens Renaissance would only accept students who resided within an approximately 100-mile

24

radius of Athens. In or about the summer of 2016, TREY HOLLADAY caused ACS to open a facility in Linden—a location within 100 miles of Marengo Academy, Jackson Academy, Pickens Academy, and Southern Academy.

93.     In or about the summer of 2016, the superintendent of the Linden, Alabama City School District (hereinafter, "Linden City Schools") agreed to allow TREY HOLLADAY and ACS to access and use classroom space in an unused building under the custody and control of Linden City Schools. TREY HOLLADAY, CARTER, and other ACS officials referred to this space as Athens Renaissance's "Linden Hub." An ACS sign was placed in front of the Hub.

94.     During in or about the summer and fall of 2016, TREY HOLLADAY and CARTER oversaw improvements to the Linden Hub. The improvements included, but were not limited to: (1) replacing the carpet; (2) replacing some ceiling tiles; and (3) placing new furniture in the facility.

95.     On or about July 21, 2016, the ACS board of education approved the hiring of J.T. to serve as a "digital learning coach/teacher ACS/REN." At all times material to this indictment, J.T. was a resident of Marengo County. At TREY HOLLADAY's direction, J.T. was to be the teacher at the Linden Hub.

96.     During the 2016–2017 school year and the first half of the 2017–2018 school year, J.T. worked for ACS at the Linden Hub. There, she taught eleventh and twelfth grade Advanced Placement English courses to full-time Marengo Academy students.

97.     Additionally, at some points during the relevant period, ACS officials used the Linden Hub to administer state-required standardized tests to full-time private school students.

98.     During the period alleged in this indictment, CORKREN and TUTT were responsible for mowing the grass at the grounds of the Linden Hub.

25

**5.      Enrollment of Private School Students in Limestone County Virtual School**

99.      In or about July of 2016, TREY HOLLADAY introduced CORKREN and SISK. Around the same time, TREY HOLLADAY told SISK that CORKREN could deliver additional students for the Limestone County Virtual School.  TREY HOLLADAY also suggested that CORKREN would be willing to pay money back to SISK if SISK asked CORKREN to do so.

100.     On or about July 29, 2016, Ed Op and LCS entered into a contract.  CORKREN signed the contract for Ed Op; Sisk executed it for LCS.  The preamble of the contract stated: "[T]here are anticipated to be a significant number of LCVS [Limestone County Virtual School] full-time and guest enrollment students in the Marengo County, Alabama area. . . during the 2016-17 school year" and "EOM [Ed Op] desires to contract with LCS to provide it with such administrative and logistical services in the state of Alabama for homeschooled students that are not enrolled in private schools."  In the official contract approved by the LCS board of education, LCS agreed to pay Ed Op $45 per student serviced each month.

101.     Thereafter, CORKREN and SISK verbally modified the agreement.  Specifically, they agreed that: (1) CORKREN would find students for the Limestone County Virtual School; and (2) LCS would pay Ed Op $55 per student per month—constituting an extra $10 per student per month than what the contract provided.  CORKREN and SISK agreed that CORKREN would set the extra money aside and, at a time and manner requested by SISK, deliver that money to a charity.

102.     In or about August of 2016, CORKREN came into contact with an official of Monroe Academy.  CORKREN offered the Monroe Academy official: (1) access to Odysseyware; (2) laptop computers; (3) increased internet capabilities; (4) standardized testing; and (5) monetary payments.  In exchange, CORKREN asked the Monroe Academy official to

26

provide student information needed to enroll the Monroe Academy students in the Limestone County Virtual School. As noted, LCS did not have access to Odysseyware. Instead, CORKREN allowed Monroe Academy students to use ACS's Odysseyware license. Monroe Academy officials agreed.

103. On or about August 26, 2016, the Monroe Academy headmaster completed and signed, on behalf of each student at Monroe Academy: (1) a Limestone County Schools Virtual/Non-Resident Enrollment Form; and (2) what purported to be an AISA Verification Release Form. These forms were similar to the ACS forms signed by other private school officials. The LCS enrollment form template was substantially identical to the ACS enrollment form template. Parents or guardians did not sign the enrollment forms and did not otherwise consent to the transfer of their children's identifying information to LCS.

104. As TREY HOLLADAY, SISK, and CORKREN then knew, the students named in the LCS enrollment and verification release forms and the parents of those students: (1) did not intend to enroll as full-time public school students for the 2016–2017 school year; and (2) did not intend to un-enroll from Monroe Academy for the 2016–2017 school year.

105. On or about January 23, 2017, SISK telephoned CORKREN. During the telephone call, SISK asked CORKREN to prepare a modified version of the LCS-Ed Op contract approved by the LCS board of education. SISK asked CORKREN to edit the board-approved contract so as to reflect that LCS owed Ed Op $55 per student. On or about that same date, CORKREN converted a portable data format (hereinafter, "PDF") version of the board-approved, executed contract into a Microsoft Word document. CORKREN then edited the payment provision of the Word document as SISK instructed. CORKREN then converted the edited Word document to a PDF document. Thereafter, CORKREN sent an email message to

27

SISK's personal email account. Attached to the message was the modified PDF-version of the

contract.



### 7.   Calculation of ACS and LCS Average Daily Memberships during the Fall of 2016

111.   On or about October 14, 2016, officials with the ASDE, from ASDE offices in Montgomery, using wire communications in interstate commerce, caused to be extracted enrollment information from ACS's student information management database.  The database reflected that full-time students of Marengo Academy, Jackson Academy, Pickens Academy, the Lakeside School, and Southern Academy had been enrolled as full-time ACS students for some or all of the 20-day period following Labor Day of 2016.  In total, ACS's enrollment information included in excess of 750 full-time private school students.

112.   These full-time private school students were, in no way, full-time virtual students of ACS.

113.   On or about October 12, 2016, officials with the ASDE, from ASDE offices in Montgomery, using wire communications in interstate commerce, extracted enrollment information from LCS's student information management database.  The database reflected that full-time students of Monroe Academy had been enrolled as full-time LCS students for some or all of the 20-day period following Labor Day of 2016.  In total, LCS's enrollment information included in excess of 200 full-time private school students.

