IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:21-CR-49-MHT-JTA-3 |
| | ) | |
| WILLIAM RICHARD CARTER, JR. | ) | |

## GOVERNMENT'S TRIAL BRIEF

Comes now the United States of America, by and through Verne H. Speirs, Attorney for the United States Acting Under Authority Conferred by 28 U.S.C. § 515, and submits this trial brief. The following sets forth: (1) the facts to be established at trial; (2) the case's procedural history; (3) the elements of the charged offenses; (4) the means by which the government intends to prove the charged offenses; and (5) remaining legal and practical issues with trial.

### I. BACKGROUND

The government's trial evidence will establish that, from 2016 through 2018, Defendant William Richard Carter, Jr. engaged with others in a conspiracy to defraud the state of Alabama of millions of dollars in education funds. Carter, through his position in the Athens City School system (ACS), used the personal identifying information of full-time private school students to enroll them as full-time public school students under the Athens virtual program, the Athens Renaissance School (ARS). This enrollment resulted in higher payments from the Alabama State Department of Education (ALSDE), from which Carter personally benefited. Carter obtained this information by providing the private schools with financial benefits. At no time did these students become full-time students at ARS; they continued to attend their private schools, receive instruction from their private-school teachers, play sports at their respective private schools, and

remain in every way private school students. The following summarizes what the government will prove at trial.

A.     **ACS and Defendant Carter**

The government's evidence will show that, during all periods alleged in the superseding indictment, Carter was an employee of ACS. Carter was hired in August 2015 as a technology teacher at ARS by William "Trey" Holladay, III, the superintendent of ACS at the time and a co-defendant of Carter's in this case. In October of 2015, Carter was elevated to coordinator of virtual programs for ACS, a position he held until June 2016. At that point, he was elevated once again to director of innovative programs, and then again in June 2017 to executive director of innovative programs. In July 2019, less than four years after he was hired as a technology teacher, Carter was named principal of Athens High School.

B.     **The Scheme**

Evidence presented at trial will prove that Trey Holladay, in his role as superintendent, developed a scheme to fraudulently enroll private school students from across the state of Alabama as full-time students at ACS through the virtual education program operated by Athens Renaissance School. The scheme involved offering private schools access to online elective classes, funds for technology upgrades and student testing, laptop computers, and payments for each student enrolled in the ARS program. In exchange, the private schools would provide the personal identifying information and grades for their students. The headmasters of the private schools who took part in the program will testify that they believed the information was necessary to enroll their students in the program that ACS was offering. Instead, ACS used the information to enroll their students as full-time public school students, entitling the system to approximately $6,000 per student in state funding. Although Holladay concocted this scheme, it

was Carter, through his various roles at ARS, who was the ACS official chiefly responsible for implementing it.

Initially, Carter and Holladay traveled to private schools around Alabama pitching the scheme. But in February 2016, Holladay engaged his old friend and a former public school educator, Greg Corkren, to act as an intermediary between ACS and the private schools. In order to do so, Corkren formed a company, Educational Opportunities and Management, LLC, or Ed Op. Corkren's role in the scheme was to recruit private schools to become a part of the program, provide the promised benefits to the schools, and ensure that the information needed to enroll the students made its way back to ACS. In exchange, Corkren was paid a portion of the state education funds received for each student enrolled at ACS. ARS employees developed a code for the students enrolled by Corkren; they were called Ed Op or EO students.

For his role in the conspiracy, Corkren was indicted and subsequently pleaded guilty. Corkren will testify that Carter was his primary contact at ACS. After Corkren delivered the necessary student information to Carter, it was Carter's responsibility to ensure that it was used to fraudulently enroll the private school students. When Corkren delivered private school report cards to Carter, Carter directed ACS employees to enter all the students' grades into the ACS system as if these students were educated through ARS—even for classes that ARS faculty were in no way involved in teaching. Carter directed ACS employees to assign ARS teachers to the private school students' classes and to adjust the course names to reflect the styles used in the public school system. Carter was also responsible for organizing the state standardized testing required of the private school students since they were now technically public school students. It was also Carter's responsibility to ensure that no part of the program would alert the ALSDE to the fraud. For instance, when ARS employees discovered that some of the students from the

3

private schools had out-of-state addresses, Carter directed Corkren to procure new, in-state addresses that would not serve as a red flag for the ALSDE.

