# UNITED STATES DISTRICT COURT MIDDLE DISTRICT ALABAMA NORTHERN DIVISION

UNITED STATES OF AMERICA

v.                                    Case No. 2:21-cr-49-MHT-JTA

WILLIAM RICHARD CARTER, JR.

## DR. WILLIAM RICHARD CARTER'S MOTION FOR NEW TRIAL

Comes now the Defendant, William Richard Carter, and pursuant to Federal Rule of Criminal Procedure 33, hereby moves for a new trial. For the reasons set forth below, a new trial should be ordered. Defendant states:

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "When considering a motion for a new trial, the district court may weigh the evidence and consider the credibility of the

witnesses." *United States v. Albury*, 782 F.3d 1285, 1295 (11th Cir. 2015) (citation and internal quotation marks omitted). For a new trial to be warranted, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id*.

"Initially, we note that a motion for new trial made on the ground that the verdict is contrary to the weight of the evidence raises issues very different from a motion for judgment of acquittal notwithstanding the verdict, which is based on the sufficiency of the evidence. On a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the verdict, and, under that light, determine whether the evidence is sufficient to support the verdict." *United States v. Corbin*, 734 F.2d 643 (11th Cir. 1984). Thus, on this motion, the court assumes the truth of the evidence offered by the prosecution. On a motion for a new trial based on the weight of the evidence, the court need not view the evidence in the light most favorable to the verdict. It may weigh the evidence and consider the credibility of the witnesses. *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980); *United States v. Simms*, 508 F. Supp. 1188, 1202 (W.D.La.1980). "If the court concludes that, 'despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new

trial, and submit the issues for determination by another jury.' *Lincoln*, 630 F.2d at 1319." *U.S v. Martinez*, 763 F.2d 1297 (11th Cir. 1985).

The decision to grant or deny a new trial motion based on the weight of the evidence is within the sound discretion of the trial court. An appellate court may reverse only if it finds the decision to be a clear abuse of that discretion. *Id*.; *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir. 1979). While the district court's discretion is quite broad, there are limits to it. The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable. *Simms*, 508 F. Supp. at 1202. The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand. *Indelicato*, 611 F.2d at 387; *United States v. Sinclair*, 438 F.2d 50, 51 n. 1 (5th Cir. 1971) (quoting Wright, Miller & Cooper, Federal Practice and Procedure: Criminal § 553, at 487). Motions for new trials based on weight of the evidence are not favored. Courts are to grant them sparingly and with caution, doing so only in those really "exceptional cases." *Lincoln*, 630 F.2d at 1319 (8th Cir. 1980); *Indelicato*, 611 F.2d at 387; *Simms*, 508 F. Supp. at 1202." *Id*.

Applying these principles, courts have granted new trial motions based on weight of the evidence only where the credibility of the Government's witnesses had been impeached and the Government's case had been marked by uncertainties and

discrepancies. Thus, for example, in *United States v. Simms*, 508 F. Supp. at 1204-08, the court granted a new trial, explaining there was no direct proof of the defendant's guilt and that "the Government's case depends upon inferences upon inferences drawn from uncorroborated testimony that . . . is subject to questions of credibility." In *United States v. Hurley*, 281 F. Supp. 443, 449 (D.Conn.1968), the court granted the new trial stating,

"If these factual issues were joined before the jury as matters of clear-cut conflicts in testimony, the jury's decision would remain inviolate. But such was not the case. The direct testimony of Rutt and MacFarlane [the Government's key witnesses] was subject to serious impeachment by prior inconsistent statements and by independent evidence." *United States v. Martinez*, 763 F.2d 1297 (11th Cir. 1985).

Dr. Carter's case has similar problems that the Government had in *Hurley*. In Dr. Carter's case, there was no direct proof of his guilt and the Government's case depended upon inferences drawn from uncorroborated testimony that was subjected to clear, obvious and sometimes blatant, questions of credibility. In *Hurley*, the Court wrote:

It seems clear the jury resolved these factual questions in the government's favor based on evidence which this Court regards as

sufficient to justify an inference that Hurley acted with criminal intent.

