IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO.   2:21-CR-49-MHT-JTA-3 |
| | ) | |
| WILLIAM RICHARD CARTER, JR. | ) | |
| | ) | |

## RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A NEW TRIAL

Comes now the United States of America, by and through Alice S. LaCour, Attorney for

the United States Acting Pursuant to Authority Granted by 28 U.S.C. § 515, and responds in

opposition to the defendant's pending motion for a new trial.  See Doc. 309.

## I. FACTS AND PROCEDURAL HISTORY

### A.      Indictment and Not Guilty Plea

On January 13, 2021, the grand jury returned a 127-count indictment against Defendant

William Richard Carter, Jr. and five others.  Doc. 1.  The indictment charged against Carter: (1)

one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371; (2) 85

counts of wire fraud, in violation of 18 U.S.C. § 1343; and (3) 35 counts of aggravated identity

theft, in violation of 18 U.S.C. § 1028A(a)(1).  See id.

Generally, the indictment alleged that Carter, a public educator, conspired with his co-

defendants to: (1) artificially inflate the enrollment numbers of public school districts (including

the Athens, Alabama City School System (ACS)); (2) based on those inflated enrollment

numbers, obtain funds from the Alabama State Department of Education (ALSDE) to which the

districts were not actually entitled; and (3) divert for their own personal use portions of the funds

obtained.  See id.  To inflate the enrollment numbers, the defendants acquired and used the

identifying information and educational records of private school students.  See id.

On March 4, 2021, Carter pleaded not guilty to the charged offenses. Doc. 82.

**B.      Trial and Conviction**

Carter's trial began on February 22, 2022. Doc. Feb. 22, 2022. By that time, the Court had dismissed, on the government's motions, seven of the wire fraud counts and one of the aggravated identity theft counts. Doc. 206 (dismissing counts 28, 79, 80, 81, 82, and 83); Doc. 218 (dismissing count 111); Doc. 262 (dismissing count 70). Accordingly, Carter went to trial on a total of 113 counts, consisting of 1 conspiracy count, 78 wire fraud counts, and 34 aggravated identity theft counts.

Following one day of jury selection, the government's case took 16 days to present. During those 16 days, the government called 96 witnesses, including: ALSDE officials, former co-workers of Carter's, private school teachers and officials, private school students whose identities were used in the scheme, parents of those private school students, an expert witness in forensic accounting (Lindsay Gill), and two co-defendants.

The testifying co-defendants were Thomas Michael Sisk (the former superintendent of the Limestone County School System) and Gregory Earl Corkren (a retired educator who, through a corporation, served as an intermediary between the public school systems and the private schools).

On March 18, 2022, the jury returned its verdict. Doc. 302. In that verdict, the jury convicted Carter of: (1) count 1 (the conspiracy count); (2) counts 21, 27, 31, and 35 (each a substantive wire fraud count); and (3) counts 125 and 126 (each an aggravated identity theft count). Id. The jury acquitted Carter on the remaining wire fraud counts and was unable to reach a verdict on the outstanding counts of aggravated identity theft. Id. After the deputy clerk

read the verdict, the government orally moved to dismiss those aggravated identity theft counts, Doc. 303, and the Court granted the motion, Doc. 304 at 2.

## C.     Motion for New Trial

On March 31, 2022, Carter timely filed a motion for a new trial.  Doc. 309; see Fed. R. Crim. P. 33(b)(2).  In his motion, Carter argues that a new trial is appropriate because the weight of the evidence did not support the verdict.  Doc. 309 at 4.  According to Carter, "there was no direct proof of his guilt and the Government's case depended upon inferences drawn from uncorroborated testimony that was subjected to clear, obvious and sometimes blatant, questions of credibility."  Id at 4, 19.

## II. LEGAL PRINCIPLES

## A.     The Rule 33 Standard

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The "interest of justice" standard set forth in Rule 33 "is a broad standard."  United States v. Vicaria, 12 F.3d 195, 198 (11th Cir. 1994).  "When considering a motion for a new trial, the district court may weigh the evidence and consider the credibility of witnesses."  United States v. Brown, 934 F.3d 1278, 1297 (11th Cir. 2019) (quoting United States v. Pearson, 746 F.2d 787, 796 (11th Cir. 1984)).

## B.     Motions for New Trials Based on the Weight of the Evidence

As is the case here, when a motion for a new trial is based not on particular legal issues, but rather on the proposition that the verdict was contrary to the weight of the evidence, a district court's discretion is more limited.  In United States v. Martinez, 763 F.2d 1297 (11th Cir. 1985), the Eleventh Circuit explained that when considering such a motion, "[t]he court may not

reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." Id. at 1312–13. Instead, to grant a new trial based on a weight-of-the-evidence theory, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." Id. at 1313; Butcher v. United States, 368 F.3d 1290, 1297 (11th Cir. 2004).

