This is Friday, March 11th, 2022.

    (Jury present at 8:40 a.m.)

    (Call to Order of the Court)

        THE COURT:  Proceed.

        MR. ROSS:  Thank you, Your Honor.

                        GREG CORKREN

        The witness, having previously been duly sworn to speak
the truth, the whole truth and nothing but the truth, further
testified as follows:

                    FURTHER DIRECT EXAMINATION
BY MR. ROSS:

Q.  Mr. Corkren, you remember yesterday we left off talking
about the Odysseyware course work that you created.

A.  Yes, sir.

Q.  Did you create Odysseyware course work multiple times?

A.  Yes, sir.

        MR. ROSS:  Let's look at Government's Exhibit 1055 A.

Q.  Now, yesterday I think we saw --

        MR. ROSS:  Actually, before we do this, let's look at
1054 A.

Q.  Do you remember, Mr. Corkren, we saw this yesterday?  These
were the reports that you sent to Dr. Carter --

A.  Yes, sir.

Q.  -- dated September 12th of 2017?

A.  Yes, sir.

**GOVERNMENT EXHIBIT**

**1**

1  Q.  All right.  Let's go now to 1055 A.  Now, do you see another

2  email from Dr. Carter to you?

3  A.  Yes, sir.

4  Q.  And this email, what's the date on it?

5  A.  September the 13th, 2017.

6  Q.  So would this be the day after you sent Dr. Carter the

7  Odysseyware course reports?

8  A.  Yes, sir.

9  Q.  How is this email address?

10 A.  Mr. Corkren, formally.

11 Q.  Did that stand out to you?

12 A.  It's a formal -- he's trying to make -- it's a formal

13 letter.

14 Q.  And what did he write in the message?

15 A.  Following the review of materials previously submitted by Ed

16 Op in regards to the 2016-17 virtual students enrolled in Athens

17 renaissance, it has been determined we need additional

18 information to complete our audit.  Specifically, we need Ed Op

19 to provide us with additional evidence involving a sample of 10

20 students from the previous listing sent the we can of September

21 6 to Ed Op.  In addition, a sample of 10 will be needed from the

22 Eufaula listing sent by the ALSDE.  That list is attached below.

23 This information is needed before 8 a.m. on Thursday, September

24 14th, 2017.  Please contact me immediately if you have any

25 questions, concerns, or need further clarification as to this

1  request.

2  Q.  Now, you had previously sent him the course reports you

3  created for those Marengo students; correct?

4  A.  That's correct.

5  Q.  And let's pull one of those up.  Let's pull up 1054 D.  This

6  was one of those reports; correct?

7  A.  That is correct.

8  Q.  Did Dr. Carter have a problem with what you had created here

9  in 1054 D?

10  A.  Yes, sir.

11  Q.  What was the problem that he had?

12  A.  It didn't have enough detail.  It was just -- the numbers

13  didn't explain what they actually accomplished in Odysseyware.

14  Q.  Did he tell you that?

15  A.  Yes, sir.

16  Q.  Did he give you more specific instructions about what he

17  wanted?

18  A.  He needed a different report that had a lot more of the

19  actual course work, not just grades of a section like it's laid

20  out there.  This is actually -- this is actually what

21  Odysseyware sends out.  I just changed these numbers to

22  correlate to the -- with the report card.  But what I had to

23  create was actual lesson grades of lessons.  And I'm sure you

24  will have an example of that here that they'll be able to see.

25  Q.  All right.  And these reports that you had created at 1054,

1 were these all for Marengo students?

2 A.  Yes, sir.

3 Q.  And going back to 1055 A, does he want these more detailed

4 reports for the Marengo students?

5 A.  Marengo students and I believe Eufaula also.

6 Q.  And Eufaula, which school was that?

7 A.  That's over in Eufaula -- the Lakeside School.

8 Q.  All right.  What's the turn around time that he gives you on

9 this request?

10 A.  It looks like one day.  Less than 24 hours.

11 Q.  All right.  Were you going to be able to create the -- I

12 guess he was asking for 20 different students?

13 A.  No, sir, there's no --

14 Q.  Well, was he asking for 20 different students?

15 A.  That is correct.

16 Q.  Were you going to be able to create 20 different reports in

17 23 hours?

18 A.  That's 40 reports because each of those reports, they had

19 four classes, so I had to have -- each kid had four different

20 reports.  Well, that's -- 20, that's 80.  That's 80 I had to

21 create.

22 Q.  You had to create 80 class reports?

23 A.  That is correct.

24 Q.  Were you going to be able to do that in 23 hours?

25 A.  No, sir.

1  Q.  Did you explain that to Mr. Carter?

2  A.  Yes, sir.  He and Trey.

3  Q.  Let's look at Government's Exhibit -- well, before we do, if

4  we look at the time here, it's September 13th at 9:01?

5  A.  Correct.

6  Q.  Let's look at Government's Exhibit 2004 and go to page 189.

7  And, sir, do you see here -- let's enlarge September 12th.  And

8  do you see at 3:18 you were speaking with Dr. Carter?

9  A.  That is correct.

10  Q.  I'm sorry.  This was September the 13th.  I'm sorry.  Let's

11  go back out.  The email that Dr. Carter sent you asking for the

12  80 reports was on September 13th; correct?

13  A.  Yes, sir.

14  Q.  And do you see here that -- I'm sorry.  We need to go to the

15  next page.  I apologize.  At 9:17 p.m., you called Dr. Carter.

16  A.  Yes, sir.

17  Q.  And spoke for 17 minutes.

18  A.  Correct.

19  Q.  And spoke to him again the next morning at 8:20 in the

20  morning.

21  A.  Yes, sir.

22  Q.  He called you.

23  A.  Correct.

24  Q.  And you-all spoke again at 8:26.

25  A.  Correct.

1    Q.  Again at 11:40 the next morning.

2    A.  That's correct.

3    Q.  During these calls, did you explain to him that you were not

4    going to have these reports at 9 o'clock that morning?

5    A.  That is correct.

6    Q.  Now, if the students had actually been taking full classes

7    on Odysseyware, would it have taken you much time to go into the

8    Odysseyware system and print the reports?

9    A.  It would have took me probably 15, 20 minutes at the most.

10   Q.  So if they were actually taking the full classes, you would

11   have given Dr. Carter what he needed.

12   A.  Yes, or he could have ran it off himself.

13   Q.  Did you explain to him why it was going to -- you weren't

14   going to be able to get these reports to him in 24 hours?

15   A.  Yes.  Because I was going to have to create it.  They hadn't

16   accomplished it, and the only way to show it would be to

17   fabricate it.

18   Q.  And did you explain that to him?

19   A.  Yes, sir.

20   Q.  What did he say?

21   A.  Trey wants you to get it done.  We need you to get it done.

22   Q.  Did you explain it to Dr. Holladay as well?

23   A.  Yes, I did.

24   Q.  And what did Dr. Holladay say?

25   A.  I need you to get it done some way, some how.

1  Q.  Did you ultimately get some reports done?

2  A.  Yes, sir, I did.

3  Q.  Did you do them all at once or did you do it over time?

4  A.  For two weeks I sat on it.  I think a week or two, I -- I

5  was looking at an impossible task, a task I knew I shouldn't be

6  doing, and the moral dilemma held me up for a week or two but

7  the constant badgering and not letting a friend down, I wound up

8  doing it.

9  Q.  Constant badgering by whom?

10  A.  Trey.  Rick was actually getting badgered.  They put a lot

11  of pressure on me.  Anyway, I did it.

12  Q.  ?

13  Q.  Once you created these reports, what did you do with them?

14  A.  I sent them to Rick electronically.

15  Q.  Pardon?

16  A.  Electronically.  I cannot remember whether a thumb drive --

17  not a thumb drive, but the I drive -- not the I drive but Google

18  Drive.

19  Q.  Let's look at Government's Exhibit 1979.  Is this your

20  Google Drive?

21  A.  Yes, sir, it is.

22  Q.  Let's go to page 61.  Now, you see, sir, that on September

23  the 19th?

24  A.  Yes, sir, I do.

25  Q.  You see you sharing PDF's?

1    A.   Yes, sir, I see them.

2    Q.   With Rick?

3    A.   Yes, sir.

4    Q.   And who are the PDF's?

5    A.   Some of the students that -- the -- some of the students

6    that I got finished that day.

7    Q.   All right.  Do you see this student Jordan F?

8    A.   Yes, sir.

9    Q.   Let's pull up Government's Exhibit 1821 and go to page 513.

10   Sir, do you recognize what we're looking at?

11   A.   Yes, sir.

12   Q.   What are we looking at?

13   A.   That's an actual report of grades on certain lessons in a

14   subject area.

15   Q.   Did you create this report?

16   A.   Yes, sir, I did.

17   Q.   How can you tell?

18   A.   I've spent a lot of time on it.

19   Q.   Is it the same student that we just saw that up loaded to

20   Dr. Carter on September the 19th of '17?

21   A.   Yes, sir.

22   Q.   And you notice the top or the text here.  Is it a little

23   crooked?

24   A.   Sir?

25   Q.   Let's enlarge this top part, please.  The line running at

1  the top of the text box, is it straight?

2  A.  No, it is not.

3  Q.  Did you notice that at the time?

4  A.  I knew it.

5  Q.  Did you say anything to Dr. Carter about it?

6  A.  No.

7  Q.  Why was this uneven?

8  A.  Well, you have to take -- I actually run a report, instead

9  of having grades in it, it would be a lot of zero's where they

10  haven't accomplished anything, and it showed where they hadn't

11  did anything in that particular class.  So you have to take it

12  and put it in -- concert the PDF to another format.  I'm not

13  going to get too much detail, but anyway, put it over to another

14  format, do your -- do the changes you need, then convert it back

15  to a PDF.

16  Q.  What was the other format that you converted it to to make

17  the changes?

18  A.  Word document.

19  Q.  And let's go back out.  These assignments that we see here,

20  are those actual assignments in Odysseyware?

21  A.  Yes, they are.

22  Q.  And the information we see over here, assignment opened,

23  where did that come from?

24  A.  I had to make that up.

25  Q.  How about assignment turned in?

A. I had to make that up.

Q. Time spent?

A. I had to make it up.

Q. Score?

A. I had to make it up. It had to -- the scores had to correspond with the actual report card to make sure it agreed with it. I had to go back and make sure the times matched up and I had to give enough length of time and change the times up. You'll see a lot of odd numbers on the right where it says time spent. That's your first clue. You've got a lot of 1's and 3's.

Q. Did the time spent always match the assignment open and turned in times?

A. Could you repeat that?

Q. Sure. Let's enlarge right here, please.

Mr. Corkren, do you see here where it says this student started the Cask of Amontillado vocabulary?

A. Yes, sir.

Q. Started it at 3:11 p.m.?

A. Correct.

Q. Finished it at 3:38 p.m.?

A. Correct.

Q. So 3:11, 3:38, that would be 27 minutes; correct?

A. Correct.

Q. How much time does it say the student spent on it?

1  A.  Says 50 minutes.

2  Q.  Is that possible?

3  A.  Yes.  That's one of the quirks of the program.  When I was

4  going through this, I thought I had to match it up, but if you

5  actually ran a real report it would have those quirks.

6  Q.  Weird times like that?

7  A.  Yes.  So it took me a while to figure out if I actually did

8  the correct time, the whole column down, somebody could -- that

9  knew anything about the program would know, hey, that's not

10  correct.

11  Q.  So this 50 minute number here, how did you come up with

12  that?

13  A.  Out of the blue.

14  Q.  Did you go into the lessons to see if the amount of time you

15  were picking actually matched the amount of time it would take

16  somebody to finish the lesson?

17  A.  No, because most -- I mean, most of the people hadn't

18  attempted these lessons.  My first task was I had to -- out of

19  the list, I had to find the kids who actually had a similar --

20  the same class.  In other words, if I had ten kids in the same

21  class, I would concentrate on that.  I didn't --

22  Q.  Why did you need to identify students that were in the same

23  class?

24  A.  Because once I changed something, I could do it -- I had

25  basically the template to change for those people.

1  Q.  You mean the same grade level?

2  A.  Same -- not the same grade level, but if they had the

3  same -- if they had the same classes on that report card, I

4  could go in and pull that same less on out and get all that

5  done.  Remember, I had to come up with four lessons, and they

6  had to match the report card.  So the first step is I would have

7  to make sure these kids -- I get as many as I could and speed it

8  up.

9  Q.  Okay.  Let's go back out.  So if you could find multiple

10  students, say, in English 9, you could use this set of lessons

11  for the English class in multiple places?

12  A.  That's an example of what I'm saying, yes.  Because all kids

13  in 9th grade take English.

14  Q.  I see.

15  A.  So that's why I zeroed in on English.

16  Q.  I see.  So let's go to page 228.  And do you see student

17  John B?

18  A.  Yes, sir.

19  Q.  Let's go to the next page.  And go to the next page.  Now,

20  did you ultimately do a whole class in algebra for John B?

21  A.  John B?  Yes, sir.

22  Q.  Let's go to the next page.  And also took biology?

23  A.  Yes, sir.

24  Q.  Let's go to page 234.  235.  I'm sorry.  All still biology

25  classes?

1  A.  Yes, sir.

2  Q.  All for John B?

3  A.  Yes, sir.

4  Q.  Let's go to 237.  This biology class, a lot of lessons here.

5  A.  Yes.

6  Q.  Let's keep going to 239.  Now, you see here we have English

7  9 for John B?

8  A.  Yes, sir.

9  Q.  Is that the same set of lessons that we saw in the English 9

10  class for student Jordan F?

11  A.  Yes.

12  Q.  Did you use the template for both students?

13  A.  Yes, sir.

14  Q.  And let's enlarge down here.  For student Jordan F, I think

15  we saw that The Cask of Amontillado vocabulary took 50 minutes;

16  right?

17  A.  Correct.

18  Q.  For this student it took an hour and 55 minutes.

19  A.  Correct.

20  Q.  Would you change the times?

21  A.  Change the times.  Not all of them, just a few of them.

22  Q.  Okay.  AMONTILLADO)?

23  Q.  Let's go back to page 513.  And we were looking, again, at

24  the report for student Jordan F.  If we could put on the screen,

25  please, -- or add to the screen Government's Exhibit 2000 B and

1 go to page 5. And, sir, is this the actual report for student

2 Jordan F?

3 A.   Yes.

4 Q.   That she was in just a Spanish class?

5 A.   Yes, sir.

6 Q.   And completed about 55 percent of the class?

7 A.   Correct.

8 Q.   Do you see appear English 9 class for this student on the

9 actual report, do you see that she was in an English class?

10 A.   Yes, sir.

11 Q.   On the -- on 2000 B, is there an English class listed there?

12 A.   Could you repeat that question?

13 Q.   Sure.  On this exhibit on the right-hand side, the actual

14 Odysseyware report?

15 A.   Yes, sir.

16 Q.   Do you see an English class?

17 A.   No, sir.

18 Q.   And we've been looking just at the English class, but for

19 this student are there four actual class reports listed?

20 A.   No.  This is fabricated on the left.

21 Q.   Did you fabricate four different classes for her?

22 A.   Yes, sir.

23 Q.   And are those four classes, were any of them real?

24 A.   No, sir.

25 Q.   Okay.  Let's go back to Government's Exhibit 1979.  And

1 let's go back to page 61.  Now let's go to 62.  We saw a moment

2 ago that you were up loading reports to Dr. Collins -- sorry --

3 to Dr. Carter.  Do you see you up loaded four more reports later

4 on September 19th?

5 A.  Yes, sir.

6 Q.  And let's go on to page 65.  And more reports here on

7 October 2nd of 2017?

8 A.  Yes, sir.

9 Q.  Let's go to page 82.  And on October 30th, were you up

10 loading more of these reports to Dr. Carter?

11 A.  Yes, sir.

12 Q.  Was that how you got the reports to Dr. Carter?

13 A.  Yes, sir.

14 Q.  When you gave Dr. Carter these reports, did you give him any

15 instruction about -- any warnings about them?

16 A.  I told him make sure that you deliver a paper copy.  Do not

17 send electronic version or it will have -- they'll be able to --

18 they'll know it's been edited.  As such, that line that we was

19 talking about.  If you had printed it, you would have never saw

20 it.  But if you do a digital copy, you would be able to detect

21 it.

22 Q.  Did you share that information with Rick Carter?

23 A.  Yes, sir.

24 Q.  What did he say?

25 A.  They still had to have it.

```
 1   Q.   Okay.  All right.  Moving on -- well, do you know what he
 2   did with these reports?
 3   A.   He passed them on to Trey Holladay.
 4   Q.   Do you know what Trey Holladay did with them?
 5   A.   He turned them -- supposed to turn them in to the state, and
 6   he was supposed to make a copy, sent it to them, not giving them
 7   the digital format.
 8   Q.   Is that what they told you that they were going to do with
 9   the reports?
10   A.   That's what they told me they would do.
11   Q.   Did Trey Holladay tell you that?
12   A.   He did.
13   Q.   Did Rick Carter tell you that?
14   A.   He did.
15   Q.   All right.  Now, did you continue -- well, we've been
16   talking about the state scrutinizing this program; correct?
17   A.   That is correct.
18   Q.   And that scrutiny occurred during August of 2017; correct?
19   A.   Yes, sir.
20   Q.   And into the fall months of 2017; correct?
21   A.   Correct.
22   Q.   And I at this you think you said yesterday that Trey
23   Holladay told you to cut Lakeside School out of the program at
24   that point.
25   A.   That is correct.
```

1  Q.  Once the state started looking at this, did you-all stop the

2  program entirely?

3  A.  No, sir.

4  Q.  Did the program continue during the 17-18 school year?

5  A.  That is correct.

6  Q.  And I think you said yesterday that during that 17-18 school

7  year, you added Conecuh county schools.

8  A.  That is correct.

9  Q.  Let's look at 1647.  Is this your agreement with Conecuh

10  county schools?

11  A.  Yes, sir.

12  Q.  Let's go to page 4.  Were they going to pay you similar to

13  Athens?

14  A.  Similar.

15  Q.  Do you see $60 per month for a tier one and 200 for a tier

16  two?

17  A.  Correct.

18  Q.  Now, that's more than Athens was paying you; correct?

19  A.  It is.

20  Q.  Did Conecuh have any students who had been in the program

21  the year before?

22  A.  Not that I know of.

23  Q.  So did --

24  A.  Not with me.

25  Q.  Pardon?

1  A.  Not with me.

2  Q.  They were brand new.

3  A.  Yes, they were.

4  Q.  So why is there a reference here, then, to tier one students

5  if Conecuh hadn't been in the program the year before?

6  A.  Because I provided him with a contract.  He was provided

7  with a contract.  I cannot remember if I gave it to him or not,

8  but I'm pretty sure I did.

9  Q.  Who is he?

10  A.  The superintendent at Conecuh county, Dr. Byrd.  I provided

11  him with a contract.  Basically, it was the contract we saw

12  earlier before we dropped -- before they dropped it down to $45

13  per month and 150 per month, we saw this -- that's where --

14  originally was shown to me to be my contract with Athens.  I

15  turned around and sent this contract to him.

16  Q.  All right.

17  A.  And he basically -- his lawyer made him change one or two

18  words, and they'll use it.

19  Q.  Did you ultimately sign this contract?

20  A.  Yes, sir, I did.

21  Q.  Let's look at page 8.  Is that your signature?

22  A.  Yes, sir, it is.

23  Q.  And do you see the Zickeyous Byrd?

24  A.  Correct.

25  Q.  Design it as well?

1  A.  Yes, sir.

2  Q.  Did you have much to do with Ed Op -- I'm sorry -- with

3  Conecuh county during the 17-18 school year?

4  A.  No, sir.

5  Q.  Who -- did you have much to do with Abbeville Christian

6  during the 17-18 school year?

7  A.  No, sir.

8  Q.  Who dealt with Abbeville Christian?

9  A.  Webb and Ms. Holladay, Deborah Holladay.

10  Q.  And the students from Abbeville Christian, were they

11  enrolled in the Conecuh county -- or listed in the Conecuh

12  county system?

13  A.  Yes, sir.  They was enrolled with them.

14  Q.  Did Abbeville Christian receive payments from Webb during

15  the 17-18 school year?

16  A.  Yes, they did.

17  Q.  Did you pay Abbeville Christian's teachers?

18  A.  I did.  One semester I did.

19  Q.  Okay.  And did you invoice Conecuh county throughout the

20  school year?

21  A.  I gave them one invoice.  I mean, it took them about three

22  or four months to pay.  And I give another invoice, and they

23  paid me that summer.

24  Q.  Let's look at 1220 A.  Do you see here an I mail from you to

25  Zickeyous Byrd?

1  A.  Yes, I do.

2  Q.  What's the subject?

3  A.  Ed Op invoice.

4  Q.  What's the date?

5  A.  The date is December 18th, 2017.

6  Q.  All right.  Let's go to 1220 B.  Is this the invoice to

7  Byrd?

8  A.  Yes, sir, it is.

9  Q.  Do you see quantity here?

10  A.  Yes, sir.

11  Q.  How many students did you have with Conecuh?

12  A.  117.

13  Q.  And how much money were you asking for?

14  A.  $7,020.

15  Q.  Did you ultimately get paid for this invoice?

16  A.  For this invoice, yes, sir, I did.

17  Q.  Let's look at 2144.  And do you see here a deposit?

18  A.  Yes, sir, I do.

19  Q.  And this bank, is this the same bank that you had been

20  depositing checks in previously?

21  A.  No.  I was with regions, and I went to first state bank.

22  Q.  Is first state bank a local bank in north Alabama?

23  A.  It's what they call a home grown bank that has about four or

24  five branch banks.

25  Q.  What caused you to change from regions to First State?

1  A.  Well, they give me a $75,000 loan.  And they were personable

2  and they weren't a big bank -- a big bank is very hard to deal

3  with as a small business.  They very tough.  The smaller banks

4  will work with you.

5  Q.  Did anyone suggest that you should deal with first state

6  bank?

7  A.  Yes, sir.

8  Q.  Who suggested it?

9  A.  Trey Holladay.

10 Q.  All right.  So let's go to page 2 on this exhibit.  Do you

11 see here the check from Conecuh county?

12 A.  Yes, I do.

13 Q.  Is that the same amount as requested on the invoice?

14 A.  It is.

15 Q.  Now, the invoice, you sent it on December 18th of '17;

16 correct?

17 A.  That's correct.

18 Q.  What's the date on this check?

19 A.  It looks like -- sorry -- it is December 7, 2018.

20 Q.  Let's enlarge that check date section. .  Is it December 7th

21 or February 7th?

22 A.  That's February 7th.

23 Q.  All right.  So were about two months late in paying you?

24 A.  Yes.  They were kind of -- they were a little bit behind.

25 Q.  Okay.

1  A.  This is actually my first payment, and I was -- I think -- I

2  just went about three months and I guess better -- lack of a

3  better term, I let them slide, and then that was my first

4  invoice.  I think you have documentation, emails, but I knew

5  they was having financial difficulty.

6  Q.  The school system?

7  A.  Yes, sir.  Or they appeared to have financial difficulty.

8  Q.  All right.  Now, we talked about adding Abbeville and the

9  Abbeville students were under Conecuh in the 17-18 school year;

10  correct?

11  A.  That is correct.

12  Q.  And we said that the state department's inquiry started at

13  the start of that school year; correct?

14  A.  That's correct.

15  Q.  After the state department inquiry began, was there another

16  private school that -- a new private school that came in in

17  17-18 with Athens?

18  A.  I don't know if they actually got in.  It was -- I was there

19  as the technical person.  I'm pretty sure you're referring to --

20         MR. FUNK:  I'm going to object.

21  A.  It's unresponsive, and I think he's guessing and assuming.

22  Needs a foundation for his knowledge.

23         MR. ROSS:  Your Honor, I can proceed.

24         MR. FUNK:  Thanks.

25         THE COURT:  Rephrase.

1  Q.  Mr. Corkren, what school do you think was associated with

2  Athens that school year?

3  A.  Marion academy.

4  Q.  All right.  Was there a school in Selma that you had

5  dealings with?

6  A.  Yes.  Meadowview Christian.

7  Q.  All right.  Who recruited Meadowview Christians?

8  A.  Webb Tutt.

9  Q.  Did you deal with them at all?

10  A.  Yes, I did.

11  Q.  Where was that school located?

12  A.  Selma, Alabama.

13  Q.  Mr. Corkren, could you find Meadowview Christian on the map?

14  A.  Yes, sir.

15      MR. ROSS:  Your Honor, may the witness step down?

16      THE COURT:  Yes.

17      MR. ROSS:  Well, hang on, before you come.  Mr. Green,

18  could we switch the system.  And Mr. Corkren, have you seen this

19  symbol before.

20  A.  If I have, I don't remember it.

21  Q.  Okay.  Could you put the placard that I'm giving you

22  approximately where Meadowview Christian it located.  Of?

23  A.  Right here.

24  Q.  Thank you.  For the record, the witness has put the placard

25  at about Selma, Alabama.

```
 1           Mr. Corkren, did you receive enrollment information on
 2   Meadowview Christian.
 3   A.   Yes, I did.
 4   Q.   And could we switch the system again and let's pull up 1035
 5   A.   What are you looking at here, sir?
 6   A.   I'm looking at an email from Deborah Holladay to myself.
 7   Q.   What's the subject?
 8   A.   Subject is enrollment for Meadowview Christian school.
 9   Q.   And what's the date?
10   A.   The date is August 28th, 2017.
11   Q.   What were you supposed to do with this enrollment
12   information?
13   A.   Send it to Athens.
14   Q.   Let's look at 1035 B.  Is this the enrollment roster for
15   those students?
16   A.   That is correct.
17   Q.   All right.  Did you also enter -- you remember the
18   independent contractor agreements that we saw yesterday?
19   A.   Yes, sir.
20   Q.   Did you receive independent contractor agreements from the
21   teachers at Meadowview?
22   A.   Yes, I did.
23   Q.   Let's look at 988A.  Is this -- do you see an email here?
24   A.   Yes, sir.
25   Q.   Who is it from?
```

1  A.  From Webb Tutt.

2  Q.  To whom?

3  A.  To myself.

4  Q.  All right.  Let's look at 988 B.  Well, is there an

5  attachment?

6  A.  There is an attachment, and it's on the bottom.

7  Q.  And what's the date on this?

8  A.  The date is August 17th, 2017.

9  Q.  Is that right around the time that we were looking at

10  yesterday that the state department started -- or that you got

11  correspondence from Dr. Holladay about the state department's

12  inquiry?

13  A.  Yes, sir, it is.

14  Q.  All right.  Let's go to 988 B.  What are we looking at here,

15  sir?

16  A.  We're looking at a teacher contract for that independent

17  contractor.

18  Q.  This teacher here, would you see completed by Gloria chance?

19  A.  Correct.

20  Q.  Where was Gloria chance employed?

21  A.  At Meadowview Christian.

22  Q.  Let's go to page 2.  Is this the rest of the contract?

23  A.  Yes, sir, it is.

24  Q.  Let's go to page 3.  Did this person sign this agreement?

25  A.  That is correct.

1  Q.  Let's go to page 4.  Did you receive one also for Iris Lynn

2  Davis?

3  A.  Correct.

4  Q.  Let's go to page 7 -- yes, page 7.  Did you receive one also

5  for Katie McIntyre?

6  A.  That is correct.

7  Q.  Go to page 10.  And from Misty Wilborne?

8  A.  Correct.  Yes, sir.

9  Q.  Page 13?

10  A.  Yes, sir (WILBORNE).

11  Q.  Did you receive one for Penny Tyle?

12  A.  Yes, sir.

13  Q.  And let's go to page 16?

14  Q.  Did you receive one for J Hamilton?

15  A.  Yes, sir.

16  Q.  These agreements that were sent to you, did you ever meet

17  any of these people?

18  A.  Maybe one or two, but not before this.

19  Q.  Did you ever tell any of these folks what to do?

20  A.  No, sir.

21  Q.  Did you ever oversee their instruction?

22  A.  No, sir.

23  Q.  Did you have anything to do with these folks at all?

24  A.  No, sir.

25  Q.  All right.  Let's look at 989 A.  Did Webb also send you a

1 second batch of contracts?

2 A. Yes, sir.

3 Q. And we won't go through each one, but let's look at 989 B.

4 Go to page 2. See one here for Betty Butler?

5 A. Yes, sir.

6 Q. Did you get a contract here for every -- for almost all the

7 teachers at Meadowview?

8 A. Correct.

9 Q. Did you consider these teachers Ed Op employees?

10 A. No, sir.

11 Q. Did you receive -- did you consider them Ed Op independent

12 contractors?

13 A. No, sir.

14 Q. What was the purpose of all these contracts?

15 A. To act like I had teachers and to be able to use them with

16 testing.

17 Q. Who had told you to get these contracts?

18 A. Trey Holladay.

19 Q. Did you send -- did you give Meadowview access to

20 Odysseyware?

21 A. Yes, sir.

22 Q. Let's look at 1034 A. Do you see here Odysseyware user

23 names sent to Rhonda barns?

24 A. Correct.

25 Q. Who is Rhonda Barnes?

1  A.  She worked at Meadowview Christian.

2  Q.  Did you -- at some point did you start to include the

3  Meadowview students in your invoices to Athens?

4  A.  I cannot recall the exact time, but I did include them

5  eventually.

6  Q.  Was it your understanding that these students would be

7  enrolled in Athens Renaissance School?

8  A.  Yes, sir.

9  Q.  And was Meadowview a new school added during the 17-18

10  school year?

11  A.  That is correct.

12  Q.  Added after the state started to ask questions?

13  A.  That is correct.

14  Q.  Let's look at Government's Exhibit 1151 A.  And you see your

15  invoice to Rick Carter?

16  A.  Yes, I do.

17  Q.  Dated November 2nd of '17?

18  A.  That is correct.

19  Q.  So this is part of the second year of the program; correct?

20  A.  Yes, sir.

21  Q.  And let's go first to 1151 B.  Now, how many students do you

22  have here?