114.   These full-time private school students were, in no way, full-time virtual students of LCS.

### 8.   Private Schools' Use of Odysseyware and Reporting of Grades

115.   During the 2016–2017 school year, students at Marengo Academy, Jackson Academy, Pickens Academy, the Lakeside School, Southern Academy, and Monroe Academy used Odysseyware and any other curriculum provided by ACS only to a limited extent.

29

116. Some students took no elective courses through Odysseyware. Other students took a small number of elective courses through Odysseyware. In most cases, employees of the private schools administered these elective courses in that such employees monitored students' progress while the students worked on the elective courses.

117. Additionally, some private school teachers occasionally used Odysseyware curriculum to obtain supplemental assignments in traditionally taught courses.

118. Additionally, as noted, some students at Marengo Academy took Advanced Placement English taught by J.T. at the Linden Hub.

119. Subject to very few possible exceptions, during the 2016–2017 school year, students at the above-referenced private schools did not take "six (6) credits per year at either the traditional or accelerated pace" through Odysseyware or any other learning management system or curriculum provided by ACS, as required by ACS's Addendum to Policy ILB to be considered full-time virtual students.

120. After the conclusion of each semester of the 2016–2017 school year, the above-referenced private schools provided to CORKREN copies of report cards pertaining to the preceding semester or, in the case of one school, a single list of all grades earned by every student during the preceding semester. At some point, CARTER instructed CORKREN to modify private school report cards or grade lists to omit the names of private schools. CORKREN then provided those report cards or grade lists (or modified versions of the report cards or grade lists that omitted the name of the private school) to CARTER. CARTER then provided those report cards or grade lists (or modified versions of the report cards or grade lists that omitted the name of the private school) to ACS officials. ACS officials, at CARTER's direction, then loaded the grades reflected on the report cards or grade lists into ACS's student

information management database to make it appear that the students had earned the grades in ACS courses. ACS officials, at CARTER's direction, loaded each grade into ACS's student information management database without regard to whether the student earned the grade through a course that utilized an ACS learning management system or instructor or through a course taught by a private school teacher in a traditional manner. ACS officials, at CARTER's direction, then generated official ACS report cards for the private school students containing grades that the private school students earned at their respective private schools.

**9.    Obtaining Private School Parent Signatures on ACS Enrollment Forms**

121.    In or about February of 2017, ASDE officials visited the physical campuses of Athens Renaissance. They went to "audit" paperwork associated with Athens Renaissance students.

122.    In connection with the audit, TREY HOLLADAY instructed CORKREN to obtain private school parent signatures on ACS enrollment forms. TREY HOLLADAY did so even though the private school officials had, for almost every student, already signed an ACS enrollment form and even though, at the beginning of the 2016–2017 school year, ACS had purported to enroll each student.

123.    Thereafter, CORKREN asked officials at the private schools whose students were fraudulently enrolled in Athens Renaissance to obtain, from the parents or guardians of their students, signed ACS enrollment forms. In some instances, CORKREN offered for Ed Op to pay and did pay a school a monetary amount for each parent-signed enrollment form the private school provided to him. ACS reimbursed CORKREN for the payments Ed Op made to private schools in exchange for the parent-signed forms.

124.    Private school officials then persuaded parents and guardians to sign ACS
enrollment forms. Private school officials caused the signed forms to be delivered to
CORKREN.

125.    For example, in or about February of 2017, the headmaster of the Lakeside
School sent a United States Mail package from Eufaula, Alabama to Northport, Alabama, the
town in which CORKREN resided. Inside the package were ACS enrollment forms signed by
Lakeside School parents.

126.    CORKREN then caused the signed forms to be delivered to CARTER. CARTER
caused the signed forms to be placed in the ACS files of the private school students.

**10.    Standardized Testing**

127.    In or about the spring of 2017, DEBORAH HOLLADAY and CARTER visited
the Linden Hub and other locations to administer state-required standardized tests to the full-time
private school students who were fraudulently enrolled in Athens Renaissance.

128.    Also in or about the spring of 2017, CARTER assisted CORKREN and SISK in
planning to administer state-required standardized tests to the full-time Monroe Academy
students who were fraudulently enrolled in Limestone County Virtual School.

**11.    Introduction of TUTT to the Scheme**

129.    In or about the spring of 2017, TREY HOLLADAY contacted TUTT and invited
TUTT to become a participant in the scheme. TUTT's role was, initially, to contact private
schools and recruit the private schools to participate in the scheme during the 2017–2018 school
year.

32

130.    TUTT agreed to participate.  Thereafter, at TREY HOLLADAY's direction, Ed Op formed an agreement with Tutt Educational, the company that TUTT formed for the purpose of participating in the scheme.

## 12.    Payments Made During the 2016–2017 School Year

131.    During the 2016–2017 school year, payments were made in the following manner:

### i.    State to ACS and LCS

132.    The state of Alabama made payments through the Foundation Program to ACS and to LCS.  These payments were, for the most part, based on the school districts' fall 2015 average daily membership.  The making of the payments involved the use of wire communications in interstate commerce.

133.    In or about September of 2017, the state of Alabama made a Current Units payment to ACS.  This payment was based on the increase in ACS's average daily membership during the fall of 2016.  That increase resulted, in large part, from the fraudulent enrollment of full-time private school students.  The making of the payment involved the use of wire communications in interstate commerce.

### ii.    ACS to Ed Op

134.    ACS made payments to Ed Op.  These payments were based on the number of private school students "served" by CORKREN through Ed Op during the preceding month.  Between on or about June 1, 2016 and on or about July 31, 2017, CORKREN received and deposited into an Ed Op account payments from ACS having a total value in excess of $500,000.

### iii.    LCS to Ed Op

135.    LCS made payments to Ed Op.  These payments were based on the number of Monroe Academy students "served" by CORKREN through Ed Op during each month.  Between

33

in or about September of 2016 through in or about February of 2017, CORKREN received and deposited into an Ed Op account payments from LCS having a total value in excess of $100,000.