ARS employees will testify that although it was understood that Carter was the ultimate authority at the virtual school, he only handled the EO students. Other administrators were in charge of the school's non-private school virtual students. Carter benefited directly from the scheme. Carter told ARS employees that he would be superintendent after Holladay retired, the culmination of his rapid ascent through the ranks at ACS. In addition, Corkren paid cash payments to Carter from the proceeds of the scheme.

## II. PROCEDURAL HISTORY

**A.    Indictment**

On January 13, 2021, the grand jury returned a 127-count indictment against Defendant William Richard Carter, Jr., as well as five co-defendants. Doc. 1. The indictment charges Carter with: (1) one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371, *see id.* at 1–61, ¶¶ 1–257; (2) 85 counts of wire fraud, in violation of 18 U.S.C § 1343, *see id.* at 61–72, ¶¶ 258–263; and (3) 35 counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), *see id.* at 72–76, ¶¶ 264–65.

The indictment generally alleges a scheme whereby public school superintendents, Defendant William L. Holladay, III (Trey Holladay) (the superintendent of the Athens, Alabama City School System (ACS), *see id.* at 1, 3–5, ¶ 1, 7–15) and Defendant Thomas Michael Sisk (the superintendent of the Limestone County, Alabama School System (LCS), *see id.* at 3, 5–6, ¶ 6, 16–18), caused identifying and educational information pertaining to full-time private school students to be inputted into their respective systems' student enrollment databases so that the private school students appeared as public virtual school students, *see generally id.* at 20–28, 43–

44, ¶¶ 74–105, 171–75.[1] To obtain the student information, the superintendents offered and caused to be offered various benefits to administrators at various private schools, including: laptop computers, access to online courses, increased internet capabilities, standardized testing, and monetary payments. *Id.* at 19, ¶ 70.

As a result of the false reporting of the private school students, when the ALSDE looked at those databases to determine what per pupil funding the state owed the school systems, the ALSDE calculated amounts that were greater than the systems would have been entitled to receive had their enrollment numbers been accurate. *Id.* at 29, 44–45, ¶¶ 111–14, 176–80.

The indictment goes on to allege that, after the state paid to ACS proceeds of the fraud, Trey Holladay, Carter (the ACS administrator tasked with overseeing ACS's virtual school, *see id.* at 2, ¶ 3), and Defendant Deborah Irby Holladay (Deborah Holladay) each received, for their own personal use, portions of those proceeds. *Id.* at 33–35, 56–60, ¶¶ 131–44, 231–51. The defendants obtained these monies through a series of transactions that involved: (1) payments from ACS to a company owned by Defendant Gregory Earl Corkren; (2) cash payments by Corkren to Trey Holladay, Carter, and a company owned by co-defendant Defendant David Webb Tutt; (3) payments by Tutt to a company owned by Deborah Holladay; and (4) transfers made by Deborah Holladay from her company's accounts to personal accounts belonging to her and her husband, Trey Holladay. *See id.*[2]

---

[1]The indictment alleges that both ACS and LCS falsely reported private school students during the 2016–2017 school year. Doc. 1 at 20–28, ¶¶ 74–105. For the 2017–2018 school year, the indictment alleges that ACS and another school district, the Conecuh County School District (CCS) engaged in the false reporting of private school students. *Id.* at 43–44, 39–49, ¶¶ 156–63, 171–75.

[2]Additionally, the indictment alleges that co-defendant Sisk received a cut of the proceeds after Corkren, at the direction of Sisk, made a payment to a charity and the charity then transferred most of the money it had received from Corkren to Sisk's personal account. Doc. 1 at 35, ¶¶ 144–45.

B.    **Arraignment**

On March 4, 2021, each defendant appeared before a magistrate judge and pleaded not guilty to all counts. Doc. 80 (Trey Holladay); Doc. 81 (Deborah Holladay); Doc. 82 (Carter); Doc. 83 (Corkren); Doc. 84 (Tutt); Doc. 85 (Sisk).

C.    **Co-defendants' Guilty Pleas**

Thereafter, on April 8, 2021, Defendants Corkren, Tutt, and Sisk changed their pleas. Doc. 106 (Sisk); Doc. 110 (Corkren); Doc. 114 (Tutt). All three defendants pleaded guilty to the conspiracy offense alleged in count one. *See id.* Additionally, Corkren entered a guilty plea to the count of aggravated identity theft charged in count 93. Doc. 110.