Therefore, there being substantial evidence to support a finding of criminal intent, and all the remaining essential elements of the crime having been proved beyond a reasonable doubt, the Court must deny the defendant's motion for judgment of acquittal. *See United States v. Masiello*, 235 F.2d 279 (2 Cir. 1956), cert. denied, *Stickel v. United States*, 352 U.S. 882, 77 S. Ct. 100, 1 L. Ed. 2d 79; *United States v. Feinberg*, 140 F.2d 592, 154 A.L.R. 272 (2 Cir. 1944), cert. denied, 322 U.S. 726, 64 S. Ct. 943, 88 L. Ed. 1562; *United States v. Wapnick*, 202 F. Supp. 712 (E.D.N.Y.1962), aff'd per curiam, 315 F.2d 96 (2 Cir. 1963), cert. denied, 374 U.S. 829, 83 S. Ct. 1868, 10 L. Ed. 2d 1052. But see *United States v. Melillo*, 275 F. Supp. 314 (E.D.N.Y.1967).

However, different considerations apply to Hurley's motion for a new trial on the ground that the verdict is against the weight of the evidence. On such a motion, the Court may weigh the evidence and consider the credibility of witnesses. If the Court determines "the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted." *United States v. Robinson*, 71 F. Supp. 9, 10 (D.D.C.1947). See also *United States v. Wapnick*, supra, 202 F. Supp. at 714.

This power obviously should be exercised cautiously and sparingly. Due respect must be accorded a jury's verdict. Yet, where justice dictates that a verdict should not stand, the Court is under a duty to act.

*Hurley* at 449.

The Court here is in a similar position.

In this case, Dr. Carter was indicted as a co-conspirator with Trey Holladay, Greg Corkren, Webb Tutt, Tom Sisk and Deborah Holladay. Deborah Holladay's case was dismissed pre-trial. Trey Holladay, Greg Corkren, Tom Sisk, and Webb

Tutt all pled guilty prior to the trial of Dr. Carter. The allegation, as charged in the Indictment (Dkt. 1, pp. 17-18), was that the conspiracy's purpose was:

## PURPOSE OF THE CONSPIRACY

"It was a purpose of the conspiracy for ACS, LCS, and CCS to obtain greater state funding allocations through the Foundation Program than they would otherwise have been entitled to by purporting to enroll into their respective virtual schools students who were in fact full-time students of brick-and-mortar private schools and who were not taking even close to what could be considered full course loads through a virtual education program. ACS would then use, directly and indirectly, portions of the excess money to fund the completion of capital projects, including, the new campus of Athens High School.

It was a purpose of the conspiracy for TREY HOLLADAY, DEBORAH HOLLADAY, CARTER, CORKREN, TUTT, and SISK to obtain, directly and indirectly, for their own personal use, portions of the increased revenue generated for ACS, LCS, and CCS by the fraudulent enrollment of private school students in ACS, LCS and CCS virtual schools." (Dkt. #1, ¶¶ 64, 65)

# EVIDENCE AT TRIAL

As the evidence unfolded at trial, the undisputed facts include that Trey Holladay, Deborah Holladay and Greg Corkren met in February 2016 at a Starbucks on the campus of the University of Alabama. It was there, that Trey Holladay asked his long-time friend and college roommate, Greg Corkren, to help him run his scheme to defraud for the purposes set forth above. Mr. Corkren agreed. In order to effectuate the scheme, Trey Holladay needed to enroll full-time virtual school students so that he, as Superintendent of Athens City Schools, could include them in his Average Daily Membership (ADM) which would result in approximately $5,500.00 per student reimbursement from the Alabama State Department of Education. Each school system's Superintendent was in charge of certifying their respective ADM. The increased enrollment of full-time virtual students and thus the increased ADM, however, would only increase the money allocated to Athens City Schools. Trey Holladay's scheme included, as charged in the Indictment, a plan and purpose to enrich himself and Mr. Corkren. In order to enrich himself and Mr. Corkren, he instructed Mr. Corkren to form a shell company. This company, Educational Opportunities Management, LLC (Ed-Op) was in fact formed by Mr. Corkren. Per their plan, Ed-Op would ostensibly serve as a third-party vendor for Athens City Schools full-time enrolled virtual students by providing the online