The Martinez Court went on to state that "[m]otions for new trials based on the weight of the evidence are not favored." Martinez, 763 F.2d at 1313; see United States v. Grzybowicz, 747 F.3d 1296, 1310 (11th Cir. 2014) (same). As such, "[c]ourts are to grant them sparingly and with caution, doing so only in those really 'exceptional cases.'" Martinez, 763 F.2d at 1313; see also United States v. Hernandez, 433 F.3d 1328, 1336–37 (11th Cir. 2005). Accordingly, "[a] district court may grant a new trial based on the weight of the evidence even if the evidence is sufficient to convict in the rare case in which the evidence of guilt although legally sufficient is thin and marked by uncertainties and discrepancies." United States v. Brown, 934 F.3d 1278, 1298 (11th Cir. 2019) (quotation marks omitted) (citing Butcher, 368 F.3d at 1297 n.4); see also United States v. Gallardo, 977 F.3d 1126, 1140 (11th Cir. 2020).

In United States v. Cox, 995 F.2d 1041 (11th Cir. 1993), the Court applied these principles to reverse a district court's granting of a new trial motion. There, the defendant, a sheriff, allegedly used county funds to pay his personal credit card bills. Id. at 1042. This conduct resulted in a grand jury indicting the sheriff and his secretary with 24 counts of mail fraud and one count of conspiracy. Id. at 1043. Both defendants proceeded to trial. Id. At trial, the jury found the sheriff-defendant guilty of 23 mail fraud counts and convicted the secretary-defendant of one count. Id. Following the trial, the sheriff-defendant moved for a new trial and the district court granted the motion "because it thought the evidence supporting the jury's

finding of fraudulent intent might be a bit thin and, thus, [the sheriff-defendant] may have suffered a miscarriage of justice." Id.

The government appealed and the Eleventh Circuit reversed. The Court began by discussing the appropriate standard of review to be applied to a district court's decision to grant a new trial based on the weight of the evidence. See 995 F.2d at 1043–44. The Court began with the premise, articulated in Martinez, that it "would review a district court's grant of a new trial in a criminal case for a clear abuse of discretion." Id. at 1043 (citing Martinez, 763 F.2d at 1312). Nevertheless, given that the Martinez Court had "enunciated a rather restrictive standard for a district court's review of a jury's verdict," the Cox panel felt obligated to "accord less deference to a district court's grant of a new trial than the 'abuse of discretion' standard of review implies." Id. (emphasis added).

The Court explained the need for closer scrutiny, stating:

When a court's grant of a motion for a new trial comes before us, we are faced with two conflicting views of the case. In a criminal case, as here, the jury has told us that the defendant is guilty beyond a reasonable doubt, while the court, by granting a new trial, has told us that the jury was wrong and that the evidence weighed heavily against the verdict of twelve men and women honest and true. Given the disagreement between the judge and jury below, and despite the label "abuse of discretion" that we have attached to our review of grants and denials alike of motions for a new trial, we have, not surprisingly, accorded grants of such motions less deference than denials.

Id. at 1044. As such, the Court concluded that "the label 'abuse of discretion' belie[d] the standard of review [it] actually appl[ies] to grants of motions for a new trial." Id. Despite the standard, the appellate court "may conclude that the district court overreached its authority by granting a new trial if [its] review of the record reveals that the evidence did not preponderate heavily against the jury's verdict." Id.

Applying this standard of review, the Court then considered the district court's decision. In so doing, the Court identified two relevant questions: (1) did the defendant "challenge[] the credibility of the United States' witnesses"? and (2) did "any uncertainties or discrepancies sull[y] the United States' case"? Id. at 1045 n. 9. Applying the test, the Court observed that: (1) the defendant "did not defy the credibility" of any of the government's 21 witnesses; and (2) the record did not indicate that the government's case was at all sullied. Id. To the contrary based on the record, "[t]he jury could (and, [the Court] believe[d], did) reasonably glean from the evidence presented at trial that [the defendant] intended to defraud [the] County." Id. at 1045. In making this conclusion, the Court stressed that the jury was able to infer the defendant's criminal intent from the fact that he used county funds to pay off his personal credit card. Id. Thus, "[t]he evidence supported the jury's adjudication of guilt, and certainly did not 'preponderate heavily against the verdict' as Martinez requires for the grant of a new trial." Id. at 1045–46.

Thereafter, in United States v. Hernandez, the Circuit applied Cox and Martinez to affirm a district court's denial of a motion for a new trial. 433 F.3d at 1336–37. In that case, "[t]he testimony of the witnesses at trial produced two conflicting stories, either of which the jury could have believed." Id. at 1336. Two witnesses testified that the defendant was not a member of the charged cocaine-distribution conspiracy, but was instead merely present at the scene of the drug transaction. Id. at 1330, 1332, 1336. On the other hand, two witnesses testified to the defendant's involvement in the conspiracy. Id. at 1336. Following his conviction, the defendant sought a new trial based on the weight of the evidence. Id. at 1332. The district court denied the motion, stating that "although he questioned the credibility of the witnesses for the prosecution and found the case against [the defendant] to be weak, he could not supplant the findings of the jury." Id. When the Eleventh Circuit affirmed, it explained that: (1) the jury had chosen to

credit the latter two witnesses and implicitly rejected the former witnesses; and (2) the district court was not permitted to "reweigh the evidence" simply because it favored another result.  Id. (quotation marks omitted) (citing Martinez, 763 F.2d at 1313–14).