23  A.  734.

24  Q.  Is this list broken out into tier one and tier two students?

25  A.  No, sir.

1  Q.  Did you bill for all of them at a rate of 150?

2  A.  Correct.

3  Q.  Now, the Meadowview students, had you provided services to

4  them during the previous school year?

5  A.  No, sir.

6  Q.  To your knowledge, would Athens have received payment from

7  the state for those students?

8  A.  They were not supposed to.

9  Q.  So why, then, did you not break them out into -- and bill

10 for them at a separate rate?

11 A.  That was my instructions per Mr. Holladay.

12 Q.  To bill for everyone at 150?

13 A.  Yes.

14 Q.  Let's look at Government's Exhibit 1151 C.  And, sir, do you

15 see -- let's look at 1151 C, and let's also bring up -- I'm

16 sorry.  Let's also bring up 1035 B.  And let's go to page 3 on

17 1035 B.  Now, do you see here, sir, students on the Meadowview

18 student list, student Kaylee Brooke H?

19 A.  Yes, I see it.

20 Q.  And going back to 1151 C, let's go to page 7.  And do you

21 see on page 7 student Kaylee Brooke H?

22 A.  Yes, sir, I do.

23 Q.  Was this student included on your invoice a Meadowview

24 student?

25 A.  Yes, sir.

1  Q.  Do you see student Baylee H on your invoice?

2  A.  Yes, sir.

3  Q.  Let's go to page 4 on 1035 B?

4        THE COURT:  Counsel, could I interrupt you a second?

5  Could I just see you over here?  This does not need to be on the

6  record.  And probably Ms. LaCour.  I don't need all of you.

7  Just a couple of you.

8     (Brief pause in the proceedings)

9  BY MR. ROSS:

10  Q.  Did you include Meadowview students on your invoice?

11  A.  Yes, sir, I did.

12  Q.  Did you alert -- well, you see here that this is -- this

13  invoice is November 2nd of 2017?

14  A.  Would you please repeat that?

15  Q.  Sure.  Let's take down the list of Meadowview students, and

16  let's go back to 1151 A.

17        THE COURT:  Counsel, just a minute.  Let me see you

18  again.  Sorry.  Something else popped into my head.

19     (Brief pause in the proceedings))

20  Q.  All right.  Looking at 1151 A, do you see the date on this

21  is November 2nd of 2017?

22  A.  Yes, sir, I do.

23  Q.  And this is the invoice for October of 2017?

24  A.  That is correct.

25  Q.  Was this the first time that you had included the Meadowview

1 students in your invoices to Athens?

2 A. Yes, sir.

3 Q. Had you included them the previous month?

4 A. No, sir.

5 Q. Let's go to 1072 A. Do you see this is your invoice for

6 September of '17?

7 A. Yes, sir, I see it.

8 Q. And sent to Dr. Carter on 9/26/17?

9 A. Correct.

10 Q. Let's look at 1072 C. And go to page 7. And, sir, if --

11 let's enlarge the HA's there. Do you remember when we were

12 looking at student [] Kailey, and her name was HA. Do you

13 remember that?

14 A. Yes, I do.

15 Q. Do you see that student on your September invoice?

16 A. No, sir.

17 Q. So November 2nd was the first time that the Meadowview

18 students were billed for; correct?

19 A. That's correct.

20 Q. Did you tell Dr. Carter beforehand that you were going to

21 start including the Meadowview students?

22 A. Yes, sir.

23 Q. Let's look at Government's Exhibit 1142 A.

24 Q. Do you see here an email?

25 A. Yes, sir.

1  Q.  Who is this email to?

2  A.  To Rick Carter.

3  Q.  Who is it from?

4  A.  From myself.

5  Q.  What's the date?

6  A.  November 1st, 2017.  Is that the day before you sent the

7  invoice to Dr. Carter.

8  A.  Yes, sir.

9  Q.  And what is the subject?

10  A.  Student list.

11  Q.  Let's look at Government's Exhibit 1142 B.  And this list of

12  students, where were these students in school?

13  A.  Meadowview Christian.

14  Q.  Do you see that student Kaylee HA?

15  A.  Yes, sir, I do.

16  Q.  And do you see that student bail Lee HO?

17  A.  Yes, I do.

18  Q.  Did you talk on the phone with Dr. Carter about this list?

19  A.  Yes, sir.

20  Q.  Let's pull -- go back and pull up 1142 A and add on the

21  screen 2004.  And if we could have 2004, and go to page 203.

22  And let's enlarge the top portion here.  And do you see, sir,

23  that at 4:07 in the afternoon on November 1st, Dr. Carter called

24  you.

25  A.  Correct.

1 Q.  And y'all spoke for six minutes.

2 A.  Yes, sir.

3 Q.  So ending at 4:13 p.m.

4 A.  Yes, sir.

5 Q.  And at 4:17 p.m., Dr. Carter called you again.

6 A.  Yes, sir.

7 Q.  4:17 would be after you sent this student list.

8 A.  Correct.

9 Q.  Did you tell Dr. Carter you were going to start including

10 the Meadowview students in your invoice?

11 A.  Yes, sir.

12 Q.  And what did he say?

13 A.  I do not recall that.

14 Q.  The next day did you send an invoice with the Meadowview

15 students?

16 A.  Yes, sir, I did.

17 Q.  All right.  Now, at some point after you started including

18 these Meadowview students, did you receive any instruction to

19 take some of them out?

20 A.  Yes, I did.

21 Q.  Let's look at 1192 A.  Do you see an email here from

22 Dr. Carter?

23 A.  Yes, I do.

24 Q.  Who is it to?

25 A.  It's to myself.

1  Q.  And what's the subject?

2  A.  Subject is withdrawal.

3  Q.  What's the date?

4  A.  November 28th, 2017.

5  Q.  What does he write in here?

6  A.  The following listing is for withdrawal.

7  Q.  Now, we talked yesterday.  You said that you would tell

8  Dr. Carter when a student was withdrawing; correct?

9  A.  That is correct.

10  Q.  The schools would tell you and then you would give that

11  information to Dr. Carter; correct?

12  A.  That is correct.

13  Q.  Why here, then, is Dr. Carter telling you what students are

14  withdrawing?

15  A.  The students had special Ed -- let's see if -- proper

16  term -- there were special Ed students, I think.

17  Q.  Let's look at 1192 B.  Was this the attachment to that

18  email?

19  A.  Yes, that is correct.

20  Q.  These students, where did these all go to school?

21  A.  All go to school at Meadowview.

22  Q.  And what does it say here next to the message?

23  A.  Transfer of in-state special Ed records.

24  Q.  Were these all special education students?

25  A.  According to this, yes.

Q.  Why would you need to pull out the students that had

transfer of in-state special education records?

A.  Because he was going to have to start servicing these

special Ed students.

Q.  What do you mean by servicing?

A.  He was going to have to send special Ed teachers down there

to accommodate their IEP's.

Q.  Let's look at 1192 B, and let's keep this on the screen --

I'm sorry.  Scratch that.

        Did you -- well, let's pull up 1201.  Did you receive

another email from Dr. Carter.

A.  Yes, sir.

Q.  This one a few weeks after the one we just saw?

A.  Could you repeat that?

Q.  Is this email just a few weeks after the ones that we saw a

second ago?

A.  Yes, sir.

Q.  What's the subject of this email?

A.  Students withdrawn to Meadowview academy.

Q.  And what did he write in the text?

A.  The following students have been withdrawn and are returning

to their private school, Meadowview.

Q.  And let's keep this 1201 on the screen, and let's add

Government's Exhibit 1192 that we were looking at a moment ago.

Sir, do these lists appear to match?

1  A.  Yes, sir.  Perfectly.

2  Q.  Well, are there a few extra students on 1201 than there

3  were -- do you see 1192 ends with student Sarah T?

4  A.  Correct.

5  Q.  And on 1201 also includes students Estella R, Zlata R, and

6  Artem D?

7  A.  Correct.

8  Q.  Otherwise do they match?

9  A.  Do the lists match.

10  A.  Other than that, correct.  Yes.

11  Q.  What was Dr. Carter sending you this list a second time

12  (ARTEM, ZLATA, ESTELLA.  And if you don't know --

13  A.  I don't know.

14  Q.  Were you supposed to continue billing for these students?

15  A.  No.

16  Q.  Were these students supposed to stop having access to

17  Odysseyware?

18  A.  Are they supposed to, correct.

19  Q.  So they could keep -- they were not supposed to be able to

20  use Odysseyware anymore after this?

21  A.  They were not -- at this time when we disenrolled them,

22  they're not part of the program, so they're not supposed to use

23  Odysseyware.

24  A.

25  Q.  Did you go in and delete their Odysseyware accounts?

1  A.  No, sir.

2  Q.  Why not?

3  A.  I was not instructed to.

4  Q.  Okay.  Did you stop billing for these students after this?

5  A.  I cannot recall that.  SARA, TEPPER).

6  Q.  Let's look at Government's Exhibit 1224.  Did Dr. Carter

7  send you the list a second time?

8  A.  Yes, sir.

9  Q.  And what -- on December 20th of 2017?

10  A.  That is correct.

11  Q.  Let's put on the screen 1201 and 1224 together.  Now, the

12  list sent on December 6th of '17, did he name Meadowview?

13  A.  What was the question, please?

14  Q.  On this first list, December 6th of 2017, does it explicitly

15  say Meadowview?

16  A.  Yes, sir, it says Meadowview academy.

17  Q.  What is the -- when he sent you the list again on December

18  20th of '17, does he include the name of Meadowview academy?

19  A.  No, sir.  He put --

20  Q.  What does he say?

21  A.  Selma, Alabama students.

22  Q.  Had these students ever left a private school in Selma,

23  Alabama?

24  A.  No, sir.

25  Q.  Had they remained throughout the school year Meadowview

1  Christian school students?

2  A.  Yes, sir.

3  Q.  During the 17 -- switching gears off of Meadowview, let's

4  talk now about the program at large.  During the 17-18 school

5  year, did you have students from Lakeside during that second

6  year?  Or did you cut -- I think we said yesterday you said you

7  cut them out of the program?

8  A.  Yes, sir.  That was right about the beginning of the school

9  year, of 17-18.

10  Q.  So Lakeside in it in the year two?

11  A.  They were not supposed to be in year two.

12  A.  Correct.

13  Q.  I think you also said you cut Marengo out of the program.

14  Is that right?

15  A.  Marengo academy?

16  Q.  Yes, sir.

17  A.  That's correct.

18  Q.  So did Marengo Academy start the year in the program?

19  A.  Yes, sir, they did.

20  Q.  At some point did they drop out?

21  A.  That is correct.

22  Q.  How about Jackson Academy?  Did you have students from

23  Jackson Academy in it throughout 17-18?

24  A.  Yes, sir.

25  Q.  How about southern academy?

1  A.  Yes, sir.

2  Q.  So those two schools remained throughout the entire school

3  year?

4  A.  Yes, sir.

5  Q.  And you said Lakeside was gone and Marengo dropped out

6  during the year.

7  A.  Correct.

8  Q.  What about Pickens Academy?

9  A.  I want to -- Pickens Academy was kicked out.

10  Q.  Were they kicked out during the school year?

11  A.  During 17-18.

12  Q.  So for part of the year you had Marengo and Pickens and

13  Jackson and southern, and for another part of the year it was

14  just Jackson and southern.

15  A.  Correct.

16  Q.  And you also had Meadowview.

17  A.  Correct.

18  Q.  All right.  During that school year, were any of the

19  students using -- were the students using Odysseyware in the

20  same way that they had used it the previous year?

21  A.  Yes, sir.

22  Q.  Were they using it for supplemental assignments?

23  A.  That is correct.

24  Q.  Let's look at -- let's look at a student -- let's pull up

25  2536 and go to 360.  And do you see here?

1    A.   Yes, sir, I do.

2    Q.   -- I'm sorry.  I gave you the wrong -- let's go to 2537 and

3    go to 360.  My mistake.  All right.  Do you see an Odysseyware

4    report for the 2017-2018 school year?

5    A.   Yes, sir, I do.

6    Q.   For student owe Olivia L?

7    A.   Yes, sir.

8    Q.   And this student, where was she in school?

9    A.   EO 3, that would be Pickens Academy.

10   Q.   How many Odysseyware classes did she take during the 17-18

11   school year?

12   A.   One.

13   Q.   And what was that class?

14   A.   PA economics.

15   Q.   Let's keep this on the screen but let's add 64 K.  Now, do

16   you see an Athens city school class schedule for this student?

17   A.   Yes, sir.

18   Q.   And this US government class, was she taking that in

19   Odysseyware?

20   A.   No, sir.

21   Q.   Algebra with finance.  Was she taking that in Odysseyware?

22   A.   No, sir.

23   Q.   Forensic crime scene investigation.  Was that being taken on

24   Odysseyware?

25   A.   No, sir.

1 Q. All right. So was Odysseyware the same in year two as it

2 was the previous year?

3 A. Yes, sir.

4 Q. Now let's talk about your -- the number of schools changing.

5 You said yesterday that the bookkeeper at Marengo affirmatively

6 identified some of the students as being Marengo students;

7 correct?

8 A. Yes, sir.

9 Q. And who did she -- who was she on the phone with when she

10 did that?

11 A. Dr. Carter.

12 Q. After that occurred, did Dr. Holladay give you any

13 instruction about what to do with Marengo?

14 A. He did, but I do not recall the specifics, what he said at

15 this moment.

16 Q. Did you get the idea that you were supposed to cut them out

17 of the program?

18 A. That is correct.

19 Q. Let's look at Government's Exhibit 1191. Now, you see here

20 an email from Rick Carter to Britney Carter?

21 A. Yes, sir, I do.

22 Q. And did you receive this email?

23 A. Yes, I did.

24 Q. Were you blind copied?

25 A. Yes, I was.

1  Q.  Do you know who Britney Carter is?

2  A.  No, sir.

3  Q.  What's the date on this email?

4  A.  November 28th, 2017.

5  Q.  And what does it say in the text?

6  A.  Britney, take a look at this list of 2016-17 virtual

7  students below and check in our Chalkable for their enrollment.

8  If they are still listed with us then pull them out back to

9  August so they are not in our ADM count for 17-18.

10  Q.  This list of students, have we seen it before?

11  A.  Yes, sir.

12  Q.  Do you know where these students went to school?

13  A.  Marengo academy.

14  Q.  Keep this on the screen and let's add 1046.  Is this the

15  same list that Dr. Carter sent you on September 6th of 2017?

16  A.  Yes, sir, it is.

17  Q.  And was this the same list that you had used to create those

18  first Odysseyware reports that you created?

19  A.  Yes, sir.

20  Q.  So Dr. Carter had this list September 6th of '17?

21  A.  That is correct.

22  Q.  September 6th of 2017, is that within the 20-day period

23  after Labor Day?

24  A.  It would be about that time.

25  Q.  So if these students were removed from the system on

1  September 6th of 2017, would they have been in the -- in there

2  for funding purposes?

3  A.  They would not be.

4  Q.  Two, almost three months later, is after that 20-day period;

5  correct?

6  A.  Correct.

7  Q.  Same list here; right?

8  A.  Correct.

9  Q.  And it was only on November 28th of '17 that Dr. Carter was

10  instructing that these students be removed; correct?

11  A.  That is correct.

12  Q.  What were you supposed to do with this information?  When

13  you received Government's Exhibit 1191, what were you to do?

14  A.  If I had received this, I was supposed to take them off my

15  roll when I was invoicing.

16  Q.  All right.  Now let's go to -- take down 1046 and just look

17  at 1191, and let's go to page 2.  Would you agree, sir, that

18  there are about 38 students listed here?

19  A.  Yes, I would.

20  Q.

21        MR. ROSS:  Your Honor, I'm having some technical

22  difficulties with the screen, but I'll keep going.  Pair.

23  Q.  Were these all of the students Marengo?

24  A.  No, sir.

25  Q.  Do you know what was significant about these particular

1  students?

2  A.  These would be the students that Dr. Carter asked Ms. Sealy

3  Martin if they were enrolled, and she said yes.

4  Q.  Do you know how he picked out these particular students to

5  ask Ms. Sealy Martin about?

6  A.  No, sir, I don't.

7  Q.  So at this point, were you supposed to pull just these 38

8  students ought of the out of the system?

9  A.  Yes, sir.

10  Q.  At some point were you told to pull more Marengo students

11  out?

12  A.  Yes, I was.

13  Q.  Let's look at 1223 A.  All right.  Do you see an email,

14  December 20th of 2017?

15  A.  Yes, I do.

16  Q.  Who is this email from?

17  A.  Rick Carter.

18  Q.  And what did he write in the subject line?

19  A.  Marengo academy identified students.

20  Q.  What does he say in the text?

21  A.  The following students is a been confirmed as reenrolling

22  into a private school.  ARS has withdrawn them from ACS

23  enrollment.  Contact me at your earliest convenience if you have

24  any questions or concerns.

25  Q.  Now, again, sir, did these -- well, before we do that, let's

1  look at 1223 B.  And let's go to page 2.  Let's go to page 3.

2  Were these all of the students at Marengo Academy?

3  A.  That appears to be all of them, the ones remaining.

4  Q.  The students at Marengo, had they ever left Marengo Academy?

5  A.  No, sir.

6  Q.  Let's go back to page 1 of 1223 B.  And let's pull up -- and

7  let's add 236 A.  Remember we looked at this back on Wednesday.

8  Do you recall?

9  A.  Yes, I do.

10  Q.  Do you remember this was an email that you sent -- or that

11  Dr. Carter sent to you on May 24th of '16?

12  A.  Yes, sir.

13  Q.  And I think you said on Wednesday that this was after you

14  had gone in and straightened out the rolls.

15  A.  Correct.

16  Q.  And what's the subject line of this -- what's the name of

17  the attachment that Dr. Carter sent to you way back in May of

18  2016?

19  A.  Marengo Academy, the document.

20  Q.  Let's go to 236 B.  Now, was this the attachment that

21  Dr. Carter sent to you back in May of 2016?

22  A.  Yes, it was is there and do you see on this attachment

23  McKenzie A.

24  A.  Yes.

25  Q.  On 1223 B, that Dr. Carter sent you on December 20th of

1  2017, do you see McKenzie A at Marengo Academy?

2  A.  Yes, I do.

3  Q.  On 236 B do you see student Savannah A?

4  A.  Yes.

5  Q.  Do you see that student on 1223 B?

6  A.  Yes, I do.

7  Q.  Do you see student Marianna E on 236 B?

8  A.  Yes, I do.

9  Q.  And is that student also on 1223 B?

10 A.  Yes, they are.

11 Q.  Mr. Corkren, is it fair to say that at least in May of 2016,

12 Dr. Carter knew where these children went to school?

13 A.  Yes, sir.

14 Q.  And had these children unenrolled from Marengo Academy

15 during the time between May of '16 and December of '17?

16 A.  Correct.

17 Q.  Had they actually stopped going to Marengo Academy during

18 that time (MARIANNA)?

19 A.  No, sir.

20 Q.  Have you sent Dr. Carter anything that would led him to

21 believe that these students had stopped attending Marengo during

22 that time period?

23 A.  No, sir.

24 Q.  Do you have any idea why it wasn't until December of 2017

25 that Dr. Carter sent you this document saying that the students

1  were at Marengo Academy?

2  A.  That was -- it would be -- I don't have any concrete

3  information why.  It would be a pure guess.

4  Q.  All right.  After you received this list, did you stop

5  including the Marengo Academy kids in your invoices?

6  A.  Yes.

7  Q.  And did you stop providing services to Marengo Academy?

8  A.  Correct.

9  Q.  Did you stop paying them?

10  A.  Correct.

11  Q.  Did you continue to use the hub in Linden after December of

12  2017?

13  A.  I had cannot remember that.

14  Q.  All right.  Now, I think you said a while ago that there was

15  a second -- we've said Lakeside dropped out at the beginning of

16  the year; correct?

17  A.  Correct.

18  Q.  And you said Marengo cut out in December of 2017.

19  A.  That's correct.

20  Q.  Was there another school that got cut from the program

21  during the 17-18 school year?

22  A.  Pickens Academy.

23  Q.  All right.  Who first told you to cut Pickens Academy out of

24  the program?

25  A.  Trey Holladay.

1  Q.  Why did he want you to cut Pickens out of the program?

2  A.  They were identified by the state as being private school

3  students, and they would not -- they were not going to do what

4  he told them to do.

5  Q.  Did he ask you anything about Trip Sanders?

6  A.  Yes, he did.

7  Q.  What did he ask you about Trip Sanders?

8  A.  He asked me if he he would do what he told him as far as the

9  state had sent a letter out asking if they had -- was enrolled

10  with Athens city schools, and he wanted to know if Trip Sanders

11  would not reply to that letter and I told him, no, Trip Sanders

12  will reply to it.  I said, he's a straight up guy.  And he's not

13  going to -- he's not going to do what you -- he's going to do

14  what the letter says.

15  Q.  And how did trip get along with Webb?

16  A.  Confrontational.

17  Q.  And so did you stop paying Pickens at some point during the

18  school year?

19  A.  Yes, sir.

20  Q.  Did you continue to send invoices to Athens during the 17-18

21  school year?

22  A.  Yes, I did.

23  Q.  Let's look at Government's Exhibit 909 A.  All right.  Is

24  this an invoice that you sent to Dr. Carter?

25  A.  Yes.

1  Q.  What's the date on it?

2  A.  It is July 27, 2017.

3  Q.  And would this be after that new contract was entered?

4  A.  It would be.

5  Q.  All right.  Let's look at 909 B.  How many students were you

6  billing for now?

7  A.  911.

8  Q.  At what rate?

9  A.  150.

10  Q.  So how much money were you asking for?

11  A.  $136,650.

12  Q.  And was that the new rate that you had?

13  A.  That would be the new rate for a second year school.

14  Q.  And let's look at 909 C.  And was this the attachment to

15  that first -- or to the July of 2017 invoice?

16  A.  Yes, sir.

17  Q.  Is the list of students still broken up by school?

18  A.  It is.

19  Q.  All right.  Did you receive payment in response to this

20  invoice?

21  A.  Yes, sir.

22  Q.  Let's look at 2137.  And is this a deposit ticket?

23  A.  That is correct.

24  Q.  Let's go to the next page.  And did you receive a check

25  dated July 31st of 2017 in the amount of $136,650?

1  A.  Yes, I did.

2  Q.  From Athens city schools?

3  A.  That is correct.

4  Q.  Let's go to 1026 A.  Is this your invoice to Athens for

5  August of '17?

6  A.  Yes, it is.

7  Q.  And did you send this to Dr. Carter?

8  A.  Yes, I did.

9  Q.  Now, the date there, August 24th of '17, let's keep this on

10  the screen but let's also pull up Exhibit 1592 B at page 3.

11  1592 B as in boy.  B as in boy.  I'm sorry.  And if we could go

12  to page 3.  All right.

13  Q.  What is the date on this letter from the state

14  superintendent to Dr. Holladay?

15  A.  August 17th, 2017.

16  Q.  And so would this invoice have come after the letter from

17  the state superintendent to Dr. Holladay?

18  A.  Yes.

19  Q.  Let's look at 1026 B.  And you can take 1592 off.  This

20  list, is it broken up by EO anymore?

21  A.  No, it is not.

22  Q.  Why did you stop separating the students out by their

23  private school?

24  A.  Because you could clearly see Pickens Academy was still

25  listed, and I was instructed not to drop them from the invoice.

1  Q.  Let's pull up 909 C and add that to the screen, please.  And
2  let's go to page 4, please.  Go to page 5.  I'm sorry.  Go to
3  page 2.  Let's try page 6.  Sorry.  Okay?
4  Q.  Now, Mr. Corkren, do you see that your invoice in July
5  included EO 4?
6  A.  Yes, sir.
7  Q.  And E O 4 was what school?
8  A.  Pickens Academy.
9  Q.  EO 4 was Pickens Academy?
10 A.  I'm sorry.  That's Eufaula.  The Lakeside School.
11 Q.  Was that the school that had sent records to the state
12 department in August of  -- the summer of 2017?
13 A.  Yes, it was.
14 Q.  All right.  Now, your invoice in August of '17, did it
15 include the Lakeside School students?
16 A.  Yes, sir.
17 Q.  It did?  So student Ann a A, is she included on 1026 B?
18 A.  Yes, sir.
19 Q.  Where?
20 A.  The one on the right, what is that, again?
21 Q.  Looking at the one on the right, is this the invoice that
22 you sent in July of 2017?
23 A.  Yes, sir.
24 Q.  In August of 2017, how many students did you have?
25 A.  Total of 712.

1  Q.  Is that fewer than you had had in July?

2  A.  Yes.

3  Q.  I think in July we saw 909; correct?

4  A.  Yes.  911?

5  Q.  Let's go to page 5 of '90 9 C.  Yes.  911?

6  A.  Correct.

7  Q.  And 712 on 1026 B; correct?

8  A.  Correct.

9  Q.  So you had lost 199 students; correct?

10 A.  That's correct.

11 Q.  Now let's go to page 6.  Do you see student Ann a A on the

12 August invoice?

13 A.  No, sir.

14 Q.  Do you see student name I son A on the August invoice?

15 A.  No, sir.

16 Q.  Do you see student Sohani A on the August invoice?

17 A.  No, sir.

18 Q.  Browning A?

19 A.  No, sir.

20 Q.  Had you removed the Lakeside School students by the time the

21 next invoice rolled around?

22 A.  Yes, sir (SOHANI).

23 Q.  And by the time the next invoice rolled around, had you

24 stopped separating the students out by private school?

25 A.  That's correct.

1 Q. Who had told you to remove the like Lakeside School

2 students?

3 A. I cannot remember that, but I got instructions to do that.

4 Q. Who would have given you those instructions?

5 A. That would have been Trey.

6 Q. All right. We've already seen that you added the Meadowview

7 students; correct?

8 A. Yes, sir.

9 Q. Let's look at 1151 A again. And this October 2017 invoice;

10 correct?

11 A. Yes, sir.

12 Q. Let's look at 1151 B. And by now, in October, was the

13 number up to 734?

14 A. 734. Correct.

15 Q. And did that include the Meadowview students?

16 A. Yes, sir.

17 Q. Let's go now to 1193 A. And do you see down at the bottom

18 here that you sent an invoice to Dr. Carter?

19 A. Correct.

20 Q. And then Dr. Carter forwarded an invoice to a certify reason

21 a Owsley?

22 A. Correct.

23 Q. What was the subject of the message that you sent to

24 Dr. Carter?

25 A. Invoice corrected.

1   Q.   And what's the date?

2   A.   The date is November 28th, 2017.

3   Q.   What does Dr. Carter say here in the text of his email to

4   Ms. Owsley?

5   A.   Corrected sheet minus 38 confirmed Marengo students.  They

6   are not in our 17-18 ADM.

7   Q.   Who were these 38 Marengo students?

8   A.   Those were the 38 that was confirmed by telephone call by

9   Dr. Carter to the secretary or bookkeeper, Amy Sealy Martin at

10  Marengo academy.

11  Q.   And were those the ones on that email, the multiple emails

12  that we've seen?

13  A.   Correct.

14  Q.   All right.  And do you know whether those students were, in

15  fact, on the ADM for 17-18?

16  A.   Which students, please?

17  Q.   Doesn't matter.  It does not matter.

18            Had you had to resubmit this invoice.

19  A.   Yes, sir.

20  Q.   Let's go to 1193 C.  And was this the list that you had

21  attached to the resubmitted invoice?

22  A.   Yes, sir.

23  Q.   And had you removed those 38 students?

24  A.   Yes, sir.

25  Q.   So let's add to the screen, please, Government's Exhibit

1  1191.  And student bow Brayden A, is that student included

2  anymore?

3  A.  No, sir.

4  Q.  Student land done A, is that student include?

5  A.  No, sir.

6  Q.  So had you taken those students out?

7  A.  I had taken them out.

8  Q.  All right.  And then we saw a moment ago that in December,

9  on December 20th of '17, Dr. Carter told you to remove all of

10  the Marengo students; correct?

11  A.  Correct.

12  Q.  Now let's look at 1225 A.  Did you remove all the Marengo

13  students by the time you sent the invoice on January 3rd of '18?

14  A.  Yes, sir.

15  Q.  Let's look at 1225 C.  And how many students are you down to

16  at this point?

17  A.  590.

18  Q.  Is that significantly less than you had the previous year?

19  A.  Almost half.

20  Q.  Is that after you had taken out the Lakeside students?

21  A.  Correct.

22  Q.  And the Marengo students?

23  A.  Correct.

24  Q.  And the Pickens students?

25  A.  Correct.

1  Q.  All right.  Could we go back to Government's Exhibit 1193 A

2  for just a moment.

3          THE COURT:  Counsel, I was just adding up our time.  We

4  started a little after 8:30th morning, and as I said, we're

5  going to go until 11:30.  That would be three hours; right?

6          MR. ROSS:  Yes, Your Honor.

7          THE COURT:  Why don't we take a brief recess now rather

8  than go the entire three hours.

9      (Recess was taken from 9:59 a.m. until 10:15 a.m., after

10        which proceedings continued with the jury present, as

11        follows:)

12          THE COURT:  Proceed.

13  BY MR. ROSS:

14  Q.  Mr. Corkren, as we continue, could you please make sure to

15  sort of orient your self towards the rest of the room when

16  answering a question after you look at the screen?

17  A.  Yes, sir.

18  Q.  All right.  Now, we were talking about invoices before the

19  break.  Let's shift now to teachers.  Okay?

20  A.  Yes, sir.

21  Q.  We saw a little while ago those contracts between Ed Op and

22  the Meadowview teachers.  Do you recall those?

23  A.  Yes, sir, I do.

24  Q.  At the end of the fall semester in 2017, did you make

25  payments to private school employees?