### iv.   Ed Op to Private Schools

136.   CORKREN, through Ed Op, made payments to the following private schools: Marengo Academy, Jackson Academy, Pickens Academy, the Lakeside School, Southern Academy, and Monroe Academy. The total value of the payments from Ed Op to these six private schools exceeded $150,000.

137.   CORKREN, through Ed Op, also made payments to other private schools that CORKREN was trying to induce to provide student information that could be used to fraudulently enroll students into ACS or LCS schools during the next school year.

### v.   Ed Op to CORKREN, TREY HOLLADAY, and CARTER

138.   CORKREN made transfers from the Ed Op account to his own personal account.

139.   CORKREN withdrew United States currency from the Ed Op account and from his own personal account.

140.   On multiple occasions, CORKREN then gave United States currency to TREY HOLLADAY.

141.   On multiple occasions, CORKREN then gave United States currency to CARTER.

### vi.   Ed Op to Tutt Educational

34

143.    Starting in March of 2017, CORKREN made payments from an Ed Op account to Tutt Educational. These payments, made between in or about March of 2017 and in or about July of 2017, had a total value exceeding $20,000.

### vii.    Ed Op to SISK

144.    On or about January 3, 2017, CORKREN wrote a check drawn on an Ed Op account payable to Charity A, a charitable organization with which SISK was affiliated. The check had a value of approximately $15,000. CORKREN did so at the direction of SISK. SISK directed that CORKREN make the payment to Charity A so that Sisk could personally enrich himself with the money paid to Charity A. The amount reflected the extra $10 per student per month that LCS had been paying Ed Op for the preceding months. On or about January 13, 2017, Charity A deposited the check from Ed Op into an account under its control.

145.    On or about January 20, 2017, Charity A, at SISK's direction, wired approximately $13,000 from its account to a personal account of SISK's.

### B.    2017–2018 School Year

#### 1.    Establishment of New Money Flow and Participants

146.    Before the beginning of the 2017–2018 school year, TREY HOLLADAY modified the scheme and caused the scheme to be modified in the following ways:

i.    TREY HOLLADAY caused the following: (1) during the 2017–2018 school year, ACS would make monthly payments to Ed Op; (2) Ed Op would then make monthly payments to Tutt Educational; (3) Tutt Educational would then make monthly payments to Sage, the company owned by DEBORAH HOLLADAY; (4) DEBORAH HOLLADAY would then use money paid to Sage for her own and her family's personal use and

35

would cause funds to move from a Sage account to personal accounts belonging to DEBORAH HOLLADAY and TREY HOLLADAY.

      ii.    TREY HOLLADAY also directed CORKREN that Ed Op should begin making payments directly to private school employees so as to make it appear that private school employees were independent contractors of Ed Op.

      147.    To make these changes, on or about June 28, 2017, TREY HOLLADAY sent an email message, using wire communications in interstate commerce, from his personal email account to CORKREN. The subject of the message was "Stuff." The message contained no text. Attached to the message were four documents, namely:

      i.    A draft agreement between ACS and Ed Op for the 2017–2018 school year. The draft agreement called for ACS to pay Ed Op per month for each student serviced: (1) $60, if Ed Op did not provide services to the student during any part of the 2016–2017 school year; and (2) $200, if Ed Op did provide services to the student during any part of the 2016–2017 school year. The term of the draft agreement was to be from July 1, 2017 through September 30, 2018.

      ii.    A draft agreement between Ed Op and Tutt Educational. The draft agreement called for Tutt Educational to "provide the Chief Executive Officer of Educational Opportunities and Management, LLC. . . with guidance, advise [sic], and assistance concerning various independent-virtual education projects, including innovative education initiatives, personnel management and nontraditional education delivery." Under the draft agreement, Ed Op was to pay Tutt Educational: (1) a monthly payment of $16,500; (2) a student management and professional development fee of $16,500; (3) an internet connectivity fee of $10,000; (4) for 10 months, a site service monthly fee of $24,000; (5) if Ed Op did not provide Tutt Educational

with laptop computers, then a single payment of $135,000; and (6) other approved expenses. The draft agreement was to expire on June 30, 2018.

            iii.      A draft agreement between Tutt Educational and Sage. The draft agreement called for Sage to provide "the Chief Executive Officer of Tutt Educational Services, LLC. . . with guidance, advise [sic], and assistance concerning professional development and teacher training." Under the draft agreement, Tutt Educational was to pay Sage a monthly fee of $16,500. The draft agreement was to expire on June 30, 2018.

            iv.      A draft agreement template between Ed Op and a "contract teacher." The draft agreement template called for the teacher to provide "student instruction, grading, testing, counseling, reporting, and assistance concerning assigned virtual education students and nontraditional education delivery." Under the draft agreement template, Ed Op was to pay the teacher $200 per student assigned. This would come in two payments. These payments would be distributed on December 15 and May 31 "or upon receipt of the required reports provided to the CEO." The draft agreement template also stated: "Payment to the Teacher will not be distributed until grade reports are received."

      148.    On or about June 28, 2017, TREY HOLLADAY, on behalf of ACS, executed the 2017–2018 ACS-Ed Op agreement. CORKREN also executed the agreement for Ed Op on or about the same date. The agreement executed on or about June 28, 2017 was substantially similar to the draft agreement sent by TREY HOLLADAY to CORKREN by email on or about the same date. However, the payment provision of the executed agreement differed from the payment provision of the email attachment draft agreement. The executed agreement called for the following monthly payments per student serviced: (1) $45, if Ed Op did not provide services

to the student during any part of the 2016–2017 school year; and (2) $150, if Ed Op did provide services to the student during any part of the 2016–2017 school year.

149. In or about July of 2017, DEBORAH HOLLADAY telephoned TUTT and informed TUTT that TUTT would be contracting with Ed Op during the 2017–2018 school year and that TUTT would be required to then make monthly payments to her company.

150. During the 2017–2018 school year, SISK did not participate in the scheme. Moreover, private school students were not fraudulently enrolled in Limestone County Virtual School during that school year. Additionally, Monroe Academy students were not fraudulently enrolled in a public school district during the 2017–2018 school year.