On December 16, 2021, Defendant Trey Holladay likewise pleaded guilty to the conspiracy offense. Doc. 191. That day, the government requested leave to dismiss with prejudice the charges pending against Deborah Holladay. Doc. 192. On December 20, 2021, the Court dismissed the indictment against Deborah Holladay. Doc. 199. Doc. 199.

Presently, Carter is the only defendant proceeding to trial.

### III. ELEMENTS OF THE OFFENSES

The following describes the elements the government will need to establish as to each count.

A.    **Conspiracy – Count 1**

To convict Carter on count 1, the government will be required to prove: (1) Two or more people in some way agreed to try to accomplish a shared and unlawful plan; (2) The defendant knew the unlawful purpose of the plan and willfully joined in it; (3) During the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; (4)

The overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy. *See* 11th Cir. Pattern Jury Inst. O13.1 (2021).

The alleged conspiracy involves wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341. To prove the object offense of wire fraud, the government will have to establish: (1) The defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises; (2) The false pretenses, representations, or promises were about a material fact; (3) The defendant acted with the intent to defraud; and (4) The defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud. *See* 11th Cir. Pattern Jury Inst. O51 (2021).

To prove the object offense of mail fraud, the government will have to establish: (1) The defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises; (2) The false pretenses, representations, or promises were about a material fact; (3) The defendant acted with the intent to defraud; and (4) The defendant used the United States Postal Service by mailing or causing to be mailed some matter, communication, or item to carry out the scheme to defraud. *See* 11th Cir. Pattern Jury Inst. O50.1 (2021).

**B.      Wire Fraud – Counts 2-27; 29-78; 84-92**

To convict Carter on the wire fraud counts, the government will have to establish: (1) The defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises; (2) The false pretenses, representations, or promises were about a material fact; (3) The defendant acted with the intent to defraud; and (4)

7

The defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud. *See* 11th Cir. Pattern Jury Inst. O51 (2021).

C. **Aggravated Identity Theft – Counts 93-110; 112-127**

To convict Carter on the aggravated identity theft counts, the government will be required to prove: (1) the defendant knowingly transferred, possessed, or used another person's means of identification; (2) without lawful authority; and (3) during and in relation to conspiracy. *See* 11th Cir. Pattern Jury Inst. O40.3 (2021).

## IV. TRIAL EVIDENCE

The following, in general terms, explains the witnesses the government intends to call and the evidence it intends to present to prove the conspiracy and the substantive counts in furtherance of that conspiracy. The fact witnesses the government will call can be generally divided into five groups—Carter's co-conspirators; ALSDE staff and administrators; private school staff and administrators; ACS employees; and the parents and students whose information was used to further the scheme. In addition to the testimony of these witnesses, the government will provide documentation in the form of emails, student records, and fraudulent documents to support the testimony of witnesses and to prove the alleged scheme. The government will also call three expert witnesses.

A. **Carter's Co-conspirators**

The government will call at least three of Carter's co-conspirators to provide evidence of the conspiracy and the means by which it was carried out. Corkren will testify that Carter was his primary contact at ACS. He will testify that Carter facilitated the transfer of students' information to ACS and the enrollment of private school students into the public school system. He will testify that Carter organized state testing for private school students. He will testify that

Carter directed Corkren to gather documentation meant to mislead the ALSDE into believing that all students enrolled in ACS had withdrawn from their private schools, should the state of Alabama ever investigate the virtual program at ARS. He will also testify that Carter accepted cash payments from Corkren, payments made with proceeds from the conspiracy. Tutt will testify as to his role in the conspiracy after he took over some of Corkren's responsibilities. In addition, Sisk, the former superintendent of Limestone County, will testify that Carter assisted Limestone County in its association with private schools—including by organizing state testing for Limestone County enrollees—even though Carter did not work for the school system. The government may also call Trey Holladay, the former superintendent of ACS and architect of the scheme.

B. **ALSDE Staff and Administrators**

ALSDE staff and administrators will testify about the law governing virtual education in Alabama. They will testify to how education dollars are apportioned in Alabama, and they will testify that increased enrollment generally leads to an increase in funding. They will also testify to the continued deception by Holladay and Carter and their efforts to mislead the ALSDE as to the true nature of the virtual program at ARS. In addition, they will testify to the interstate nature of communications to and from ACS, including the transmission of enrolment data from ACS to ALSDE offices in Montgomery.