education.  In turn, Trey Holladay would secure a contract between Athens City Schools and Ed-Op and Athens City Schools would pay Ed-Op on a per student serviced basis.  Trey Holladay, via the Athens City Board of Education, secured the contract between Athens City Schools and Ed-Op.  The undisputed evidence included Athens City School Board members trusting Trey Holladay, as Superintendent, that Ed-Op would fulfill its obligations pursuant to the contract and had the capability to do so.  No one on the Athens City Board of Education ever researched Greg Corkren or Ed-Op prior to entering into the contract(s).

Alabama passed a new virtual school law in 2015.  The language was somewhat vague, and witnesses testified, for example, that committees were formed to help define a "full-time virtual student"; no clear-cut mileage parameters existed for public school systems that wished to provide services to those outside of their districts and there were questions of how public-school systems would be reimbursed for these students.  It is not in dispute that Trey Holladay was often in Montgomery, the Capital of Alabama, lobbying legislators and seeking approval of his interpretation of the virtual school law.  The evidence was borne out at trial that Trey Holladay attended these meetings either alone or with the Athens City School's attorney, Shane Black.  Mr. Black did not testify at Dr. Carter's trial.  At one of the last meetings in Montgomery, Serena Owsley, the Athens City School's Chief

School Financial Officer also attended. At these meetings with the Alabama State Department of Education Officials, Trey Holladay was told that his version of what was allowable was incorrect. To no avail, Trey Holladay returned to Athens and extolled the virtues of and that he had secured the permission of, the State Department of Education Officials for "Dual Enrollment" of private school students. It is not in dispute that Trey Holladay, along with Athens City Schools, held a "virtual showcase" openly inviting private schools to attend and openly promoting dual enrollment for private school children who would also enroll in Athens City Schools public school virtual program. Many employees at the Athens City Schools, including the principal of the virtual school, Joanna May, Beth Patton and Dr. Carter participated in the organizing of and presenting at the virtual showcase. The unrebutted evidence at trial was that Trey Holladay was told one thing by the officials in Montgomery and upon his return to Athens, told the attorney, the CSFO, the principal, Dr. Carter, the front office staff and others, that what he envisioned was within the bounds of the rules. As a result, Dr. Carter, the principal, the vice-principal and the office personnel began to enroll what they believed were full-time Athens City School virtual students. As a result, they were inputted into the State's system so that Athens City Schools would be reimbursed for each student.

Meanwhile, Mr. Corkren was actively selling the program to private schools; offering upgraded internet capabilities, access to a virtual software platform, free laptops etc. In exchange, Mr. Corkren requested executed Athens City Schools virtual enrollment forms for the private school students as well as student identification information that was required by the Alabama State Department of Education so each virtual student would be counted in the ADM. The evidence showed that each of the private school's Headmaster initially signed-off on their students' enrollment in the public school virtual program. They did this, the evidence showed, because Mr. Corkren told them that they had the authority to do so. Later, Mr. Corkren paid each Headmaster to have parents sign the enrollment forms. Many parents actually signed the enrollment forms as they were lied to by the Headmasters regarding the purpose of the form. Most parents signed the form without reading it believing they were signing a sort-of permission slip so their child could take an online course at their respective private school. The evidence, via the students and parents who testified, was that they never consented to their or their child's information to be sent to Ed-Op or to Athens City Schools as the enrollment form stated.