Similarly, district courts across the Circuit have declined to grant new trials based on the impeachment of government witnesses or inconsistencies in the government's case.  See United States v. Johnson, No. 2:17-CR-207-KOB-HNJ, 2019 WL 10565358, *11–13 (N.D. Ala. Mar. 5, 2019) (noting discrepancies between the government's evidence and the defendant's testimony, which "trouble[d] the court," along with inconsistencies among government witnesses, but denying the motion for a new trial); United States v. Brown, No. 9:17-cr-80102-ROSENBERG, 2018 WL 10247955, *3 (S.D. Fla. Feb. 21, 2018) (declining to grant the defendant's motion for a new trial when the defendant based his motion in part on the fact that a government witness "'was impeached on the most critical aspect of his testimony'" because a "reasonable jury" could have found the defendant guilty, despite the impeachment); United States v. Delaughter, No. 8:07-CR-201-T-27TBM, 2007 WL 3034645, *2 (M.D. Fla. Oct. 16, 2007) (declining to order a new trial despite the fact that one of the law enforcement officers testified differently on cross-examination than on direct examination regarding whether his past encounters with the defendant had resulted in an arrest; explaining that "the two law enforcement officers who purchased crack cocaine from Defendant were not impeached to the degree that the 'government's case had been marked by uncertainties and discrepancies'" and "the evidence against Defendant was compelling").

In sum, these cases illustrate that it is, indeed, the "exceptional case[]," in which a district court may grant the type of motion Carter files here.  See Martinez, 763 F.2d at 1313 (quotation

marks omitted).  And the fact that witnesses were impeached at trial does not, standing alone, render a case exceptional.  See, e.g., Hernandez, 433 F.3d at 1336–37.

### III. ARGUMENT

The following summarizes the evidence of Carter's guilt of the counts of conviction and then turns to the specific arguments Carter makes in his motion for a new trial.

**A.      The Evidence of Carter's Guilt of the Counts of Conviction**

As noted, the jury convicted Carter of one count of conspiracy, four counts of wire fraud, and two counts of aggravated identity theft.  As discussed below, there was overwhelming evidence on each count.

**1.      The Conspiracy Count**

During trial, on March 11, 2022, the government filed proposed findings of fact and conclusions of law regarding the existence of the conspiracy charged in count one and Carter's membership in that conspiracy.  Doc. 287.  That document, submitted for the purpose of establishing the admissibility of statements of co-conspirators made in furtherance of the charged conspiracy, see Fed. R. Evid. 801(d)(2)(E), presents the facts the government proved and the means by which the government proved each fact.  In addition to establishing the admissibility of the co-conspirator statements, that submission also reveals that there was overwhelming evidence of Carter's guilt of count one—the conspiracy count for which the jury convicted him.

**2.      The Wire Fraud Counts**

The jury found Carter guilty on four substantive wire fraud counts, namely counts 21, 27, 31, and 35.  Doc. 302.  Each count pertained to the October 14, 2016 submission from ACS to the ALSDE of a private school student's name for the purpose of obtaining funding.  See Doc. 1 at 61–63, ¶ 260.

For the jury to convict Carter on those wire fraud counts, it needed to find: (1) that Carter knowingly devised or participated in a scheme to defraud the ALSDE by using false or fraudulent pretenses, representations, or promises; (2) the false pretenses, representations, or promises were about a material fact; (3) Carter acted with the intent to defraud; and (4) Carter transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud. See 18 U.S.C. § 1343; see also 11th Cir. Crim. Pattern Jury Inst. O51 (2022).

The evidence discussed in the March 11, 2022 submission proved each element. It is also worth noting that each of the four students identified in the wire fraud counts of conviction resided outside of Alabama during the 2016-2017 school year. The jury saw and heard evidence showing that Carter played a key role in submitting to the ALSDE false in-state addresses for each out-of-state student.[1] As such, on these particular counts, there was heightened evidence of Carter's intent to defraud as compared to the other wire fraud counts.

### 3.    The Aggravated Identity Theft Counts

As for counts 125 and 126—the two aggravated identity theft counts—the jury needed to find: (1) that Carter knowingly transferred, possessed, or used another person's means of identification; (2) that he did so without lawful authority; and (3) that he did so during and in relation to corresponding wire fraud counts. See 18 U.S.C. § 1028A(a)(1); see also 11th Cir. Pattern Jury Inst. O40.3 (2022).

---

[1] Namely, Jennifer Sallee, who served as the assistant principal of the Athens Renaissance School during the 2016-2017 school year, testified that she and other employees discovered the existence of the out-of-state students while enrolling students in advance of that school year. She brought the issue to Carter's attention. Subsequently, she received in-state addresses for the out-of-state students. Co-defendant Corkren testified that he created those fake addresses and provided them to Carter. Additionally, the jury reviewed emails sent by Carter (one to Corkren and another to ACS staff members) in which Carter referred to Corkren's creation of those fake addresses. See Gov't Exs. 368, 369.