1  A.  Yes, sir, I did.

2  Q.  Now, during the December of 2016, we saw yesterday you paid

3  Christmas bonuses.  Do you remember that?

4  A.  Yes, sir, I do.

5  Q.  And those were just checks directly to the private schools;

6  correct?

7  A.  Correct.

8  Q.  Did you do the same thing when you paid the employees during

9  the fall of 2017?

10  A.  No, sir.

11  Q.  What did you do when you paid the employees during the fall

12  of 2017?

13  A.  I would calculate how many students they had enrolled with

14  the program.  I would go to the headmaster -- I couldn't keep up

15  with the list of teachers, so the way it was laid out, some

16  people were using Odysseyware, some were not.  Some had more

17  students, some didn't.  It was impossible for me to know exactly

18  how much the amount was for each teacher.  So I would go to the

19  headmaster and say, this is how much money we have to disburse

20  amongst the teachers, and according to what you feel like they

21  deserve, I'm going to leave that up to you.

22  Q.  And did you pay just the teachers who were using

23  Odysseyware?

24  A.  No, sir.

25  Q.  Who all did you pay?

1  A.  Most of the time it was everyone in the school that was

2  employed at that school, including custodians and lunchroom

3  personnel.

4  Q.  Why did you pay everyone employed at these private schools?

5  A.  If that's the way the headmaster wanted to do it, I was

6  willing to do it.  And those teachers agreed.

7  Q.  All right.  Let's look at Government's Exhibit 1218.  Do you

8  see an email from sue is an Bailey?

9  A.  Yes, sir.

10  Q.  Who is it to?

11  A.  To myself.

12  Q.  And who else?

13  A.  Carbon copy to Webb Tutt.

14  Q.  What's the date on it?

15  A.  December 14, 2017.

16  Q.  What's the subject?

17  A.  Subject is names for bonus checks.

18  Q.  And you see a list of names there?

19  A.  Yes, sir.

20  Q.  What does it say down at the bottom of the -- of that list

21  of names?

22  A.  I don't know if you can do anything for them, but school

23  secretary Darlene Arnold and bookkeeper is Linda Middleton just

24  in case you can.  Thanks for doing this.  I know they will

25  appreciate it.

1  Q.  All right.  Let's go now to Government's Exhibit -- let's

2  keep this on the screen and go to Government's Exhibit 11.  And

3  let's go to page 34, please.  Now, sir, do you see on this page

4  a check here to Linda Middleton?

5  A.  Yes, sir, I do.

6  Q.  Is that based on the email from Ms. Bailey?

7  A.  Yes, sir.

8  Q.  And let's enlarge from there down.  Do you see a check to

9  Jacob Webb?

10  A.  Yes, sir, I do.

11  Q.  Was Jacob Webb one of the folks on the list?

12  A.  Yes, sir.

13  Q.  And, again, if you can, please look at me?

14  A.  Yes, sir.

15  Q.  I know it's a lot of turning.  Do you see a check to marry

16  Margaret Powell?

17  A.  Yes, sir.

18  Q.  Was that one of the names on the list?

19  A.  Yes, sir, it is.

20  Q.  Do you see a check to Joe Jones?

21  A.  Yes, sir.

22  Q.  Is that one of the names on the list?

23  A.  Yes, sir, it is.

24  Q.  Do you see that Mr. Jones and Mr. Webb and Ms. Powell

25  received $750 apiece?

```
 1  A.  Correct.

 2  Q.  How much did Ms. Middleton get?

 3  A.  $375.

 4  Q.  So did she get less than the other folks?

 5  A.  Yes, sir.

 6  Q.  Did Ms. Arnold also get less?

 7  A.  Yes, sir.

 8  Q.  Was she the school secretary?

 9  A.  Correct.

10  Q.  Why did you give less to the bookkeeper and to the

11  secretary?

12  A.  That was -- actually, after this email, I showed up and that

13  was what Ms. Bailey and I agreed.  Basically, I took a

14  teacher -- a teacher allotment and split it between the two of

15  them.

16  Q.  I see.  So they each got half of what a teacher would

17  receive?

18  A.  Correct.

19  Q.  And you decided that with Ms. Bailey?

20  A.  Yes, sir.

21  Q.  Is that your handwriting on all these checks?

22  A.  The names are Ms. Bailey's handwriting.  The amount and my

23  name is my handwriting.

24  Q.  So you filled out the checks, and you gave them to

25  Ms. Bailey for her to put names on them?
```

A.  Yes, sir.  She would fill out -- I would show up with a

check, and then I would fill out the amount and then she would

put the names on who was supposed to get it.

Q.  And these teachers that were receiving checks, who did they

work for?

A.  They worked for Jackson Academy.

Q.  Did you also write checks for Southern Academy teachers?

A.  Yes, sir, I did.

Q.  Let's take down 1218 and add Government's Exhibit 92 K on

the left hand side.  If we could add Government's Exhibit 92 K

on the left hand side.  Thank you.  All right.  Now do you see

here a Southern Academy report card?

A.  Yes, sir, I do.

Q.  And on Government's Exhibit 11, let's go to page 42.  All

right.  Now, sir, do you see here on page 42 of Government's

Exhibit 11 a check payable to Cynthia McGill?

A.  Yes, sir, I do.

Q.  Was Cynthia McGill a southern academy teacher?

A.  Yes, sir.

Q.  And let's go back out.  Do you see -- let's go to page 43 of

Government's Exhibit 11.  And do you see a check on page --

enlarge right here.  Do you see a check to Amanda Bovis?

A.  Yes, sir, I do.

Q.  For $1,000?

A.  Correct.

1   Q.  And was she a southern academy teacher?

2   A.  Yes, sir, she was.

3   Q.  Did you write checks to all of the Southern Academy

4   teachers?

5   A.  Yes.

6   Q.  Why did the Southern Academy teachers get $1,000 but the

7   Jackson Academy teachers only got 750?

8   A.  The teacher pupil ratio.  And I cannot recall if it included

9   lunchroom personnel and those people.

10  Q.  Let's pull up Government's Exhibit 2553.  And let's put that

11  on the page -- on one side of the screen along with Government's

12  Exhibit 11 at page 45.  Page 45, please.  All right.  Now, on

13  2553, could we go to page 3.  Now, do you see here Randy

14  McCrory?

15  A.  Yes, sir.

16  Q.  And is he the custodian?

17  A.  Yes, sir.

18  Q.  And let's enlarge that check right there that I've just

19  indicated on 1145.  Do you see a check to Randy McCrory?

20  A.  Yes, sir.

21  Q.  How much did he get?

22  A.  $250.

23  Q.  Let's go back out.  Do you see a Christine Roberts?

24  A.  Yes, sir, I do.

25  Q.  And do you see a check to Christine Roberts?

1   A.   Yes, I do.

2   Q.   How much did she get?

3   A.   $250.

4   Q.   What is her position at southern academy?

5   A.   She is the lunchroom personnel.

6   Q.   Did Ms. Roberts have anything to do with Odysseyware?

7   A.   No, sir.

8   Q.   Did Mr. McCrory have anything to do with Odysseyware?

9   A.   No, sir.

10  Q.   Why did you pay these folks money?

11  A.   That was the amount that Mr. Mickleboro decided he wanted to

12  give them.

13  Q.   All right.  Let's go, actually, to page 4 of 2553.  Did you

14  also pay Wanda Washburn?

15  A.   Yes, sir.

16  Q.   Was she also a lunchroom worker?

17  A.   Yes, sir.

18  Q.   Do you see a check to Ms. Washburn here on page 45 also for

19  $250?

20  A.   Yes, sir.

21  Q.   And did you also pay the teachers from Meadowview?

22  A.   Yes, sir.

23  Q.   Let's look at page 32.  We can take down 2553.  Now, do you

24  see here on page 32 of 1145 a check to a Kim test test?

25  A.   Yes, sir, I do.

1   Q.  Is your Mike completely not working, sir?

2   A.  I'll speak up.  I can get it.

3            THE COURT:  Is it not working?

4            THE COURT:  Is it not working, Anthony?  He didn't have

5   it on.

6            THE COURT:  I just turned 0 off when it stopped

7   working.

8            MR. ROSS:  Mr. Green, could we -- do we have the lapel

9   mic?  Battery is dead.

10           THE COURT:  Is that mic not working?

11           THE COURTROOM DEPUTY:  It's working, Judge.  I need to

12  put another battery in.

13           THE COURT:  Oh, it just needs a battery.  Let's just

14  keep on.

15           THE WITNESS:  I can project.  I'm an old coach.

16  Q.  Do you see a check here to Kim Testes?

17  A.  Yes, sir, I do.

18  Q.  Okay.  Let's look at -- let's keep this on the screen and

19  look at Government's Exhibit 89 B.  You see a Meadowview report

20  card here?

21  A.  Yes, I do.

22  Q.  For student norm a S?

23  A.  Yes, I do.

24  Q.  And is Kim Testas listed as a Meadowview teacher?

25  A.  That is correct.

1  Q.  Why did the Meadowview teachers only get $450?

2  A.  That was determined by the number of students, how much

3  money they had to divvy up, and by the headmaster.

4  Q.  All right.  Was Trey Holladay aware that you were paying

5  these private school teachers?

6  A.  Yes, sir.

7  Q.  Did he direct you to do so?

8  A.  That is correct.  Yes, sir.

9  Q.  Was Rick Carter aware you were paying the private school

10 teachers?

11 A.  Yes, sir.

12 Q.  Did you discuss that with him?

13 A.  Yes, sir.

14 Q.  Did you receive grades from the private schools during the

15 17-18 school year?

16 A.  Yes, sir, I did.

17 Q.  Let's look at Government's Exhibit 1217.  What do you see

18 here, sir?

19 A.  I see an email from Susan Bailey to myself.

20 Q.  What's the date on it?

21 A.  December 14th, 2017.

22 Q.  And could you read the text of the email.

23 A.  Yes, sir.  Greg, Webb met with us today.  I asked him about

24 getting that bonus for my teachers.  Here is my STI information

25 now log in and you can log in from this page.  All grades are

1  supposed to be in STI by Sunday night.  And that was her user

2  name and password.  Webb said he would call you.  I will be in

3  Birmingham from tonight through Sunday evening.  Thanks, Susan

4  Bailey.

5  Q.  So is Ms. Bailey giving you access to the Jackson Academy

6  system?

7  A.  Yes, sir.

8  Q.  Did you log in using her name and password to the Jackson

9  Academy system?

10  A.  Yes, I did.

11  Q.  Once you were in there, could you see all of the grades in

12  the school?

13  A.  Yes, sir.

14  Q.  Did you see all of the attendance records?

15  A.  Yes, sir.

16  Q.  Could you see all of the information about all of the

17  students?

18  A.  All the information they had, I could see.  Yes, sir.

19  Q.  Did you log in to her account?

20  A.  Yes, I did.

21  Q.  And did you print report cards from her account?

22  A.  Yes, I did.

23  Q.  Let's look at Government's Exhibit 2032 C.  Is this a

24  Jackson Academy report card for the fall of 2017?

25  A.  Yes, it is.

1  Q.  And let's enlarge the bottom.  Did you print this on

2  February 16th of 2018?

3  A.  Yes, sir.

4  Q.  At 4:10 in the morning?

5  A.  Yes, sir.

6  Q.  Was that unusual that you would be working at those hours?

7  A.  No.

8  Q.  Okay.  Let's go out.  Let's go to page 111 of this document.

9  You see a report card here for student Elizabeth M?

10  A.  Yes, sir.

11  Q.  Let's go to page 121.  Do you see one for student Hayden M?

12  A.  Yes, sir.

13  Q.  Now, did you -- yesterday we saw you sending report cards to

14  Dr. Carter's G mail account.  Do you recall that?

15  A.  Yes, sir.

16  Q.  And I think you described -- you said that those -- when you

17  sent them to his G mail account, you hadn't altered them;

18  correct?

19  A.  That's correct.

20  Q.  And that was during the 16 -17 school year; correct?

21  A.  That is correct.

22  Q.  During the 17-18 school year, did you alter the report cards

23  before you sent them to Dr. Carter?

24  A.  Yes, sir.

25  Q.  Who told you to alter the report cards?

1    A.   Rick.   Rick Carter.

2    Q.   So keeping -- let's go back to page 111.  And keeping this

3    document on the screen, let's add Government's Exhibit 50 M as

4    in mouse.  All right.  Do you see a report card here for the

5    same student?

6    A.   Yes, sir, I do.

7    Q.   Same school year?

8    A.   Yes, sir.

9    Q.   Let's enlarge the bottom right hand corners of both 232 C,

10   111, and 50 M.  Do they both say 2/16/2018?

11   A.   Yes, sir.

12   Q.   Does one have a different time?

13   A.   Yes, sir.

14   Q.   Did you print this one at -- did you print a second copy?

15   A.   Yes, sir, I did.

16   Q.   All right.  Let's go back out.  Now, what is the difference

17   between 232 C and 50 M?

18   A.   The one on the right has my company name and address and the

19   one on the left has the actual school, the actual school and

20   their address.

21   Q.   Are the grades the same?

22   A.   Yes, they are.

23   Q.   Are the classes the same?

24   A.   Yes, they are.

25   Q.   Are the teachers the same?

1  A.  Yes, they are.

2  Q.  And were these teachers who worked for Jackson Academy?

3  A.  They were.

4  Q.  Were they teachers that you had started to write checks to?

5  A.  They were.

6  Q.  Did these people work for Ed Op?

7  A.  No, sir.

8  Q.  Is that your home address at the top?

9  A.  Yes, sir.

10 Q.  What did you do with the Ed Op report card after you created

11 it?

12 A.  I sent them to Rick Carter.

13 Q.  And do you recall the date at the bottom here, February 16th

14 of 2018?

15 A.  Yes, sir, I do.

16 Q.  Let's go now to Government's Exhibit 1979.  And please go to

17 page 84.  Do you see here that you shared items with Dr. Carter

18 at that time?

19 A.  Yes, sir, I see it.

20 Q.  And let's go back out.  Do you see it says you shared 89

21 items on February 17th.

22 A.  Yes, sir.

23 Q.  And are those Jackson academy students?

24 A.  Yes, sir.

25 Q.  Were those the Ed Op versions of the Jackson Academy report

1  cards?

2  A.  Yes, sir, yes, they would be.  Yes, sir.

3  Q.  So for example, let's keep this on the screen and add

4  Government's Exhibit 2032 C.  And let's go to page 23.  And do

5  you see where it says know a C?

6  A.  Yes, sir, I see.

7  Q.  And let's enlarge that box, February 17th.  Do you see know

8  a C?

9  A.  Yes, sir, I do.

10  Q.  Let meets let's go to page 1 of 2032 C.  Do you see Nicholas

11  A?

12  A.  Yes, sir.

13  Q.  And you see where it says Nicholas A?

14  A.  Yes, sir.

15  Q.  Let's go to page 13 of 2032 C.  See where it says Zachary B?

16  A.  Yes, sir.

17  Q.  And did you share with Dr. Carter Zachary B?

18  A.  Yes, sir.

19  Q.  Were these the converted report cards that you were sharing?

20  A.  That one right there is not a converted, that's the actual

21  report card.

22  Q.  Before you shared them with Dr. Carter, did you convert them

23  to Ed Op report cards?

24  A.  The ones on the left are have been converted, yes.

25  Q.  Okay.  Did you also receive report cards from Southern

1  Academy?

2  A.  Yes, sir, I did.

3  Q.  Let's look at -- take these down and pull up 2071 A.  And is

4  this a Southern Academy report card for the fall semester of

5  2017-2018?

6  A.  Yes, sir.

7  Q.  Let's go to page 62.  Do you see a report card for student

8  Montana C?

9  A.  Yes, sir.

10 Q.  Let's go to page 85.  Do you see one for student Nicholas A?

11 A.  Yes, sir.

12 Q.  Let's go to page 112.  Do you see one for student Augusta A?

13 A.  Yes, sir, I do.

14 Q.  Did you convert all of these report cards to Ed Op report

15 cards?

16 A.  That is correct.

17 Q.  And after you converted them to Ed Op report cards, what did

18 you do?

19 A.  I sent them to Dr. Carter.

20 Q.  Let's look at Government's Exhibit 1305 A.  You see an email

21 here, EO 5 -- report cards E 05 first semester 2017-2018 1st

22 through 6th grade?

23 A.  Yes, sir, I see it.

24 Q.  Are there attachments?

25 A.  Yes, sir, there are.

1  Q.  What's the date?

2  A.  February 22nd, 2018.

3  Q.  And which account are you sending this to?

4  A.  To Dr. Carter's private G mail account.

5  Q.  All right.  Let's pull up Government's Exhibit 1305 B.  What

6  are we looking at here?

7  A.  We're looking at a report card from Southern Academy that

8  has been sanitized.

9  Q.  How so?

10  A.  Their panther logo has been taken off, in other words, the

11  water mark.  Their header has been removed and my logo replaced

12  it at the top.

13  Q.  Who made all of those changes?

14  A.  I did.

15  Q.  Let's go to 1305 E.  And go to page 6, please.  Was this

16  also attached to the email that you sent to Dr. Carter?

17  A.  Yes, sir.

18  Q.

19  Q.  And if we could keep this on the screen and let's also pull

20  up 2071 A at page 53.  And, sir, student name on these two

21  documents appear to be the same?

22  A.  Yes, sir.

23  Q.  And teacher appear to be the same?

24  A.  Correct.

25  Q.  Grade level the same?

```
 1  A.  Yes, sir.

 2  Q.  Is this box right here the same as the other box?

 3  A.  Yes, sir.

 4  Q.  Did you remove everything else from the southern academy

 5  report card?

 6  A.  That is correct.

 7  Q.  And did you add this header?

 8  A.  Yes, sir.

 9  Q.  Who directed you to make all of these changes?

10  A.  Rick Carter.

11  Q.  And, sir, the edited report cards that you created during

12  the 17-18 school year, did you do that after the state had

13  started asking questions about the program?

14  A.  Yes, sir.

15  Q.  Edited)?

16  Q.  Were the two things ever linked in your mind?

17  A.  Yes, sir.

18  Q.  How so?

19  A.  Why would we have to hide the fact that everyone knows

20  they're private school students?  Why do I have to do all this

21  work because everyone already knows?

22  Q.  When you say everyone, who are you talking about?

23  A.  Everyone in the private schools and most of the people in

24  renaissance knew these kids were -- coming from private schools.

25  I knew -- if I wouldn't have started suspecting something, I
```

1  would have -- it would be pretty foolish.

2  Q.  All right.  The classes that are listed on this report card,

3  were they all taken at Southern Academy?

4  A.  Yes, sir.

5  Q.  All right.  Now, you remember yesterday that we got -- we

6  went through emails from Dr. Carter about missing senior grades.

7  Do you recall that?

8  A.  Yes, sir, I do.

9  Q.  And those were the seniors from 2016-2017; correct?

10 A.  That is correct.

11 Q.  Let's pull up, please, Government's Exhibit 1308.  Sir, do

12 you see an email here from Rick Carter to yourself?

13 A.  Yes, I do.

14 Q.  What is the subject line of the email?

15 A.  2016-2017 cohort information.

16 Q.  And is Rick Carter forwarding you an email from someone

17 else?

18 A.  Yes, he is.

19 Q.  From whom?

20 A.  From Dr. Who will a day.

21 Q.  And what did Dr. Who will a day say to Dr. Carter?

22 A.  FYI.  Need to make this a priority.

23 Q.  Was Dr. Holladay forwarding an email that he had received?

24 A.  Yes, sir.

25 Q.  Who had sent him the email?

1  A.  A Tony Thacker from the Alabama state department of
2  education.
3  Q.  All right.  Let's go to page 2.  And do you see a list of
4  numbers?
5  A.  Yes, sir, I do.
6  Q.  This numbers here in this column, are those student
7  identification numbers?
8  A.  Yes, sir, it is.
9  Q.  Let's go to page 3.  What is written below all the student
10  identification numbers, if we could enlarge that.
11  A.  Would you like me to read it.
12  Q.  Please, sir.
13  A.  Good morning, Trey.  I received an update from our
14  prevention and support services section that indicates that the
15  students listed above as 2016-2017 federal graduates did not
16  earn the required 24 credit hours.  This may be a simple
17  clerical issue of some type.  However, we have reopened the
18  cohort portal through the end of the business day on February
19  28th and wanted to provide you with an opportunity to have
20  someone in your system check into the situation prior to the
21  data being finalized for submission to the USDOE.  Should you
22  have any questions regarding the information shown above, please
23  feel free to contact prevention and support services at a
24  telephone number.
25  Q.  All right.  And so this is referring to students in the

1  16-17 school year; correct?

2  A.  Correct.

3  Q.  And students who would have graduated the year before this

4  email was sent; correct?

5  A.  That is correct.

6  Q.  And this is saying that students who were listed as

7  graduates didn't have enough credits?

8  A.  That is correct.

9  Q.  Is that consistent with those lists of missing credits that

10 we saw from yesterday?

11 A.  That is correct.

12 Q.  Let's go to page 1.  What's the date and time -- let's

13 enlarge that, please.  What's the date and time that Dr. Carter

14 sent this to you?

15 A.  That would be Monday, February 26th, 2018 at 11:19 a.m.

16 Q.  Keep this on the screen and add government's 2004 at page

17 236.  And enlarge the top here.  The minute after Dr. Carter

18 sent this to you, what did he do?

19 A.  He sent it to me -- he called me.  I'm sorry.

20 Q.  He called you?

21 A.  He called me.

22 Q.  At 11:20 a.m.

23 A.  Correct.

24 Q.  Now, what did he do at 11:36?

25 A.  He called me again.

1  Q.  What did he do at 12:07?

2  A.  He called me again.

3  Q.  Now, you see that each of these calls appears to have lasted

4  a minute?

5  A.  Yes, sir.

6  Q.  Is it possible you didn't answer those calls?

7  A.  That would be it.  Yes, sir.

8  Q.  So you would have had -- by 12:07 would have had three

9  missed calls from Rick Carter?

10  A.  Yes, sir.

11  Q.  Within an hour?

12  A.  Correct.

13  Q.  Was that common that he would call you three times in a row

14  like that?

15  A.  If something was urgent, he would do that.

16  Q.  At 12:25, did you finally call him back?

17  A.  Yes, sir.

18  Q.  And y'all spoke for three minutes?

19  A.  Correct.

20  Q.  And did you call him again at 2:05?

21  A.  That's correct.

22  Q.  Did you-all discuss this -- the missing information?

23  A.  Yes, sir.

24  Q.  What -- well, let's keep the phone records on the screen and

25  let's bring up Government's Exhibit 1309.  Do you see an email

1  here from Rick Carter to you?

2  A.  Yes, sir, I do.

3  Q.  Also dated February 26th?

4  A.  That is correct.

5  Q.  And is there a subject?

6  A.  There's no subject.

7  Q.  Now, the forwarded email, did it have any student names in

8  it?

9  A.  Correct.

10 Q.  Were their names in the email that we saw a second ago from

11 Mr. Thacker at the state department of education?  Were there

12 any student names in that email?

13 A.  No, sir.

14 Q.  Were there just student numbers?

15 A.  There were numbers.

16 Q.  Did you know which numbers -- which students corresponded to

17 which numbers?

18 A.  No, sir.

19 Q.  Looking now at the email sent at 3:00, do we have student

20 names?

21 A.  Yes, we do.

22 Q.  And who sent you the names here?

23 A.  Rick Carter.

24 Q.  Let's enlarge the text here.  All right.  Now, out next to

25 each name is what?

1   A.   Is the classes that they are missing.

2   Q.   Do you see the EO code next to several of these names?

3   A.   Yes, sir, I do.

4   Q.   Who told you which EO school corresponded to which student?

5   A.   Rick Carter.

6   Q.   Based on -- did having that EO code there help you to get

7   the information that you needed to get?

8   A.   Yes, sir.

9   Q.   How so?

10  A.   It told me exactly which school to talk with.  In other

11  words, the headmaster, to make sure we didn't miss anything.

12  Q.   So Rick Carter was telling you which schools to go to to get

13  the missing information.

14  A.   Yes, sir.

15  Q.   What were you supposed to do after you received this

16  document at 1309?

17  A.   I don't recall that.  It looked like a daunting task.  I was

18  lost.

19         MR. FUNK:  Objection.  He have said I don't recall.

20  Now he's guessing.

21         MR. ROSS:  Your Honor, we can move on.

22  Q.   Did you gather up the missing items listed at Government's

23  Exhibit 1309?

24  A.   I don't recall.

25  Q.   Let's look at Government's Exhibit -- let's keep 1309 on the

1  screen.  I'm sorry.  And also bring up Government's Exhibit 1318

2  A.  And do you see a response that you sent the next day,

3  Tuesday February 27th at 1:24 p.m.

4  A.  Yes, sir, I do.

5  Q.  What did you write in the response?

6  A.  ?  What did you write when you responded to Dr. Carter.

7  A.  EO 2.

8  Q.  Looking back at 1309, were there EO 2 students listed on

9  here?  Do you see sandy S listed as EO 2?

10  A.  Yes, I do.

11  Q.  Did that indicate that you were missing something for

12  student sandy S?

13  A.  That is correct.

14  Q.  Do you see that it says missing 12th?

15  A.  That is correct.

16  Q.  Let's go to the second page of 1318 A.  And what's attached

17  here?

18  A.  A PDF.

19  Q.  What's the name of the PDF?

20  A.  S sandy report card.

21  Q.  All right.  Let's open up 1318 B.  And do you see a report

22  card for student sandy S?

23  A.  That is correct.

24  Q.  For what school year?

25  A.  2016-2017.

1  Q.  And had you edited the report card?

2  A.  Yes, I did.

3  Q.  Now, back in 16-17, were you editing report cards?

4  A.  No, I was not.

5  Q.  So this was something that you did in 17-18 only?

6  A.  I cannot remember the crossover point.

7  Q.  All right.  Let's take down 1309.  Bring up 850 A, please.

8  And had you already received the Jackson Academy report cards

9  from Ms. Bailey?

10  A.  Yes, sir.

11  Q.  And let's go to page -- let's go to 850 B and go to page 18.

12  Did you already have this student's report card from the

13  previous year?

14  A.  Yes, sir, I did.

15  Q.  All right.  Let's take all this down, and let's pull up 1319

16  A.  And do you see where you wrote EO 3 here?

17  A.  Yes, sir, I do.

18  Q.  Were there missing items for EO 3 students?

19  A.  Yes, there were.

20  Q.  Do you see student Tressie C?

21  A.  Yes, I do.

22  Q.  See student William J?

23  A.  Yes, I do.

24  Q.  See student Dustin J?

25  A.  Yes, I do.

1  Q.  Let's go to page 2 of this exhibit.  And did you attach

2  report cards for those students?

3  A.  Yes, sir, I did.

4  Q.  Let's pull up 1319 B.  Is this the report card that you

5  attached for student Tressie C?

6  A.  Yes, it is.

7  Q.  Did you edit it before you sent it?

8  A.  Yes, sir.

9  Q.  Let's go to 1320 A.  You see you wrote EO 5 on this one?

10  A.  Yes, sir, I did.

11  Q.  And were there missing report cards for EO 5 students?

12  A.  Yes, sir.

13  Q.  Let's go to page 2.  And you see an attachment?

14  A.  Yes, sir, I do.

15  Q.  What's the attachment?

16  A.  E 05 12th grade report cards, 2016-2017 .  Said 1207, but go

17  ahead.

18  Q.  Let's open 1320 B.  Were these the Southern Academy report

19  cards?

20  A.  Yes, they were.

21  Q.  And had you edited these report cards as well?

22  A.  That is correct.

23  Q.  And edited them before you sent them?

24  A.  Yes, sir.

25  Q.  All right.  Let's go back to 1320 A.  Now, do you notice,

1   Mr. Corkren, on here that you're also -- there are students

2   listed for EO 4?  Students Alonzo M and Hunter W?

3   A.  Yes, sir, I see them.

4   Q.  Did you get those missing items from the Lakeside School?

5   A.  No, sir.

6   Q.  Why did you not contact the Lakeside School to get the

7   missing items?

8   A.  I was instructed to break off all contact with them.

9   Q.  Just a few more topics, Mr. Corkren.  During the spring of

10  2018, did Athens conduct standardized testing for the private

11  schools?

12  A.  Yes, sir, they did.

13  Q.  Who scheduled the standardized testing for the private

14  schools during spring of 2018?

15  A.  Rick Carter.

16  Q.  Let's look at 1413 A.  Do you see an email?

17  A.  Yes, sir.

18  Q.  Who's it from?

19  A.  Rick Carter.

20  Q.  Who's it to?

21  A.  To myself.

22  Q.  And what's the date on it?

23  A.  April 10th, 2018.

24  Q.  What is the subject of the email?

25  A.  Testing dates.

Q.   And what does Rick Carter write in the email?

A.   Please notify students.

Q.   Let's look at 1413 B.  What are the schools listed here?

A.   Jackson Academy, Meadowview Christian, Southern Academy.

Q.   Now, does it say academy on here?

A.   No, sir.

Q.   It just says Jackson, Meadowview, southern?

A.   That's what they were.  That's what's written.

Q.   And Jackson, Jackson is also a town in Alabama; right?

A.   That is correct.

Q.   So that could have referred to Jackson, Alabama; right?

A.   It could have.

Q.   Is Meadowview a town in Alabama?

A.   No, sir.

Q.   Is Southern a town in Alabama?

A.   Not that I'm aware of.  No, sir.

Q.   And this is something Carter is sending to you?

A.   Yes, sir, that is.

Q.   And is this after Dr. Carter had prepared that spreadsheet listing the names of the private schools based on the enrollment forms?

A.   That is correct.

Q.   After the audit that we talked about yesterday where he was trying to find the private school students?

A.   Yes, sir, that is.

1  Q.  And then in April of 2018, he knew which schools to schedule

2  for standardized testing?