**4. ASDE Investigation of Fraudulent Enrollment of Private School Students and ACS's Submission of False Documents**

164. On or about August 17, 2017, the state superintendent of education sent a letter to

TREY HOLLADAY. The letter stated that ASDE officials had learned, through contact with

private school officials, that, "in exchange for enrollment and access to virtual content provided

40

through Athens Renaissance School, the private school is offered a per student allotment as well as a laptop for each student enrolled." The state superintendent suggested that the enrollment of private school students was "in conflict with the Virtual School Law and call[ed] into question the legitimacy of a significant portion of the 2017 funded ADM [average daily membership] reported by ACS." At the conclusion of the letter, the state superintendent stated that the ASDE would "need to consider, among other things, an extrapolation of disallowed ADM [average daily membership] and corresponding consequences in funding."

165. After receiving this letter, TREY HOLLADAY shared it with TUTT. TREY HOLLADAY also discussed the matter, over the telephone and in person, with ASDE officials. During conversations, TREY HOLLADAY insisted that all students purportedly enrolled in Athens Renaissance were taking full course loads through Athens Renaissance. For example, on or about August 18, 2017, in an email message sent to a member of the Alabama board of education, TREY HOLLADAY wrote, "They are taking a full class load from us and we're educating them." As TREY HOLLADAY then knew, this statement was false.

166. During discussions with ASDE officials, TREY HOLLADAY learned that the ASDE had confirmed that, in or about the fall of 2016, ACS had included in its average daily membership report full-time students of the Lakeside School. Accordingly, in or about August of 2017, TREY HOLLADAY instructed CORKREN to discontinue issuing payments to the Lakeside School and informed him that ACS would not be enrolling the Lakeside School students for the 2017–2018 school year.

167. As part of an effort to convince ASDE officials that ACS had educated all of the private school students fraudulently enrolled in Athens Renaissance during the 2016–2017 school year, TREY HOLLADAY instructed CORKREN to obtain and to provide to ACS

Odysseyware course completion reports for certain students of Marengo Academy and of the Lakeside School. CORKREN then informed TREY HOLLADAY that such reports would show that the private school students were not taking full course loads through Odysseyware. In response, TREY HOLLADAY directed CORKREN to "handle it." CORKREN understood this to mean that he should falsify such reports so that they would falsely reflect that the students were taking full course loads through Odysseyware. As TREY HOLLADAY and CORKREN then knew, the subject students had not taken full course loads through Odysseyware or any other curriculum provided by ACS during the 2016–2017 school year and any reports reflecting that they had would be false documents.

168.    Per TREY HOLLADAY's instructions, during in or about the fall of 2017, CORKREN prepared such reports. CORKREN then sent the falsified reports to CARTER.

169.    On or about November 17, 2017, CARTER sent an email message to the interim state superintendent of education and the deputy state superintendent of education for the division of administrative and financial services. CARTER copied TREY HOLLADAY on this email message. Attached to the email message were, among other things, 20 falsified Odysseyware course completion reports prepared by CORKREN. Each false report purported to show that the subject student (either a 2016–2017 full-time Lakeside School or Marengo Academy student) had taken a full course load through Odysseyware during the 2016–2017 school year. As CARTER and TREY HOLLADAY then knew, these documents were false. CARTER sent the documents to the ASDE officials for the purpose of causing the ASDE officials to authorize the issuance of full payment from the Education Trust Fund for the private school students fraudulently enrolled in Athens Renaissance during the 2016–2017 school year.

170.    In or about March of 2018, the ASDE sent letters to private schools requesting

enrollment records so the ASDE could determine whether full-time private school students had

been included in ACS's fall 2017 average daily membership report. When he learned about

these letters, TREY HOLLADAY, indirectly through, CORKREN and TUTT, instructed the

officials of the private schools receiving these letters that the private schools were under no legal

to provide the ASDE with the requested data.

**5.    Enrollment of Private School Students in Athens Renaissance**

171.    For the 2017–2018 school year, private school students from Marengo Academy,

Jackson Academy, Pickens Academy, and Southern Academy were fraudulently enrolled in

Athens Renaissance School. This occurred even though neither the students at those schools nor

their parents nor guardians: (1) intended to enroll as full-time public school students for the

2017–2018 school year; or (2) intended to un-enroll from their respective private schools for the

2017–2018 school year.

172.    Additionally, in or about August of 2017, TUTT contacted the headmaster of

Meadowview Christian School. TUTT offered the headmaster: (1) access to online curriculum;

(2) laptop computers; and (3) money to pay the school's internet bill. In exchange, TUTT asked

the headmaster to provide student information. The headmaster accepted TUTT's offer.

173.    Thereafter, in or about August of 2017, DEBORAH HOLLADAY received from

Meadowview Christian School information needed to enroll Meadowview Christian School

students in Athens Renaissance. DEBORAH HOLLADAY sent this information to CORKREN.

CORKREN then sent this information to ACS officials.

174.    In or about August of 2017, a Meadowview Christian School official sent to

TUTT copies of independent contractor agreements signed by Meadowview Christian School

43

employees. These agreements purported to make the Meadowview Christian School employees independent contractors of Ed Op. After receiving these documents, TUTT sent them to CORKREN.

175. On or about November 13, 2017, an ACS official purportedly enrolled into Athens Renaissance students who were full-time Meadowview Christian School students. When the ACS official did so, the ACS official backdated the enrollments to, for most students, August 9, 2017. This occurred even though neither the Meadowview Christian School students nor their parents nor guardians: (1) intended to enroll as full-time public school students for the 2017–2018 school year; or (2) intended to un-enroll from Meadowview Christian School for the 2017–2018 school year.

## 6. Calculation of ACS ▮▮▮▮ Average Daily Memberships During Fall 2017

176. On or about October 10, 2017, officials with the ASDE, from ASDE offices in Montgomery, using wire communications in interstate commerce, extracted enrollment information from ACS's student information management database. The database reflected that full-time students of Marengo Academy, Jackson Academy, Pickens Academy, and Southern Academy had been enrolled as full-time ACS students for some or all of the 20-day period following Labor Day of 2017. On or about November 13, 2017, an ACS official modified the database so as to make it appear that full-time students of Meadowview Christian School had been enrolled as full-time ACS students for some or all of the 20-day period following Labor Day of 2017. The ASDE then extracted this November 13, 2017 update. In total, ACS's enrollment information included in excess of 500 full-time private school students.