C. **Private School Staff and Administrators**

Private school staff and administrators will testify to their interactions with Carter and his co-conspirators. These interactions include Holladay and Carter's initial pitch to private schools, in which they laid out the benefits they could offer the schools in exchange for their students' information. These staff and administrators will testify that they provided student data and grades

9

at Carter's request. They will testify that they were led to believe that their students would, at all times, remain students at their private schools. They were led to believe that any enrollment was into the program itself, not the public school system. They will testify that their students were taught by private school teachers and earned their grades from those teachers. They will testify that to the extent their students used the Athens program for instruction, it was only for electives and as supplemental coursework. None of their students were receiving full-time instruction from ARS teachers.

**D.      ACS Staff**

ACS staff will testify that they were directed by Carter to enroll private school students as if they were full time students taking all their classes at ARS. They will testify that they used private school grades from private school report cards to generate ARS report cards. When the classes taught by the private school and the public school didn't match, they would use the ARS class that most closely fit the private school report cards. In order to avoid using social security numbers, ACS staff generated temporary student IDs, a mechanism ordinarily only used when a student did not have a social security number. ACS staff will testify that Carter handled all the private school students, while allowing other administrators to manage the virtual education of non-private school enrollees.

**E.      Private School Parents and Students**

The private school parents and students whose information was used in the scheme will testify that they never attended ARS or any ACS institution. They will further testify that at all times they remained private school students, never gave permission to be enrolled in a public school and, in fact, had no knowledge that this enrollment was ongoing.

F.   **Expert Witnesses**

In addition to these fact witnesses, the government intends to call three expert witnesses as well. The first, Rick Bagwell, will testify to the interstate nature of communications made between ACS and the ALSDE through the Alabama Supercomputer. Bagwell is a Network Engineer and Engineering Manager with General Dynamics Information Technology. He has served in that capacity with General Dynamics and its predecessor company since approximately 1996. Bagwell, through his role at General Dynamics, helps run and maintain the Alabama Supercomputer Authority. The Authority, located in Huntsville, Alabama, is the network backbone used to transmit information between local school systems and the ALSDE in Montgomery. Bagwell will testify to the structure of the system, the interstate pathways information takes when traveling through the supercomputer, and the general interstate nature of the Internet.

The government also intends to call FBI Special Agent Blake Downing as an expert in cellular site location. Special Agent Downing has received over 500 hours of training in the use of cellular phones in investigations, including cellular historical and real time analysis. He will analyze historical phone records and testify to the locations of Carter and co-conspirators based on their cellular phone usage. Furthermore, Special Agent Downing will testify as to who Defendant Carter called or received calls from and how long those calls lasted.

Finally, the government intends to call Lindsay Gill as an expert in forensic accounting. Ms. Gill is a certified fraud examiner and specializes in the areas of fraud examination, data analytics, and investigative financial consulting. She has analyzed the bank records of Carter, his co-defendants and entities related to co-defendants. She will testify to the sources of funds for individuals and entities including Carter, Educational Opportunities and Management, LLC, Tutt

Educational Services, LLC, and Sage Professional Development, LLC and their use of the funds. Furthermore, Ms. Gill will testify to the disbursement path of funds originating from the Alabama State Department of Education.

## V. OTHER OUTSTANDING ISSUES

### A.   Interstate Commerce

As of this filing, the parties have not yet reached a stipulation regarding the interstate commerce element of a wire fraud conspiracy. Wire fraud requires that the government prove the defendants "transmit[ed] or cause[d] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce" information related to the fraud scheme. 18 U.S.C. § 1343. The Eleventh Circuit Pattern Jury Instructions explain that his provision requires proof "the Defendant transmitted or caused to be transmitted by [wire] [radio] [television] some communication in interstate commerce to help carry out the scheme to defraud." Pattern Crim. Jury Instr. 11th Cir. OI O51 (2020). The instructions further explain, "To 'use' interstate [wire] [radio] [television] communications is to act so that something would normally be sent through wire, radio, or television communications in the normal course of business." *Id.* In *United States v. Jasen,* a panel of the Eleventh Circuit addressed an argument that the government had failed to satisfy the jurisdictional element of wire fraud because the defendants' real estate fraud had all occurred intrastate. 693 F. App'x 801 (11th Cir. 2017). The Court rejected this claim. "Despite the Jasens' assertion that their conduct occurred locally, the Commerce Clause permits Congress to criminalize a local, intrastate act if a channel of interstate commerce (here, the telecommunications network) is used to facilitate the commission of the act. *United States v. Ballinger*, 395 F.3d 1218, 1225 (11th Cir. 2005) (en banc)." *Id.* at 803; *Cf. United States v. MacEwan*, 445 F.3d 237, 243–44 (3d Cir. 2006) ("Regardless of the route taken, however, we

12

conclude that because of the very interstate nature of the Internet, once a user submits a connection request to a website server or an image is transmitted from the website server back to user, the data has traveled in interstate commerce.").