As the Director of Innovative Programs at Athens City Schools, Dr. Carter was the go-between with each of the school's vendors. These included paper

suppliers, hotels, rental car companies, virtual school providers like FuelEd, GradeResult and of course, Ed-Op. The evidence showed that Dr. Carter would receive report cards and grades and student information from virtual providers, including Ed-Op, and forward them to the office personnel who would assign teachers and input grades pursuant to Alabama State Department of Education rules and advisements. The evidence showed that Dr. Carter received falsified report cards and enrollment data from Ed-Op (Mr. Corkren). At the same time, Dr. Carter would forward those false documents to the front office personnel resulting in those "students" being enrolled and counted in Athens City Schools ADM. The evidence is unrebutted that the personnel who inputted the data were fooled by the documents provided by Mr. Corkren. Similarly, at Limestone County Schools, Tom Sisk provided insight that Amanda Hardiman, who like Dr. Carter, received student data and report cards from Greg Corkren, also inputted hundreds of private school students into the database, believing that the data sent to her from Greg Corkren was legitimate. Dr. Sisk admitted that she unwittingly acted in a way that facilitated Dr. Sisk's and Greg Corkren's scheme. These facts no more make her a knowing, willful co-conspirator any more than Dr. Carter was. Since she too received student data and inputted data, an inference exists that she was, like Dr. Carter, involved in a conspiracy; however, no evidence exists that she had the specific intent to defraud, and is therefore not guilty of a crime, also like Dr. Carter.

The evidence is unrebutted that the scheme to defraud included an agreement of a 50/50 split between Greg Corkren and Trey Holladay. Greg Corkren was submitting invoices to Dr. Carter who would then forward them on to the CSFO Owsley. Ms. Owsley, trusting their validity, paid the invoices that Ed-Op submitted. Ed-Op's invoices asserted that it actually provided the services agreed to in the contract with Athens City Schools and that Ed-Op serviced the number of students counted on the invoices. Since Ed-Op was receiving the money, Trey Holladay needed a mechanism to acquire his 50 percent. As a result, and in an effort to conceal, Trey Holladay instructed his other long-time friend, Webb Tutt, to also form another shell company. This was completed and named Tutt Educational Services. Additionally, he instructed that his wife, Deborah Holladay, form a shell company. This was accomplished and named Sage Professional Development. Holladay then directed Ed-Op to contract with Tutt who would contract with Sage. Holladay directed that Ed-Op would pay Tutt $33,000.00 per month and that Tutt would then pay Sage $16,500.00 per month. This was the scheme to get Holladay his share of the money. No evidence exists that Dr. Carter knew about the Tutt and Sage contractual arrangement. Further, no evidence, including forensic accounting evidence, exists that Dr. Carter ever formed a company that had any money move through it. These facts are unrebutted.

As the Court is aware, the only codefendants to testify in Dr. Carter's trial were Tom Sisk and Greg Corkren. No other witnesses testified that Dr. Carter was aware of and knowingly participated in the scheme, even though dozens of Athens City School employees and School Board members acted in a way, unwittingly, to help the success of the scheme.

Tom Sisk was the Superintendent of Limestone County Schools. He was not at the initial meeting at the University of Alabama when the scheme was hatched. Later; however, he had a meeting with Mr. Corkren and Dr. Holladay and they discussed the scheme. He then joined the conspiracy and facilitated a Greg Corkren forged contract between Ed-Op and Limestone County Schools. The fake contract led to overpayments. In lieu of forming a shell company, *a la* Tutt, Corkren and Deborah Holladay, Tom Sisk had Ed-Op write a check for the overpayments to a charity that he could effectively control. After Ed-Op paid the charity, Dr. Sisk directed most of the money out of the charity to his personal account for his own use. At trial, he confessed to having a plea agreement with the Government whereby he knew that the Government had the sole discretion to recommend, via 5K1.1, a reduction in his offense level.