As for the first element, the jury saw evidence of Carter: (1) receiving the names of the 2 students identified in counts 125 and 126—each Southern Academy students; (2) causing those names to be entered into ACS's enrollment database; and (3) as a result, causing the names to be reported to the ALSDE.[2] The jury also heard from the two students named in those counts and each testified to not having authorized anyone to use the students' names and educational records. Finally, the jury could conclude, based on the evidence discussed in the government's March 11, 2022 filing, that Carter used the names in furtherance of the scheme to commit wire fraud. See Doc. 287.[3]

### 4. Pinkerton Liability

The above discussion explains why the jury had ample evidence to find that Carter personally committed the wire fraud and aggravated identity theft offenses charged. However, it is also worth noting that the Court instructed the jury that it could find Carter guilty of substantive offenses pursuant to a Pinkerton liability theory. Doc. 298 at 26–27; see Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180 (1946). In light of this instruction, even if the jury was unconvinced that Carter personally committed or aided and abetted in the commission of the

---

[2]Pages 42 and 43 of government's exhibit 2549 summarized the trial exhibit-evidence as it pertained to those particular students. See Gov't Ex. 2549 at 42–43.

[3]On the third element, it does not matter that, despite convicting Carter of aggravated identity theft in counts 125 and 126, it acquitted him of counts 42 and 43—the related wire fraud counts. In United States v. Powell, 469 U.S. 57, 105 S. Ct. 471 (1984), the Supreme Court explained that "inconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense." Id. at 65, 105 S. Ct. at 476. The Court went on, "It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." Id. In United States v. Dew, 490 F. App'x 245 (11th Cir. 2012), the Eleventh Circuit relied on Powell to affirm an aggravated identity theft conviction, notwithstanding the jury's acquittal on the predicate conspiracy and mail fraud charges. Id. at 246. As was the case in Dew, here, it is "equally possible that the jury, through mistake, compromise or lenity, arrived at the wrong verdict as to the [substantive wire fraud charges] and not the charge of aggravated identity theft." See id. As such, the jury's acquittal on counts 42 and 43 provides no basis to disturb the convictions on counts 125 and 126. See id.; see also United States v. Mitchell, 146 F.3d 1338, 1344–45 (11th Cir. 1998) ("Consequently, as long as the guilty verdict is supported by sufficient evidence, it must stand, even in the face of an inconsistent verdict on another count.").

offenses charged in counts 21, 27, 31, 35, 125, and 126, it had good reason to find him guilty of those offenses. Specifically, as discussed, there was overwhelming evidence of the existence of the conspiracy, the fact that those offenses were committed in furtherance of the conspiracy, and the foreseeability to Carter that those offenses would be committed.

## B.    Carter's Arguments

Carter's arguments are not tailored to specific offenses. Instead, he makes arguments about specific pieces of evidence. He fails to explain how each evidentiary deficiency he perceives tends to negate his guilt on any particular count. Additionally, most of the arguments contained in the motion for a new trial were previously made either to the Court in support of Carter's motion for judgment of acquittal or to the jury during closing argument. Despite having heard these very arguments, the Court denied the Rule 29 motions, Doc. 295; Doc. 297, and the jury convicted Carter, Doc. 302. Nevertheless, the government responds to each argument in turn.

### 1.    Impeachment of Co-defendant Sisk

First, Carter suggests that Co-defendant Thomas Sisk "was not believable by any standard." Doc. 309 at 14. According to Carter, Sisk testified falsely about: (1) whether Carter was present at an initial meeting between Co-defendants Corkren and William L. Holladay, III (Trey Holladay); and (2) whether Sisk believed that a check written by Corkren to a charity was to be used for charitable purposes. Id.[4]

---

[4] Carter also makes the generalized claim that Sisk's "testimony was subject to serious impeachment by prior inconsistent statements and by independent evidence." Doc. 309 at 14. It is not clear whether this sentence is intended to refer to the specific portions of Sisk's testimony discussed earlier in the same paragraph or to some other "serious impeachment." To the extent that it is the latter, the government lacks sufficient detail to respond to the argument.

As for the first alleged basis for Sisk's "serious impeachment," Carter misrepresents the trial record. Based on the government's notes and recollection, the following occurred during Sisk's testimony: (1) Sisk testified that, while he and Trey Holladay were travelling to a superintendents' meeting, Trey Holladay suggested to Sisk that Limestone County Schools (LCS) could make money by adding virtual students and that Trey Holladay knew someone who could provide LCS with virtual students; (2) Sisk testified that he subsequently attended a meeting with Trey Holladay, Corkren, and a fourth person; (3) after an objection, Sisk informed the Court that Carter was not at that "initial meeting with Trey Holladay and Greg Corkren," <u>see</u> Doc. 309 at 14; (4) the Court did not allow Sisk to testify to what the fourth person said during that meeting; (5) Sisk testified that Carter attended a later meeting involving Sisk, Trey Holladay, and Corkren; and (6) on cross-examination, Sisk expressed confusion regarding the date of that later meeting. To the extent that Sisk was unsure as to where the later meeting fell in the timeline of events, such confusion hardly rises to the level of "serious impeachment." More likely, it was "a simple mistake"; and the Court instructed the jury that simple mistakes did "not necessarily mean that the witness was not telling the truth." <u>See</u> Doc. 298 at 7.

As for the second perceived shortcoming in Sisk's testimony, Carter is correct that Sisk testified that he initially accepted the check from Corkren intending to use the funds for charitable purposes. But, Sisk also did not dispute the fact that he ultimately put the money to his personal use. Carter fails to explain why both cannot be true.