3  A.  Yes, sir, that's correct.

4  Q.  Did you share this information with other folks?

5  A.  Yes, sir.

6  Q.  Let's look at 417 A.  Who did you send it to?

7  A.  An email from myself to Deborah Holladay.

8  Q.  And let's look at 417 B.  Same document?

9  A.  Same exact document.

10  Q.  Let's look at 418 A.  Did you send the -- did you break it

11  up and send it to Mr. Tutt?

12  A.  Yes, sir, I did.

13  Q.  (That was 1418 A?)

14  Q.  Let's look at 1418 B.  I'm sorry.  1418 B.

15  Q.  Did you edit it down to just the Jackson schedule?

16  A.  Yes, sir, I did.

17  Q.  Why did you do that?

18  A.  It was -- the only information they needed.  They didn't

19  need to know what everybody else -- you send them the stuff

20  that's pertinent to them.

21  Q.  So you sent it -- did you sent send it directly to

22  Ms. Bailey?

23  A.  This right here, I did.

24  Q.  Well, let's go back to 418 A.  1418 A.  I'm sorry.  Are you

25  sending this to Ms. Bailey?

1  A.  I'm sending it to Webb Tutt, and he's going to turn around

2  and give it to Ms. Bailey.

3  Q.  Why did you send it to Mr. Tutt for Mr. Tutt to give to

4  Ms. Bailey?

5  A.  That was the chain of command, chain of flow set up by Trey

6  Holladay.

7  Q.  So did Trey Holladay in that second year not want you

8  dealing directly with the headmasters as much?

9  A.  Correct.

10 Q.  Let's look at 1419 A.  Did you also break up the Meadowview

11 schedule?

12 A.  That's correct.

13 Q.  And send that to Mr. Tutt?

14 A.  Yes, sir.

15 Q.  Let's look at 1420 A.  And the southern schedule?

16 A.  Yes, sir.

17 Q.  All right.  Now, you mentioned this a while ago, but were

18 you aware of letters that the state department of education sent

19 to the private schools?

20 A.  Yes, sir.

21 Q.  Who told you about those letters?

22 A.  I cannot recall.

23 Q.  Did Dr. Holladay give you any instructions after the letters

24 were sent to private schools?

25 A.  Yes, sir.

1  Q.  What instruction did he give you?

2  A.  He told me to tell the headmasters to ignore that letter,

3  and he showed a law saying -- stating that the state could not

4  ask questions of private schools.  Some type of very recent

5  legislation that was passed four or five years ago.

6  Q.  Did you tell the headmasters to ignore the letters?

7  A.  Yes.

8  Q.  Did you talk to Webb Tutt about it?

9  A.  Yes.

10  Q.  Did you give Mr. Tutt any money?

11  A.  Yes, sir, I did.

12  Q.  How much -- cash?

13  A.  Cash.

14  Q.  How much cash did you give Mr. Tutt?

15  A.  $2,000.

16  Q.  What was the purpose of that $2,000 cash payment to

17  Mr. Tutt?

18  A.  To bribe the headmaster at Pickens Academy.

19  Q.  To bribe him for what purpose?

20  A.  To get them to not answer the letter.

21  Q.  Do you know if Mr. Tutt ever actually gave the money to the

22  headmaster?

23  A.  No, I do not.

24  Q.  Did you tell anyone else that you were going to give that

25  cash to Mr. Tutt for him to give to the headmaster at Pickens

1 Academy?

2 A.  Trey Holladay.

3 Q.  And what did Trey Holladay say?

4 A.  He was the one suggested it in the first place.

5 Q.  All right.  During the 2017-2018 school year, did you

6 continue to give Rick Carter that monthly cash payment of

7 $1,000?

8 A.  Yes, sir.

9 Q.  Did you also continue to pay Trey Holladay cash payments?

10 A.  Yes, sir.

11 Q.  Did you ever give Rick Carter cash when you were in

12 Orrville, Alabama?

13 A.  Yes, sir, I did.

14 Q.  Did you give Trey Holladay cash when you were in Orrville,

15 Alabama?

16 A.  Yes, I did.

17 Q.  Where is Orrville, Alabama?

18 A.  That is very close to Selma, right outside sell that,

19 Alabama.

20 Q.  Could you find it on the map?

21 A.  Yes, sir, I could.

22         MR. ROSS:  Your Honor, may the witness approach the

23 demonstrative?

24         THE COURT:  Yes.

25 Q.  Mr. Corkren, I'm handing you a marker, and I ask that you

1   place a circle around Orrville, Alabama.

2   A.  Right -- there we go.

3   Q.  All right.  Now, Mr. Corkren, is this where I'm indicating

4   where the circle is approximately where Orrville, Alabama is

5   located?

6   A.  Yes, sir.

7   Q.  For the record, the witness has placed a circle on the map

8   around Orrville.

9           Do you remember about when it was that you were in

10  Orrville, Alabama, with cash.

11  A.  I cannot tell you exact date, but it was in the spring of

12  that 2018.

13  Q.  Let's look at Government's Exhibit 1155.  Do you see here an

14  email from Rick Carter to Susan Bailey?

15  A.  Yes, sir.

16  Q.  What's the date on the email?

17  A.  That's November the 6th, 217.

18  Q.  Was that approximately when you were in Orrville?

19  A.  That would have been.

20  Q.  All right.  And what did Dr. Carter write to Ms. Bailey?

21  A.  Would you be able to meet at 1:00 at the following location?

22  Orrville farmer's market.

23  Q.  Now, before we go on, Ms. Bailey, what position did she

24  told?

25  A.  She was the headmaster at Jackson Academy.

1  Q.  And Rick Carter's dealing directly with a headmaster at

2  Jackson Academy?

3  A.  Yes, sir.

4  Q.  And is this during the time period that you were sending him

5  the course completion reports?

6  A.  That is correct.

7  Q.  Is this during the time period that the state inquiry is

8  going on?

9  A.  Yes, sir, it is.

10  Q.  To your knowledge, did the state ever learn about Jackson

11  Academy?

12  A.  To my knowledge, no, sir.

13  Q.  And this meeting, is this the place -- did you attend this

14  meeting?

15  A.  Yes, sir, I did.

16  Q.  Did the meeting ultimately occur?

17  A.  It did.

18  Q.  And did it occur at the Orrville farmer's market?

19  A.  Yes, sir, it did.

20  Q.  And was Dr. Carter at the meeting?

21  A.  Yes, sir, he was.

22  Q.  Was Dr. Holladay?

23  A.  Yes, sir, he was.

24  Q.  After the meeting, did you, Dr. Carter, and Dr. Holladay go

25  anywhere?

1   A.  Yes, sir, we did.

2   Q.  Where did you go?

3   A.  Across the street to Dr. Holladay's mother's house.

4   Q.  Where were his parents home?

5   A.  His parents' home, yes.

6   Q.  Were they both there?

7   A.  Yes, sir, they were.

8   Q.  And what did y'all do at Dr. Holladay's parents' home?

9   A.  We just visited his mom and dad, and that's where I give

10  Rick and Trey money.

11  Q.  Did you give it to them at the same time?

12  A.  No, sir.

13  Q.  How did you do that?

14  A.  I gave Trey -- when Rick would go out of the picture, I

15  would give money to Trey.  And then when Trey went out of the

16  picture, I give money to him.  Trey knew about the money going

17  to Rick, but Rick, I assume, didn't know that Trey was getting

18  money.

19  Q.  Did you know for sure whether Rick knew that or not?

20  A.  I wasn't for sure.  And I wasn't going to let Rick know that

21  Trey knew, so that's the reason why I do both of them like that.

22  Q.  I see.  Mr. Corkren, do you know about how much money you

23  gave Dr. Carter over the course of this business?

24  A.  $21,000.

25  Q.  How do you know that?

1  A.  $1,000 a month for 21 months until the endeavor ended.

2  Q.  So you stopped giving him money when the endeavor ended?

3  A.  Correct.

4  Q.  Did you tell him each time to give the money to his mom?

5  A.  No, sir.

6  Q.  Did you tell him that the first time?

7  A.  Correct.  It was a gift to his mother and every month was a

8  gift to his mother.

9  Q.  Did you say that every time, though?

10  A.  I didn't have to say it.  I said it at the beginning.

11  Q.  Do you know whether he actually gave the money to his

12  mother?

13  A.  I don't know.

14  Q.  At the end of the school year in 2018, did you also write

15  checks to the private schools directly?

16  A.  Yes, sir, I did.

17  Q.  Now, throughout the year, had Webb Tutt been making the

18  monthly per-student payments?

19  A.  Yes, sir, he did.

20  Q.  Why did you make those a payments at the end of the school

21  year?

22  A.  It was the final payment.  I was wanting to pay these -- pay

23  what was guaranteed -- was promised to them.  And I didn't trust

24  Webb to do it.  I felt like if he thought the program was

25  shutting down, he would keep the money and not give it to the

1   schools.

2   Q.  Did you also receive report cards from the private schools

3   at the end of the 2017-2018 school year?

4   A.  Yes, I did.

5   Q.  Let's look at Government's Exhibit 1502 A.  Do you see here

6   an email from Brandy Roye to you?

7   A.  Yes, sir, I do.

8   Q.  Who is Ms. Roye?

9   A.  Ms. Roye worked at Southern Academy.  She was the technical

10  person there.  She did what Odysseyware they did, she was my --

11  she was my contact point with Southern.

12  Q.  And did she send you report cards?

13  A.  Yes, sir.

14  Q.  Let's look at 1502 M.  Were these some of the report cards

15  attached?

16  A.  Yes, sir.

17  Q.  Let's go to page 7.  See a report card for student Anna Kate

18  D?

19  A.  Yes, sir.

20  Q.  Let's go to page 11.  See one for Amelia H?

21  A.  Yes, sir.

22  Q.  Let's go to page 16.  Do you see one for John DP?

23  A.  Yes, sir, I see it.

24  Q.  Did you share these report cards with Dr. Carter?

25  A.  Yes, sir.

1  Q.  And let's look at Government's Exhibit 1979 alternate page

2  88.  And, sir, do you see -- I'm sorry.  Let's go to page 89.  I

3  apologize.  All right.  Do you see sharing report cards EO 5

4  report cards?

5  A.  Yes, sir, I see it.

6  Q.  And who was Sandra Akin?

7  A.  That was a teacher at Southern.

8  Q.  At Southern?  If you don't recall --

9  A.  I don't recall.

10  Q.  That's fine.  Before you sent them, had you converted them

11  to -- had you stripped off the Southern Academy name?

12  A.  I don't recall that.

13  Q.  Let's look at Government's Exhibit 96 N.  N as in north.

14  All right.  Is this a report card for student Ann a KD?

15  A.  Yes, sir.

16  Q.  And do you see Southern Academy on it at all?

17  A.  No, sir.

18  Q.  Do you see anything on it?

19  A.  No, sir.

20  Q.  Why had you not put an Ed Op logo at the top?

21  A.  Time.  Why -- I mean, useless to myself.

22  Q.  By this point, was the business wrapping up?

23  A.  Oh, yes, sir.

24  Q.  All right.  Did you also get report cards from Jackson?

25  A.  Yes, sir.

1  Q.  Did you send those on to Carter?

2  A.  Yes, sir, I did.

3  Q.  Did you get report cards from southern?

4  A.  Yes, sir.

5  Q.  And did you send those on to Carter?

6  A.  Yes, sir, I did.

7  Q.  All right.  Did you get correspondence from Dr. Carter about

8  graduating seniors again at the end of 17-18?

9  A.  Yes, sir, I did.

10  Q.  Let's look at Government's Exhibit 1279.  And do you see an

11  email here from Dr. Carter, needed data points?

12  A.  Yes, sir, I see it.

13  Q.  And this is for -- what is the date on this email?

14  A.  The date is February 7th, 2018.

15  Q.  And do you see that this refers to college and career ready

16  indicators.

17  A.  Correct.

18  Q.  Do you know what those are?

19  A.  It's -- at that particular time, it had just been sent out

20  that the state wanted all the seniors to start taking this test,

21  and it's basically -- all the other tests they were receiving

22  was for college.  This was more for trade school or going

23  straight into the work force.  A lot of factories moving into

24  the state wanted this.

25  Q.  So did graduating seniors have to have one of these six

1  things?

2  A.  That's correct.

3  Q.  So either a score of 3, 4, 5 on an AP test?

4  A.  Correct.

5  Q.  Or dual enrollment course?

6  A.  Correct.

7  Q.  When it says dual enrollment, does that refer to

8  simultaneous enrollment in a private school and a public school?

9  A.  Dual would be a community college.

10  Q.  Or military enlistment?

11  A.  Correct.

12  Q.  Did all of the students receive all of these credentials?

13  All the private school students?

14  A.  Not that I -- I don't recall.

15  Q.  Did Dr. Carter ever instruct you to withdraw seniors who

16  were about to graduate?

17  A.  I don't remember that.

18  Q.  Let's look at Government's Exhibit 1445.  Do you see an

19  email from Rick Carter?

20  A.  Yes, I do.

21  Q.  Who's it to?

22  A.  To myself.

23  Q.  Which account did he send it from?

24  A.  He sent it from his private G mail account.

25  Q.  And what's the date?

A.  That is April 26th, 2016.

Q.  Is that right before the end of the school year?

A.  Yes.  That is correct.

Q.  What does he write in there?

A.  We removed seniors of EO 5 and Meadowview.  These were still on.

Q.  Do you know why they had removed seniors?

A.  I don't know -- I don't want to assume, so, no.

Q.  Had these students actually dropped out of school right before graduation?

A.  No, sir.

Q.  Where were these students going to graduate from?

A.  EO5 is Southern Academy and Meadowview Christian.

Q.  All right.  Did this business come to an end in 2018?

A.  Yes, sir, it did.

Q.  What caused it to come to an end?

A.  FBI visited a school.

Q.  Did you have a meeting -- before the FBI visit, did you have a meeting at a Cracker Barrel?

A.  Yes.  We had several meetings at cracker barrels.

Q.  Who all attended the last meeting at the Cracker Barrel?

A.  Myself, Rick Carter, Trey Holladay, Deborah Holladay, Webb Tutt.  I cannot recall if Jill Tutt was there or not.  I don't believe she was there.

Q.  Do you remember which Cracker Barrel this meeting occurred

1  at?

2  A.  One around Gardendale, Alabama.

3  Q.  What did y'all discuss at the meeting?

4  A.  The drawing down of this and what's going on and the

5  government figuring out this stuff.

6  Q.  All right.  Did you get any money after y'all decided to

7  wrap up the business?

8  A.  Yes.

9  Q.  Why did you get more money after you decided to wrap things

10 up?

11 A.  I had contracts with these -- we had contracts with these

12 private schools, and they based their whole school year budget

13 on this money.  I being a principal in the past knew they would

14 be hurting if they didn't have that money, so I wanted to make

15 sure they got the money.

16 Q.  All right.  Let's look at Government's Exhibit 1475 A.  Do

17 you see an email that you sent to Trey Holladay?

18 A.  Yes, sir.

19 Q.  Dated May 15th of 2018?

20 A.  Yes, sir.

21 Q.  Was this after the meeting at the Cracker Barrel?

22 A.  Yes, sir.

23 Q.  Is there an attachment at the bottom?

24 A.  Yes, sir.

25 Q.  What's the name of the attachment?

1   A.   Settlement document.

2   Q.   Let's look at Government's Exhibit 1475 B.  Is this a letter

3   that you sent to Dr. Holladay?

4   A.   Yes, sir.

5   Q.   Who told you to write this letter?

6   A.   Dr. Holladay.

7   Q.   Do you see where it says, my company has 42 teachers under

8   contract for a remaining balance of $266,000?

9   A.   That is correct.

10  Q.   Who were these 42 teachers?

11  A.   Those would the the teachers that I still had under -- I was

12  still servicing the schools.

13  Q.   Now, 266,000 divided by 42, would you agree that that's

14  about $6,333?

15  A.   That is correct.

16  Q.   Were you going to pay 42 teachers 6 -- over $6,000 each?

17  A.   No, sir.

18  Q.   Well, then, why did you need $266,000?

19  A.   I was under contract with the teachers, but I wasn't under

20  contract with the schools.  So I took what we owed the schools

21  and took it out of that amount and paid them what was owed on

22  the contract that Webb Tutt had a contract with them, and I

23  basically took that contract over and made sure that I got the

24  money that was promised.

25  Q.   All right.  Now, you see where it says, my company also has

1  $27,600 in rent.

2  A.  Yes, sir.

3  Q.  Were you renting any buildings?

4  A.  No, sir.

5  Q.  What did that refer to?

6  A.  That's schools like the 8500 would be the internet access

7  and then that would be the money -- the 2000 -- 2666 would be

8  money I give the teachers, and then that would be money left

9  over.

10  Q.  Left over for whom?

11  A.  For myself and Trey and Deborah Holladay and Webb Tutt.

12  Q.  All right.  Who came up with these amounts?

13  A.  Trey Holladay.

14  Q.  Did you ultimately sign an agreement?

15  A.  Yes, sir.

16  Q.  Let's look at Government's Exhibit 1477 A.  Do you see EOM

17  termination agreement?

18  A.  Yes, sir, I do.

19  Q.  And who sent you the agreement?

20  A.  Trey Holladay.

21  Q.  Let's look at 1477 B.  Was this attached to the agreement

22  sent by Holladay?

23  A.  Yes, sir, it is.

24  Q.  Let's go to page 2.  How much money is Athens agreeing to

25  pay in this contract?

1    A.   $302,100.

2    Q.   And if we could, let's enlarge paragraph seven.  And were

3    you committing to exactly how you were going to spend that

4    money?

5    A.   Could you repeat that question?

6    Q.   Do you see where it says EOM represents and warrant that it

7    presently owes its teachers $266,000, rental obligations of

8    $27,600, and $8,500 in internet related charges.  And then

9    later, these obligations will all be paid and satisfied from the

10   fee set forth in section 6.

11   A.   Yes, sir.

12   Q.   Were you actually going to spend $266,000 paying teachers?

13   A.   No, sir.

14   Q.   All right.  Did this ensure that some money would go to

15   Deborah who will day?

16   A.   Yes, sir.

17   Q.   All right.  Let's look at Government's Exhibits 1482.  Did

18   you send a signed agreement back to Trey Holladay?

19   A.   Yes, sir, I did.

20   Q.   Let's look at page 3.  Is this the signed agreement?

21   A.   Yes, sir, it is.

22   Q.   Let's go to page 6.

23   Q.   Do you see your signature at the bottom?

24   A.   Yes, sir, I do.

25   Q.   All right.  Did you get that $302,000 payment?

```
 1   A.  Yes, sir.

 2   Q.  Was it split between two different checks?

 3   A.  Yes, sir, it was.

 4   Q.  Let's look at Government's Exhibit 2147.  And do you see a

 5   deposit here of an $81,300 check?

 6   A.  Yes, sir, I see it.

 7   Q.  What's the date on the check?

 8   A.  May 17, 2018.

 9   Q.  And let's look at Government's Exhibit 1500 A.  Do you see a

10   check -- an email here, final invoice?

11   A.  Yes, sir, I do.

12   Q.  Who did you send it to?

13   A.  I sent it to Rick Carter.

14   Q.  Let's go to 1500 B.  What does it say on the invoice?

15   A.  It says services, digital education services.

16   Q.  What's the quantity of digital education services?

17   A.  I'm sorry.  One.

18   Q.  And what's the rate?

19   A.  $220,800.

20   Q.  Now, sir, have you ever seen an invoice for almost a quarter

21   of a million dollars that just says, one and something that

22   vague?

23   A.  In my business, in the school business, no.

24   Q.  No?

25   A.  No, sir.
```

1  Q.  Were you concerned that Dr. Carter might ask questions when

2  you were asking for this much money and it was this Vega

3  description?

4  A.  No, sir, I was not concerned.

5  Q.  Why were you not concerned?

6  A.  Because he knew what it was.

7  Q.  Did you receive this money?

8  A.  Yes, sir.

9  Q.  Let's look at Government's Exhibit 2148.  And do you see

10 your bank statement?

11 A.  Yes, sir, I do.

12 Q.  For the month of -- or for May 31st of '18 through 6/29 of

13 '18?

14 A.  Yes, sir, I see it.

15 Q.  Let's go to page 2.  And do you see here a deposit of

16 $220,800?

17 A.  Yes, sir, I do.

18 Q.  Was that the payment from Athens?

19 A.  Yes, sir.

20 Q.  Did you ever get all the computers back from Southern

21 Academy?

22 A.  No, sir.

23 Q.  Let's look at Government's Exhibit 1448 A.  I'm sorry.  1488

24 A.  Do you see an email here from Mark Mickleboro?

25 A.  Yes, sir.

1  Q.  And do you see an attachment down at the bottom?

2  A.  Yes, I do.

3  Q.  What's the name of the attachment?

4  A.  Donation letter.

5  Q.  Let's look at Government's Exhibit 1488 B.  Who wrote this

6  letter?

7  A.  Mr. Mickleboro, myself.  I believe I sent it to him and he

8  signed it.

9  Q.  Did you tell him just to send it to you?

10 A.  I believe so, yes, sir.

11 Q.  Why is that?

12 A.  Because I was going to give them their computers.  Athens

13 was not going to use them.  They were going to throw them away,

14 but they wanted them, so I was going to have a letter saying

15 that basically I didn't stash them at my house.  They were

16 worthless to me also.  That's the reason -- I'm sorry.

17 Q.  Did you tell Trey Holladay that you were going to give the

18 computers to Southern Academy?

19 A.  Yes, sir.

20 Q.  Did you tell Rick Carter?

21 A.  Yes, sir.

22 Q.  And what did they say?

23 A.  Fine.  That was -- okay.

24 Q.  Did they say anything else besides fine?

25 A.  That would be Trey Holladay's call right there.  Rick knew

1  about it, but that's not his call.

2  Q.  Okay.  Just a couple of other points.  Let's look at

3  Government's Exhibit 1510.  Now, do you see here -- we won't get

4  into the text of this -- did you get more emails about seniors

5  missing credits at the end of the 17-18 school year as well?

6  A.  Yes, sir.

7  Q.  And we won't go through them all, but do you see an email

8  here from Rick Carter?

9  A.  Yes, sir, I do.

10  Q.  Let's enlarge that email. .  What email account is that?

11  A.  It's -- I don't know.  It's not his school address.

12  Q.  And what does it say down here, Rick Carter, EDD?  What's

13  listed below that?

14  A.  It says president and founder, Phoenix educational services,

15  LLC.

16  Q.  Have you ever heard of Phoenix educational services, LLC?

17  A.  I do not recall.

18  Q.  Do you know why Rick Carter was listed as the president and

19  founder of this LLC?

20  A.  Yes.

21  Q.  Why is that?

22  A.  All the work he was doing for -- such as Limestone county

23  account and then Conecuh account, he wasn't getting paid.  He

24  was doing it for Trey.  So Trey told him to go do this, and he

25  could make money doing the work for me outside of what he's

1  doing for Athens city.

2  Q.  Who told you that?

3  A.  Trey Holladay and Rick Carter.

4  Q.  Let's look at Government's Exhibit 2437.  And do you see

5  here Alabama secretary of state's records?

6  A.  Yes, sir, I do.

7  Q.  For what company?

8  A.  For.

9  Q.  What company do you see up at the top?

10  A.  Phoenix educational services, LLC.

11  Q.  Who is listed as the registered agent?

12  A.  Rick Carter.

13  Q.  And when -- what is the formation date?

14  A.  That would be December 15th, 2017.

15  Q.  Is that during that second school year, the 17-18 school

16  year?

17  A.  Yes, sir, that would be.

18  Q.  Is that while you all were doing this work?

19  A.  That is correct.

20  Q.  Two final points, Mr. Corkren.  First thing:  Going back to

21  August of 2017, did you -- during August of 2017, you remember

22  we saw that letter from the state superintendent of education?

23  A.  Yes, sir.

24  Q.  Did you ever have any angry conversations with Mr. Holladay?

25  Did y'all ever get in any arguments?

1  A.  During this time frame?

2  Q.  Yes, sir.

3  A.  I don't recall.

4  Q.  Do you recall any arguments with Mr. Carter?

5  A.  No, sir.

6  Q.  Do you remember either one of them getting on to you?

7  A.  They would hound me sometimes about things.

8  Q.  Hound you about what?

9  A.  Around the time that I would drag my feet on stuff, getting

10  these fabricating these -- whatever there was some illegal to

11  do, it would take me a long time, and they knew I didn't want to

12  do it, but they knew the buttons to push.

13  Q.  Did either one of them ever read you the riot act about the

14  fact that you had enrolled private school students?

15  A.  No.  No.  No, sir.

16  Q.  All right.

17        THE COURT:  It's now 11:30.  You need to find a good

18  stopping place.

19        MR. ROSS:  Your Honor, this is -- well, one point with

20  this document and then this will be a good stopping point.

21  Q.  If we could, go to page 10 of Government's Exhibit 2437.

22  Q.  All right.  You see articles of dissolution here for Phoenix

23  educational services?

24  A.  Yes, sir, I see it.

25  Q.  Let's enlarge this right here.  What is listed as the reason

1  for filing the articles of dissolution?

2  A.  It said he never opened for business.

3  Q.  Okay.

4         MR. ROSS:  Your Honor, this is a good point.

5         THE COURT:  Very good.  We'll recess, then, until

6  12:30.

7     (Recess was taken from 11:29 a.m. until 12:48 p.m., after

8       which proceedings continued with the jury present, as

9       follows:)

10        THE COURT:  Proceed, counsel.

11        MR. ROSS:  Your Honor, no further questions.

12        THE COURT:  Pardon?

13        MR. ROSS:  No further questions.

14        THE COURT:  Very good.  Cross?

15                        CROSS-EXAMINATION

16  BY MR. FUNK:

17  Q.  Mr. Corkren, good afternoon.

18  A.  Good afternoon to you, too.

19  Q.  I'd like to begin, hopefully, with some things that we can

20  actually agree on.

21     Number one, can you agree with me that you've lied to people

22  in this case in order for you to make money?

23  A.  Could you repeat that, please?

24  Q.  Sure.  Can you agree with me that you've lied to people

25  throughout this case so you could make money?

```
 1  A.  Throughout this case?

 2  Q.  Yeah.

 3  A.  No, sir.

 4  Q.  Okay.  Did you say earlier today that you had paused when

 5  Mr. Ross was asking you about falsifying the Odysseyware

 6  material because of a moral dilemma?  Is that what I heard you

 7  say?

 8  A.  You're going to have to repeat that.

 9  Q.  Sure.  Did I hear you say when Mr. Ross asked you about

10  faking the Odysseyware material that you paused because of a

11  moral dilemma?  Is that what I heard you say?

12  A.  We would have to get the court reporter to read it back.

13  Q.  I'm asking you --

14  A.  I believe we agree on that.

15  Q.  Did you say that or not?

16  A.  Yes, sir.

17  Q.  Okay.  And I take it that checks that you got, $220,000

18  check, had you overcome any moral concern you had.  Agreed?

19  A.  Sir, I'm very hard of hearing.  I have to read lips, and my

20  eyes are bad, too.

21  Q.  You can't hear me like you heard Mr. Ross?

22  A.  Yes.

23  Q.  Okay.

24  A.  Just speak up a little.

25  Q.  Sure.  The checks that you got helped you get over any moral
```

1  dilemma you had. Do you agree with that?

2  A. Which checks are you talking about?

3  Q. All of them.

4  A. No. I still had the moral dilemma.

5  Q. But you didn't stop. You continued to send invoices and

6  cash checks; right?

7  A. That's correct. I had people I had to pay.

8  Q. So whatever moral dilemma you had was over come, was it not?

9  A. I still had that moral dilemma as I'm speaking to you.

10  Q. Let's see if we can agree on another thing. Number two.

11  You have met with the FBI and US attorneys? You've been meeting

12  with them since 2019; right?

13  A. Correct.

14  Q. The first meeting you met was November 4 of 2019; right?

15  A. I would assume so, yes, sir.

16  Q. And then November 18 of 2019 you met again?

17  A. To sum it up, I met with them a lot. I do not know the

18  dates. I don't know how many times. But you are correct.

19  Q. June 16, 2020 sound familiar to you?

20  A. Yes, sir.

21  Q. October 9, 2020 you met with all of them again?

22  A. Yes, sir.

23  Q. December 9, 2020, you met with them again?

24  A. Yes, sir.

25  Q. April 29 in 2021 you met with them?

1  A.  Yes, sir.

2  Q.  And then not only did you meet with them, you then met with

3  the government lawyers to prepare for coming here.

4  A.  Yes, sir.

5  Q.  And you did that December 20th of 2021?

6  A.  Yes, sir.

7  Q.  January 12 of 2022?

8  A.  Yes, sir.

9  Q.  And then you came back the next day on January 13, 2022.

10  A.  Yes, sir.

11  Q.  Right?  Your lawyer with you?

12  A.  Yes, sir.

13  Q.  Now, I asked to meet with you on January 19 through your

14  lawyer, didn't I?

15  A.  Sir?

16  Q.  I asked to speak with you on January 19 via a zoom call that

17  we scheduled on the 24th.

18  A.  That's correct.

19  Q.  Did you know about that?

20  A.  Yes, I did.

21  Q.  And you canceled it; right?

22  A.  I department.  My attorney did.

23  Q.  Oh, your lawyer decided that.

24  A.  You want to know his exact words?

25  Q.  No, I really don't.

```
 1   A.  Okay.

 2   Q.  You never met with me is the bottom line.

 3   A.  That's correct.

 4   Q.  Right?

 5   A.  That's correct.

 6   Q.  I didn't have anything to offer you, did I?

 7   A.  No, sir.

 8   Q.  Now, with all of these in each of these meetings with the

 9   government lawyers, isn't it true that they reviewed documents

10   that they were intending to show you for your testimony?

11   A.  They showed me some documents.

12   Q.  And, in fact, on that January 13, 2022, meeting -- so that's

13   two months ago -- you actually had with these folks a sort of

14   dress rehearsal.  A mock trial, did you not?

15   A.  Yes, sir.

16   Q.  So you practiced questions and answers?

17   A.  Yes, sir.

18   Q.  And, in fact, you said -- you alluded to it today when

19   Mr. Ross asked you a question.  And you said, I'm sure you're

20   going to have an example of that.  Do you remember saying that

21   today?

22   A.  That wasn't because of that.  It's because of what was going

23   on in the trial.

24   Q.  Well, you knew what he was going to ask you.  These last two

25   and a half days, you've known it.
```

1  A. All humans assume if a pattern, you go by a pattern, that

2  was the pattern.