177. These full-time private school students were, in no way, full-time virtual students of ACS.

44



180.    On or about July 11, 2018, an ACS official withdrew the full-time Meadowview

Christian School students from the ACS student information management database and

backdated the withdrawals to August 9, 2017.

## 7.    Private Schools' Use of Odysseyware and Reporting of Grades

181.    During the 2017–2018 school year, students at Marengo Academy, Jackson

Academy, Pickens Academy, Southern Academy, Meadowview Christian School,

used Odysseyware and any other curriculum provided by ACS only to a

limited extent.

182.    Some students took no elective courses through Odysseyware.  Other students

took one or two elective courses through Odysseyware.  In most cases, employees of the private

schools administered these elective courses in that such employees monitored students' progress

while they worked on the elective courses.

183.    Additionally, some private school teachers occasionally used Odysseyware

curriculum to obtain supplemental assignments in traditionally taught courses.

184.    Additionally, as noted, some students at Marengo Academy took Advanced
Placement English taught by J.T. at the Linden Hub.

185.    Subject to very few possible exceptions, during the 2017–2018 school year,
students at the above-referenced private schools did not take "six (6) credits per year at either the
traditional or accelerated pace" through Odysseyware or any other learning management system
or curriculum provided by ACS, as required by ACS's Addendum to Policy ILB to be considered
full-time virtual students.

186.    During the 2017–2018 school year, Jackson Academy,

, Meadowview Christian School, and Southern Academy provided to CORKREN
copies of report cards pertaining to the preceding semester. CORKREN provided modified
versions of those report cards to ACS officials,

Per CARTER's instructions given the previous school
year, the report cards were modified to omit the private schools' names. ACS officials, at
CARTER's direction, then loaded the grades reflected on the report cards from Jackson
Academy and Southern Academy into ACS's student information management database so as to
make it appear that the students had earned the grades in ACS courses. ACS officials, at
CARTER's direction, loaded each grade into ACS's student information management database
without regard to whether the student earned the grade through a course that utilized an ACS
learning management system or instructor or through a course taught by a private school teacher
in a traditional manner. ACS officials, at CARTER's direction, then generated official ACS
report cards for the private school students containing grades that the private school students
earned at their respective private schools.

### 8.    Standardized Testing

187.    During in or about the spring of 2018, CARTER scheduled the administration of standardized tests of private school students enrolled in Jackson Academy, Southern Academy, and Meadowview Christian School. On or about April 10, 2018, CARTER sent the test schedules to CORKREN by email. When he did so, CARTER instructed CORKREN to "[p]lease notify students." On or about the same date, CORKREN sent the test schedules to TUTT. On or about the same date, TUTT sent the test schedules to DEBORAH HOLLADAY.

188.    In or about April and May of 2018, DEBORAH HOLLADAY went to Jackson and Greensboro to administer the standardized tests to the full-time private school students.

189.    At various times, DEBORAH HOLLADAY sent United States Mail packages containing standardized testing materials.

190.    On or about January 26, 2018, DEBORAH HOLLADAY sent a package via first-class mail from Athens to Tuscaloosa. Written on the receipt associated with the transaction were the words, "Mailed testing."

191.    On or about March 9, 2018, DEBORAH HOLLADAY sent via the United States Mail packages from Athens to Marion, Jackson, Greensboro, and Selma.



47



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

### i.   **Marion Academy**

197.   During in or about the fall of 2017, TUTT visited Marion Academy and asked

officials at Marion Academy to consider associating with ACS.  TUTT mentioned that

Meadowview Christian School and Marengo Academy were already associated.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

200. In or about January of 2018, CORKEN delivered computers to the campus of Marion Academy. These computers were purchased by ACS and constituted the property of ACS. Also in or about January of 2018, CORKREN sent to a Marion Academy official Odysseyware usernames and passwords for the Marion Academy students. ACS paid for the Marion Academy students' access to Odysseyware.

201. In or about February of 2018, CARTER delivered additional computers to Marion Academy after the computers brought by CORKREN did not work well. These computers were purchased by ACS and constituted the property of ACS.



50













**11.   Payments Made During the 2017–2018 School Year**

231.   During the 2017–2018 school year, payments were made in the following manner:

    i.   **State to ACS**

232.    The state of Alabama made payments through the Foundation Program to ACS

███████ These payments were, for the most part, based on the school districts' fall 2016 average daily membership.

233.    During the 2017–2018 school year, the ASDE reviewed the possibility that ACS had falsely inflated the number of full-time virtual students enrolled in Athens Renaissance during the fall of 2016. In connection with this inquiry, the ASDE withheld some funding otherwise due to ACS for its enrollment of students during the fall of 2016. Due to this withholding, the virtual students enrolled in Athens Renaissance during the fall of 2016 only earned for ACS approximately 75 percent of what they would have otherwise earned but for the withholding.

234.    The making of the payments from the state to ACS ███████ involved the use of wire communications in interstate commerce.

## ii.    ACS to Ed Op

235.    ACS made payments to Ed Op. These payments were based on the number of private school students "served" by CORKREN through Ed Op during the preceding month. Between in or about September of 2017 and in or about June of 2018, CORKREN received and deposited into an Ed Op account payments from ACS having a total value in excess of $1,000,000.





### v.   Ed Op to Tutt Educational

238.   CORKREN, though Ed Op, made payments to Tutt Educational.  Between in or about August of 2017 and in or about June of 2018, Ed Op made payments to Tutt Educational having a total value in excess of $580,000.

### vi.   Ed Op to Private Schools

239.   CORKREN, through Ed Op, made payments to the following private schools: Jackson Academy, Southern Academy, and Meadowview Christian School.  The total value of the payments from Ed Op to these 3 private schools exceeded $25,000.