Assuming the parties do not reach a stipulation on this technical element of wire fraud, the government intends to show by competent evidence that the defendants made "some communication in interstate commerce to help carry out the scheme to defraud," as required by the Eleventh Circuit Pattern Jury Instructions. The defendants in this case used email to plan and execute their fraudulent scheme. They communicated with each other, with private schools, and with the ALSDE by email. They transmitted contracts, promotional material, and other documents by email. In addition to their use of email, the defendants uploaded or caused to be uploaded students' records and biographical data to online databases. These databases were then accessed by the ALSDE. In order for the ALSDE to do so, information was transmitted from local databases to databases housed in Montgomery.

To present this information to the jury, the government will call Dennis Pope, the director of information technology at the ALSDE, who will testify to the interstate nature of the email systems used by ACS and the ALSDE. He will also testify to the fact that the ALSDE and the school systems use the Alabama Supercomputer to transmit information. The government will also call Rick Bagwell, one of the experts listed above, to discuss the interstate structure of the Internet pathways most often used by local school systems to transmit information to the ALSDE.

B.      **Stipulations, Motions in Limine, and other Trial Issues**

The parties continue to work to preadmit all exhibits. Assuming the parties continue to agree on preadmission, the parties will move to admit any exhibits that have not been

preadmitted at the beginning of trial. In addition, the parties agreed and this Court has permitted the use of electronic exhibits and of exhibits that are not redacted. The parties will continue to work towards stipulations that save time and court resources.

The Court has provisionally denied the government's motion in limine to permit the use of 404(b) evidence. At an appropriate time at trial, the government may move the Court to allow it to present evidence of Carter's prior employment history. Other than those already mentioned, the government does not anticipate any further significant legal issues.

The government intends to use a number of demonstrative exhibits to help the jury understand the voluminous evidence that will be presented at trial. These exhibits include a map of Alabama showing the locations of ACS and of the private schools at issue in the case; a map demonstrating the locations of Carter and Corkren on days Corkren will testify he gave Carter cash from the scheme; charts summarizing the extent of each private school's role in the scheme; and a chart summarizing the information about each student victim, including their private school, the years they were enrolled in the virtual program, and the extent to which they actually used the curriculum provided by ACS.

Finally, as discussed with the Court at the pretrial conference, the government will work with court staff to ensure monitors displaying exhibits are not visible to the gallery. Per the Court's earlier order, the government will alert the Court when an exhibit contains student information. Nevertheless, because so many of these exhibits will contain student information, it will be a burden on court staff and the Court's time to turn the monitors on and off every time an exhibit with student information is shown.

Respectfully submitted, this 24th day of January, 2022.

        VERNE H. SPEIRS
        ATTORNEY FOR THE UNITED STATES
        ACTING UNDER AUTHORITY
        CONFERRED BY 28 U.S.C. § 515

        /s/Jonathan S. Ross
        Jonathan S. Ross
        Assistant United States Attorney
        131 Clayton Street
        Montgomery, Alabama 36104
        Phone: (334) 223-7280
        E-mail: jonathan.ross@usdoj.gov

        /s/Brett J. Talley
        Brett J. Talley
        Assistant United States Attorney
        131 Clayton Street
        Montgomery, Alabama 36104
        Phone: (334) 223-7280
        E-mail: brett.talley@usdoj.gov

        /s/Alice S. LaCour
        Alice S. LaCour
        Assistant United States Attorney
        131 Clayton Street
        Montgomery, Alabama 36104
        Phone: (334) 223-7280
        E-mail: alice.lacour@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CR. NO. 2:21-CR-49-MHT-JTA-3 |
| ) | |
| WILLIAM RICHARD CARTER, JR. ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

Respectfully submitted,

/s/Jonathan S. Ross
Jonathan S. Ross
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Phone: (334) 223-7280
E-mail: jonathan.ross@usdoj.gov