At trial, Dr. Sisk testified that Dr. Carter was at that initial meeting with Trey Holladay and Greg Corkren. He testified that the meeting occurred at the Regions Bank building where Dr. Carter's office was located. This statement was never disclosed to the FBI by Tom Sisk. Upon cross examination, in addition to the revelation that he said that Dr. Carter was present at the meeting for the first time at trial, his credibility was severely undermined when defense counsel pointed out that Athens City Schools had not even rented the Regions Bank Building space at the time Dr. Sisk says Dr. Carter was at the meeting. This witnesses testimony was an obvious attempt to impute knowledge of the scheme to Dr. Carter and to ingratiate himself with the Government. This Court was present for his testimony. Tom Sisk was not believable by any standard. In the face of documented evidence to the contrary, he tried with all of his might to say that he believed the check written by Ed-Op to the charity was legitimate. Defense counsel had to drag it out of Dr. Sisk, upon significant confrontation of the obvious facts and documented evidence, that his position was pure fantasy. His testimony was subject to serious impeachment by prior inconsistent statements and by independent evidence. Not to be outdone, the Government called Mr. Corkren.

It is hard to imagine a witness being subjected to more serious impeachment by prior inconsistent statements and by independent evidence than Mr. Corkren. For

starters, he admitted participating in a mock trial with the Government to prepare for defense counsel's cross examination. He admitted receiving pointers on how to answer and how to act in Court. Act he did. In terms of impeachment, he stated at trial that when Trey Holladay decided to include Webb Tutt into the scheme, that there was a meeting on December 2, 2016, at a Cracker Barrel restaurant in Gardendale, Alabama. At the restaurant, Greg Corkren, Trey Holladay and Deborah Holladay and Dr. Carter purportedly sat and discussed the plan. Upon cross examination of FBI Agent Bridges, he confirmed, via Dr. Carter's phone records, that on the date and time of the Cracker Barrel meeting, Dr. Carter was in Atlanta, Georgia and not in Gardendale, Alabama discussing the scheme. Again, like the tainted testimony of Tom Sisk, the independent evidence of the phone records conclusively refuted and undermined Greg Corkren's testimony as it related to a crucial part of this prosecution, i.e., Dr. Carter's knowledge and willful participation in the scheme.

Further, Greg Corkren admitted that when he initially decided to meet with the FBI and the Government lawyers, the Agents asked for an overview of the scheme. Upon their asking, "Who was dirty?" Mr. Corkren answered, "Trey Holladay, Webb Tutt and Tom Sisk." This initial statement by Mr. Corkren occurred in 2019. Mr. Corkren continued to meet with the FBI and the Government lawyers.

It was not until Trey Holladay pled in December 2021 that Mr. Corkren began to practice his testimony with the Government implicating Dr. Carter.

At trial, Greg Corkren testified that after Dr. Carter's father died in September of 2016, he felt sorry for Dr. Carter's mother as she was left with very little money. He testified that he would give $1,000.00 per month to Dr. Carter as a gift for his mother. He stated that it was his intent for Carter to give the money to his mother. Upon cross examination, he admitted that he told the Agents and Government lawyers that had Dr. Carter's father not died, he would not have given him money. Further, he admitted that Trey Holladay never instructed him to give Dr. Carter any money. Lindsey Gill, the forensic accountant, did not and could not corroborate that Greg Corkren ever gave Dr. Carter any money.

Importantly, Greg Corkren did not testify that Dr. Carter knowingly, willfully and with the specific intent to defraud, ever join the conspiracy. In fact, Mr. Corkren testified how he kept his 50/50 agreement with Trey Holladay a secret from Tom Sisk and everyone else, save Deborah Holladay. Greg Corkren did infer that Dr. Carter knew about the scheme, but nothing more.

Amazingly, at trial, Mr. Corkren, would not admit that he lied to people in order to make money. Further, he took the fantastical position that he made no profit during this scheme. The Government's expert witness, Lindsay Gill, the forensic accountant, testified to the contrary. Further, Ms. Gill testified that while Dr. Carter deposited and withdrew cash during the pendency of the scheme, he also did so prior to his father dying, thus long before Corkren purportedly ever gave him money for his mother. Further, she testified that the cash she saw flow through Dr. Carter's account had an unknown source. This testimony is in opposite of her testimony regarding the flow of money between Athens City Schools and Ed-Op and Tutt Educational and Sage Professional, the shell corporations. Further, she diagrammed how the money connected and flowed from the school system, via the shell companies, to Mr. Corkren, Mr. Tutt and the Holladay's personally. She offered the same connections and flow via the charity in Dr. Sisk's case and him personally. All the forensic accounting testimony was evidence of the indicted purpose of the conspiracy. On the other hand, nowhere, did she offer any connection, forensically, between Dr. Carter and any of the other actors.