Additionally, it is worth noting that documentary evidence proved the extent to which Carter assisted Sisk and LCS in falsely enrolling private school students. For example, the jury saw an email from Carter to Corkren in which Carter expressed excitement after scheduling standardized tests for Monroe Academy students—students who were enrolled in LCS's virtual

school.  See Gov't Exs. 604A–604B.  The government also presented a series of January 2017 emails between Carter and Corkren wherein Carter guided Corkren through transforming Monroe Academy report cards into "Ed Op" report cards.  See Gov't Exs. 535A, 535B, 535C, 542A, 542B, 536A, 536B, 537A, 537B, 540A, 540B, 538, 541A, 541B, 544, 576A, 576B.  In short, the jury could have completely disregarded Sisk's testimony and still had good reason to conclude that Carter knowingly assisted LCS in falsely reporting private school students to the ALSDE.

## 2.     Corkren's Trial Preparation

During cross-examination, closing argument, and now in the motion for a new trial, Carter attempts to make much hay out of the fact that the government met with Corkren to prepare him to testify.  Doc. 309 at 15.[5]

Despite having belabored the point, Carter does not cite to any authority suggesting that it was improper for the government to meet with a witness in advance of calling the witness to testify or that such preparation was proper grounds for impeachment.  Indeed, one circuit offers a pattern jury instruction saying just the opposite.  See 7th Pattern Crim. Jury Inst. 3.02 (2020) ("It is proper for an attorney to interview any witness in preparation for trial.").  In the Seventh Circuit opinion providing the basis for the instruction, the court added, "[A]n attorney who does not question, rehearse and prepare his witnesses before trial is not properly prepared for trial." United States v. Torres, 809 F.2d 429, 439–40 (7th Cir. 1987); see also United States v. Welton,

---

[5]Throughout his motion, Carter implies that the government improperly coached Corkren or instructed him to testify falsely.  See Doc. 309 at 15 ("[Corkren] admitted receiving pointers on how to answer and how to act in Court.  Act he did."); id. at 16 ("It was not until Trey Holladay pled guilty in December 2021 that Mr. Corkren began to practice his testimony with the Government implicating Dr. Carter."); id. at 21 ("[T]he Government had dress rehearsals with Mr. Corkren prior to trial[.]").

The record is devoid of any evidence that such occurred.  Absent more specific allegations, the government does not believe that Carter's attack on the professionalism of the government attorneys and investigating agents merits further response.

No. CR 09-00153 MMM, 2009 WL 2390848, *4 (C.D. Cal. Aug. 1, 2009) ("It is, of course, proper for an attorney to meet with a witness in preparation for trial." (quotation marks omitted)).

While Carter would have preferred Corkren to have been unprepared, his desire does not render the trial preparation meetings improper. Moreover, the jury heard evidence and argument about such meetings, and yet still voted to convict Carter. Even if the Court were to conclude that the government's meetings with Corkren were excessive, it may not, in ruling on the motion for a new trial, substitute its judgment for that of the jury's "simply because it feels some other result would be more reasonable." See Martinez, 763 F.2d at 1312–13.

### 3. Corkren's Failure to Initially Include Carter Among Those Who Were "Dirty"

Next, Carter harps on the fact that, during his first meeting with agents, Corkren did not include Carter among a list of individuals who were "dirty." Doc. 309 at 15. While this may be so, Carter does not point to any indication that Corkren provided inconsistent statements about Carter's level of involvement in the scheme. Nor does Carter suggest that Corkren failed to initially disclose Carter's involvement. Moreover, to the extent that this fact was impeaching, the jury heard the fact and yet found Carter guilty. Carter offers no basis for the Court to disregard the jury's assessment of the evidence. See Martinez, 763 F.2d at 1312–13.

### 4. Gift Testimony

Fourth, Carter emphasizes that Corkren testified that he intended the cash he gave Carter to be a gift. Doc. 309 at 16. This is an accurate description of Corkren's direct examination testimony. Of course, during cross-examination, Carter's attorneys suggested that Corkren never gave any cash to Carter at all. In any event, the jury was aware of this fact when it voted to convict Carter. The jury's decision makes sense.

14

First, Corkren's intentions were not inconsistent with Carter's guilt. The jury was asked to consider Carter's mental state when he received the cash payments—not Corkren's when he gave the money. Certainly, there was sufficient evidence for the jury to conclude that Carter—a public school official who was actively engaged in deceiving the ALSDE into believing that full-time private school students were virtual public school students—appreciated the wrongfulness of accepting bundles of cash from a school district vendor who was helping him with the deception.

Second, even if one were to set aside all evidence of Corkren giving Carter cash, there would still be a basis to conclude that Carter personally enriched himself through his participation in the conspiracy. The ACS financial officer, Serena Owsley, testified that, by the end of the scheme, Carter had risen from receiving a teacher's salary to being the second highest paid person in the school district. Given that the person responsible for promoting Carter was his co-defendant, Trey Holladay, the jury was able to make the logical inference that Carter's increased pay was the direct result of his work in the scheme.