3  Q. Well, you've practiced this. It's not a pattern. You've

4  practiced doing what you did with Mr. Ross before coming today.

5  A. Because we would be 3 or 4 weeks going over it if I wouldn't

6  have practiced it.

7  Q. Do you need to practice telling the truth? Is that what you

8  need?

9  A. When I look at something, I have to read it all. Once I see

10 it, I understand what it is. If I didn't understand it, I would

11 have to sit there and read everything. But he gave me a heads

12 up what he was going to do where I wouldn't sit up here and

13 waste the Court's time.

14 Q. So you were concerned about the Court's time. That's why

15 you were meeting with the government.

16 A. Yes. I want to be out of here. I got a spring game my

17 son's going to play in tomorrow.

18 Q. That's what's important to you?

19 A. In the morning, and I want to get out of here like these

20 people do also.

21 Q. You're worried about them. Is that what you're telling us?

22 That's your concern?

23 A. If you look at them, you can tell they ready to go home.

24 Q. Yeah. So when you had this practice trial, who played the

25 role of Mr. Ross?

```
 1  A.   Himself.

 2  Q.   And who played me?

 3  A.   An attorney from the criminal division.  I've only met that

 4  day.

 5  Q.   Was it not one of these three lawyers sitting here?

 6  A.   No, sir.

 7  Q.   Somebody else did that.

 8  A.   Someone else.  I cannot recall his name.

 9  Q.   And he went over questions that they thought I would ask; is

10  that right?

11  A.   Yes, sir.

12  Q.   And then you gave answers; is that right?

13  A.   They wanted to determine my demeanor.

14  Q.   They wanted to determine your demeanor?  Is that what you

15  just said?

16  A.   Yes.  Being a football coach, you tend to blow up, but I

17  dealt with parents.  I've -- I have 5,000 people in the stands

18  arguing, yelling how stupid I am, so I'm used to heat.  You can

19  bring it on.

20  Q.   So they were practicing and giving you advice on how to act

21  in front of the jury.  Is that what you're telling us?

22  A.   I'm saying they wanted to see how I reacted.

23  Q.   Did anybody give you any advice?

24  A.   My attorney.

25  Q.   Your lawyer did.
```

A.  Yes, sir.

Q.  He gave you advice on how to behave, how to act?  Is that it?

A.  He said when you start needling me to remain calm like I am.

Q.  Remain calm?

A.  Because I've been there, done that.  You have to talk and listen to people, which I'm doing, and respond.  And that's what I'm trying to do.

Q.  Okay.  Now, the other day, on Wednesday, you started -- Mr. Ross asked you a question, and you pulled a yellow note out of your pocket.  Do you remember when you did that?

A.  Yes, sir.  Do you want them?

Q.  Who wrote the notes?

A.  I got my attorney to.

Q.  He wrote you notes?  Was that to help you remember things?

A.  To remember the EO's where I wouldn't waste time.  But the EO's are already on the paper, so I really didn't need it.

Q.  Okay.  But you pulled it out.  I don't care to see it.  I didn't ask you for it.

A.  Okay.  Sorry.

Q.  Now, the first time you met with the agents, you also had your lawyer with you, did you not?

A.  First time I met with who?

Q.  The first time you met with the agents and the lawyers on November 4 of 2019, your lawyer was also with you, was he not?

1  A.  That is correct.

2  Q.  And the indictment in this case, the formal charging

3  document, that wasn't filed until January 13 of 2021; correct?

4  A.  Correct.

5  Q.  And that was 14 months after that first meeting.  Can we

6  agree on that?

7  A.  I would agree on it.

8  Q.  Okay.  And before you went in and spoke to FBI agents and

9  assistant United States attorney's, I assume you and your lawyer

10 discussed that?

11 A.  Yes, sir.

12 Q.  Okay.  And at the time you went in there -- or before you

13 went in there that first time, you had access to your bank

14 accounts, did you not?

15 A.  Yes, sir.

16 Q.  So you knew that Ed Op, was Mr. Ross showed you, had taken

17 in over 1.7 million from Athens city schools alone; right?

18 A.  That is correct.

19 Q.  And another 120,000 from Dr. Sisk over there at Limestone

20 county; right?

21 A.  That is correct.

22 Q.  Now, when you met with Mr. Ross on January 13 of this year,

23 two months ago, did you tell him that you believed you did not

24 make a profit in this case?

25 A.  Yes, sir.

1  Q.  You told him that?

2  A.  Yes, sir.

3  Q.  When you go see them -- were you put under oath?

4  A.  Oath?

5  Q.  Yeah.

6  A.  I was on a plea agreement.  Any lies, I would not --

7  Q.  When you spoke to them the first time in November, were you

8  put under oath in 2019?

9  A.  I cannot recall that.

10  Q.  Does the oath matter to you?

11  A.  Oath matters, truth matters.  That's what's the moral

12  dilemma.

13  Q.  Okay.  You also knew before you went in there the first time

14  that you had deposited $465,000 into your personal account from

15  the Ed Op account.

16  A.  That is correct.

17  Q.  All right.  And before you decided to go in and meet with

18  the government, you also had access to your computers; right?

19  A.  Yes, sir.

20  Q.  And you knew all the contracts and other -- the other work

21  that you did in this case that -- you knew they were on those

22  computers, did you not?

23  A.  Yes, sir.  They was on emails.

24  Q.  Okay.  And you also, I take it, knew that you did not have

25  to go speak with the government; right?  You weren't required to

1 do that, were you?

2 A.  That is correct.

3 Q.  Okay.  And I assume you were advised that if you got

4 formally charged that you could make the government bring forth

5 actual evidence of your guilt; right?

6 A.  Sir, could you repeat that?

7 Q.  Sure.  Before going to see these folks, you knew that if you

8 got formally charged?

9 A.  Yes, sir.

10 Q.  That you could demand your right to having a trial and force

11 them to see if they could put forth real documented evidence of

12 your guilt.  You knew that before seeing them; right?  That you

13 had to a right to a trial?

14 A.  Oh, yes.  Everybody has a right to trial.

15 Q.  And your lawyer was with you before you went -- while you

16 went to that first meeting, was he not?

17 A.  Yes, sir.

18 Q.  And so knowing all that, that you had bank records and

19 computers and you could make the government prove their case if

20 they charged you, you chose to go see them.  Right?

21 A.  The evidence was overwhelming.

22 Q.  And when you were doing that, you could agree with me that

23 you believed that was in your best interests to do that; right?

24 A.  Correct.

25 Q.  I mean, you weren't there for any other person's interests.

1  It was yours, was it not?

2  A.  That's correct.

3  Q.  Now, you and your lawyer had plenty of time to discuss the

4  case, review all the documents in this case; right?

5  A.  That's correct.

6  Q.  That's what I want to focus on this afternoon is the

7  documented actual evidence that proves you're a fraud; right?

8  A.  That is correct.

9  Q.  A thieve?

10  A.  That is correct.

11  Q.  And a liar; right?

12  A.  That is correct.

13  Q.  It's not just somebody saying that, there's actual

14  documented evidence of that; right?

15  A.  That is correct.

16  Q.  Now, little background, because you've been on the stand for

17  a long time.  Can you pull up 520, please.  Can you see this

18  email, sir, Government's Exhibit 520?  Do you see it?

19  A.  Yes, sir.

20  Q.  All right.  It's an email chain, so it kind of starts down

21  at the bottom.  Do you see that?  You were congratulating

22  Dr. Holladay?  Do you see that where it said I'm proud of you?

23  By the way, we can actually call you doc holiday.  Do you see

24  that?

25  A.  That is correct.

```
 1  Q.  So this was December of 2015; right?
 2  A.  That is correct.
 3  Q.  And then he writes -- or you wrote -- he writes you back.
 4  Do you see at the top where he says thank you?  Do you see that?
 5  A.  Yes.
 6  Q.  All right.  And he writes to you, you know besides Deborah,
 7  and Deborah is his wife; right?  Deborah Holladay is his wife;
 8  right?
 9  A.  Yes.  I'm sorry.  I was reading it.  Go ahead.
10  Q.  And he says, you're the only one that knows -- know my
11  journey.  And you actually know a longer time than she does.
12  Exclamation point?
13  A.  Did you say I was writing this.
14  Q.  No.  Trey Holladay is writing it.
15  A.  Okay.
16  Q.  See that?
17  A.  I agree with you.
18  Q.  So Trey's responding you when you congratulate on getting
19  his decorate.  What he's saying, I've known you longer than my
20  wife.
21  A.  Yes, and that is correct.
22  Q.  And Mr. Ross asked you about that.  It's just been a while.
23  So I'm rehashing it a little bit.  You said that you two were
24  like brothers; right?
25  A.  He always said that.  Yes.
```

1  Q.  Former college roommates, football teammates?

2  A.  Right.

3  Q.  And Mr. Ross got into you, that you and Deb, his wife, met

4  at that Starbucks at the University of Alabama in January,

5  February 2016.  Did I go too fast for you?

6  A.  Yeah, you was kind of mumbling together.

7  Q.  I'm sorry.  Mr. Ross then asked you and you confirmed that

8  you, Trey Holladay, and his wife, Deborah, met at the Starbucks

9  at the University of Alabama January, February 2016; right?

10  A.  Yes.  That's correct.

11  Q.  All right.  And at that meeting, Trey tells you, hey, I've

12  already enrolled about 200 Marengo students into the iNow

13  system.  Do you remember saying that to Mr. Ross?

14  A.  I don't remember him saying anything about Marengo.  He said

15  he had -- he showed me a law stating he could do it.  And I

16  don't believe he told me at that time.  I cannot remember.  He

17  told me eventually, but I cannot remember if it happened that

18  particular day while I'm standing here.

19  Q.  Okay.  Look at that screen again on this 5/20?

20  A.  10/4.

21  Q.  You see the sentence?  Then he says, I still have some

22  things going on that I believe you may be interested in that

23  will allow you to stay retired.

24  A.  Yes, sir.

25  Q.  Light?  And I wanted to keep you in mind.  Right?

1  A.  Correct.

2  Q.  This is really the first evidence of Trey Holladay formulate

3  being this plan.  Do you agree with me?

4  A.  I agree with you.

5  Q.  And I think you said you wanted to stay retired, but your

6  retirement wasn't what you wanted it to be, and I think you said

7  you were looking for something easy; right?

8  A.  Correct.  I was looking for something around $2,000 that was

9  easier.  My health and everything.

10  Q.  Okay.  And you started to say that at some point Trey was

11  saying to you, hey, there's this new law, this thing is great,

12  but I need someone to deal with the private schools because I'm

13  a superintendent of a public school system, and I can't do that.

14  I need you, old friend.  Words to that effect.

15  A.  That would have been later on.  I don't think it was that

16  day.

17  Q.  I understand.

18  A.  It was all candy and roses that day.

19  Q.  Not at the Starbucks meeting but later he's telling you,

20  hey, there's this new law that allows us to do this.  Would you

21  agree with me?

22  A.  The first law says I'll be able to deal and go out and get

23  students.

24  Q.  Right.  And so he then says to you, here's what we're going

25  to do.  You're going to form a company and then I, Trey

1  Holladay, when I say I?

2  A.  Yes.

3  Q.  I'm going to get a contract between your company and Athens

4  city schools, and I'm going to be able to get it approved by our

5  board.  Right?

6  A.  That's correct.

7  Q.  All right.  You guys talk again at some point you then agree

8  to the numbers, as Mr. Ross -- as you testified?

9  A.  Correct.

10 Q.  And you guys, as you said before, agreed to that 50/50

11 split; right?

12 A.  That was after I agreed to do it and --

13 Q.  Okay.

14 A.  Right before the contract was signed.  Yes.

15 Q.  All right.  So you do form Ed Op.  That was February 25 of

16 2016; right?

17 A.  Yes, sir.

18 Q.  And you knew before you went and saw the agents that that

19 business record existed.

20 A.  Yes, sir.

21 Q.  Right?  So that's an example of documented evidence; right?

22 There's nothing you can say or do, it the what it is.

23 A.  That is correct.

24 Q.  All right.  And the address that was on it was the address

25 that you put as the office address; right?

1  A.  Yes, sir.

2  Q.  All right.  Now, you had already said -- I believe it was

3  yesterday morning -- Mr. Ross showed you an email, and you had

4  responded -- I got to talk to the big man.  Remember saying

5  that?

6  A.  Yes, sir.

7  Q.  And then Mr. Ross asked you, who's the big man?  And you

8  said, Trey Holladay.

9  A.  100 percent.

10  Q.  And you also used the phrase money man, did you not, in

11  describing Trey Holladay?

12  A.  Yes.

13  Q.  Let's go to 166 A, please.  So this is April 5, 2016; right?

14  Do you see that date?

15  A.  Yes, sir, I do.

16  Q.  So this is 17 days before the contract got signed with

17  Athens city and Ed Op; right?

18  A.  Yes, sir.

19  Q.  And there it is.  There's the money man.  He sent you the

20  proposed contract, and he says, let's talk dollars.  Right?

21  A.  That's correct.

22  Q.  And that's between the two of you, was it not?

23  A.  This particular email, yes.

24  Q.  I mean, that's what your agreement with Trey was about, was

25  money; right?

1  A.  Yes.

2  Q.  Now, attached to this was a proposed contract.  Could you

3  open 166 B, please, the attachment.  And I think Mr. Ross went

4  over this contract with you; right?  That was the proposed one

5  between Ed Op and Athens city that Trey Holladay assured you

6  he'll get through to the board; right?

7  A.  Yes.

8  Q.  All right.  Did Holladay tell you that Shane Black wrote

9  this contract?

10  A.  I cannot recall, but I think he said board attorney.

11  Q.  Okay.  All right.  So April 22 comes, 2016.  You do enter

12  that contract with Athens city; right?  April 22?

13  A.  Yes, sir.

14  Q.  And, again, that contract, when it's signed, there's no

15  refuting that documented evidence.  That's evidence of your

16  agreement with Athens city; right?

17  A.  Yes, sir.

18  Q.  Do you agree with me that naming this company educational

19  opportunities and management, LLC, was designed to have people

20  think it was something it was not?  Do you agree with that?

21  A.  No, sir.  It's a catchy name.  You always hear op ed, and I

22  watch news, and it was just a catchy name.  I just reversed it

23  to Ed Op.

24  Q.  Okay.

25  A.  Name recognition.

1   Q.  Okay.  Shortly thereafter, so the contract was signed on

2   April 22.  May 3rd, which is ten or -- two weeks later, you

3   cosponsor that digital show case; right?  Let's pull it up.  172

4   B, please.  I'll help you with the dates.  I'll help you

5   Q.  All right.  You see that in the upper left-hand corner where

6   it says may 3rd, 2016?

7   A.  Yes, sir.

8   Q.  And that's you right down there in the bottom, cohosted by

9   Ed Op; right?

10  A.  Yes, sir.

11  Q.  So this was about two weeks after you signed the contract

12  with Athens city; right?

13  A.  Correct.

14  Q.  There you are cosponsoring the digital learning showcase;

15  right?

16  A.  Correct.

17  Q.

18  A.  I was asked for this logo by Rick Carter --

19  Q.  I haven't asked you a question.  Mr. Ross can ask lots of

20  them when I'm finished.

21  A.  I'm sorry.

22  Q.  Now, when you were talking with Mr. Ross about this show

23  case, what you said was that Rick Carter was tasked with

24  planning the show case.  Do you remember saying that?

25  A.  Yes.

```
 1   Q.  And you said he was tasked with it by Trey Holladay.

 2   A.  Yes, sir.

 3   Q.  Was that Trey Holladay's way, kind of directing people to do

 4   things and telling people to do things?

 5   A.  Yes.  I would agree with you that Trey Holladay told him

 6   everything to do.

 7   Q.  And that was --

 8   A.  100 percent.

 9   Q.  And that was his way with everybody.  He was kind of a

10   carries mat particular man.  Agree with that?

11   A.  Yes, I do.

12   Q.  Kind of running the show, kind of person.

13   A.  Yes, sir.

14   Q.  Okay.  Now, did I hear you say that you borrowed money from

15   your children to help coresponse or this?

16   A.  Yes, sir.

17   Q.  I take it, then, that --

18   A.  It wasn't this one.  It was the -- during the summer, the

19   training sessions.

20   Q.  Oh, okay.  So it wasn't for this.

21   A.  It wasn't this.  I didn't pay any money at this particular

22   time.  But in the summer is when I paid for those two training

23   sessions.

24   Q.  Well, didn't you pay for a private schools to come stay

25   overnight in hotels for the digital show case?
```

1  A.  Not for then.  That -- Athens actually paid for that, I

2  believe Rick handled that.

3  Q.  Okay.  What did you do, then, to cohost?

4  A.  Give them this Ed Op logo and show up.

5  Q.  Okay.  All right.  Now, the people that were showing up --

6  in fact, the people that Holladay directed Carter to invite were

7  private schools.

8  A.  That's correct.

9  Q.  I mean, that wasn't a secret; right?

10  A.  That is correct.

11  Q.  Now let's go to the next page, please.  Did you see -- you

12  saw Dr. Carter there; right?  At the show case?

13  A.  Yes, I see Dr. Carter.

14  Q.  And Ms. May?  You saw her?

15  A.  Yes, I do.

16  Q.  And then Ms. Patton?

17  A.  Yes, sir, I do.

18  Q.  All right.  Let's go to the next page.  And then the next

19  page?

20  A.  All right.  So do you see that this last page of the

21  brochure for what you cosponsored, there's Dr. Holladay telling

22  whoever would listen to him that dual enrollment was the

23  greatest thing since sliced bread; right?

24  A.  Yes, sir, I agree with you.

25  Q.  All right.  And he believed that this law, as you said to

1   Mr. Ross, time's are changing.  He said that to you, that this
2   new law was changing times in education and that we're going to
3   be able to do this virtual education and dual enroll kids;
4   right?  I Trey Holladay said that.
5   A.  I would agree with you, yes.
6   Q.  Okay.  So Mr. Ross showed you -- pull up 230 B, please.  So
7   Mr. Ross showed you when Dr. Carter sent you this template.  Do
8   you remember that for the items that he needs to enroll
9   full-time virtual kids, and he gave you this sample.  And you
10  see what it says up here at the top?
11  A.  Yes, sir, I do.
12  Q.  And that's Dr. Carter repeating what Dr. Holladay was
13  telling everybody in May of '16, that dual enrollment was
14  allowable; right?
15  A.  I would agree with you, yes.
16  Q.  Now, that's May of 2016.  Did you know that Dr. Holladay had
17  actually met with state department people prior to putting on
18  this digital show case?
19  A.  No, I didn't.
20  Q.  He kept you in the dark about that, didn't he?
21  A.  Yeah.  He -- we -- Rick and I started finding out what
22  you're getting to, he was keeping things from us.
23  Q.  All right.  So let's go to 239 A.  So if you can enlarge
24  that email, please.  So this is an email from Trey Holladay in
25  June of 2016.  And do you see the fellow in the upper left?

1   A.   Yes.   That's Dr. Byrd.

2   Q.   And that's another superintendent; right?   Just like Trey

3   Holladay?

4   A.   Yes.   He's county school superintendent, yes.

5   Q.   And so do you see the attachment that's on here?   It says,

6   EOM contract.

7   A.   Yes, I do.

8   Q.   And EOM is just educational opportunities management.   The

9   same as Ed Op; right?

10  A.   Yes, sir.

11  Q.   So when we see EOM, that's you; right?

12  A.   Yes, sir.

13  Q.   I want you to read this email, please.

14  A.   Good afternoon.   I wanted to let you know that we --

15  Q.   Slow down, sir.

16  A.   I'm sorry.

17  Q.   That's all right.

18  A.   Good afternoon.   I watned to let you know that we, Athens

19  City Schools, are planning to partner with several school

20  systems to leverage resources for virtual school options.   We

21  have also partnered with an educational management company to

22  assist us with the ALSDE requirements to ensure foundation

23  funding for any student attending our virtual program at Athens

24  Renaissance School.

25  Q.   Slow down a little bit.

1   A.  All right.  I am more than happy to offer assistance if you

2   need anything from us.  If all eight school systems that have

3   have shown interest join us, all of the systems could serve any

4   student in the state.  I will be at the CLAS conference on

5   Monday --

6   Q.  You can stop.  You can stop.

7   A.  Okay.

8   Q.  Thank you.  Now, did you know that Trey Holladay sent this?

9   A.  That's the first time I've seen it.

10  Q.  Okay.  Did gray Holladay tell you he was going to be sending

11  people a copy of your contract between Ed Op and Athens city

12  schools?

13  A.  No, sir.

14  Q.  Do you see -- and you just read it -- that he says he's

15  partnering with educational management company.  That's you;

16  right?

17  A.  That would be me.  Yes, sir.

18  Q.  And he's telling people that you're supposed to be assisting

19  with -- what is that?  ALSDE.  What is that?

20  A.  I lost you at the ALSDE.

21  Q.  You see this?

22  A.  Yes.  That's Alabama state department of education

23  requirements, whatever he's referring to.

24  Q.  And you're supposed to be assisting with the ALSDE

25  requirements.  That's what he's saying, right?

1  A.  Exactly.

2  Q.  Was that in your contract?

3  A.  I don't recall.  It may say it in there.

4  Q.  You don't have a clue what was in your contract, do you?

5  A.  You are correct.

6  Q.  All right.  So after this show case, you start dealing with

7  some private schools, as you've said; right?

8  A.  I missed you on the end of that.

9  Q.  I'm sorry?  I'm sorry?

10  A.  I didn't understand you.  I'm sorry.

11  Q.  My fault.  After the digital show case when those private

12  schools were attending, after that you started dealing with the

13  private schools; right?

14  A.  After the show case.

15  Q.  Yeah.

16  A.  Yes, sir.

17  Q.  And you agree with me, when you first went in to see the FBI

18  and the lawyers, you knew that there was a large documented

19  trail of all of your dealings with these private schools; true?

20  A.  That is true.

21  Q.  And you knew that they have the power to subpoena.  You know

22  what a subpoena is?

23  A.  Yes, I do.

24  Q.  It commands people to hand things over, does it not?  It's a

25  court order; right?

1  A.  That's correct.

2  Q.  And you knew they had the power to get those documents

3  before you went in to see them.  Do you agree with me?

4  A.  Yes, I did.

5  Q.  All right.  By the way, you said on Wednesday that you

6  provided the government with certain emails?  Do you remember

7  saying that?

8  A.  Yes, sir.

9  Q.  How did that happen?

10  A.  I sent them every one of my emails I had.

11  Q.  When?

12  A.  When I first walked in the door.

13  Q.  Before you got there in November of '19?

14  A.  I cannot remember which time, but it was very early on.

15  Q.  Did you do that through your lawyer or you did that on your

16  own?

17  A.  I gave them to my lawyer and he gave it to them.

18  Q.  All right.  And so I take it you gathered them, gave them to

19  your lawyer; right?  Your lawyer didn't go in your computer and

20  gather them; right?

21  A.  Excuse me.

22  Q.  Sure.  Sure.  You gathered your emails from your computer

23  and gave them to your lawyer; right?  Your lawyer didn't get on

24  your computer, did he?

25  A.  That is correct.

1  Q.  Okay.

2  A.  I sent them to him.

3  Q.  You can get back on the stand.

4  A.  I can't see you then.  I have a glare up here.

5  Q.  So do I.

6  A.  Okay.

7  Q.  So you chose the emails to give to your lawyer to give to

8  the government; true?

9  A.  Yes, sir.

10  Q.  And did you send or did you give to your lawyer to give the

11  government the emails for the context contacts you had over at

12  Limestone county?  Tommy Hunter, shell I Smith?  Let me ask you

13  that.  Tommy hunter and shell I Smith were your contacts over at

14  Dr. Sisk's place, Limestone county, were they not?

15  A.  I don't recall.

16  Q.  You don't remember who you sent emails back and forth with

17  at Limestone county?

18  A.  That's six years ago.

19  Q.  Well, so is this.  So is Dr. Carter six years ago.  Right?

20  A.  He and I talked daily.

21  Q.  So when you practiced before coming for the trial, did any

22  of these folks show you any of those emails?

23  A.  I don't recall.

24  Q.  Well, the answer is no, because they didn't.  Isn't it?  Not

25  I don't recall.  The answer is no.

```
 1  A.   That's your answer.  I don't recall.

 2  Q.   So they may have and you have forgotten that?

 3  A.   I don't remember.

 4  Q.   Do you remember Amanda hard a man?  Do you remember who she

 5  was over at Limestone?  The accountability data manager?  Do you

 6  remember her?

 7  A.   Could you say that name again?

 8  Q.   Amanda hard a man.

 9  A.   I don't remember her.

10  Q.   Okay.

11  A.   I met them probably one time.

12  Q.   Okay.  Now, you also said that it seems that -- and tell me

13  if I'm wrong -- you were suggesting that when Dr. Carter sent

14  you a spreadsheet in the spreadsheet format, that that would

15  allow for mass enrollment on iNow.  And I think you said it

16  would take like five seconds.  Did I hear you right?

17  A.   Yes.  It's a format you're supposed to send it in.

18  Q.   You were suggesting that Dr. Carter did that on purpose so

19  that they could mass enroll.  Did you mean to indicate that to

20  us?

21  A.   Yes.  That's what you do when you want to mass enroll.

22  Q.   Pull up 366, please.  Can you highlight it, please?

23       Read this email, please.  Well, first of all -- I'm sorry.

24  My fault.  Do you see the date?  This is August of 2016, the

25  height of all these new enrollments; right?
```

1  A.  Correct.

2  Q.  And do you know Jennifer Sallee, Joanna May, Lorri Haynes,

3  Ruth Southers?

4  A.  Works at Athens.

5  Q.  Yeah.  You told us already.  You know Ruth Southers.  She's

6  the registrar.

7  A.  Yes.

8  Q.  Right?

9  A.  Yes, sir.

10  Q.  And this is from Dr. Carter; right?  Right?  The email is

11  from Dr. Carter.  Do you see it?

12  A.  I see it.

13  Q.  I want you to read it out loud.

14  A.  Thank you for going above and beyond --

15  Q.  No, no.  The first word is not thank you.  What's the first

16  word?

17  A.  Ladies.  Thank you for going above and beyond this weekend

18  with enrollments.  We are close to the finish line now.  Ed Op 5

19  remains and Mr. Corkren should have us ready today.

20  Q.  Do you remember Rick Carter bugging you to get EO 5 --

21  that's Southern Academy -- do you remember bugging you to get it

22  to them?

23  A.  Remember.

24  Q.  Do you remember Dr. Carter bugging you to get him the

25  southern documents?

1  A.  The enrollment forms?

2  Q.  Yeah.

3  A.  I remember getting pressure, yes.

4  Q.  There's no mass enrollment going on.  These women were

5  working weekends, working on this stuff, watching television at

6  night.

7  A.  If you've you forgot about transcripts and grades.

8  Q.  You think there was mass enrollment that happened?  That's

9  what you think?

10  A.  Oh, it did.

11  Q.  Who told you that?

12  A.  Rick Carter, and it's evidence he sent me a mass enrollment

13  form.  When you go into the program, you set up the columns to

14  print it out.

15  Q.  Okay.

16  A.  In the way you need it.

17  Q.  Okay.  Let's talk about documented evidence.  Pickens

18  Academy, for instance.  You know there's a contract between you

19  and Pickens Academy; right?

20  A.  Yes, at one time, yes.

21  Q.  There were 166 forms signed by Trip Sanders; right?

22  A.  Yes, sir.

23  Q.  And by the way, Holladay provided you with the enrollment

24  form, told you it was okay for headmasters to sign it.  That's

25  where you got the enrollment form; right?

 1  A.  Yes, sir.  He provided it, but I do the it from Rick.

 2  Q.  Well, when --

 3  A.  Rick is --

 4  Q.  When you talked to the agents, you told them, Dr. Holladay

 5  provided you with the enrollment form, and he told you it was

 6  okay to get the headmasters to sign you.  Rick didn't tell it he

 7  will you that?

 8  A.  And that's what you told the agents on your first meeting,

 9  did you not.

10  A.  Yes.  I told them it was from Mr. Holladay.

11  Q.  You didn't say Rick Carter when you talked to them the first

12  time.

13  A.  That's correct.

14  Q.  In fact, Holladay said, and what you told them, was hey,

15  here's the form, I used it before at Marengo Academy before you

16  were even on the scene.  That's what he told you; right?

17  A.  He told me what?  I'm sorry.

18  Q.  Dr. Holladay, when he gave you the enrollment form, told

19  you, here's the one I used for Marengo.

20  A.  I don't remember that, no.

21  Q.  Okay.  You knew at Pickens there were checks; right?

22  A.  I'm sorry.

23  Q.  Evidence of checks you wrote to Pickens Academy?  You knew

24  that documented evidence was out there before you went to see

25  them; right?

1  A.  Oh, yes.

2  Q.  And with Pickens, Tutt got involved with Pickens; right?

3  A.  Who?

4  Q.  Tutt.  Webb Tutt.  He got involved with Pickens.

5  A.  Yes, sir, he did.

6  Q.  Right?

7  A.  Yes, sir.

8  Q.  And you knew that he formed a BS company, too, just like

9  you; right?

10  A.  That's correct.

11  Q.  And so you knew that evidence was documented in the Alabama

12  business; right?

13  A.  Yes, sir.

14  Q.  You knew that there was independent contractor agreements;

15  right, between Tutt and Ed Op?