### vii.   Ed Op to Private School Employees

240.   CORKREN, through Ed Op, made payments to employees of the following private schools: Jackson Academy, Southern Academy, Meadowview Christian School,

### viii.   Ed Op to CORKREN, TREY HOLLADAY, and CARTER

241.   CORKREN made transfers from the Ed Op account to his own personal account.

242.   CORKREN withdrew United States currency from the Ed Op account and from his own personal account.

243.   On multiple occasions, CORKREN then gave United States currency to TREY HOLLADAY.  On multiple occasions, CORKREN also gave United States currency to CARTER.



#### x. Tutt Educational to Sage

246. Tutt Educational made payments to Sage. Between in or about August of 2017 and June of 2018, Tutt Educational made payments having a total value in excess of $160,000.

#### xi. Tutt Educational to Private Schools

247. Tutt Educational made payments to the following private schools: Marengo Academy, Jackson Academy, Pickens Academy, the Lakeside School, Southern Academy, Monroe Academy, Meadowview Christian School,                              , and Marion Academy. The total value of the payments to these schools exceeded $280,000.

#### xii. Tutt Educational to TUTT

248. Tutt Educational made transfers from a Tutt Educational account to the personal accounts of TUTT.

#### xiii. Sage to DEBORAH HOLLADAY

249. Sage made transfers from Sage accounts to the personal accounts of TREY HOLLADAY and DEBORAH HOLLADAY.

250. Sage made expenditures from the Sage account that went to the personal use of TREY HOLLADAY and DEBORAH HOLLADAY.

#### xiv. Sage to Private Schools

251. Sage also made payments to Southern Academy and an employee of Southern Academy.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

252. In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Middle District of Alabama and elsewhere:

253. The factual allegations contained in paragraphs 66 through 69, 71, 74 through 77, 82 through 85, 88, 90 through 95, 99 through 103, 105 through 109, 120, 122, 123, 126 through 130, 136 through 145, 147 through 149, 152 through 158, 160, 162, 165 through 174, 186 through 191, 197 through 201, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ 238 through 244, and 246 through 251 of count 1 this indictment are hereby realleged and incorporated herein as if copied verbatim.

▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

255. On or about June 2, 2017, in Pike County, within the Middle District of Alabama, CORKREN met CARTER. During that meeting, CORKREN delivered to CARTER a quantity of United States currency. The United States currency constituted the proceeds of the wire and mail fraud conspiracy.

256. On or about November 9, 2017, in Dallas County, Alabama, during a visit to the residence of a family member of TREY HOLLADAY, CORKREN delivered to CARTER and to

60

TREY HOLLADAY each quantities of United States currency. The United States currency constituted the proceeds of the wire and mail fraud conspiracy.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2–92
(Wire Fraud)

257.   The factual allegations contained in each of the foregoing paragraphs of this indictment are hereby realleged and incorporated herein as if copied verbatim.

258.   Between in or about February of 2016 and continuing until in or about August of 2018, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendants,

WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
DEBORAH IRBY HOLLADAY a/k/a "Deb," and
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"

with the intent to defraud, knowingly and willfully devised, and attempted to devise, and participated in, with knowledge of its fraudulent nature, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

259.   The factual allegations contained in the manner and means section of count 1 of this indictment are hereby realleged and incorporated herein as if copied verbatim.

## WIRE COMMUNICATIONS

260.   On or about October 14, 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, for the purpose of executing the scheme and artifice to defraud and for obtaining money and property by false and fraudulent pretenses, representations, and promises, and attempting to do so, the defendants,

61

WILLIAM LEE HOLLADAY, III a/k/a "Trey" and
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"

knowingly transmitted, caused to be transmitted, and aided and abetted the transmission of wire

communications in interstate commerce, to wit: the extraction of stored student information data

about particular full-time private school students by ASDE officials for the purpose of

calculating the average daily membership of ACS during the 20 school days following Labor

Day of 2016, with each fraudulently enrolled full-time private school student giving rise to a

separate count:

| COUNT | STUDENT | STUDENT'S ACTUAL PRIVATE SCHOOL |
|-------|---------|--------------------------------|
| 2 | J.M. | Marengo Academy |
| 3 | M.G. | Marengo Academy |
| 4 | C.D. | Marengo Academy |
| 5 | W.D. | Marengo Academy |
| 6 | C.E. | Marengo Academy |
| 7 | J.Br. | Marengo Academy |
| 8 | S.O. | Marengo Academy |
| 9 | E.S. | Marengo Academy |
| 10 | J.Be. | Marengo Academy |
| 11 | E.M. | Jackson Academy |
| 12 | H.M. | Jackson Academy |
| 13 | J.K. | Jackson Academy |
| 14 | J.G. | Jackson Academy |
| 15 | J.P. | Jackson Academy |

| 16 | R.S. | Jackson Academy |
| 17 | W.F. | Jackson Academy |
| 18 | Sk.S. | Jackson Academy |
| 19 | Sh.S. | Jackson Academy |
| 20 | A.M. | Pickens Academy |
| 21 | C.R. | Pickens Academy |
| 22 | J.R. | Pickens Academy |
| 23 | J.M. | Pickens Academy |
| 24 | L.D. | Pickens Academy |
| 25 | O.L. | Pickens Academy |
| 26 | R.H. | Pickens Academy |
| 27 | T.C. | Pickens Academy |
| ███ | ███ | ████████ |
| 29 | A.D. | The Lakeside School |
| 30 | H.S. | The Lakeside School |
| 31 | D.B. | The Lakeside School |
| 32 | J.F. | The Lakeside School |
| 33 | J.W. | The Lakeside School |
| 34 | L.G. | The Lakeside School |
| 35 | M.C. | The Lakeside School |
| 36 | A.M. | The Lakeside School |
| 37 | M.C. | Southern Academy |
| 38 | N.A. | Southern Academy |

| 39 | C.D. | Southern Academy |
| 40 | B.H. | Southern Academy |
| 41 | A.A. | Southern Academy |
| 42 | A.H. | Southern Academy |
| 43 | A.D. | Southern Academy |
| 44 | J.P. | Southern Academy |

261. On or about October 10, 2017, in Montgomery County, within the Middle District of Alabama, and elsewhere, for the purpose of executing the scheme and artifice to defraud and for obtaining money and property by false and fraudulent pretenses, representations, and promises, and attempted to do so, the defendants,