As was discussed in chambers, wire fraud is a specific intent crime. This requires a heightened burden for the Government. No direct evidence exists that Dr. Carter knowingly, willfully and with the specific intent to defraud, entered into a

conspiracy for the purposes charged in the Indictment. The Government relied on inference upon inference and the substantially impeached testimony of Greg Corkren. Dr. Carter obviously received false documents and forwarded those documents to the office personnel for their entry into the system. As was his job, he was the go-between for each of the schools' vendors. The evidence clearly established that Trey Holladay was a charismatic, influential go-getter who everyone believed. Trey Holladay would often use Dr. Carter as an unwitting pawn to perform tasks and manage programs to further the scheme between Dr. Holladay and Greg Corkren.

The uncontroverted evidence was that the plan was for Trey Holladay and Greg Corkren to split the ill-gotten gains 50/50. The scheme expanded with the addition of Webb Tutt and Deborah Holladay so Trey Holladay could get paid. Tom Sisk was a one-off, between he and Greg Corkren. Every Dr. Carter e-mail admitted into evidence has an innocent explanation as it does a guilty explanation. The innocent explanation was that he believed that Mr. Corkren was doing as he contracted to do, servicing full-time virtual students and Dr. Carter was simply gathering legitimate data and forwarding it on, like Amanda Hardiman from Limestone County Schools. The guilty explanation was that he knowingly, willfully and with the specific intent to defraud participated in effectuating the scheme even

though he did not enrich himself. While this may survive a Rule 29 standard, in this unique case, it does not survive an intellectually honest Rule 33 review.

On a motion for a new trial based on the weight of the evidence, this Court need not view the evidence in the light most favorable to the verdict. It may weigh the evidence and consider the credibility of the witnesses. In conducting that analysis here, in this unique case, since there exists no direct proof of the defendant's guilt and that the Government's case depended on inferences drawn from uncorroborated testimony that was subject to significant questions of credibility, this Court may grant the motion with confidence. In order to deny this motion, given the evidence in the case, the Court would have to ignore the significant credibility problems with the only two witnesses who link Dr. Carter to the conspiracy. Even then, there is no evidence that Dr. Carter knowingly, willfully and with the specific intent to defraud joined this conspiracy in order to gain financially for himself or so that Athens City Schools would have more money for capital projects, as charged in the Indictment. There simply is no evidence even tending to prove that Dr. Carter enriched himself or joined the conspiracy to acquire money for capital projects, as it is charged. The forensic accountant actually contradicted the testimony of Greg Corkren sufficiently to grant the instant motion.

Even Serena Owsley, the CFSO, was impeached when she too, tried to put Dr. Carter in a position to learn that Trey Holladay was told to stop what he was doing. At first, she testified that Dr. Carter was at the last meeting with the Alabama State Department of Education officials with her and Trey Holladay which would have imputed knowledge of the conspiracy. However, she admitted, only under cross examination, that upon reflection, Dr. Carter was not present for that crucial meeting and thus had no knowledge of the wrongdoing.

## CONCLUSION

The Government knew that it had only inferences of Dr. Carter's knowing, willful participation in the conspiracy with scant inferences of his specific intent to defraud. Almost always, in fraud cases, the circumstantial evidence that tends to prove a defendant's specific intent to defraud is the acquisition of money or property. That crucial element, in this unique case, is wholly absent in the record evidence, as it relates to Dr. Carter. The Government knew that it could only prove that Dr. Carter simply handled the fraudulent student data and assisted with its entry into the database. The Government, for four weeks, proved that fact *ad nauseam*. No matter the number of times Dr. Carter handled the data and no matter how often he would forward it to be entered into the system, this fact does not elevate him to a knowing,

willful conspirator who entered the conspiracy with the specific intent to defraud. Who enters into a multi-million dollar conspiracy for zero money? The real co-conspirators, Dr. Holladay, Greg Corkren, and Webb Tutt, each made hundreds of thousands of dollars. Here, Dr. Carter was like a repetitive, unwitting mule in a drug trafficking case who received no money for his task and risk since he did not realize he was assisting criminal activity.