**5.      Gill's Inability to Testify to Corkren Giving Carter Cash**

Next, Carter repeats an argument his attorney first made to the jury—that "Lindsay Gill, the forensic accountant, did not and could not corroborate that Greg Corkren ever gave Dr. Carter any money." Doc. 309 at 16. Elsewhere in the motion, Carter claims that Gill "actually contradicted the testimony of Greg Corkren sufficiently to grant the instant motion." Id. at 19. These claims are disingenuous and they ignore the fundamental difference between a fact witness and an expert witness.

Corkren was a fact witness. He testified to giving Carter $1,000 in cash. He said that he did so approximately once each month over a 21-month period. Corkren described the locations

wherein he gave Carter this money—in Double Springs, Alabama; in Troy, Alabama; in Orrville, Alabama; in Athens, Alabama. He explained his reasons for giving Carter cash. He identified telephone calls documented in telephone records that preceded his meeting Carter for a cash handoff. On his own bank statements, Corkren pointed out withdrawals he made to gather the currency that he then gave to Carter. Corkren was able to do all of this because he was present at the scene each time he gave money to Carter.

Gill was an expert witness. As Carter's attorneys made clear, she received significant compensation from the government to review financial records gathered during the investigation and make conclusions about the sources and uses of the funds. She testified that, during her review of the records, she observed cash leaving Corkren's accounts and she saw cash entering Carter's accounts. On cross-examination, she did not dispute that she could not testify to the source of the cash entering Carter's account. She explained the untraceable nature of cash. She also noted that, unlike Corkren, she was not present when Carter received cash. Such testimony was consistent with her being an outside expert. Had Gill, for example, ridden with Corkren to Double Springs on September 19, 2016 and witnessed Corkren hand cash to Carter, then her personal involvement in the case would have rendered her unable to provide an expert opinion.

In any event, there is no inconsistency with a fact witness having greater knowledge about historical events than an expert witness. Thus, it is not surprising that the jury was unmoved by the suggestion of defense counsel during closing argument that 'to believe Corkren, [it] would have to disbelieve Ms. Gill.' The logical flaws are readily apparent in the statement. Indeed, one accepting illicit proceeds might prefer that such proceeds come in the form of cash, so that someone like Gill, years later, would be unable to testify to the source of such cash.

In short, this dubious argument falls far short of revealing a "manifest injustice" in allowing the verdict to stand.  <u>See</u> <u>Martinez</u>, 763 F.2d at 1312–13.

**6.      Corkren's Testimony about the Cracker Barrel Meeting**

Carter also argues that Corkren incorrectly testified that Carter was present for a December 2, 2016 meeting at a Cracker Barrel restaurant.  Doc. 309 at 15.  Once again, Carter mischaracterizes the record.

During direct examination, Corkren testified that, at the end of the scheme, during the spring of 2018, he went to a Cracker Barrel restaurant in Gardendale, Alabama and there met with Carter, Trey Holladay, Webb Tutt, Deborah Holladay, and possibly Jill Tutt.  <u>See</u> Ex. 1 (Draft Transcript of Corkren Testimony, March 11, 2022) at 97.  During that meeting, Corkren discussed with the others the fact that authorities had discovered the scheme.  <u>Id.</u>  During this exchange, Corkren noted that he attended "several meetings at cracker barrels."  <u>Id.</u>

Later, on cross-examination, Carter's attorney, reading from a report of an interview of Corkren, questioned Corkren about a wholly different meeting at a Cracker Barrel restaurant. According to the rough draft of the transcript of Corkren's testimony, the exchange regarding this different meeting went as follows:

Q.  Okay.  Now, you had mentioned Gardendale Cracker Barrel with Mr. Ross.  Do you remember talking about that?

A.  Yes.

Q.  Okay.  I want to make sure that we have it right.  You met with the agents in October, and what you had said to them was on December 2nd, 2016, that Trey, Deborah, Dr. Carter, and you met at the Gardendale Cracker Barrel, and that was the time when Trey laid out the plan for Webb to get involved.

A.  It was then or one other time in Decatur crack he will [sic] barrel.

Q. When you mentioned the Gardendale Cracker Barrel at the time you talked to the agents, that's when Trey was telling people, I'm going to get Webb involved. Do you remember that?

A. One of those times. Either that one or that other time.

Q. And that was December 2nd, 2016, which makes sense timingwise with Webb Tutt's involvement. Agreed?

A. Agreed. Yes.

Q. So was it – it was just before the four people that you said: Trey, Deb, Dr. Carter, and you; right?

A. At Gardendale.

Q. Yeah. And you told them you didn't eat that day. Does that refresh your memory at that meeting?

A. I cannot remember. I'm trying to remember. I'm sorry.

Q. But it was the four of you sitting at a table.

A. I would agree, yes. You were told that.

Id. at 197–98.

At that point, the questioning turned to another topic. This exchange is that the totality of what Carter describes as Corkren being "caught lying while attempting to place Dr. Carter at a meeting that he and the Government knew Dr. Carter was not present for." Doc. 309 at 21. Carter's rhetoric vastly overstates what occurred. In truth, defense counsel raised a new topic on cross-examination. In response, Corkren stated that he could not remember. The questioning moved on.