16  A.  Yes.

17  Q.  Let's pull up 868 E and D, side by side, please.  You've

18  seen these before, have you not?

19  A.  Yes, I've seen it.

20  Q.  And before you went and spoke with these folks, you knew

21  these were in existence, did you not?

22  A.  Yes, sir.

23  Q.  Who drafted these?

24  A.  Sir?

25  Q.  Who wrote these independent contractor agreements?

1   A.   That would be Trey Holladay.

2   Q.   No.  He sent them to you.  You don't know who wrote them.

3   A.   You are correct.  You are correct.

4   Q.   Right.  So just because somebody sent you something doesn't

5   mean they wrote it.  Do you agree with that?

6   A.   I totally agree with you.

7   Q.   Thank you.  See you knew with Pickens the documented

8   evidence against you included contracts, enrollment forms,

9   checks, business records, student ID's, transcripts?  I mean, I

10  could show you, but you know they exist; right?  All of those

11  things I just said, you know exist and are documented; right?

12  A.   Yes.  I know all that.

13  Q.   By the way, Trip Sanders.  Did you write him a

14  recommendation for a job at Ole Miss?

15  A.   Did I?

16  Q.   Yeah.  Did you?

17  A.   I don't recall that.

18  Q.   Okay.  Did he ask you for one?

19  A.   I don't recall that.

20  Q.   So that you don't recall.

21  A.   I have lots of people that's asked me that.

22  Q.   You have lots of people asks asking you to write them

23  recommendations?

24  A.   Back in the day when I was a principal.

25  Q.   All right.  So regarding Marengo Academy, I take it you let

1 your lawyer know about the documented evidence that existed of

2 your guilt regarding Marengo Academy before I deciding to go

3 talk to those folks; right?

4 A.  That is correct.

5 Q.  And there are checks out there to Marengo; right?

6 A.  That is correct.

7 Q.  You sent four of them to Coach James; right?

8 A.  I sent four.

9 Q.  Checks to coach James at Marengo.

10 A.  I do not recall.  I sent checks to Marengo, yes.

11 Q.  And then Ms. Etheredge took over and she kept taking six

12 more of them for a total of 10 for 40,000.

13 A.  Correct.

14 Q.  Right?

15 A.  For the school.  Yes.

16 Q.  Well, Tutt took over from you, and he sent them checks, too;

17 right?

18 A.  I assume he did, yes.

19 Q.  Well, you know that he did.

20 A.  He was supposed to, yes.

21 Q.  All right.  And then there's evidence of really what you

22 wanted was the rosters and grades and student ID's right?

23 There's evidence of that?

24 A.  I'm losing you there.

25 Q.  There's evidence that you got the student identification

1  material from them, is there not?

2  A.  Yes, sir.  I obtained the info, yes, sir.

3  Q.  And you knew that documented evidence existed before you

4  went and saw them; right?

5  A.  Yes, sir.

6  Q.  And so some of the evidence at this point you knew in your

7  head before you spoke to them were your company that's a shell

8  company did, right?  Ed Op?

9  A.  Oh, yes.  Corrects.

10  Q.  You knew that Tutt had a shell company; right?

11  A.  Yes.

12  Q.  And then all the other things I've talked about.  Checks and

13  forms and all that; right?

14  A.  Correct.

15  Q.  Now, do you agree with me that you miss lead the headmasters

16  of the private schools to get them to sign the enrollment forms?

17  Do you agree with me?

18  A.  To get them to sign the enrollment form?

19  Q.  Yes.

20  A.  At that time, I was had no clue at the very beginning.

21  Q.  It's not a difficult question.  Do you agree with me that

22  you misled them to get them to sign it?

23  A.  No, I do not agree with you.

24  Q.  You think you were 10 0 percent transparent and honest and

25  told them exactly what it was, and they signed them.  Is that

1  what you're telling us?

2  A.  That is correct.

3  Q.  Did you practice that answer with them?

4  A.  No, sir.

5  Q.  Okay.  Do you agree with me that you paid the headmasters

6  later to get the parents to sign the forms by then misleading

7  the parents?  Do you agree with that?

8  A.  No, I do not.

9  Q.  Okay.  Do you know what con and con man stands for?

10  A.  Con and con man?

11  Q.  What's the con stand for?  Do you know?

12  A.  What's a con?

13        MR. ROSS:  Objection.  Relevance.

14        THE COURT:  Overruled.

15  Q.  Do you know what that means, the con part of con man?

16  A.  No.

17  Q.  It means confidence.

18  A.  Confidence.

19  Q.  Yes.  You gain people's confidence by telling them one thing

20  and then doing another.

21  A.  That is correct.

22  Q.  So presume that con man means what I just said.  I want you

23  to presume that.

24  A.  Yes, sir.

25  Q.  Do you agree with me that you did that?  You told people one

1  thing and then did another?

2  A.  To those headmasters?  No.

3  Q.  Yeah.

4  A.  No.

5  Q.  Okay.  How about to the parents of the kids?

6  A.  I never spoke to the parents.

7  Q.  Well, you spoke to them through their headmasters; right?

8  A.  Correct.

9  Q.  They freely handed them over to you; right?  The headmasters

10  freely handed them to you, just willy-nilly handed them.  Here

11  you go.  You didn't have to force them to give them to you;

12  right?

13  A.  No, I didn't force them.

14  Q.  And including the student information.  They freely handed

15  you student data.

16  A.  That's correct.

17  Q.  They did that because of what you said to them.  Can you

18  agree with me about that?

19  A.  What I said to them?

20  Q.  Yeah.

21  A.  They all knew -- they were going on Trey Holladay's word.

22  They all knew him.  They didn't know from Adam's house cat.

23  Q.  Okay.  You didn't tell any of them about your 50/50 split

24  with Trey; right?

25  A.  Of course not.

1  Q.  Okay.  All right.  So there's more documented evidence over

2  at Lakeside; right?  Site contract, Ed Op checks; right?

3  A.  Yes, sir.

4  Q.  All right.  One thing I want to clear up.  Holladay,

5  Dr. Holladay is the one who originally sent you that ASA form.

6  Remember when Mr. Ross showed you the AISA form and you said

7  that Trey got it off the internet?  Got it off the web site,

8  that logo?

9  A.  Yes.  And you are correct.

10 Q.  Okay.  It was Holladay who sent it to you on May 11; right?

11 Do you want to see it?

12 A.  No.  I agree with you.  He's the one that sent it to me.

13 Q.  Right.  Mr. Ross didn't ask you about that.  Holladay sent

14 it to you on May 11; right?  And it was blank.  Do you remember

15 that?

16 A.  I don't know, but I agree with you, he sent it to me and

17 said -- I said, how did you get this form?  And he said he

18 pulled it off the internet.

19 Q.  Right.

20 A.  And I assumed that the AISA had a form on there.

21 Q.  Right.

22 A.  But later I found out he created it, grabbing a logo off the

23 web site.

24 Q.  Let's pull up 221 B, please.  So can you look at the screen?

25 A.  I see it.

1  Q.  All right.  So that's the blank one; right?

2  A.  Yes, sir.

3  Q.  And then how about 222 A.  That was what you got on May 11.

4  And then here's the email that Mr. Ross showed you Dr. Carter

5  sent it two days later.  Do you see that?

6  A.  Yes, sir.

7  Q.  All right.  Let's pull up B, the attachment.  And the

8  difference is this.  That Holladay had instructed Carter to

9  populate it with -- let's make this bigger, please.  You then

10 got it populated with that; right?  So all the forms had that on

11 it.  Do you see it?

12 A.  I see it.

13 Q.  And who were these forms to be sent to?

14 A.  To whichever school the private schools that needed it.

15 Q.  Okay.  I asked a bad question.  They were then going to be

16 returned to who?  Who does it say?

17 A.  Ruth Southers.

18 Q.  Right.

19 A.  Registrar.

20 Q.  You had said to Mr. Ross return to Dr. Carter.  But that's

21 not true.  They were supposed to be sent to route Southers;

22 right?

23 A.  Do you see that?  Let's back out so we can see the whole

24 thing, please.

25 A.  Go ahead.

1  Q.  Right?  This verification form is supposed to be filled out,

2  student information, and returned to Athens Renaissance School,

3  attention Ruth Southers, registrar.  Do you see that?

4  A.  I see it.

5  Q.  And it wasn't going back to Dr. Carter; right?

6  A.  You're incorrect.  Anything I sent to Athens went to him.

7  Q.  Okay.

8  A.  I don't care what it says on there.  Everything went to him.

9  Q.  This is what you got from Dr. Carter, 222 B, right?

10 A.  What was the CC?

11 Q.  Look at the screen.  All right?

12 A.  All right.

13 Q.  This is what you got from Dr. Carter, what you're looking

14 at; right?

15 A.  Yes, sir.

16 Q.  Okay.  Now, let's pull up 1309.  Mr. Ross showed you this

17 today.  Now, repeatedly he called this Dr. Carter's list.  Do

18 you remember him saying that to you when he would ask you

19 questions about it?

20 A.  Dr. Carter's what?

21 Q.  List.  He called this Carter's list.

22 A.  Yes.  Correct.

23 Q.  Well, the truth is this is an example, is it not, of you got

24 this from Dr. Carter, but you have no idea who wrote this list.

25 Right?

1  A.  Correct.

2  Q.  Yeah.  The counselors wrote this, sent it to Carter, who

3  sent it to you.  All you know is you got this from Carter;

4  right?

5        MR. ROSS:  Objection to the facts put in the question

6  that the witness lacks personal knowledge about.

7        THE COURT:  I think that's his point, actually.

8        MR. FUNK:  Thank you.

9        MR. ROSS:  Your Honor --

10       THE COURT:  He does have personal knowledge about it.

11 Overruled.  Go ahead.  Ask your question again, though.

12       MR. FUNK:  I will.  I think it's easily done this way.

13 Q.  Ruth Southers is the registrar; right?

14 A.  That is correct.

15 Q.  At Athens?

16 A.  Yes.

17 Q.  And then there are other counselors at Athens; right?

18 A.  I assume there are, yes.

19 Q.  And their job is to impart, make sure students are on track

20 to graduate.  That's what their job is; right?

21 A.  That is correct.

22 Q.  And hopefully they're looking at students' stuff that

23 they're on track to graduate; right?

24 A.  That is correct.

25 Q.  And that's what -- and this email and others he showed you

 1  today are reflecting things that are missing for kids that are

 2  hoping to graduate; right?

 3  A.  Right.

 4  Q.  Carter's job wasn't to be a counselor for kids; right?

 5  A.  Correct.

 6  Q.  That was supposed to be your job for the virtual kids, was

 7  it not?

 8  A.  No, sir.

 9  Q.  You weren't supposed to be providing a virtual education for

10  these kids?

11  A.  As you can see in this email, everything I did was sent

12  through him and everything I got was sent through him.

13  Q.  I didn't ask you where it was sent.  I asked you what you

14  were contracted to do.  It was supposed to be providing virtual

15  education for virtual students, was it not?

16  A.  On the contract it says I'm to do exactly what they say.  In

17  other words, do I know what's in the contract?  No, because in

18  the contract it specifically says that I have to seek advice and

19  counsel for them.  And once I read that, the other stuff --

20  basically, I said, whatever they told me to do, I've got to do.

21  Q.  Okay.  All right.  We can move on.  Jackson Academy.  Before

22  you went and saw them, you knew there were checks from you, from

23  Tutt; right?  You knew there was documented evidence regarding

24  Jackson Academy before you went and saw them?

25  A.  Yes.

1  Q.  Right?

2  A.  Yes.

3  Q.  Okay.  Now, the documents that you've acknowledged, what

4  they tend to prove is that you and Holladay agreed to enroll

5  these kids to increase the ADM at Athens city; right?

6  A.  Correct.

7  Q.  And you had to increase the ADM so you two could make money;

8  true?

9  A.  That's what he wanted.

10  Q.  Okay.

11  A.  I wanted $2,000, a small job.

12  Q.  I understand.  All right.  Let's talk about Dr. Sisk.  He --

13  you had a little different deal there, but it's clear from the

14  documented evidence with Dr. Sisk that trail, if you will,

15  proved that you and Dr. Sisk committed a crime there.  Agreed?

16  A.  That is correct.

17  Q.  There is the contract between Ed Op and Limestone county;

18  right?

19  A.  Yes, sir.

20  Q.  And then there is that check made out to the charity.  You

21  remember that?

22  A.  I do.

23  Q.  And the napkin itself is a piece of evidence; right?

24  A.  That is correct.

25  Q.  And it had Dr. Sisk's address written on it; right?

1  A.  It does.

2  Q.  Why did you save that napkin?

3  A.  I've asked myself, but when you know there a crime, you

4  better be able to show -- I don't know.  It was just something

5  fishy.  The address, I got it -- I don't know.  I've asked

6  myself.  I don't know why I kept it.  Just lucky I kept it.

7  Q.  All right.  The other documented evidence over at Limestone

8  is that changed contract between you and Limestone.  Remember

9  the $5,050 change?

10  A.  Yes, sir.

11  Q.  And that's where you changed page 3.  Remember that?

12  A.  That is correct.

13  Q.  And that was a PDF when you got it; right?

14  A.  That is correct.

15  Q.  So you knew -- what year was that?

16  A.  '16.

17  Q.  So six years ago, you knew how to change a PDF document?

18  A.  Everyone does.  I'm sorry.  Yes.

19  Q.  Okay.  Well, you taught computers; right?

20  A.  That's correct.

21  Q.  Okay.  Now, do you agree with me that when you changed that

22  document to $55, your intent was to lie and to fool people?

23  A.  Yes, sir.

24  Q.  And you and Sisk agreed to lie and fool people so that Sisk

25  could make money and you could make money.

1  A.  No, sir.

2  Q.  Okay.  Did Sisk make money from this?

3  A.  Obviously.

4  Q.  Okay.  Did you make money from this?

5  A.  I did.

6  Q.  Okay.  The charity angle was complete BS, and both of you

7  knew it.  Can you agree with that?

8  A.  No.

9  Q.  Did you think the charity was legitimate?

10 A.  When I saw the address, it was fishy.  Before that, I

11 thought he was going to do with the money what he was intending

12 to do, was feed the teachers.  If you've been in school business

13 long enough to know, you've got people that pool money out of

14 their pocket all the time to do things.  They're not lawyers.

15 Q.  You changed the contract to something that the board didn't

16 approve; right?

17 A.  As instructed by Dr. Sisk.

18 Q.  But you didn't do that to help a charity.

19 A.  You've got to give me a damage good reason to do it, and it

20 was a sad story.

21 Q.  It was so you could make money.  You can't admit that today?

22 A.  I didn't make a dime of that.  I donated all to that

23 charity.

24 Q.  Okay.  Well, you continued to bill -- in fact, every bill

25 you sent to them was $5,050, not 45, was it not?

1   A.  It ended about the time he got the check.

2   Q.  I didn't ask you about it -- when it ended.  I asked every

3   invoice you sent them was for $55, the lie, not the $45 that the

4   board approved.  True?

5   A.  Every invoice I got?  Yes.  $55.

6   Q.  Yes.  Yes.

7   A.  That's correct.

8   Q.  You made money off that, did you not?

9   A.  The extra money --

10  Q.  Yeah.

11  A.  The $10, all of that went to that charity.  If you calculate

12  it up, you'll see that $10, every bit of that went into his

13  charity.

14  Q.  How about the invoices that didn't go there?  Did you make

15  money off that?

16  A.  For the other schools?

17  Q.  I'll move on, Mr. Corkren.  Did you know that Dr. Sisk was

18  using the charity to try to hide the money?  How about that?

19  A.  Yes.

20  Q.  Okay.  Now, on Wednesday Mr. Ross -- when he asked you about

21  Limestone county, you used the phrase, when I was doing business

22  with Sisk.  Do you remember saying those words?

23  A.  Yes, sir, I do.

24  Q.  Do you consider what you were doing with Sisk business?

25  A.  That was a reference to Limestone county.

1  Q.  Yeah.

2  A.  His school system.

3  Q.  Do you consider that legitimate business, what you were

4  doing?

5  A.  Yes, sir.

6  Q.  Okay.  You also said on Wednesday that you sent Limestone's

7  student information to Dr. Carter.  Do you remember saying that?

8  A.  I did.

9  Q.  Now, tell me if I missed it.  I didn't see a corresponding

10 Google Drive up load or an email to Dr. Carter.  I don't believe

11 Mr. Ross showed you that.  Am I wrong about that?

12 A.  You're not wrong.

13 Q.  All right.  So what we have is you saying that you did that?

14 A.  Correct.

15 Q.  Before we believe leave Limestone, let's pull up 277 A,

16 please.  Can you see the screen?

17 A.  Yes, sir, I do.

18 Q.  All right.  So there it is.  You sent on July 18th, 2016,

19 that's you sending to Dr. Sisk the current agreement between Ed

20 Op and Athens city schools.  And then you say, feel free to use

21 this as a guide.  Do you see that?

22 A.  That is correct.

23 Q.  And then you attach it as an attachment to the email; right?

24 A.  That's correct.

25 Q.  Let's pull up that, 277 B, which is the contract.  And let's

1    go to page 6, please.  If we could put that side by side with

2    571 B, please.  571 bravo, page 7.  Page 7.

3    Q.  So you sent the contract to Dr. Sisk; right?

4    A.  Yes.

5    Q.  Right?

6    A.  Yes.

7    Q.  Okay.  Do you see the cross out over here on the Limestone

8    one?  Do you see that?

9    A.  I do.

10   Q.  Did you do that?

11   A.  No, sir.

12   Q.  Okay.  Okay.  I asked you about the initial Marengo kids.  I

13   want to make sure I understand.  Dr. Holladay, did he tell you

14   that he and Ms. May got about 200 Marengo kids, or was it less

15   than that?

16   A.  I don't remember --

17   Q.  It's not on the screen.  You can take everything on the

18   screen.  There's nothing on the screen what I'm asking about.

19   A.  I don't remember.

20   Q.  Okay.  But you know that those kids, those students

21   initially were given computers, but it wasn't by you and your

22   company; right?

23   A.  That is correct.

24   Q.  It was before your involvement.

25   A.  That is correct.

1  Q.  Okay.  Now, you -- is it true that before the digital show

2  case, you were about 40 to $50,000 in debt?  Is that true?

3  A.  Before the initial show case?

4  Q.  Yes.

5  A.  The what?

6  Q.  Were you in debt?

7  A.  Credit card debt, yes.

8  Q.  For how much?

9  A.  If you think it's 40 or 50, that's probably about right.

10  Q.  Well, it's not me thinking it.  It's what you told the FBI;

11  right?

12  A.  Yes.

13  Q.  And then later, didn't you tell them it went to over 100?

14  A.  That was when I had that training session during the summer

15  and I wasn't receiving checks.

16  Q.  Right.

17  A.  So I was having to -- I was marking my credit cards out, all

18  those things.  In other words, on fate that faith that this was

19  a good deal.  In other words, it was going to turn out this way.

20  I didn't know it was going to turn out this way.  Go ahead.

21  Q.  So I take it -- number one, going into that much debt, you

22  trusted that you were going to make money to pay off that debt;

23  true?

24  A.  Of course.  Yes.

25  Q.  Not just 2 grand a month.

1  A.  Well, when I realized what was going on and I had to do do

2  it and --

3  Q.  Did you just say had you to do it?  Is that what you just

4  said?

5  A.  I just signed a contract, as you said, and I was -- in the

6  contract it says seek and all that, and that's just part of the

7  deal.  I had to go up there and pay for people's rooms, give

8  them meal money, and I had to come up with money for it.

9  Q.  You also seemed to say to Mr. Ross near the end of your

10 testimony that Trey and Dr. Carter were hounding you and you had

11 to do it.  I mean, are you conveying to us that you didn't do

12 what you did of your own free will?  Are you trying to say that?

13 A.  No, I wouldn't be -- I would be lying because I didn't have

14 a gun to my head, but I felt a lot of pressure.

15 Q.  You're an old football coach; right?

16 A.  Yes, sir.

17 Q.  Tough guy?

18 A.  I assume.

19 Q.  Now, the first meeting you had with them on November 4 of

20 2019 was right over here on Clayton street where their office

21 is; right?

22 A.  I'm sorry.  I couldn't understand you.

23 Q.  The first time you met with the US attorneys and the FBI

24 agents, November 4 of 2019, was right over here at their office,

25 was it not?

1  A.  That is correct.

2  Q.  Now, at that time, Trey Holladay had not pled guilty; true?

3  A.  That is correct.

4  Q.  And he had not spoken to the FBI; true?

5  A.  They never -- you asked if I had spoken?

6  Q.  No.  I asked if Trey Holladay had spoken to them by then.

7  A.  I don't know who they spoke to or who -- they -- I was not

8  privy to any of that information.

9  Q.  Okay.  Do you agree with me that at that initial meeting,

10 that first meeting with you, that they were trying to get an

11 overview, an understanding of what happened, kind of A to Z,

12 who, what, when, where, kind of the whole picture; right?

13 A.  I cannot -- I don't know what they was after.  I just had to

14 tell them my part.

15 Q.  Okay.  Now, at that first meeting you told them, Trey needed

16 a middle man between he and the private schools; right?

17 A.  I didn't pick up on that first.

18 Q.  Yeah, you didn't.

19 A.  What did you say?

20 Q.  The first meeting, you told the agents that Trey Holladay

21 needed a middle man between he and the private schools.  You

22 told them that?

23 A.  Yes, sir.

24 Q.  Right?

25 A.  I did.

1  Q.  You also told them at the first meeting that Holladay gave

2  you the enrollment forms for the private schools to sign; right?

3  A.  Yes.

4  Q.  And how he gave you the AISA unenrollment form; right?

5  That's what you told them at your first meeting; right?

6  A.  Correct.

7  Q.  And then you confirmed that the deal was 50/50 split.  You

8  told them that at the first meeting; right?

9  A.  Yes.

10  Q.

11  Q.  Now, in order for you and Dr. Holladay to make money, the

12  corporation, the company, the shell company, Ed Op, and the

13  contract between Ed Op and Athens city schools, that was

14  necessary for you two to make money; right?

15  A.  You're going to have to repeat that.  I'm sorry.

16  Q.  If you didn't didn't have these companies and you falsely

17  inflated the ADM, the only result would be Athens city schools

18  having a lot of money.  Right?

19  A.  Correct.

20  Q.  And the company your company, that's the vehicle to get the

21  money, the increased money, out of Athens city schools; right?

22  A.  I still don't follow you.

23  Q.  Okay.  When Athens city schools' ADM would go up?

24  A.  Yes, sir.

25  Q.  That meant more money for Athens city schools.

1  A.  That is correct.

2  Q.  Right?

3  A.  Yes, sir.

4  Q.  In order for you and Trey Holladay to access that increased

5  money, you had to create your company.

6  A.  They wouldn't have that money if you wouldn't have -- you're

7  speaking of a dilemma there.

8  Q.  Do you not understand what I'm asking you?

9  A.  You're trying to twist my words.

10  Q.  I promise you, that's not my intent.

11  A.  Yes, you are.

12  Q.  Okay.  Remember the first meeting when Trey Holladay told

13  you to form a company?

14  A.  Correct.

15  Q.  And that he -- do you know why he did that?

16  A.  He said the state superintendent -- he told me -- he said

17  the state superintendent said I couldn't work directly with

18  private schools.

19  Q.  But that was the way the two of you were going to make money

20  through your company; right?

21  A.  At that time, I didn't know Trey was wanting to make money

22  out of the company.

23  Q.  Okay.

24  A.  I knew I would make money.  Obviously because I was getting

25  a job, but he didn't -- he hit me up later about the other

1  money.

2  Q.  All right.  At that first meeting, naturally, the lawyers

3  and agents asked you about money; right?

4  A.  Yes, sir.

5  Q.  And you had said that Dr. Holladay -- that you would pay

6  Dr. Holladay between 10 and $20,000 every time you met up, about

7  once a month.  Do you remember that?

8  A.  I believe my words was every so often.  I wouldn't give him

9  10 or 20 a month.

10  Q.  You said one time a month to the agent.  Is that not true?

11  A.  I may have misspoke or something, but I don't remember

12  giving him 10 or $20,000 a month.  I gave him a large -- quite a

13  bit of money, but not every month.

14  Q.  Do you remember also adding a story that you once put

15  $20,000 in a shoe box and gift wrapped it and gave it to

16  Holladay's brother?

17  A.  Yes, I remember that story.

18  Q.  You told that to the agents on your first meeting; right?

19  A.  That's correct.

20  Q.  Do you agree with me that there's no way for us to verify if

21  that story is true or not?  Do you agree with me?

22  A.  That's correct.

23  Q.  And did you know that Agent Bridges went out and spoke to

24  John Holladay, his brother, and asked him about it?

25  A.  No, I didn't know that.

1  Q.  Guess what he said?

2  A.  What did he say?  I don't know what you're talking about.

3  A.  Of course he did.

4  Q.  But you said it; right?  That's the evidence that this shoe

5  box story existed is because you said it; is that it?

6  A.  That's correct.

7  Q.  You want us to believe you when you say that; right?  Is

8  that true or not?

9  A.  Could you repeat it exactly the way --

10  Q.  Yeah.  Do you want us to believe what you're saying here in

11  the last couple of days?

12  A.  Yes, I want you to believe me.

13  Q.  You do.  Well, you need it; right?  With the agreement you

14  have with them.

15  A.  The agreement I'm supposed to tell the truth.

16  Q.  Yeah.  Okay.  That shoe box story that can't be verified, as

17  you said, do you see the difference between a shoe box story and

18  contracts and bank records and student enrollment forms?  Do you

19  see the difference in that?

20  A.  One, if you could prove it, it wouldn't be -- I wouldn't be

21  very smart if I was giving someone something under the table.

22  Of course they will be able to deny it.

23  Q.  Okay.  Well, when you first met with the lawyers and the

24  agents, do you agree with me that the purpose for you being

25  there was to try to help yourself?

1  A.  Yes.  Mentally and -- everything.  It was time to come

2  clean.  Everything I knew.  This is actually -- I know I look

3  like I'm frustrated, but it's invigorating.

4  Q.  This is invigorating for you?

5  A.  Yes.  Telling the truth, I've felt more -- I've felt so much

6  better yesterday and today, and I'll feel a lot better after

7  this is over.  And I'm trying my best.  I'm sorry, but --

8  Q.  Let me ask you a question; okay?  Because this is the time

9  for questions and answer.

10  A.  Yes, sir.

11  Q.  Okay?  Did the government lawyers offer you anything at that

12  initial November 4, 2019, meeting?

13  A.  There is a form that you have to sign, and it says -- I

14  cannot recall, but they didn't offer me anything.  They just

15  said if I tell the truth and everything, they'll try to help me.

16  Q.  On November --

17  A.  And the gist I can remember.

18  Q.  Let me ask it again.  On November 4, 2019, did these

19  government lawyers offer you anything?

20  A.  Did they offer me anything?

21  Q.  Yes.

22  A.  Not that I recall.  That's --

23  Q.  Did you hold back anything when they asked you questions?

24  A.  No, sir.

25  Q.  Now, you also in that first meeting when you were describing

1  the payments to Dr. Holladay, you had said that Dr. Carter

2  wasn't present when you would pay, even though at times they

3  were together .  And you said, like, you would wait until

4  Dr. Carter would go to the bathroom or get some food, and while

5  he was away you would pay Holladay.  Do you remember saying

6  that?

7  A.  Yes.

8  Q.  Okay.  And at that first meeting do you also remember saying

9  that -- you said Holladay, Sisk, and Webb Tutt were dirty, but

10 Zickeyous Byrd was hard headed.  Do you remember saying hard

11 headed to them?  That Dr. Byrd was hard headed?  Do you remember

12 using that word?

13 A.  I said -- could you repeat that again?

14 Q.  Sure.  What you told them was this:  You said that

15 Dr. Holladay, Sisk, and Webb Tutt were dirty, but that Zickeyous

16 Byrd was just hard headed.  Do you remember saying that to them?

17 A.  No, I don't remember -- I know I said it was dirty, but I

18 don't know why I would call Dr. Birds hard headed.

19 Q.  Okay.  When they asked you who was dirty, you said Holladay,

20 Sisk, and Webb Tutt.  You remember that?

21 A.  That's correct.

22 Q.  This was at the first meeting when they were asking you

23 about this case; right?  This was at the first meeting when they

24 were asking you for the very first time about this case.  That

25 was your answer, was it not?

1    A.  If it's documented, that would have been.  I can't remember

2    exactly.  But like I said, Dr. Byrd's not hard headed.  I know I

3    wouldn't say that.

4    Q.  Okay.  Well, then you told them that during the second year

5    of the agreement with Trey Holladay, that he changed the manner

6    that the two of you would be paid.  Do you remember telling them

7    that?

8    A.  Two of us would be paid?

9    Q.  The manner with which you would get paid.

10   A.  My company?  Yes.  Correct.

11   Q.  Okay.  Let me get to it.  What Holladay did is he directed

12   you this.  He said, here's what's going to happen.  My old

13   football buddy, Webb Tutt, he's going to form a company and so

14   is my wife Deborah.  Holladay told you that.

15   A.  In so many words, yes.

16   Q.  And he said Tutt's going to work for you; right?  And we're

17   going to create contracts so that ACS will continue to pay Ed

18   Op; right?  Right?

19   A.  You want me to put everything in my words?

20   Q.  No.  I want you to answer my question.  Right?  And my

21   question is this:  What he said was, Tutt's going to work with

22   you, and we're going to create contracts so that Athens city

23   schools will continue to pay you, and you will then pay Tutt's

24   shell company.  That's what Holladay told you; right?

25   A.  Your words, not mine.

1 Q. Well, isn't that true what I just said?

2 A. No.

3 Q. Okay. Should we pull up 868 D and E again, side by side.

4 And let me ask you a question before you look at it. Let me ask

5 you a question.