WILLIAM LEE HOLLADAY, III a/k/a "Trey" and
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"

knowingly transmitted, caused to be transmitted, and aided and abetted the transmission of wire communications in interstate commerce, to wit: the extraction of stored student information data about particular full-time private school students by ASDE officials for the purpose of calculating the average daily membership of ACS during the 20 school days following Labor Day of 2017, with each fraudulently enrolled full-time private school student giving rise to a separate count:

| COUNT | STUDENT | STUDENT'S ACTUAL PRIVATE SCHOOL |
| --- | --- | --- |
| 45 | J.M. | Marengo Academy |
| 46 | M.G. | Marengo Academy |
| 47 | C.D. | Marengo Academy |

64

| 48 | W.D. | Marengo Academy |
| 49 | C.E. | Marengo Academy |
| 50 | J.Br. | Marengo Academy |
| 51 | S.O. | Marengo Academy |
| 52 | E.S. | Marengo Academy |
| 53 | J.Be. | Marengo Academy |
| 54 | E.M. | Jackson Academy |
| 55 | H.M. | Jackson Academy |
| 56 | J.K. | Jackson Academy |
| 57 | J.G. | Jackson Academy |
| 58 | J.P. | Jackson Academy |
| 59 | R.S. | Jackson Academy |
| 60 | Sk.S. | Jackson Academy |
| 61 | Sh.S. | Jackson Academy |
| 62 | W.F. | Jackson Academy |
| 63 | R.A. | Pickens Academy |
| 64 | C.R. | Pickens Academy |
| 65 | J.R. | Pickens Academy |
| 66 | J.M. | Pickens Academy |
| 67 | L.D. | Pickens Academy |
| 68 | O.L. | Pickens Academy |
| 69 | R.H. | Pickens Academy |
| 70 | A.M. | Pickens Academy |

| 71 | M.C. | Southern Academy |
| 72 | A.N. | Southern Academy |
| 73 | J.B. | Southern Academy |
| 74 | B.H. | Southern Academy |
| 75 | A.A. | Southern Academy |
| 76 | A.H. | Southern Academy |
| 77 | A.D. | Southern Academy |
| 78 | J.P. | Southern Academy |

262.    On or about November 13, 2017, in Montgomery County, within the Middle

District of Alabama, and elsewhere, for the purpose of executing the scheme and artifice to

defraud and for obtaining money and property by false and fraudulent pretenses, representations,

and promises, and attempted to do so, the defendants,

> WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
> DEBORAH IRBY HOLLADAY a/k/a "Deb," and
> WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"

knowingly transmitted, caused to be transmitted, and aided and abetted the transmission of wire

communications in interstate commerce, to wit: the extraction of stored student information data

about particular full-time private school students by ASDE officials for the purpose of

calculating the average daily membership of ACS during the 20 school days following Labor

Day of 2017, with each fraudulently enrolled full-time private school student giving rise to a

separate count:

| COUNT | STUDENT | STUDENT'S ACTUAL PRIVATE SCHOOL |
|---|---|---|
| ███ | ███ | ████████████ |
| ███ | ███ | ████████████ |
| ███ | ███ | ████████████ |
| ███ | ███ | ████████████ |
| ███ | ███ | ████████████ |

263.    On or about the dates listed below, in the locations listed below, within the

Middle District of Alabama, and elsewhere, for the purpose of executing the scheme and artifice

to defraud and for obtaining money and property by false and fraudulent pretenses,

representations, and promises, the below-listed defendants knowingly transmitted, caused to be

transmitted, and attempted to do so, and aided and abetted the transmission of wire

communications in interstate commerce, to wit: the transmission of email messages in

furtherance of the scheme and artifice to defraud, with each email message giving rise to a

separate count:

| COUNT | ON OR ABOUT DATE | DEFENDANT CHARGED | DESCRIPTION OF EMAIL MESSAGE | LOCATION MESSAGE SENT OR RECEIVED |
|---|---|---|---|---|
| ███ | ████████ | ██████ | ████████ | ███████ |



| 86 | February 24, 2017 | CARTER | Message from CARTER'S ACS email account to L.H., an Athens Renaissance guidance counselor, DEBORAH HOLLADAY, and CORKREN having the subject of "Re: EOs," instructing them that, among other things, "Mr. Corkren will finalize report cards for all his EO's in the next week or so." | Sent from Montgomery County. |
| ██ | ████████ | ████ | ████ | ██ |



| 90 | November 17, 2017 | CARTER | Message from CARTER's ACS email account to the deputy state superintendent of education for the division of administrative and financial services having the subject "Requested Information on Virtual," containing ACS's response to ASDE's request for documents relating to Athens Renaissance, including false Odysseyware reports. | Received in Montgomery County. |
| ■ | ■■■ ■ ■■ | ■■■ | ■■■ | ■■■ |

| 92 | December 7, 2017 | CARTER | Message from CARTER's ACS email account to an Alabama Senate staff person having the subject "Athens City Schools Assistance Needed," stating, among other things, "we have taken measures in the current school year to prevent private school enrollees from participating in our full-time programs (even though many legislators support it, there is no law prohibiting it and [ASDE] has not issued any guidance against it)." | Received in Montgomery County. |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 93–127
(Aggravated Identity Theft)

264.   The factual allegations contained in each of the foregoing paragraphs of this

indictment are hereby realleged and incorporated herein as if copied verbatim.