The Government knew that Dr. Carter was not present at the Starbucks at the University of Alabama, that he was not present at the meetings in Montgomery, that he was not present at the meeting when Webb Tutt was brought in and that Dr. Carter was not instructed to form a shell company, so he could get paid for his role. Unlike Dr. Holladay, Mr. Corkren and Mr. Tutt, the Government also knew the forensic accountant could not link Dr. Carter to any flow of money related to the scheme. Consequently, the Government had dress rehearsals with Mr. Corkren prior to trial and then at trial, he was caught lying while attempting to place Dr. Carter at a meeting that he and the Government knew Dr. Carter was not present for. FBI Agent Bridges knew that Greg Corkren had lied on direct examination that Dr. Carter was not at that Cracker Barrel on December 2, 2016, as well and he said nothing, until confronted with the phone records that confirmed the impossibility of Dr. Carter being present for the meeting. The problematic nature of the evidence brings to the

forefront that the trial was based upon inferences and severely impeached testimony. It is no surprise that Greg Corkren also has a plea agreement that contains a 5K1.1. He admitted that he would not survive prison. He also admitted that he knew that the Government held a major role in whether or not he would be imprisoned. He and Dr. Tom Sisk had not been sentenced at the time of their testimony. Not surprisingly, the Government's case was marked by uncertainties and discrepancies during the most crucial of these witnesses' testimony. Greg Corkren testified that he admitted to 34 aggravated identify thefts while meeting with the FBI Agents and lawyers for the government. This admission occurred prior to him being indicted and prior to his plea agreement being executed. Upon indictment, he was only charged with one, random aggravated identify theft count, Count 93. (Dkt. 1). At trial, he again admitted to all 34 of the aggravated identity counts that Dr. Carter faced. This discrepancy raises the spectre of unfairness. Further, the Government's intrusion into bargained-for testimony and their failing to properly indict someone who admitted to crimes in the Government's presence raises serious uncertainties and discrepancies of whether Greg Corkren was actually guilty of those uncharged crimes that he admitted to in the jury's presence. Dr. Carter faced 113 felony counts, each with specific *scienter* requirements. Even the jury, via a note on March 17, 2022, during deliberations, questioned whether it was its place to know what the defendant had in mind? Uncertainties abounded in this trial, as it was presented and

as it was concocted. The uncertainty and confusion caused by the Government's presentation resulted in the jury asking "are we here to defend what the accused has done?"

Your undersigned knows well that the granting of a Rule 33 Motion for New Trial is to be issued sparingly. This is one of those cases. Given the testimony and evidence in the case, with an honest assessment, this Court should conclude that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, and as such, set aside the verdict, grant a new trial, and submit the issues for determination by another jury. Another jury will not be saddled with the extraordinary number of 113 counts as this jury was and the next jury will need only consider the 7 counts remaining for a new trial and without much of the uncertainties and discrepancies that permeated the first trial.

**WHEREFORE**, William Richard Carter, respectfully requests that this Court grant the Motion and enter an Order for a new trial on the 7 counts that remain.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to the United State's Attorney's Office by CMECF delivery this 31st day of March 2022.

/s/ Kepler B. Funk

**Alan S. Diamond, Esquire**
**Kepler B. Funk, Esquire**
**Keith F. Szachacz, Esquire**
FUNK, SZACHACZ & DIAMOND, LLC
3962 West Eau Gallie Blvd. Suite B.
Melbourne, Florida 32934
(321) 953-0104
Florida Bar No. 0949698, 957781 & 973866
alan@fsdcrimlaw.com;
kep@fsdcrimlaw.com
Attorneys for Defendant