This was not the seminal moment of the trial, as Carter would like one to think. Looking to the guidance articulated in Cox: (1) Carter did not defy Corkren's credibility when he pursued this line of cross-examination; and (2) the government's case was in no way sullied by this minor discrepancy. See Cox, 995 F.2d at 1045 n. 2. At best, in this moment and in the subsequent

questioning of Special Agent Ben Bridges about Carter's location on December 2, 2016, Carter

cast doubt on whether he attended this December 2, 2016 Cracker Barrel meeting. Unfortunately

for Carter, the government had never tried to prove that he did.[6]

### 7. Corkren's Charges

Towards the end of his motion, Carter makes a puzzling argument. He writes,

> Upon indictment, [Corkren] was only charged with one, random aggravated
> identity theft count, Count 93. At trial, he again admitted to all 34 of the aggravated
> identity theft counts that Dr. Carter faced. This discrepancy raises the spectre [sic]
> of unfairness. Further, the Government's intrusion into bargained-for testimony
> and their failing to properly indict someone who admitted to crimes in the
> Government's presence raises serious uncertainties and discrepancies of whether
> Greg Corkren was actually guilty of those uncharged crimes that he admitted in the
> jury's presence. Dr. Carter faced 113 felony counts, each with specific *scienter*
> requirements.

Doc. 309 at 22. This argument, lacking any citation to authority, is not clear.

Carter appears to suggest that the government had some duty to charge Corkren with

more offenses than those contained in the indictment. Carter is wrong. It is well-established

that, absent a constitutional claim, the Court may not review an exercise of prosecutorial

discretion. See In re Wild, 994 F.3d 1244, 1263 (11th Cir. 20201) ("Judicial review of a

prosecutor's decision whether to prosecute is the very quintessence of an impairment of

prosecutorial discretion." (quotation marks and alterations omitted)). Even if the government did

have some duty to charge Corkren with more offenses, it is not obvious how the government's

failure to do so harmed Carter.

Moreover, what Carter seems to ignore is that, given that during 2016-2017 school year,

ACS submitted over 900 private school student names to the ALSDE and, during the 2017-2018

school year, it submitted over 500, Carter too could have faced far more aggravated identity theft

---

[6]To the extent that Carter succeeded in discrediting a prior statement made by Corkren to investigators, he
fails to explain how this one fact casts doubt on the entirety of Corkren's three-day testimony.

charges than were in fact charged.  Carter fails to grapple with whether the government had a

duty to pursue additional charges against him as well.

To the extent that the government improperly obtained "bargained-for testimony," he

forgets that the Federal Rules of Criminal Procedure specifically authorize the government, in a

plea agreement, to agree that the government will "not bring, or will move to dismiss, other

charges."  Fed. R. Crim. P. 11(c)(1)(A).  Carter does not explain how the government's entering

into an agreement expressly permitted by the Federal Rules raises "uncertainties and

discrepancies"—much less "serious" ones.

### 8.     Carter's Intent

Carter again suggests that there was "[n]o direct evidence . . . that Dr. Carter knowingly,

willfully, and with the specific intent to defraud, entered into a conspiracy for the purposes

charged in the Indictment."  Doc. 309 at 17–18.  Carter previously made this argument in support

of his motion for judgment of acquittal.  The Court rejected it at that time.

Carter does not specifically explain why the Court should revisit its prior rulings.  Of

course, at the Rule 29 stage, the Court was obligated to "view[] all the evidence in a light most

favorable to the government," see United States v. Grigsby, 111 F.3d 806, 833 (11th Cir. 1997),

whereas, in considering Carter's motion for a new trial, it may independently weigh the

evidence, see Brown, 934 F.3d at 1297.  Although it is less than clear, the government presumes

that it is for this reason that Carter reasserts this previously rejected argument.

First, although the Court is entitled to independently weigh the evidence, the Court's

discretion after weighing such evidence is not as broad as Carter suggests.  As noted, should the

Court grant Carter's motion, it would have to conclude "that the jury was wrong and that the

evidence weighed heavily against the verdict of twelve men and women honest and true."  See

<u>Cox</u>, 995 F.2d at 1044. The Eleventh Circuit would closely scrutinize any such conclusion and reverse absent some showing that allowing the verdict to stand would result in a miscarriage of justice. <u>See</u> <u>Martinez</u>, 763 F.2d at 1313–14. Therefore, although the Court may reweigh the evidence, after doing so, it may not order a new trial unless the evidence leans very heavily against the verdict. <u>See</u> <u>id.</u>

Second, regardless of the lens the Court uses, the evidence points in only one direction—to Carter's guilt of the offenses of conviction. As for Carter's intent to defraud, the evidence cited in the government's March 11, 2022 filing refutes Carter's claim. Additionally, the Court could consider the following as evidence of Carter's criminal intent:

- Sallee's testimony that Carter instructed her not to discuss the enrollment of private school students with Trey Holladay, because Carter was the one who was to take the fall when things went bad, and it was for that reason that he was paid the "big bucks";

- Owsley's testimony that Carter made a similar statement to her;

- Emails showing Carter repeatedly using personal email accounts when sending or receiving email messages containing private school student information or discussing the scheme, <u>see, e.g.</u>, Gov't Exs. 105A, 105B, 105C, 105D, 105E, 220A, 220B, 536A, 536B, 555, 588A, 588B, 597.