6 A. Yes, sir.

7 Q. Isn't it true that you were to pay Tutt educational $33,000

8 a month, and then Tutt pursuant to the contract would then pay

9 Sage 16, 5, which is half of 33?

10 A. Okay. You asked me if I was supposed to pay Tutt 33 and

11 then he was supposed to turn around and give Deborah Holladay

12 16, 5.

13 Q. Yeah.

14 A. Yes.

15 Q. And Holladay directed that. That wasn't you.

16 A. Holladay directed it. He didn't tell me about shell company

17 like you threw that term in there.

18 Q. Okay. Well, you agreed with me that Ed Op was a shell

19 company. You just said that about 20 minutes ago. Right?

20 A. Yes. It appears to be so, yes.

21 Q. Well, Tutt's is a shell company, is it not?

22 A. I didn't know it at the time.

23 Q. Sage is a shell company, is it not?

24 A. I would say so.

25 Q. I mean, these are companies in name only. I mean, can you

1  admit that?

2  A.  Yes.

3  Q.  I mean, when you signed these contracts, you wrote CEO and

4  president.  That's garbage, is it not?  You weren't CEO of

5  anything.

6  A.  I was going to hire employees.  I had a bookkeeper.

7  Q.  You were going to hire employees?

8  A.  Yes.

9  Q.  When were you going to do that?

10  A.  When I had a minute to breathe.  I was working felt like 24

11  hours a day.

12  Q.  Now, when you were talking to the agents this first time,

13  you knew about these shell companies and the contracts, did you

14  not?

15  A.  I knew about all the information, yes.

16  Q.  Along with the banking records that go with them.  You knew

17  that existed before you decided to speak with them; true?

18  A.  Yes.  Of course.

19  Q.  And don't you agree with agree with me that the purpose of

20  sage -- right?  That's Deborah Holladay's company.

21  A.  Yes.

22  Q.  That the purpose of that was to try to put a layer between

23  Dr. Holladay and you so he could get paid?

24  A.  Where who could get paid?

25  Q.  He could get paid through his wife.

1  A.  That is correct.

2  Q.  That was the point of creating sage, was it not?

3  A.  Yes.

4  Q.  Now, did Shane black discuss needing three levels of

5  separation so that Holladay could get paid?  Did you hear him

6  say something like that?

7  A.  No.  Talking about Shane -- did I hear Shane Black or Trey

8  Holladay.

9  Q.  Did somebody say that?

10  A.  Trey Holladay did.

11  Q.  Okay.  Did Trey Holladay say Shane black said that?

12  A.  Yes.  You are correct.

13  Q.  Okay.

14  A.  He said that.

15  Q.  But you didn't hear Shane Black say those words.

16  A.  No.  I wouldn't know Shane Black if he walked up here.

17  Q.  All right.  Now, still at this first meeting that -- at the

18  FBI in November of '19 -- we're still on the first meeting with

19  these folks.

20  A.  Okay.

21  Q.  Are you with me?

22  A.  Yes, sir.  I'm listening.  You had described that the state

23  department began to ask Holladay questions and that you said

24  that Holladay directed Dr. Carter to contact private schools to

25  find out how many private students were enrolled in ARS.  Right.

1  A.  That is correct.

2  Q.  And that's when -- and I think you said it to Mr. Ross --

3  either you or Tutt -- and I think you clarified that -- he went

4  in person or you went in person.  But either way?

5  A.  It got done.  Go ahead.

6  Q.  The two of you either called or saw in person the private

7  school, and you told them to tell Carter that none of their

8  students were enrolled.

9  A.  That's correct.

10  Q.  Now, in 2017 the state department, in fact, did raise

11  questions about Athens city's enrollment; right?

12  A.  Correct.

13  Q.  And then when it did so, that's when Trey Holladay

14  instructed you to prepare those false documents to submit to the

15  state; right?  The fake Odysseyware?

16  A.  The fake what?

17  Q.  Odysseyware.

18  A.  The course completion records?

19  Q.  Yes.

20  A.  Yes.

21  Q.  And of course, they were false, as you've said; right?

22  A.  That's correct.

23  Q.  And you did that at the direction of Trey Holladay; true?

24  A.  Yes.

25  Q.  Now, you said that -- you said yesterday that you told

1  Dr. Carter that.  Do you remember that?

2  A.  He knew about it.

3  Q.  Because you said you told him that?  Is that right?

4  A.  Yes.  He was well aware of it.

5  Q.  Did you also tell the agents that you had heard state

6  superintendent Bice say words like think outside the box and do

7  whatever you can to educate kids?  Do you remember telling the

8  agents that?

9  A.  I heard him say think outside the box.  I don't recall him

10 saying do whatever you can to help kids.  I mean -- that doesn't

11 mean go break the law or anything, but he said think outside the

12 box, do new things, of that nature.

13 Q.  What you said is a total lie, is it not?

14 A.  What?

15 Q.  What you just said is a total lie.

16 A.  What --

17 Q.  That Dr. Bice said think outside the box or do whatever you

18 can.  Dr. Bice never said words like that.

19 A.  I could have a million teachers come in here and tell you

20 that they heard them at that time.  I was at a professional

21 development at Oxford that teachers were required to -- they

22 call them institutes where --

23 Q.  Describe Dr. Bice for us.  Describe him.

24 A.  He was a guy with a gray beard, mustache, beard, what you

25 would call -- not totally gray, but -- you know.  Everybody

1  knows who Dr. Bice is.

2  Q.  And where were you exactly when you heard him say -- talking

3  about the state department rules?  Where was this?

4  A.  It was at Oxford high school.  He was not speaking to me, he

5  was speaking to everyone at the institute.

6  Q.  Now, at this first meeting, you also -- you did say at that

7  first meeting that you gave Dr. Carter $1,000 a month to give to

8  his mother after his father died, just like you said in here.

9  You said that at your first meeting, did you not?

10  A.  That's correct.  It was a gift and I'll say it's a gift.

11  And it was a gift.

12  Q.  You also said that he didn't ask for it.

13  A.  That is correct.

14  Q.  And you also said to the agents that you wouldn't have given

15  it to him if his dad had not died.  Do you remember saying that?

16  A.  That's correct.

17  Q.  Okay.  Did you say -- did you tell these agents that story

18  to somehow make yourself look like a good guy?

19  A.  No.  It was the truth.

20  Q.  Well, there's no documented evidence that you have given

21  Rick Carter any money, is there?

22  A.  Do I have a picture of me handing him money?  No, sir.  Do I

23  have a canceled check?  No, sir.

24  Q.  It's you saying it.  It's you saying it happened; right?

25  A.  Yes.  I have evidence to back it up, at least the state

1  does -- the country does.  I'm sorry.

2  Q.  Oh, okay.  Did you put that money in a shoe box when you

3  gave it to him?

4  A.  $1,000 in an envelope.

5  Q.  Well, let me ask you this.  You have no problem writing

6  checks to strangers out of your Ed Op account for Christmas

7  gifts, for instance; right?  You didn't have a problem doing

8  that, did you?

9  A.  Those checks -- that's correct.

10  Q.  I mean?

11  A.  They weren't strangers, they was teachers.

12  Q.  Well, the cafeteria staff and the janitorial staff, you know

13  those people?

14  A.  Believe it or not, I was at those schools quite often and I

15  knew a lot of them.

16  Q.  All right.  You know, how many checks do you think Ed Op

17  wrote to people?  I mean, I stopped my slash count when Mr. Ross

18  was showing them to you.  How many do you think that there is?

19  A.  Identify I'd have to go back and look.

20  Q.  You wrote 20 grand checks for Christmas bonuses alone, did

21  you not?

22  A.  Yes.

23  Q.  I mean, all of those were checks.  You weren't hiding it;

24  right?

25  A.  That's correct.

1  Q.  I mean, you have no trouble writing checks, but you didn't

2  write him one.

3  A.  That's right.

4  Q.  Is that it?

5  A.  The other ones were not a crime, and I felt like educators,

6  principals who get money from someone --

7  Q.  I'm not interested in your feelings.  Let me ask you a

8  question.  Did the government offer you anything at the end of

9  that meeting?

10  A.  At the end of that meeting?

11  Q.  Yeah.  At the end of the meeting, did they offer you

12  anything?

13  A.  I don't remember.

14  Q.  Well, you went back on the 18th; right?  Two weeks later;

15  right?

16  A.  I went back how long?

17  Q.  You went back to the FBI and talked to these lawyers two

18  weeks later, did you not?

19  A.  Okay.  Yes, sir.

20  Q.  Why?

21  A.  They wanted me to come back.  We were not finished the first

22  time.

23  Q.  Okay.  And at that meeting, that's when you detailed

24  Limestone county and the Sisk deal; right?

25  A.  I heard Limestone county.  Yes, sir.  What?

1 Q. At the second meeting, you detailed what you did with

2 Dr. Sisk and Limestone county; right?

3 A. I cannot recall.

4 Q. Have you met so many times you can't even keep them

5 straight?

6 A. Sir?

7 Q. Have you met so many times with them that you can't keep

8 them straight?

9 A. That's correct.

10 Q. Did the government offer you anything after that meeting?

11 November 18, 2019. Did they offer you anything?

12 A. I don't recall.

13 Q. All right. Seven months later, you decided to go back. Did

14 they offer you something to get you to come back? That would be

15 June 16 of 2020. Did they offer you something to come back 7

16 months later?

17 A. All these meetings were part of the first agreement --

18 Q. I'm asking about this one. Did they offer you something to

19 come back in June?

20 A. I don't remember.

21 Q. Now, at that meeting you told them this: Sisk did not know

22 that you were kicking cash back to Holladay. Do you remember

23 saying that?

24 A. I said Sisk did not what?

25 Q. Sisk -- are you having trouble hearing me?

1  A.  I already told you I'm heard of hearing and I had to have

2  two shots in my eyes the other day for bleeding in my eyes.  I'm

3  not -- I'm having a hard time.

4  Q.  Are you feeling okay to continue?

5  A.  Oh, yes.  We're going to get this done.

6  Q.  Okay.  Yeah, we are.  Sisk did not know you were kicking

7  cash back to Holladay.  Did you tell them that?

8  A.  Sisk did not know.

9  Q.  That you were paying Holladay.

10  A.  That's correct.

11  Q.  The only people who knew that were you, Trey Holladay, and

12  his wife; right?  Mr. Corkren, that's not a tough question.

13  A.  Yeah, it is.  I want to tell the truth.  I'm going to get it

14  exactly 100 percent right so I have to think about it.  That's a

15  long time ago.  I don't think she knew 2nd beginning, but she

16  eventually knew, I'm pretty sure.

17  Q.  There were three people that knew you were paying Holladay.

18  You, Holladay, and his wife.  Right?

19  A.  I would assume eventually, yes.

20  Q.  Well, you've said that time and time and time again.  Every

21  time they've asked you that, that's how you've answered it.

22  Right?

23  A.  I guess.  I don't remember.

24  Q.  Okay.  You also told them when they asked, you said, I

25  didn't keep a ledger of the money that I paid Dr. Holladay.  Do

1  you remember saying that?

2  A.  That's correct.

3  Q.  That's what you told them; right?

4  A.  Yes.

5  Q.  So we don't have any way to check or verify, even if you

6  paid Holladay any cash; right?

7  A.  I do not, but I'm pretty sure they do.

8  Q.  I would have to ask them?  Is that what you're saying?

9  A.  Yes.

10 Q.  Okay.  On that June 16, 2020, meeting at the US attorney's

11 office, did you leave there with some kind of agreement?  June

12 6th, 2020, did they offer you anything as you left their office

13 that day?

14 A.  I don't recall.  I remember we signed an agreement at some

15 time, and that was the same agreement the whole time.

16 Q.  All right.  Three months later, you went back.  So now we're

17 at October 9, 2020.  You met with them again; right?

18 A.  Yes, sir.

19 Q.  Did you have an agreement with them before you walked in

20 their door October of 2020?

21 A.  Yes, sir.

22 Q.  You had an agreement with them?

23 A.  We had an agreement at the first meeting that covers all the

24 agreement.  I mean, all the meetings.

25 Q.  What agreement are you talking about?

1  A.  The agreement you're talking about.

2  Q.  No, I don't think so.

3  A.  It's an agreement saying that, hey, we want your testimony

4  or we want to know what happened.  I don't know what it's

5  called.  I'm not a lawyer.

6  Q.  All right.  Let me ask you this.  The agreements you had

7  with the government, have there only been one?

8  A.  That I can recall.  There may be more.

9  Q.  And you're telling me you had that in 2020?

10  A.  Sir?

11  Q.  Are you telling me you had that one agreement in 2020?

12  A.  Yes, that I'm aware of.  I would have to ask my attorney.

13  Q.  How many agreements do you have with the federal government,

14  sir?

15  A.  I only remember one.  You're trying to ask me something I

16  can't remember or I can't recall.  I can't invent it.

17  Q.  You left their office in October 9 of 2020.  In your mind,

18  did you have an agreement with them?

19  A.  I had an agreement with them.

20  Q.  Okay.  Well, you went back on December 9, did you not?

21  A.  Yes.

22  Q.  And you're telling us that the agreement was for your

23  testimony?  Is that it?

24  A.  That was the first time I walked in the door.

25  Q.  Who told you that from their office?

1  A.  That's what I remember from the agreement.

2  Q.  My question was who.  So it would be a person's name.  Who

3  told you that?

4  A.  Who told me what?

5  Q.  Who told you that you had an agreement?

6  A.  When I signed an agreement when I first went in there.

7  Q.  Who gave it to you, then?

8  A.  My attorney was present.  Do you want to ask him?

9  Q.  I didn't ask that.  I'm asking for which one of these

10  people, if it was one of them, told you or signed an agreement

11  at that first meeting?  That's what I want to know.

12  A.  I do not remember.

13  Q.  But it was one of them.

14  A.  There's the man that could tell you exactly --

15  Q.  I'm asking you, sir.

16  A.  What I signed.

17  Q.  I'm asking you.

18  A.  I don't remember.

19  Q.  But it was one of them?

20  A.  I don't remember.

21  Q.  Was it somebody from their office?

22  A.  I do not remember.

23  Q.  Okay.  Now, at that meeting in December of 2020, you were

24  asked about the out of state addresses.  Remember that?

25  A.  Yes, sir.

1 Q. Okay. And I want to make sure I understood what you said

2 the other day. Was it Dr. Holladay who said that he thought

3 that the state would fund them because they had some agreement

4 with neighboring states? Is that what you said?

5 A. He said they would -- that the states had an agreement. You

6 are correct.

7 Q. Okay. And that's why you sent them in with out of state

8 addresses, because Trey said it wasn't an issue.

9 A. That's correct. Rick didn't tell me that.

10 Q. Okay. I understand. And that's when he initially said to

11 you, Trey Holladay said to you, hey, Greg, go get the

12 headmasters to change the addresses, and you weren't comfortable

13 with doing it, so you did it yourself.

14 A. That's correct.

15 Q. All right. Now, on Wednesday you added something. You said

16 that Dr. Carter knew that you were doing that.

17 A. That he knew -- I'm sorry. He knew what?

18 Q. You said -- you added that Dr. Carter knew you were doing

19 that, changing and putting in fake addresses. Remember saying

20 that on Wednesday?

21 A. That is correct.

22 Q. That's the first time you've ever said that, ever, anywhere

23 to anybody. True?

24 A. False.

25 Q. Okay. Did you ever say that to any of these agents or

1  lawyers?  You didn't.

2  A.  I cannot recall.  They may have written it down, but I know

3  my attorney has heard it and Rick's heard me say how I did it.

4  Q.  Okay.

5  A.  I don't ever remember denying that exactly how it happened.

6  Q.  Let me ask you this question.  You've admitted to lying to

7  people; right?

8  A.  Yes.

9  Q.  Okay.  And when you lie, is there any way for us to know

10  when you're doing that?

11  A.  The evidence.  Paperwork.

12  Q.  No.  I mean just you talking.  Without anything else.

13  A.  I don't think anybody can tell when you're lying.

14  Q.  Okay.  Now, the indictment in this case -- remember, you

15  agree with me, that wasn't filed until January 13 of 2021.

16  Right?

17  A.  Yes, sir.

18  Q.  So before the indictment was filed, you had told the

19  government that you entered into a plan with Holladay; right?

20          THE COURT:  Let me just interrupt you here for a

21  second.  I just want to make sure, is there any member of the

22  jury who would like to take a recess right now?  I really would

23  prefer to go until 3:30, but if you want to take a short recess,

24  that's fine.  Just raise your hand if one of you needs to take a

25  recess.  Okay.  Let's proceed.  But if one of you really does

1  need to take a recess before 3:30, because we're going to recess

2  at 3:30, just let me know.  Thank you.  Proceed.

3  Q.  Okay.  So at this point, before the indictment was filed,

4  you had told them about your role soliciting private schools;

5  right?

6  A.  Yes.

7  Q.  For student information?  You also had told them that you

8  acquired this student's information; right?  You told them that

9  you were handed student information from the private schools?

10  A.  That's correct.

11  Q.  And you told them that you got that from dozens and dozens

12  of kids.

13  A.  You told me that I got what, now?  I'm sorry.

14  Q.  You had told the government lawyers that the understood

15  identification you got was for dozens and dozens of students.

16  True?

17  A.  Did you say dozens and dozens of students?

18  Q.  Yes.

19  A.  You've got to repeat it over.  I'm sorry.  It's well

20  documented that I have hearing trouble and vanity keeps me from

21  getting a hearing aid.  I'm 57 years old.

22  Q.  So am I.  I'm 57.  Okay.  So let me ask you this question

23  again.  Isn't it true that you told these lawyers that you had

24  acquired student data from dozens and dozens of students?

25  A.  I acquired student data for dozens and dozens of students?

1  Yes.

2  Q.  Okay.  You had a deal with them?

3  A.  Yes, sir.

4  Q.  Long before the indictment was filed.

5  A.  That is correct.

6  Q.  And you in this case, you got charged with a grand total of

7  one, one aggravated identity theft.  Isn't that true?

8  A.  That's correct.

9  Q.  But you admitted to them dozens and dozens and dozens of

10  them.

11  A.  That's correct.

12  Q.  That's not a coincidence, is it?

13  A.  That's part of the plea agreement.

14  Q.  You were charged with two counts; right?  Count 1,

15  conspiracy, and count 93, aggravated identity theft; right?

16  A.  That's correct.

17  Q.  And so the victim in count 93 whose identity you stole, was

18  there anything different -- by the way, it's ES.  ES.  Those are

19  that student's initials, the letter E, the letter S.  Do you

20  understand me?

21  A.  You're going to have to go back to the sentence before.

22  Someone else was coughing and I missed it.

23  Q.  Sure.  Count 93?

24  A.  Yes, sir.

25  Q.  The victim whose identity that you stole in count 93.  That

1   student's initials are ES.  Did you hear me?

2   A.  Did I get -- did I get what?  Okay.  Go ahead.

3   Q.  Can you hear me?

4   A.  I can hear you better now.

5   Q.  You don't have to stand there.  Get in the box, please, sir.

6       (Brief pause in the proceedings)

7   Q.  Stay right there.

8       The student's identity who you stole in count 93, that

9   student's initials are ES.  Did you know that?

10  A.  In the count it says that, yes.

11  Q.  Was there anything different about ES's situation than the

12  other students?

13  A.  I'm not aware.

14  Q.  Even did you even know what school ES went to?

15  A.  There was a lot of students named ES.

16  Q.  Well, you pled to stealing one student's identity.

17  A.  Yes, sir.

18  Q.  Do you even know if it's a male or a female?

19  A.  I do not.  I do not know.

20  Q.  Does it matter to you?

21  A.  It mattered, but if I'm guilty, I'm guilty.

22  Q.  You're just trying to get the best deal you with is what you

23  told us; right?

24  A.  Of course.

25  Q.  All right.  On April 8th of 2021, an hour after Dr. Sisk

1  pled guilty, you and your lawyer appeared in court.  Do you

2  remember doing that via video?

3  A.  Yes, I do.

4  Q.  And you appeared there to formally plead guilty to

5  conspiracy and this magical count 93; right?

6  A.  Is it a magical count?

7  Q.  Count 93.  That's what you were pleading guilty is; right?

8  A.  That's correct.

9  Q.  That's the aggravated identity theft count; right?

10  A.  Correct.

11  Q.  But before you entered the plea, the judge explained to you

12  that the conspiracy count was punishable by up to five years in

13  prison.  Do you remember her telling you that?

14  A.  I remember going over -- yes.

15  Q.  And a fine of up to $250,000.  Do you remember when she said

16  that?

17  A.  That's correct.

18  Q.  And then for count 93 what she told you was, a sentence of

19  two years' imprisonment that must be served consecutive to any

20  other term of imprisonment.  Do you remember when she said that

21  to you?

22  A.  Yes, sir.

23  Q.  What does consecutive mean?

24  A.  It means after whatever you serve before.  In other words,

25  you have to serve them separately.

1  Q.  So if you got five years on conspiracy, if you have to get

2  two more after the five on the aggravated identity theft.

3  A.  That's correct.

4  Q.  And that one also has a fine of up to $250,000; right?

5  A.  Correct.

6  Q.  And the judge also explained to you that under our

7  constitution and the laws here in this country, that you're

8  giving up your right to a trial if you enter a plea; right?

9  A.  Yes.

10  Q.  She said that you could make the government produce company

11  tent evidence before a jury that convinced each and everyone of

12  those 12 jurors of your guilt beyond a reasonable doubt before

13  you could be found guilty.  Do you remember when she said that

14  to you?

15  A.  Yes, sir.

16  Q.  She also told you you wouldn't have to prove your innocence

17  because you're presumed innocent.  Do you remember her saying

18  that?

19  A.  That's correct.

20  Q.  And then she asked you if you understood all of that, and

21  you said yes.  Do you remember that?

22  A.  Yes, sir.

23  Q.  And so knowing all of that, you then swore under oath that

24  you were guilty; right?

25  A.  That is correct.

1  Q.  And you pled guilty because you are guilty.

2  A.  That is 100 percent correct.

3  Q.  Now, before you appeared on that day, you and your lawyer

4  discussed sentencing guidelines; right?  How had he they applied

5  to you?

6  A.  I asked him.

7  Q.  Well, the judge asked you that, and you said yeah, he did;

8  right?

9  A.  Yes, sir.

10  Q.  You know, there's one contract that we didn't talk about,

11  though, and that's the one that you, in fact, made with the

12  government.  You signed a contract with fact , did you?

13  A.  The plea agreement, yes.

14  Q.  Not just an understanding.  Signed contract.

15  A.  I've signed something.

16  Q.  You don't want to go to prison, do you?

17  A.  Who does?

18  Q.  How would going to prison affect your life?

19  A.  I wouldn't make it out alive.

20  Q.  Do you have a wife?

21  A.  Yes.

22  Q.  Children?  You've got four; right?

23  A.  I've got four.

24  Q.  How would that affect them?

25  A.  I can only imagine.

1  Q.  Okay.  Let's look at that contract you signed with the

2  government.  Let's go to defense Exhibit 49, page 1.  You're

3  going to have to look at the screen.  If you want --

4  A.  She's got one.

5  Q.  Whatever you need to do.  All right.  Can you see that on

6  your screen?  That's the cover page.  There's you; right?

7  A.  That is correct.

8  Q.  And there is the plea agreement.  Do you see that?

9  A.  Yes, sir, I see it.

10  Q.  And there's your lawyer's name and Mr. Ross and Ms. LaCour

11  and Mr. Tally.  Do you see that?

12  A.  Yes, I do.

13  Q.  Let's go to page 42, please.  And that's the last page of

14  your agreement; right?

15  A.  Yes, sir.

16  Q.  And there's the name, there's Mr. Ross and Ms. LaCour and

17  Mr. Tally, and then your signature; right?

18  A.  That's correct.

19  Q.  And then your lawyer; right?

20  A.  That is correct.

21  Q.  The name at the top, do you see that, criminal chief?

22  A.  Correct.

23  Q.  Do you see that signature at the very top?

24  A.  Yes.  Speirs?

25  Q.  Yes.  Was he the one who played the role of me when you

1  practiced before coming in?

2  A.  I don't recall.

3  Q.  You're not sure?  Okay.  But this was submitted -- you see

4  this was submitted on April 7, 2021?  Do you see that?

5  A.  Yes, sir, I see it.

6  Q.  That's the day before you came before the judge to plead

7  guilty; right?

8  A.  I assume so, yes, sir.

9  Q.  Now, there is a part of this agreement that Mr. Ross didn't

10  talk about, and that's called an addendum.  Do you remember

11  that?

12  A.  I don't remember.

13  Q.  Let's go to defense Exhibit 50, please.  Do you see that?

14  A.  I see it.

15  Q.  Do you see how it says addendum to plea agreement?

16  A.  Yes, I do.

17  Q.  That's the most important part of your plea agreement, isn't

18  it?

19  A.  I don't know.

20  Q.  All right.  Well, let's go to page 6.  Number one, there's

21  signatures again; right?  On the addendum?

22  A.  Yes, sir.

23  Q.  And, again, that was the day before.  Do you see that?

24  A.  Yes, sir.

25  Q.  Now, you were explained, were you not, that each crime's got

1  an offense level assigned to it, and the higher the level, the

2  worse it is?  The more prison?  You were explained words like

3  that; right?

4  A.  Yes.  Mandatory sentencing guidelines?  Is that what you're

5  talking about?

6  Q.  Yeah.

7  A.  Yes, sir.

8  Q.  So as part of your deal with the government, let's go to

9  defense Exhibit 50, page 1, please.  Let's highlight Roman

10 numeral II down, please.  This is your addendum.  Do you see

11 that?  Now we're going to highlight it.  Do you see the first

12 sentence?

13 A.  Yes, sir, I do.

14 Q.  The government contemplates that the defendant -- that's

15 you; right?

16 A.  Correct.

17 Q.  Will provide substantial assistance to the government in at

18 least one on going investigation or prosecution.  Do you see

19 that?

20 A.  Yes, sir, I do.

21 Q.  What was your understanding of substantial assistance?

22 A.  Help them out as well as I could.

23 Q.  I'm sorry?  I didn't hear what you said.

24 A.  My understanding was to help him in whatever they needed

25 help on.  If I knew something, I knew it.  If I didn't, I

1  didn't.  Telling the truth.

2  Q.  Now, when you agreed to this in April, Dr. Holladay had not

3  pled guilty, did he?

4  A.  That's correct.

5  Q.  And is it accurate that you were expecting to provide

6  substantial assistance in Dr. Holladay's case?

7  A.  That's correct.

8  Q.  But he then pled guilty in December, did he not?

9  A.  He did.

10  Q.  And that was eight months after you signed your deal.

11  A.  Yes.

12  Q.  But that wasn't a reason for you to get out of this deal.

13  You were stuck with this deal; right?

14  A.  Yes.  I agreed to it.

15  Q.  I'm saying Dr. Holladay pleading guilty didn't have an

16  effect on your plea; right?

17  A.  Yes.

18  Q.  And so if you agree with me that this case, Dr. Carter's

19  case, is the only opportunity that you have to assist the

20  government?

21  A.  No, I do not agree with you there.

22  Q.  What else do you have to assist the government?

23  A.  Do you know how many people pled guilty to this besides

24  myself?

25  Q.  You think they pled guilty because of you?

```
 1  A.  You betcha.

 2  Q.  Deborah Holladay was indicted, was she not?

 3  A.  Yes, she was.

 4  Q.  What happen to her case?

 5  A.  It was dismissed.

 6  Q.  She didn't plead guilty because of you.

 7  A.  She pled guilty.

 8  Q.  She didn't plead guilty, sir.

 9  A.  She did plead guilty.

10  Q.  Deborah Holladay plead guilty?

11  A.  From what I remember, yes, she did, and the charge was

12  dismissed later on.  The man's right there.

13  Q.  Yeah, he is.

14  A.  That's what I remember.

15  Q.  And you haven't been sentenced yet; right?

16  A.  That's correct.

17  Q.  When is your sentencing?

18  A.  End of this month with Judge Thompson.

19  Q.  Okay.  Now, let's look some more at this addendum.  Let's

20  look at the second sentence.  Do you see it?

21  A.  Yes, sir, I do.

22  Q.  And what that says is if you provide assistance, then the

23  government will, at your sentencing, seek a reduction in that

24  offense level; right?  Do you see that?

25  A.  Yes, sir.
```

1  Q.  And then there's that 5K1 language.  You see that?

2  A.  I see that.

3  Q.  That's a legal guideline that allows that to happen; right?

4  A.  If you say so.

5  Q.  Well, let's go to the most important part of this agreement.

6  Let's go to page 2, please.  Let's highlight just the first

7  sentence.  This is page 2 of your agreement.  I want you to read

8  the first sentence to us slowly.

9  A.  The extent of any requested reduction will be at the

10 government's discretion.  The government will base the extent of

11 its request upon the following factors.  The significance and --

12 Q.  So what that first sentence is, sir, is that the extent of

13 the reduction of your level is at their discretion.

14 A.  That is correct.

15 Q.  Not yours?

16 A.  That is correct.

17 Q.  Right?  Nobody else but them; right?

18 A.  Yes.

19 Q.  Now, this agreement, you read every word of your plea

20 agreement.  You read every word of it?

21 A.  Yes, I did.

22 Q.  Remember earlier when we were showing you a contract, and

23 you said, oh, there's some legal mum bow jumbo in there and you

24 didn't really read that.  You remember saying that?