265.   On or about October 14, 2016, in Montgomery County, within the Middle District

of Alabama, and elsewhere, the below-listed defendants, aiding and abetting each other,

knowingly used, without lawful authority, the means of identification of other persons during

and in relation to a felony violation enumerated in Title 18, United States Code, Section

72

1028A(c), to wit: the offenses in this indictment identified as related counts below, knowing that the means of identification belonged to another actual person, that is, they knowingly used the names of actual persons known to the grand jury, listed by their initials below, to commit wire fraud, with the use of each name giving rise to a separate count:

| COUNT | DEFENDANT(S) CHARGED | RELATED WIRE FRAUD COUNT | VICTIM |
|-------|----------------------|--------------------------|--------|
| 93 | TREY HOLLADAY, CARTER, and CORKREN | 9 | E.S. |
| 94 | TREY HOLLADAY and CARTER | 11 | E.M. |
| 95 | TREY HOLLADAY and CARTER | 12 | H.M. |
| 96 | TREY HOLLADAY and CARTER | 13 | J.K. |
| 97 | TREY HOLLADAY and CARTER | 14 | J.G. |
| 98 | TREY HOLLADAY and CARTER | 15 | J.P. |
| 99 | TREY HOLLADAY and CARTER | 16 | R.S. |
| 100 | TREY HOLLADAY and CARTER | 17 | W.F. |

| 101 | TREY HOLLADAY and CARTER | 18 | Sk.S. |
|---|---|---|---|
| 102 | TREY HOLLADAY and CARTER | 19 | Sh.S. |
| 103 | TREY HOLLADAY and CARTER | 20 | A.M. |
| 104 | TREY HOLLADAY and CARTER | 21 | C.R. |
| 105 | TREY HOLLADAY and CARTER | 22 | J.R. |
| 106 | TREY HOLLADAY and CARTER | 23 | J.M. |
| 107 | TREY HOLLADAY and CARTER | 24 | L.D. |
| 108 | TREY HOLLADAY and CARTER | 25 | O.L. |
| 109 | TREY HOLLADAY and CARTER | 26 | R.H. |
| 110 | TREY HOLLADAY and CARTER | 27 | T.C. |
| █ | █ | █ | █ |

| 112 | TREY HOLLADAY and CARTER | 29 | A.D. |
| --- | --- | --- | --- |
| 113 | TREY HOLLADAY and CARTER | 30 | H.S. |
| 114 | TREY HOLLADAY and CARTER | 31 | D.B. |
| 115 | TREY HOLLADAY and CARTER | 32 | J.F. |
| 116 | TREY HOLLADAY and CARTER | 33 | J.W. |
| 117 | TREY HOLLADAY and CARTER | 34 | L.G. |
| 118 | TREY HOLLADAY and CARTER | 35 | M.C. |
| 119 | TREY HOLLADAY and CARTER | 36 | A.M. |
| 120 | TREY HOLLADAY and CARTER | 37 | M.C. |
| 121 | TREY HOLLADAY and CARTER | 38 | N.A. |
| 122 | TREY HOLLADAY and CARTER | 39 | C.D. |

| 123 | TREY HOLLADAY and CARTER | 40 | B.H. |
| 124 | TREY HOLLADAY and CARTER | 41 | A.A. |
| 125 | TREY HOLLADAY and CARTER | 42 | A.H. |
| 126 | TREY HOLLADAY and CARTER | 43 | A.D. |
| 127 | TREY HOLLADAY and CARTER | 44 | J.P. |

Each in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## FORFEITURE ALLEGATION-1

A.    The allegations contained in Count 1 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

B.    Upon conviction of the offenses in violation of Title 18, United States Code, Section 371, set forth in Count 1 of this Indictment, the defendants,

WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
DEBORAH IRBY HOLLADAY a/k/a "Deb,"
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"
GREGORY EARL CORKREN a/k/a "Greg,"
DAVID WEBB TUTT, and
THOMAS MICHAEL SISK a/k/a "Tom,"

76

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all proceeds obtained, directly or indirectly, from the offenses in violation of Title 18, United States Code, Section 371.

C. If any of the property described above, as a result of any act or omission of the defendants:

    (1)    Cannot be located upon the exercise of due diligence;

    (2)    Has been transferred or sold to, or deposited with, a third party;

    (3)    Has been placed beyond the jurisdiction of the court;

    (4)    Has been substantially diminished in value; or

    (5)    Has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c) .

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

## FORFEITURE ALLEGATION-2

A. The allegations contained in Counts 2-92 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

B. Upon conviction of the offenses in violation of Title 18, United States Code, Section 1343 set forth in Counts 2-92 of this Indictment, the defendants,

77

WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
DEBORAH IRBY HOLLADAY a/k/a "Deb," and
WILLIAM RICHARD CARTER, JR. a/k/a "Rick,"

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C)

and Title 28, United States Code, Section 2461, all proceeds obtained, directly or indirectly, from

the offenses in violation of Title 18, United States Code, Section 1343.

C.     If any of the property described above, as a result of any act or omission of the

defendants:

(1)     Cannot be located upon the exercise of due diligence;

(2)     Has been transferred or sold to, or deposited with, a third party;

(3)     Has been placed beyond the jurisdiction of the court;

(4)     Has been substantially diminished in value; or

(5)     Has been commingled with other property which cannot be divided without
        difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

982(b)(1) and Title 28, United States Code, Section 2461(c) .

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United

States Code, Section 2461.

## FORFEITURE ALLEGATION-3

A.     The allegations contained in Counts 93-127 of this Indictment are hereby realleged

and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United

States Code, Section 982(a)(2)(B).

B.     Upon conviction of the offenses in violation of Title 18, United States Code,

Section 1028A(a)(1), set forth in Counts 93-127 of this Indictment, the defendants,

78

WILLIAM LEE HOLLADAY, III a/k/a "Trey,"
WILLIAM RICHARD CARTER, JR. a/k/a "Rick," and
GREGORY EARL CORKREN a/k/a "Greg,"

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(B),

any and all property constituting or derived from proceeds defendants obtained directly or

indirectly as a result of the offenses in violation of Title 18, United States Code, Section

1028A(a)(1).

C.     If any of the property described in this forfeiture allegation, as a result of any act

or omission of the defendants:

      (1)     Cannot be located upon the exercise of due diligence;

      (2)     Has been transferred or sold to, or deposited with, a third party;

      (3)     Has been placed beyond the jurisdiction of the court;

      (4)     Has been substantially diminished in value; or

      (5)     Has been commingled with other property which cannot be divided
           without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 982(a)(2)(B).

A TRUE BILL:

Foreperson

LOUIS V. FRANKLIN, SR.
UNITED STATES ATTORNEY

Jonathan S. Ross
Assistant United States Attorney

79

Brett J. Talley
Assistant United States Attorney

Alice S. LaCour
Assistant United States Attorney

Verne H. Speirs
Assistant United States Attorney