- Emails showing Carter drafting and sending a letter to be given to parents by Abbeville Christian Academy to explain the school's involvement in the scheme, with such letter never mentioning that the private school's students would be enrolled in the Conecuh County School System, <u>see</u> Gov't Exs. 921A, 921B; and

- A memorandum drafted by Carter to Trey Holladay explaining services performed for ACS by Linden, Alabama City Schools Superintendent Timothy Thurman, when in fact, as Thurman testified, he did not perform such services, <u>see</u> Gov't Ex. 2504.

As was the case in <u>Cox</u>, these points of evidence provided a basis for the jury to infer evidence of Carter's criminal intent. <u>See</u> 995 F.2d at 1045. So long as such a basis existed, there is no reason to set aside the verdict. <u>See</u> <u>id.</u>

As for Carter's claim that he was unaware of the alleged purposes of the conspiracy, <u>see</u> Doc. 1 at 17–18, ¶¶ 64–65, that argument also falls short. First, as the Court instructed the jury, "[a] person may be a conspirator without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators." Doc. 298 at 12–13. As such, the government did not need to prove that Carter was aware of all purposes of the conspiracy. <u>Cf.</u> <u>United States v. Frans</u>, 697 F.2d 188, 190 n.1 (7th Cir. 1983) ("A party need not know all of the details of a conspiracy to be proved a co-conspirator."); <u>United States v. Escalante</u>, 637 F.2d 1197, 1200 (9th Cir. 1980) (same). Even still, the government's evidence more than proved that Carter fully understood and sought to further each alleged purpose.

First, numerous witnesses (including Sallee, Corkren, Sisk, ALSDE Deputy Superintendent Andy Craig, and Owsley) testified that it was well understood that the enrollment of the private school students meant more revenue for the public school systems at issue. <u>See</u> Doc. 1 at 17, ¶ 64. Even Marc Mickleboro, the headmaster of Southern Academy (a school visited by Carter and for whom Carter prepared a promotional PowerPoint presentation, <u>see</u> Gov't Ex. 129A, 129B) testified to understanding that ACS sought his students' information to get increased funding from the state. Given this general understanding, along with the amount of work Carter did in furtherance of the scheme, it was an easy inference to draw that Carter too

understood that a reason for obtaining private school student information and then enrolling those students was to get more money for the school systems.

Second, Rusty Johnson, who, at the time, was the chairman of the Athens City Board of Education, testified that ACS: (1) needed more money to fund capital projects; and (2) was better able to complete such projects because of the increased revenue generated by the private school students. See Doc. 1 at 17, ¶ 64. He also testified that, after the first such project finished—the new Athens High School—Carter became the principal of that high school. These facts suggest that it was a reasonable inference that Carter understood that ACS needed the money the private school students generated so that it could build a new high school.

Third, as discussed, the evidence showed that Carter—through payments from Corkren and increased salary—received money. As such, the jury could find that he knew that some of the motivation for the scheme was to personally enrich himself as well as his co-conspirators. See id. at 18, ¶ 65. Moreover, the volume of emails and telephone calls alone established that Carter knew that Corkren was working in furtherance of the scheme. Unless Carter assumed that Corkren was volunteering his time, then Carter undoubtedly knew that a purpose of the scheme was to enrich Corkren. The same goes for Deborah Holladay, with whom Carter had dealings related to the scheme. See, e.g., Gov't Exs. 921A, 921B.

In short, the evidence more than established Carter's fraudulent intent. Carter contends, "Every e-mail admitted into evidence has an innocent explanation as it does a guilty explanation." Doc. 309 at 18. This is a bit of an overstatement. It is hard to fathom an innocent explanation for Carter's emails regarding the replacement of out-of-state addresses with fake in-state addresses. See Gov't Ex. 368, 369. Accepting Carter's claim as true, though, it reveals the shortcomings of Carter's motion. At best, Carter points to minor discrepancies over the course

of almost four weeks of evidence presentation. Carter's arguments, while hyperbolic, do not overwhelmingly negate the evidence of guilt such that letting the verdict stand would result in a manifest injustice. See Martinez, 763 F.2d at 1313–14. Accordingly, there is no basis for casting aside the judgment of "twelve men and women honest and true." See Cox, 995 F.2d at 1044. In other words, this is not an "exceptional case"; as such, there is no justification for granting Carter's "disfavored" motion. See Martinez, 763 F.2d at 1313.

## IV. CONCLUSION

Based on the foregoing, the government asks that the Court deny the motion for a new trial.

ALICE S. LACOUR
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY
CONFERRED BY 28 U.S.C. § 515

/s/Jonathan S. Ross
Jonathan S. Ross
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: jonathan.ross@usdoj.gov

/s/Brett J. Talley
Brett J. Talley
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: brett.talley@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA    )
    )
    v.    )    CR. NO.   2:21-CR-49-MHT-JTA-3
    )
WILLIAM RICHARD CARTER, JR.    )

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2022, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to all counsel of

record.

Respectfully submitted,

/s/Jonathan S. Ross
Jonathan S. Ross
Assistant United States Attorney
131 Clayton Street
Montgomery, Alabama 36104
Phone: (334) 223-7280
Fax: (334) 223-7135
E-mail: jonathan.ross@usdoj.gov