25 A.  Correct.

```
 1   Q.  But when it was you, you read every word.

 2   A.  I want to say my attorney sat with me and made me read it.

 3   Q.  He went over every word.

 4   A.  Yes, he did.  I learned a lesson.

 5   Q.  Now, the judge also told you that both the offense that you

 6   admitted to are felonies; right?

 7   A.  Admitted to how many?

 8   Q.  That both of the crimes that you admitted to were felonies.

 9   A.  They were.  Yes, sir.

10   Q.  Right?  And the judge said if I accept your plea, if I

11   accept your plea, then you're going to be adjudged guilty and

12   you'll be a convicted felon.  Do you remember her warning you of

13   that before you pled?

14   A.  Yes, sir.

15   Q.  And she also said, well, if you're a convicted felon, you

16   can't vote, can't possess a firearm, can't hold office, can't

17   serve on a jury.  Do you remember her telling you that?

18   A.  Yes, sir.

19   Q.  And you pled anyway.

20   A.  Yes, sir.

21   Q.  And she accepted it.

22   A.  That is correct.

23   Q.  Right then and there, and you were a convicted felon.

24   A.  I am a convicted felon.

25   Q.  Facing prison.
```

1  A.  Seven years at this time.  Correct.

2  Q.  And that's when the judge asked if Mr. Ross had an opinion

3  about letting you stay out after your presumption of innocence

4  was gone and you were a convicted felon.  Do you remember her

5  saying that, asking him that?  And he said, I have no objection

6  to you remaining free?

7  A.  Yes, I remember.

8  Q.  You remember that?

9  A.  I remember it.

10  Q.  Okay.  Did you expect to be released after you pled to these

11  felonies?

12  A.  My lawyer said I would likely be released.

13  Q.  Really?

14  A.  It's up to them.  It's pretty much assumption at the

15  location, doing a zoom meeting.

16  Q.  You've been out now for -- it's been 11 months since you

17  pled; right?

18  A.  Yes.

19  Q.  I assume you're grateful to these folks?

20  A.  You assume what, sir?

21  Q.  You're grateful to them?

22  A.  They haven't done anything for me yet.

23  Q.  They haven't.

24  A.  No.  Not that I'm aware of.  I may be blind to it.

25  Q.  Well, you haven't been sitting in jail for the last 11

1  months.

2  A.  Neither has anyone else.

3  Q.  Okay.  Do you agree agree with me that they've been

4  assessing your performance over the last three days?

5  A.  I would say that, yes, sir.

6  Q.  Do you admit that you committed these crimes for money?

7  A.  Yes, part of it.

8  Q.  How much money would it take for you to go to prison for

9  seven years?

10  A.  I don't have a --

11  Q.  Now, on Wednesday you said Beth McKinney -- remember Beth

12  McKinney, the computer gal at ACS?

13  A.  Yes.

14  Q.  On Wednesday you said either she put the stickers on the lap

15  tops or she gave them to you to put on.  Do you remember saying

16  that?

17  A.  Yes, I do.

18  Q.  Let's look at 2465 FF, please.  Is it possible to zoom on

19  the sticker?  Thank you.  That's a laptop, right, sir, before we

20  zoom in?

21  A.  That is.

22  Q.  Is that the ticker that you were talking about?

23  A.  Yes, sir, inventory sicker.  Yes, sir.

24  Q.  And it says ACS V 0045?

25  A.  That's correct.

1  Q.  Did I read that right?

2  A.  You did.

3  Q.  So this is an example of a sticker that Ms. McKinney put on

4  or she gave to you to put on.

5  A.  That's correct.

6  Q.  Let's pull up 1892, please.  Now, is this the -- is this the

7  inventory that document that Ms. McKinney would create?

8  A.  That who would.

9  Q.  Ms. McKinney, the computer gallon.

10 A.  No, that's actually a document that I created.

11 Q.  You did.

12 A.  To keep up with it myself and know where the computers were

13 at.

14 Q.  Got it.  But the stickers you got from Ms. McKinney.

15 A.  Yes.  She didn't have time to put them on and do this, so I

16 was supposed to put them on and do the identifiers where we

17 could keep up with the location.

18 Q.  She told you she didn't have time to do that?

19 A.  Well, she was already -- they were already late, and the

20 email was saying and everything, they was already late, and it

21 would take her a week or two to do it.  So I was already going

22 to do everything, so I just added another step on my end when I

23 was putting the --

24 Q.  Were you presented when this big shipment of computers came

25 over at central office?  Were you there?

1  A.  When they got off the truck?  No.

2  Q.  Yeah.

3  A.  No.

4  Q.  I'm sorry?

5  A.  When they got off the truck?

6  Q.  Yeah.

7  A.  No, I wasn't.

8  Q.  You were not.  Okay.  Did you load them in your vehicle?

9  A.  Yes.

10  Q.  From central office?

11  A.  Yes.

12  Q.  Is that when she gave you the stickers?

13  A.  Yes.  After I got through loading them.

14  Q.  Okay.  Now, you had mentioned Gardendale Cracker Barrel with

15  Mr. Ross.  Do you remember talking about that?

16  A.  Yes.

17  Q.  Okay.  I want to make sure that we have it right.  You met

18  with the agents in October, and what you had said to them was on

19  December 2nd, 2016, that Trey, Deborah, Dr. Carter, and you met

20  at the Gardendale Cracker Barrel, and that was the time when

21  Trey laid out the plan for Webb to get involved.

22  A.  It was then or one other time in Decatur crack he will

23  barrel.

24  Q.  When you mentioned the Gardendale Cracker Barrel at the time

25  you talked to the agents, that's when Trey was telling people,

1  I'm going to get Webb involved.  Do you remember that?

2  A.  One of those times.  Either that one or that other time.

3  Q.  And that was December 2nd, 2016, which makes sense

4  timingwise with Webb Tutt's involvement.  Agreed?

5  A.  Agreed.  Yes.

6  Q.  So was it -- it was just before the four people that you

7  said:  Trey, Deb, Dr. Carter, and you; right?

8  A.  At Gardendale.

9  Q.  Yeah.  And you told them you didn't eat that day.  Does that

10  refresh your memory at that meeting?

11  A.  I cannot remember.  I'm trying to remember.  I'm sorry.

12  Q.  But it was the four of you sitting at a table.

13  A.  I would agree, yes.  You were told that.

14  Q.  Yesterday you described going to the ATM on a lot of

15  occasions to withdraw cash, and you said over a period of

16  time -- and you used the word sneaky, so as not to draw

17  attention to yourself.  Do you remember that testimony?

18  A.  Yes.

19  Q.  Let's go to 4 B, page 58, please.

20        MR. ROSS:  Judge, may I have a second?  May I have one

21  second?

22        THE COURT:  Yes.

23     (Brief pause in the proceedings)

24  Q.  (Mr. Funk, continuing:)  Let me ask you this.  Is it true

25  that you withdrew $65,000 in cash?

1  A. At one time?

2  Q. Yeah. It was $65,858.78.

3  A. Cash, or are you talking about a certified check?

4  Q. No. You cashed it.

5  A. I cashed it?

6  Q. Yeah.

7  A. I don't recall that.

8  Q. Let's do 2520. All right. Let's look at this. Before we

9  zoom in, this is Ed Op's use of funds and your cash withdrawals.

10  Do you see that?

11  A. Yes, sir.

12  Q. Do you see that? All right. Let's highlight over here,

13  please. I need the whole thing. From there -- my purple to the

14  right, please. Category and withdrawal?

15  Q. These are your cash withdrawals out of Ed Op, are they not?

16  A. Is this --

17  Q. Do you need me to go back and show you again? I will.

18  A. Go ahead. Yes.

19  Q. I will. See? Okay. Ed Op use of funds, cash withdrawal.

20  Do you see that?

21  A. I see it.

22  Q. All right. So let's go back and zoom back to where we were,

23  please. So these are your cash withdrawals from your Ed Op

24  account; right?

25  A. That's correct.

1  Q.  So there's one for 1200.  Do you see that?

2  A.  Yes.

3  Q.  4,000?

4  A.  Correct.

5  Q.  4,000?

6  A.  Correct.

7  Q.  There's one for 25,000.  Do you see that?

8  A.  Yes.

9  Q.  That's a cash withdrawal, is it not?

10  A.  That's listed as cash withdrawal.  That right there is a

11  certified check to buy a 2011 Ford pickup truck.

12  Q.  All right.  So let's pull out -- back, please.  So is it

13  your testimony that this chart that we're looking at , when it

14  says cash withdrawal, is not accurate?

15  A.  Where did you get the 65,000 you was talking about?

16  Q.  I'm not asking you about 65,000.  I'm asking you -- you just

17  said the cash withdrawal wasn't cash withdrawals.  So what I'm

18  asking you is, is this exhibit that you're looking at, when it

19  says cash withdrawal, is it not accurate?

20  A.  This is accurate, because you've asked me about $65,000.

21  Q.  I'm not asking you about 65,000.  Let's try it again.  Let's

22  try it again.  This document that you're looking at, 2520, it's

23  Government's Exhibit 2520, do you see it?

24  A.  Yes, sir, I see it.

25  Q.  And it says cash withdrawals.  All of these are cash

1  withdrawals.  Do you see that?

2  A.  That's what it's listed as, yes.

3  Q.  And that's my question.  Are you saying that this chart is

4  not accurate when it says cash withdrawals?  Tell me if it's not

5  accurate, tell me.

6  A.  It's accurate, but that's not cash.  That's a certified

7  check.

8  Q.  Okay.

9  A.  To a guy's credit union.

10  Q.  Okay.  How about the 17,000?  Was that cash or a check?  Do

11  you see it?  Let's zoom in on it.

12  A.  The 1710, that's when I bought my father's truck from my

13  mom.  It was a 2012 Ford.

14  Q.  I'm not interested in the car.  I'm interested in whether

15  that was cash or not.

16  A.  That was a certified check.

17  Q.  Okay.  So when it shows the 17,000, that's not cash either,

18  then; is that right?

19  A.  Those two things.  Everything else is cash.

20  Q.  So the 4,000 was cash?

21  A.  That's correct.

22  Q.  All right.  Let's pull back out.  Now, yesterday you also

23  seemed to say that when it came to report cards -- you can stand

24  up.

25  A.  Anything else?

1  Q.  Okay.  Stay right there.  That's fine.  You seemed to

2  indicate that you would send them to Dr. Carter, through his

3  private email, and then you used the word, then he would

4  sanitize them of the private school references?  Is that what

5  you were saying yesterday?  Before he sent them to the staff.

6  A.  Did you say I sanitized them or he sanitized.

7  Q.  No.  That you sent it to his private email, and then he

8  would remove the private school references before he sent it to

9  his people; is that what you said or did I mishear you?

10         U.S. ATTORNEY:  Your Honor, I think that

11  mischaracterizes this witness's testimony from yesterday.

12         MR. FUNK:  That's what I'm asking.

13         THE COURT:  He can answer the question.  Is that what

14  you said or not.

15  Q.  Did you say that or not?

16  A.  Did I say what?

17  Q.  When you sent Dr. Carter report cards, you said to us that

18  you sent them to his private email; right?

19  A.  If I did, it showed it on there, yes.

20  Q.  Okay.  And that -- did you mean to suggest, then, that the

21  private school references would be removed by him before he sent

22  them -- sent those to the girls at Athens?  Did I hear you right

23  or not?

24  A.  To the gals at Athens?

25  Q.  Yes.

1  A.  I assumed that he was sending them on.  I know what I sent

2  him.

3  Q.  Okay.  You said yesterday is what you sent him had the

4  private school logos on them.

5  A.  Yes.  I believe there was examples.

6  Q.  And that's why you said you sent it to his private email,

7  because they had the logos on it.  That's what you said; right?

8  A.  That, or he requested it.

9  Q.  Okay.  But in any event, you sent them with the private

10  school logos on them; right?

11  A.  Yes.

12  Q.  All right.  And did I hear you right, then they would be

13  sanitized for the private school references would be removed or

14  or or or or or before he sent them to the ladies at Athens?  Did

15  I hear you right?

16  A.  I assumed that.

17  Q.  You assumed that.

18  A.  Yes.

19  Q.  Okay.  So when you were talking about that yesterday, about

20  the private emails, you don't know that he did that, you just

21  assume that he did that; is that right?

22  A.  That's correct.

23  Q.  All right.  Let's go to 823 A.  So this was -- you see how

24  you start down at the bottom?  You sent these EO 5, 11th grade

25  report cards to Dr. Carter at 8:03?  Do you see that?

1  A.   Yes, I do.

2  Q.   And then do you see that he forwarded them to Sharon Kilgore

3  46 minutes later?  Do you see that?  2049 is 8:49?

4  A.   Yes.

5  Q.   46 minutes later, he forwarded -- and by the way, you did

6  send it to his G mail account, and then he sent it to

7  Ms. Kilgore not from his G mail account; right?  Do you see

8  that?

9  A.   True.  You said it's how long after I sent it?

10 Q.   You sent it at 8:03.  Do you see that?

11 A.   That's correct.

12 Q.   And then he forwarded it at 2049.  Do you see that?

13 A.   Yes, sir.

14 Q.   All right.  You sent it to his G mail account.  Do you see

15 that?

16 A.   Yes.

17 Q.   And then when he forwarded it, he used the school account.

18 Do you see that?

19 A.   I do.

20 Q.   All right.  So let's see what he forwarded.  Let's go to 823

21 B.   That's what he sent to Athens.

22 A.   That's what I sent to them or he sent?

23 Q.   That's right.

24 A.   Okay.  Go ahead.

25 Q.   That wasn't sanitized , was it?

1  A.  That's what he sent on?

2  Q.  Yeah.

3  A.  That's why I said I assumed it.

4  Q.  Yes.  So when I you a assumed that, you were wrong.

5  A.  That's correct.

6  Q.  Go to the next page, please.  And the next page.  And I

7  could keep going.  That's what he sent to Athens.

8  A.  Okay.

9  Q.  Now, we talked about that digital show case and dual

10 enrollment.  That's what Dr. Holladay was telling everybody who

11 would listen to him, that these private school kids -- it's not

12 a problem.  Right?

13 A.  That's correct.

14 Q.  It wasn't a secret.  It wasn't a secret that they were

15 recruiting private schools.

16 A.  That's correct.

17 Q.  There's no need to sanitize it.  Everybody knew it?

18 A.  At one point, that's what I was required to do.  I'm just

19 doing what the man said.  Just like he was.

20 Q.  I understand.  Now, remember, I talked to you about Amanda

21 hard a man?  She was the person over at Limestone county?

22 A.  Yes, sir.

23 Q.  And you had -- I think you billed for 376 students?

24 A.  377, I think.

25 Q.  Okay.  Let's go to 450 B, bravo.  There it is.  376?

1  A.  You're correct.  My bad.

2  Q.  And that's because she inputted 376 students into iNow;

3  right?

4  A.  Okay.  She did it?

5  Q.  Yeah.

6  A.  They had to get it in there somehow.  Yes.

7  Q.  And I think Mr. Ross showed you, you deposited that money;

8  right?

9  A.  Correct.

10 Q.  So by Ms. Hard I man entering the 376 students into iNow,

11 she was -- I mean, she was acting in a way that helped Dr. Sisk

12 get paid without even knowing it.  Do you agree with that?

13 A.  That's correct.

14 Q.  I mean, she didn't know about the charity scam; right?

15 A.  That's correct.

16 Q.  Now, you said Dr. Holladay was the money man; right?

17 A.  He was the boss.

18 Q.  He never paid Dr. Carter a dime.

19 A.  That I'm aware of.

20 Q.  And he never told you to pay Dr. Carter a dime; right?

21 A.  That's correct.

22 Q.  And you agree with me that the money in this case ran

23 through Ed Op?

24 A.  Yes, sir.

25 Q.  A charity; right?

1  A.  A charity --

2  Q.  Money ran through a charity?

3  A.  There was money given to a charity, yes.  Dr. Sisk.

4  Q.  Tutt educational services, money ran through there; right?

5  A.  That's correct.

6  Q.  And sage, Deborah Holladay's company; right?

7  A.  That's correct.

8  Q.  Now, the practice trial sessions that you had, remember we

9  talked about the three times you were practicing?

10  A.  Yes.

11  Q.  Coming here?

12  A.  Yes.

13  Q.  Were they -- were any of those meetings recorded so we could

14  hear your exact words?

15  A.  Not that I'm aware of.

16  Q.  Now, over the past day or so, your memory of specific phone

17  call conversations from six years is remarkable how it matched

18  up when Mr. Ross showed you an email and then phone calls to

19  Dr. Carter.  Was that part of the exhibits that they showed you

20  when you were rehearsing?

21  A.  Some of them.

22  Q.  I mean, you don't have that kind of memory to recall a phone

23  call on a particular day and time six years ago, do you?

24  A.  Some phone calls, yes.

25  Q.  You've told us today at times you didn't rather things that

1  happened just not too long ago.

2  A.  That's correct.  I'm human.

3  Q.  Right.  And all of the meetings with the agents, you never

4  once said, hey, he sent me this email and then I called him and

5  we talked about this before the email or after the email.  Not

6  one single time when you met with these agents did you say

7  anything like what you came in here and said.  Right?

8  A.  I would have to think about it.  I don't know.

9  Q.  Then today the government showed you an email that put

10  Dr. Holladay in Orrville, Alabama.

11  A.  That's correct.

12  Q.  And now you say, I gave the money in Orrville, Alabama.

13  A.  Uh-huh.

14  Q.  Right?

15  A.  It's unprovable.

16  Q.  I can't challenge that, can I?  But you said it.

17  A.  I said it, and there's --

18  Q.  No documented evidence of it.

19  A.  You are correct.

20  Q.  But you knew he was in Orrville when they showed you that

21  email.  That put them there?

22  A.  I remember the meeting.

23  Q.  Okay.  You may have met him, sir, but you never gave him a

24  dime.

25  A.  I may have what?

1  Q.  You may have met him, but you never gave him a dime.

2  A.  That's what you say.

3  Q.  You agree with me unquestionably that your agreement with

4  Dr. Holladay was 50/50; right?

5  A.  Yes, sir.

6  Q.  Let me try this one last time.  6 B, page 58.  Let's zoom in

7  on the top half.

8  Q.  All right.  So is that the -- there's the 65,000.  That

9  was -- you got a cashier's check?  Is that what you did?

10  A.  There you go.

11  Q.  Gotcha.  Thank you very much, Mr. Corkren.

12      I'm finished, Your Honor.  Thank you.

13          THE COURT:  Any redirect?

14                  REDIRECT EXAMINATION

15  BY MR. ROSS:

16  Q.  Could I have on the screen -- Mr. Corkren, could you -- if I

17  speak loudly, can you go --

18  A.  Yes, sir.

19  Q.  All right.

20  Q.  Ready, sir?

21  A.  Yes, sir.

22  Q.  All right.  Could we have up Government's Exhibit 1309.

23  Now, Mr. Corkren, I think that Mr. Funk showed you this during

24  cross-examination; correct?

25  A.  Yes, sir.

```
 1   Q.   And I think he described it as these students were hoping to

 2   graduate; is that right?

 3   A.   I believe so, yes, sir.

 4   Q.   The date on this email is February of 2018; correct?

 5   A.   That's correct.

 6   Q.   I think we talked about during your direct examination that

 7   these students were 2017 graduates; correct?

 8   A.   That's correct.

 9   Q.   So these students were not hoping to graduate at that point;

10   correct?

11   A.   That is correct.

12   Q.   Had they already graduated?

13   A.   Yes.

14   Q.   And the EO students.  From what type of school had the EO

15   students graduated?

16   A.   Private schools.

17   Q.   All right.  Now, Mr. Funk also asked you about checks to

18   Dr. Carter.  Do you recall that?

19   A.   I recall that.

20   Q.   And he said -- he asked you if there were any checks that

21   you gave to Dr. Carter; correct?

22   A.   I'm sorry.  I missed that.

23   Q.   He asked you if you had given any checks to Dr. Carter;

24   right?

25   A.   That's correct.
```

1  Q.  And you said no; correct?

2  A.  That is correct.

3  Q.  Did you give any checks to Trey Holladay?

4  A.  No, sir, I didn't.

5  Q.  Why did you not write a check to Trey Holladay?

6  A.  Because I knew it was wrong.  It was illegal.  Public school

7  official cannot take any kind of money, gift or otherwise, and I

8  knew that.

9  Q.  Did you give him cash, knowing that doing that was wrong?

10  A.  Yes, sir.

11  Q.  Did the fact that you knew it was wrong influence whether

12  you wrote a check or whether you gave him cash?

13  A.  Most definitely.

14  Q.  How so?

15  A.  Write a check, it would show a trail.  Why would you write a

16  public school official a check?  And I would have to come up

17  with an answer and without an invoice, you don't have an

18  anticipate.  So it's -- elementary, everyone in here knows if

19  you're going to do something illegal, you better do it in cash.

20  Q.  Did you know that giving Dr. Carter was money was wrong?

21  A.  Probably legally, yes, but morally... morally I thought it

22  was the right thing to do.

23  Q.  Mr. Corkren, is that why you didn't write Dr. Carter a

24  check, because you legally thought it was the wrong thing to do?

25  A.  Yes.

1  Q.  Mr. Corkren, Mr. Funk also asked you about someone named

2  Amanda hard a man.  Do you remember that?

3  A.  Yes, I remember.

4  Q.  And did you -- do you remember that person?

5  A.  Not really.

6  Q.  Did you talk to her on the phone?

7  A.  Not that I recall.

8  Q.  Did you meet with her in person?

9  A.  I wouldn't know her.

10 Q.  Did you talk to Rick Carter on the phone?

11 A.  Daily.

12 Q.  Who do you think you talked to more during all this, Rick

13 Carter or Trey Holladay?

14 A.  Rick Carter.

15 Q.  Mr. Funk also asked you about your ability to remember phone

16 calls.  Do you recall that?

17 A.  Correct.

18 Q.  Do the documents help you to remember things?

19 A.  Most definitely.

20 Q.  Could you remember them without the documents?

21 A.  Maybe.

22 Q.  All right.  And last, this agreement that you were

23 referencing, the agreement that you entered the first time you

24 came to meet with the government.  Do you remember that?

25 A.  Yes, sir.

1  Q.  You kept saying that you signed something when you got

2  there?

3  A.  Correct.

4  Q.  Do you remember that being referred to as a proffer letter?

5  A.  In part of my -- I don't remember.  I converted it in my

6  terminology, plea agreement, I guess.

7  Q.  Do you remember signing a letter that said you weren't

8  receiving any form of immunity?

9  A.  That's correct.

10  Q.  Signing a letter that said that your decision to grant the

11  interview was voluntary?

12  A.  That's correct.

13  Q.  Signing a letter that said that you were a target of a

14  federal investigation?

15  A.  Number one target, yes.

16  Q.  Did you understand that when you came to that meeting, you

17  were, indeed, a target of a federal investigation?

18  A.  Yes, sir.

19  Q.  And that the letter -- it promised you that nothing that you

20  said to the government would be used against you?

21  A.  That is correct.

22  Q.  And you signed that letter before you later entered into the

23  plea agreement; correct?

24  A.  I don't remember the plea agreement, but, yes.

25  Q.  The document that Mr. Funk showed you.

1  A.  Correct.  Yes.

2  Q.  And after you signed the letter, you were, indeed -- after

3  you signed the proffer letter at the first meeting, you were,

4  indeed, prosecuted; correct?

5  A.  That is correct.

6  Q.  And you are currently a defendant in a federal case;

7  correct?

8  A.  Correct.

9  Q.  One moment, Your Honor.

10     (Brief pause in the proceedings)

11 Q.  Mr. Corkren, do you remember exactly how many times you

12 talked to Dr. Carter during that period that you were involved

13 in this?

14 A.  No, sir.

15 Q.  Did you during your cooperation with the government, did you

16 prepare a spreadsheet listing all of the phone calls that you

17 had that you were relevant to this business?

18 A.  Yes, I did.

19 Q.  And did you provide that spread sheet to the government?

20 A.  Yes, sir.

21 Q.  Would looking at that spreadsheet refresh your recollection

22 as to how many times you talked to Dr. Carter?

23 A.  Yes, sir.

24 Q.  Mr. Green, can we have just the witness screen on?

25         THE COURTROOM DEPUTY:  Trying to turn off the jury --

1  the monitors.

2        THE COURT:  What do you mean by witness screen?

3        MR. ROSS:  The screen in the witness box.  Could we

4  have only that screen on.  Is there Mr. Corkren, is your screen

5  still on.

6  A.  Sir?

7  Q.  Is the screen in front of you still on?

8  A.  This one right here?

9  Q.  Yes.

10  A.  Yes, sir.

11  Q.  Can we have on the witness's screen what been marked for

12  identification purposes only as Government's Exhibit 2580.  And

13  could we scroll all the way to the top.  Please add a row

14  beneath one.  And please click filter, and please filter in

15  column H, day select all, please scroll down, and please select

16  Rick Carter cell.  And Rick Carter office.

17  Q.  Mr. Corkren, does viewing this document refresh your

18  recollection as to how many times you spoke to Dr. Carter during

19  the course of this business?

20  A.  That would refresh my memory.  Yes, sir.

21  Q.  How many times did you speak to Dr. Carter during this

22  business on the phone?  How many different phone calls?

23  A.  Wait a minute.  I'm looking.

24  Q.  Do you see down -- a filter number?

25  A.  It says 908 out of 3200.  I assume it's 908 calls.

1  Q.  Is that consistent with your memory?

2  A.  Yes.

3  Q.  Could we go back to column H.  Let's deselect all.  Scroll

4  down to the bottom.  Scroll up, please.  Could we select Trey

5  Holladay superintendent and Trey Holladay work.  Mr. Corkren,

6  does this refresh your recollection as to how many times you

7  spoke to Trey Holladay during the course of this business?

8  A.  Yes, sir.

9  Q.  How many times did you speak to Trey Holladay?

10  A.  660 times.

11  Q.  So would you agree that you spoke to Dr. Carter about a

12  third again more number of calls than with Trey Holladay?

13  A.  Yes, I would agree with that.

14  Q.  All right.  Mr. Corkren, while you've been here, have you

15  shared everything that you were involved in about Trey Holladay?

16  A.  Have I shared it.

17  Q.  Have we talked about all the different aspects of this?

18  A.  During this case?

19  Q.  Yes, sir.

20  A.  No, sir.

21  Q.  Are there other parts that we haven't gone into?

22          MR. FUNK:  Judge, I'm going to object as to relevance.

23          THE COURT:  Yes.  How is this relevance?

24          MR. ROSS:  Your Honor, I'll move on.  One moment, Your

25  Honor.

1      (Brief pause in the proceedings)

2           MR. ROSS:  No further questions, Your Honor.

3           THE COURT:  Any further cross?

4           MR. FUNK:  Briefly.

5                          RECROSS-EXAMINATION

6  BY MR. FUNK:

7  Q.  You told us you went to Dr. Carter's mother's house.

8  A.  No, Dr. --

9  Q.  I mean, Dr. Carter's mom's.  Did you go down there for

10 the --

11 A.  We didn't go -- we went to the funeral home, yes.

12 Q.  So you knew what her address was; right?

13 A.  I knew.

14 Q.  You knew what her address was because you went to her

15 address.

16 A.  I went.

17 Q.  To her home, to her address?

18          MR. ROSS:  Objection, Your Honor.  The witness --

19 Mr. Funk's mischaracterising what he's saying.

20 Q.  I'll ask a different question.  Was there anything

21 preventing you from sending a check to Dr. Carter's mother?

22 A.  I've never been to their house.  I didn't know her address.

23 Q.  Okay.  Well, you talked to Dr. Carter 900 times.  You could

24 have asked him his mother's address, could you not?

25 A.  I could have, yes.

1 Q.  And that --

2 A.  I could have, yes.

3 Q.  And then sent a check to his mother?

4 A.  I could have, yes.

5 Q.  Nothing prevented you from doing that.

6 A.  You're right.

7 Q.  And then when Mr. Ross says you're being prosecuted now, you

8 got prosecuted for one aggravated identity theft.  Can you admit

9 to us today that you committed dozens of them?

10 A.  Can I admit to it.

11 Q.  Yes.

12 A.  Oh, yes.

13 Q.  That's all I have, judge.

14      MR. ROSS:  Nothing further, Your Honor.

15      THE COURT:  Thank you.  You may step down.

16      THE WITNESS:  Thank you.  It's now 3:25.  I think the

17 jurors wanted to break at 3:30.  Why don't we just find out how

18 your case is going before I left the jurors go.

19      MR. ROSS:  Your Honor, we are still on schedule to

20 finish by Wednesday.

21      THE COURT:  By Wednesday?

22      MR. ROSS:  Yes, Your Honor.

23      THE COURT:  You when say finish by Wednesday, is that

24 the middle of Wednesday?  Full day on Wednesday?  What?

25      MR. ROSS:  I hesitate to commit.  Your Honor, we have

 1  some decisions to make about our case over the weekend that will

 2  influence that.  And I don't know that I can say at this point.

 3          THE COURT:  Very good.  We're going to start at 8:30 on

 4  Monday so that -- I'm going to try -- we're going to try to

 5  really finish up.  So I apologize to the jury, but I think

 6  you-all are ready to bring this -- the evidentiary portion to a

 7  close as quickly as we can.  So let's start at 8:30 and try to

 8  really put in a full day.  Okay?  Hold on just a second.  Yes.

 9  8:30.  Thank you.

10          (Jury out at 3:24 p.m.)

11          MR. ROSS:  Your Honor, could we provide something to

12  the Court.

13          THE COURT:  Pardon?

14          MR. ROSS:  We have something to provide to the Court.

15          THE COURT:  Do we need him any longer?

16          MR. ROSS:  No, Your Honor.

17          THE COURT:  What is it?  Is this what I asked for?

18          MR. ROSS:  Your Honor, it's tabbed with each exhibit,

19  and the tabs that have an X indicate that the agreement has not

20  been stipulated to.  That there is a dispute over these.

21          THE COURT:  Very good.  Thank you very much.

22          And when you go home, I hope you won't be shouting.

23  You were shouting at me just then.

24          MR. PULLIAM:  Your Honor, may I approach, Your Honor?

25  Max Pulliam, member of the Bar.

1          THE COURT:  Pardon me?

2          MR. PULLIAM:  It's a personal matter.

3          THE COURT:  Oh, certainly.  (3:27 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25