IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

UNITED STATES OF AMERICA )
)           CRIMINAL ACTION NO.
v.              )              2:21cr49-MHT
)                 (WO)
WILLIAM   RICHARD   CARTER, )
JR.                     )

OPINION ON ADMISSIBILITY OF CO-CONSPIRATOR
STATEMENTS AND ON MOTION FOR NEW TRIAL

This case centers on a conspiracy to commit fraud

within Alabama's system of funding for public education,

through the enrollment of private school students as

full-time public school virtual students.  One of the

defendants, William Richard Carter, Jr., was convicted

by a jury of conspiracy to commit offenses against the

United States as well as several counts of wire fraud and

aggravated identity theft.

Two issues are currently before the court.  The first

is the admissibility of co-conspirators' statements

against Carter at trial, pursuant to Federal Rule of

Evidence 801(d)(2)(E).  Previously, at trial, the court

made brief oral findings, concluded that the statements

were admissible at Carter's trial, and promised that a more detailed opinion would follow.  The second issue is whether Carter is entitled to a new trial.  After the trial, he filed a motion for a new trial based on the weight of the evidence, pursuant to Federal Rule of Criminal Procedure 33(a).  In a brief order entered a couple of weeks ago, the court denied the motion and promised that an opinion would follow.

With this promised opinion, the court explains in more detail why it admitted the co-conspirator statements at trial and explains why it denied Carter's new-trial motion.


## I.  PROCEDURAL BACKGROUND

Carter, along with defendants William Lee ("Trey") Holladay, III, Gregory Earl Corkren, David Webb Tutt, and Thomas Michael Sisk, was charged in a 127-count

indictment.[1]  The indictment charged all five defendants with one count of conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371.  It also charged Carter and Holladay with multiple counts of wire fraud, in violation of 18 U.S.C. § 1343, and charged Carter, Holladay, and Corkren with one or more counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A.  Prior to trial, Holladay, Corkren, Tutt, and Sisk entered guilty pleas to one or more counts.

Carter proceeded to a jury trial, at which Corkren and Sisk testified.  At the conclusion of the evidence, and as required by law, *see United States v. Hewes*, 729 F.2d 1302, 1312 (11th Cir. 1984), the court addressed the issue of the admissibility of out-of-court co-conspirator statements.  The court made oral findings that the government had shown by a preponderance of the evidence all of the requisites for the admissibility of any

_____

1.  Holladay's wife was also indicted, but the indictment was later dismissed as to her.

out-of-court co-conspirator statements that were received against Carter, and the court promised that a more detailed opinion would follow. In addition, the court denied Carter's oral motions for a judgment of acquittal.

The jury found Carter guilty of one count of conspiracy to commit wire fraud against the United States, four counts of wire fraud, and two counts of aggravated identity theft. The jury found him not guilty of the remaining 74 counts of wire fraud and was unable to reach a verdict on the remaining 32 counts of aggravated identity theft. The court granted the government's oral motion to dismiss the counts for which the jury could not reach a verdict.

After the trial, Carter filed a motion for new trial, and the court later entered a brief order denying the motion, with a promise that an opinion would follow.

## II. FACTUAL BACKGROUND

The alleged conspiracy at the heart of the indictment consisted of an agreement among the defendants, including several public-school administrators, to acquire the identifying information and educational records of private school students and to use this information to inflate the enrollment numbers of at least two public school districts, the Athens City School District and the Limestone County School District. These artificial increases in reported enrollment increased the funding that the districts received from the Alabama State Department of Education. The indictment alleged that portions of this increased funding were to be used to fund capital projects and that the defendants diverted other portions of the increased funding for their own personal gain. The charged conspiracy existed between approximately February 2016 and August 2018.

The evidence at trial revealed the following. From 2013 through at least the end of the 2017-2018 school year, Holladay was the superintendent of the Athens City

School District.  Sisk was the superintendent of the Limestone County School District.  Corkren and Tutt were retired educators and friends of Holladay.  Finally, Carter was an Athens district employee whose position changed several times between 2015 and 2017.  In August 2015, he began as a technology teacher at the Athens Renaissance School, discussed in more detail below.  He was subsequently promoted to coordinator of virtual programs for the Athens district in October 2015, director of innovative programs for the district in June 2016, and executive director of innovative programs for the district in July 2017.  *See* Johnson Feb. 23, 2022, R.D. Trial Tr. 110-17.  Carter also had a prior relationship with Holladay.  *See* Sallee Feb. 25, 2022, R.D. Trial Tr. 206-09.

Before proceeding to discuss the conduct and communications of Carter and his codefendants, the court begins with an overview of the relevant context, including the State's system of funding for public

education and the development of the Athens school district's virtual programs.

## A. Education Funding

At all relevant times, Alabama public school districts received funding from local and state tax revenues. School districts received most state funding from the Education Trust Fund, which in turn required the districts to participate in the Foundation Program--a "formula based system" administered by the Alabama State Department of Education to determine the amount of state funding each district would receive. Johnson Feb. 23, 2022, R.D. Trial Tr. 75. The Foundation Program allocated funding in proportion to a school district's "average daily membership," a metric that was computed based on a district's average number of enrolled students during the 20 school days immediately following Labor Day. *See* Craig Mar. 7, 2022, R.D. Trial Tr. 178-79; Bice Feb. 23, 2022, R.D. Trial Tr. 192-94. Generally, a higher average daily membership corresponded with a higher

funding allocation through the Foundation Program. During the relevant period, adding one additional student to a district's average daily membership would result in an increase of between $ 5,500 and $ 7,000 to the district's annual funding allocation.[2] *See* Craig Mar. 7, 2022, R.D. Trial Tr. 179; Johnson Feb. 23, 2022, R.D. Tr. 76.

To manage student enrollment, each public school district in the State needed to input the personal information of its students into a database that was

---

2. For the most part, payments were made "in arrears," which meant that a school district's average daily membership at the start of one school year would affect its funding for the following school year. Craig Mar. 7, 2022, R.D. Trial Tr. 183; Johnson Feb. 23, 2022, R.D. Trial Tr. 100-01. However, certain "current units" payments were made in the same year in which a school district's average daily membership was calculated. These "current units" payments increased a school district's funding for the current school year based on any increase in that district's average daily membership as compared against the previous year. As a result of these payments, a school district's immediate growth would have some effect on the funding received in the same year in which the new average daily membership was calculated. Craig Mar. 7, 2022, R.D. Trial Tr. 186-89.

accessible by the State Department of Education. *See* Britney Carter Mar. 7, 2022, R.D. Trial Tr. 54. The data maintained for each student enrolled in a district included the student's schools attended and dates of attendance, course schedules, instructors, grades, attendance records, standardized test scores, and personal identifying information. *See* Stringham Mar. 4, 2022, R.D. Trial Tr. 110-11; Britney Carter Mar. 7, 2022, R.D. Trial Tr. 63. The student information maintained in each district's database was used to calculate its average daily membership for funding purposes. *See* Stringham Mar. 4, 2022, R.D. Trial Tr. 119-20.

A student could be enrolled in only one school district's database at a time. The database management program would prevent one school district from enrolling a student who was already enrolled in another district. *See* Bice Feb. 23, 2022, R.D. Trial Tr. 216; Sallee Feb. 25, 2022, R.D. Trial Tr. 174-75, 235; Corkren Mar. 9, 2022, R.D. Trial Tr. 248. However, the State Department of Education did not maintain or access databases for

private schools, and private school students were not tracked. *See* Sallee Feb. 25, 2022, R.D. Trial Tr. 175; Craig Mar. 7, 2022, R.D. Trial Tr. 248; Bice Feb. 23, 2022, R.D. Trial Tr. 216. Consequently, a private school student could be enrolled in a public school district's database without triggering any errors.

## B. Athens Renaissance School

Around 2014, the Athens City School District (which is located in Limestone County, Alabama) opened the Athens Renaissance School, a blended and virtual K-12 public school that became a stand-alone school in the fall of 2016.[3] *See* Johnson Feb. 23, 2022, R.D. Trial Tr. 73-74; Sallee Feb. 25, 2022, R.D. Trial Tr. 115-16. "Blended" students received part of their instruction in person and part of their instruction virtually; "virtual"

---

3. Prior to 2016, the Renaissance School operated without a stand-alone school code, which meant that its students were officially registered as attending traditional schools within the Athens school district.

students received all of their instruction virtually. Sallee Feb. 25, 2022, R.D. Trial Tr. 112, 124. The Athens school district contracted with several companies to obtain licenses for learning-management systems--software platforms that provided curriculums, course content, and assessments for the blended and virtual students' classes. A learning-management system called Odysseyware was the Renaissance School's main curriculum provider. *See id.* at 119. Odysseyware did not provide live instructors, requiring instead that school systems using its software provide instructors and administrators to oversee Odysseyware courses.

Also in 2014, the Athens school district's board of education adopted a policy authorizing the district's superintendent and the board to accept applications for enrollment of nonresident students--students outside of the district's geographic area. Under this "Non-Resident Student Admissions Policy," the district was required to charge $ 1,200 in annual tuition to any nonresident student, subject to limited exceptions. Gov't Ex. 1; *see*

*also* Johnson Feb. 23, 2022, R.D. Trial Tr. 80-82. The following year, the State passed a law providing that "[a] full-time student enrolled in a virtual program shall be enrolled and count in the average daily membership of the local school." Ala. Code § 16-46A-2(a); *see also* Johnson Feb. 23, 2022, R.D Trial Tr. 76. Shortly afterward, the district adopted a policy under which the Renaissance School could enroll students as either full-time or guest-enrolled students. *See* Gov't Ex. 1627. Full-time students were subject to the district's standard eligibility requirements and enrollment procedures, such as the nonresident student admissions policy; full-time resident students could participate in Renaissance School courses and programs for free, while full-time nonresident students would be required to pay a nonresident tuition fee. All full-time students were required to take a minimum number of credits per year and would be considered truant if they fell too far behind the pace of one or more of their classes. In contrast, guest-enrolled students, who could

12

simultaneously remain enrolled in another public, private, or home school, could take a limited number of courses through the Renaissance School for a per-course fee. With respect to guest-enrolled students, the policy noted, "A fee is necessary because Athens City Schools will NOT receive public funding for guest-enrolled students." *Id.* at 9 (emphasis in original).

In the summer before the 2015-2016 school year, Holladay sought a waiver of certain State Department of Education requirements as applied to the Athens district and the Renaissance School. *See* Gov't Ex. 1666. One of his requests "would allow Athens City Schools to offer one or more traditional, online, or blended courses to students that are enrolled at other public and non-public schools (or students that are home schooled) as 'guest students' ... without enrolling them as a student in the Athens City Schools." *Id.* at 8. Holladay later stated that he intended "to attract home school students, private school students, and other non-traditional students that have abandoned public education ... and to

enroll or 'recover' them as full-time students in our school system." Gov't Ex. 1678 at 1. Despite this reference to full-time students, he simultaneously reiterated the difference between full-time students, who were required to take a minimum number of credits per year and could be counted toward the district's average daily membership, and guest-enrolled students, who could not be counted toward average daily membership. *See id.* at 2. Nothing in the proposed waiver indicated that the district could enroll a full-time private school student as a full-time virtual student at the Renaissance School. *See* Bice Feb. 23, 2022, R.D. Trial Tr. 207-10, 215. In November 2015, the State Department of Education generally granted the waiver, subject to numerous advisements. *See* Gov't Ex. 1682. With respect to Holladay's request regarding guest enrollment of home school and private school students, the department advised that "'Guest-enrolled' students will not be entered or enrolled into" the Athens school system's student database with the department and that "No

Foundation Program units are earned" for such students. *Id.* at 4-5.

### C. Agreements with Private Schools

In September 2015, Holladay entered into an agreement with the administration of the Marengo Academy, a private school in Linden, Marengo County, Alabama. Holladay offered to provide Marengo Academy with Athens City School District laptops, upgraded internet access, and access to online courses through the Odysseyware learning-management system licensed by the Athens Renaissance School. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 52-53 (laptops), 56-57 (online courses), 71-81 (internet access). In exchange, Marengo Academy would provide the Athens district with identifying information and transcripts of its private school students. *See id.* at 49-50. Holladay directed Athens district officials to use this information to enroll Marengo Academy students as full-time nonresident Renaissance School

students, who could be counted for purposes of the Athens district's average daily membership and funding allocation, rather than guest-enrolled students, who could not. *See id.*; Johnson Feb. 23, 2022, R.D. Trial Tr. 77-79. Because private school students, such as those attending Marengo Academy, did not appear in the databases accessed by the State Department of Education, the Athens district could enroll these students as Renaissance School students without triggering any error. The students whose information was used in this way continued to attend Marengo Academy as full-time students, continued to pay Marengo Academy the tuition they had already been paying, and continued to receive instruction from Marengo Academy teachers; they did not pay tuition to the Athens Renaissance School, despite the policy of the Athens district, and did not take full-time course loads at the Renaissance School. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 56-60; Johnson Feb. 23, 2022, R.D. Trial Tr. 88.

In March 2016, Holladay met with the state
superintendent of education and other representatives of
the State Department of Education. *See* Craig Mar. 7,
2022, R.D. Trial Tr. 214-20. The state superintendent
raised two concerns about the Athens school district's
virtual-student enrollment practices. First, the state
superintendent advised that the Renaissance School should
refrain from enrolling full-time virtual students who
resided more than 100 miles outside of Athens. *See id.*
at 215-16. Second, the state superintendent expressed
concerns about the Athens district's practice of
enrolling private school students at the Renaissance
School and counting them as full-time students to
increase the district's average daily membership. *See
id.* 217-20; Gov't Ex. 151. With respect to the first
issue regarding enrollment of students substantially
outside of Athens, Holladay agreed to discontinue the
practice. *See* Craig Mar. 7, 2022, R.D. Trial Tr. 215-16.
With respect to the private-school issue, in a subsequent
email, the attorney for the Athens district's board of

education stated that the district would "pull back" and would "not enroll any full-time student into its Renaissance School unless that student first presents papers showing that, if he/she was enrolled in any public or private school, that [sic] he/she has *withdrawn* from such school." Gov't Ex. 151 at 2 (emphasis in original). But Holladay did not "pull back."

Around the time of this meeting, Holladay instructed Corkren, who was unaffiliated with the Athens school district, to form a limited liability corporation. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 53-54; *see also* Gov't Ex. 2438 (state record of formation of Corkren's corporation). Corkren, acting through his corporation, would offer incentives for private schools to provide student information that could be used to enroll the private school students as Renaissance School students. Toward the end of the 2015-2016 school year, Corkren assisted in managing the records of Marengo Academy students enrolled at the Renaissance School. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 58-60. Then, in April 2016,

his corporation, Educational Opportunities and Management, LLC, also known as Ed-Op, entered a contract with the Athens school district. The contract's preamble explained that "there are anticipated to be a significant number of [Renaissance School] full-time and guest enrollment students in the Marengo County, Alabama area ... during the 2016-17 school year." Gov't Ex. 1657 at 2. In exchange for Ed-Op's "assistance with respect to the logistics and administrative issues presented by serving [these] Students," the Athens district agreed to compensate Ed-Op with monthly payments of $ 45 per student enrolled at the Renaissance School by Ed-Op. *Id.* at 2, 4. Holladay instructed Corkren to split a portion of these monthly payments between the two of them. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 101-02.

In May 2016, Carter, then the Athens City School District's coordinator of virtual programs, organized a district "Digital Learning Showcase," attended by himself, Holladay, and Corkren, as well as representatives of the Jackson Academy in Jackson, Clarke

County, Alabama, the Pickens Academy in Carrollton, Pickens County, Alabama, the Lakeside School in Eufaula, Barbour County, Alabama, and the Southern Academy in Greensboro, Hale County, Alabama. *See id.* at 103-06. According to Corkren, the purpose of the event was "[t]o recruit ... private schools and their students." *Id.* at 105. The Athens district directly and indirectly paid for lodging and meals for the private school representatives. *See* Gov't Ex. 172A (email from Carter to private school administrators); Corkren Mar. 9, 2022, R.D. Trial Tr. 108. During meetings and visits with the private school administrators, Holladay, Corkren, and Carter encouraged the private schools to provide the Athens district with student information, including student and parent identifying information, transcripts, and report cards. In exchange, the district would provide the private schools with various benefits, including Odysseyware access, laptops, improved internet capabilities, standardized testing, and monetary payments. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 83-93,

118-22; Sallee Feb. 25, 2022, R.D. Trial Tr. 134-35; Mickleboro Feb. 28, 2022, R.D. Trial Tr. 77-88, 106-08. Documents prepared by Carter advertised the benefits the private schools would receive. *See* Gov't Ex. 129B (PowerPoint presentation for Southern Academy advertising "No Risk for Southern Academy" and "They are still your students"); Gov't Ex. 200B (condensed list of the benefits). Administrators from Jackson Academy, Pickens Academy, Lakeside School, and Southern Academy agreed to the proposed exchange, joining the Marengo Academy as participants. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 118-22, 129.

Throughout the summer of 2016, Corkren collected student information from the private schools using a template designed by Carter. *See id.* at 132-45; Gov't Ex. 230B (template that Carter emailed to Corkren). This information included students' names, genders, grades, birthdates and ages, social security numbers, races and ethnicities, and residential addresses. *See, e.g.*, Gov't 255B (information collected from Jackson Academy).

21

Corkren sent the spreadsheets he collected to Carter. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 140-41, 145-47. Carter then shared the student information with Athens district officials for enrollment in the district's student database. *See* Sallee Feb. 25, 2022, R.D. Trial Tr. 139-41.

Carter also prepared several forms purporting to alter the status of the private school students. First, he prepared "Verification Release Forms" that were prepopulated with the collected student information. *E.g.*, Gov't Ex. 259B (forms for Jackson Academy); *see also* Corkren Mar. 9, 2022, R.D. Trial Tr. 156-59. These forms, which included the misappropriated header of the "Alabama Independent School Association," indicated that the "Purpose of Verification" was "UN-ENROLLMENT." *E.g.*, Gov't Ex. 259B. Each form contained a line for a private school's "HEAD OF SCHOOL OR REGISTRAR" to sign. *Id.* Carter sent the prepopulated forms to Corkren, who in turn sent them to private school officials for their signatures. *See* Corkren Mar. 9, 2022, R.D. Trial Tr.

160-62. Based on Corkren's representations, the private school headmasters or assistant headmasters signed the forms. *See id.* at 152, 155. Corkren collected the administrator-signed forms and returned them to Athens district officials. The district kept the forms as nominal proof that the students had unenrolled from their private schools before enrolling in the district's Renaissance School. Corkren characterized the unenrollment of the private school students as a "farce." *Id.* at 149-50.

Carter also prepared a template "Athens City Schools Virtual/Non-Resident Enrollment Form," which Corkren shared with the private school administrators to enroll private school students at the Renaissance School. Gov't Ex. 258B; *see also* Sallee Feb. 25, 2022, R.D. Trial Tr. 173-74. Each form required the student's name, a parent or guardian's name, and the student's address, grade level, date of birth, and school. In addition to ostensibly enrolling each student in the Athens district, the form also included a release consenting for the

Renaissance School to share the student's educational records with Ed-Op. Corkren again sent the forms to the private school headmasters to be completed. Where the form required the signature of a "GUARDIAN/AUTHORIZED OFFICIAL," Corkren instructed the headmasters that they could sign on behalf of their students. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 165-67.

Headmasters or assistant headmasters from the private schools completed these forms, in the vast majority of cases without the consent of the students' parents or guardians, and provided them, as well as students' transcripts, to Corkren. In turn, Corkren delivered the forms and records to Carter for entry into the Athens district's student database. *See id.* at 132-33, 167-77. After receiving the student information, Carter instructed district officials to refer to the private schools as "EOs," short for Ed-Op, with each private school receiving its own numbered code (EO1, EO2, etc.). *See* Sallee Feb. 25, 2022, R.D. Trial Tr. 131-32. At Carter's direction, district officials used the

information received to enroll the private school students as full-time students at the Renaissance School. *See id.* at 137-38; Britney Carter Mar. 7, 2022, R.D. Trial Tr. 66-69; *see also* Gov't Ex. 366 (email from Carter celebrating the enrollment of the Ed-Op students).

Holladay, Corkren, and Carter encountered a problem with some of the student information that had been collected from the private schools. Some of the private school students lived out of state in Georgia or Mississippi. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 208-09. The Athens district officials who had been tasked to enroll the private school students informed Carter of this problem. *See* Sallee Feb. 25, 2022, R.D. Trial Tr. 148-50. To address this obstacle to enrolling the students as Renaissance School students, Holladay instructed Corkren to create in-state addresses for those students. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 214-15. Carter similarly encouraged Corkren to change the addresses, sending him a to-do list that included the task "Address Change on the out of state addresses."

Gov't Ex. 368. Carter emailed two Renaissance School employees that Corkren would "send us our new addresses for our EO students with out of state addresses." Gov't Ex. 369. Using vacant Alabama addresses that he found online, Corkren created fake addresses for the out-of-state students and emailed them to Carter. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 216-19. He explained to Carter how he had created the fake addresses. *See id.* at 220. Carter then directed Athens district officials to use the fake addresses to enroll the out-of-state students in the district's student database. *See* Sallee Feb. 25, 2022, R.D. Trial Tr. 154, 182.

In exchange for the private schools' student information, Corkren, with Holladay's and Carter's knowledge, delivered Athens City School District laptops and monetary payments to the participating private schools and their employees. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 221-31; Corkren Mar. 10, 2022, R.D. Trial Tr. 30-35, 47-48, 56-57; Mickleboro Feb. 28, 2022, R.D. Trial Tr. 111-15. Corkren occasionally consulted Carter

26

to determine whether a payment requested by a private school administrator had been "promised" previously. Corkren Mar. 10, 2022, R.D. Trial Tr. 48.

In addition to the Athens district's arrangements with the private schools, in the summer of 2016 Holladay connected Corkren with Sisk to discuss a similar process to enroll students from other private schools as virtual students in the Limestone County School District. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 196. The Limestone district and Ed-Op entered into a contract that paralleled the contract between the Athens district and Ed-Op. *See* Gov't Ex. 1623. While the Limestone contract provided for the same $ 45 monthly per-student payments to Ed-Op as in the Athens contract, *see id.* at 3, Corkren and Sisk subsequently edited the contract, without approval of the Limestone district's board of education, to increase the amount to $ 55, *see* Sisk Mar. 3, 2022, R.D. Trial Tr. 165-70; Corkren Mar. 9, 2022, R.D. Trial Tr. 198-99; Corkren Mar. 10, 2022, R.D. Trial Tr. 28-29. Using the Athens district's Odysseyware license and

similar forms to those used for the Renaissance School enrollments, Corkren and Holladay facilitated an exchange of benefits for private school student information between the Limestone district and the Monroe Academy in Monroeville, Monroe County, Alabama. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 205–07. As was the case for the five private schools that cooperated with the Athens district, parents or guardians of the Monroe Academy students did not sign the forms, and the students did not intend to unenroll from Monroe Academy and enroll in the Limestone district's virtual school.

Once the private school students had been enrolled as students in the Athens district or the Limestone district, Holladay, Corkren, and Carter required private school transcripts and report cards for entry into the student databases. As Corkren testified, if Carter had input the students' Odysseyware grades, rather than "their actual [private] school grades," the students would have had almost all zeros and would not appear to be full-time public school students. Corkren Mar. 10,

28

2022, R.D. Trial Tr. 58-59.  Therefore, Carter created an Ed-Op form to collect private school grades and, in Corkren's words, "[t]o hide the fact the grades came from private school students."  *Id.* at 62; *see also* Gov't Ex. 507B.  Despite the fact that Ed-Op did not employ any teachers or counselors, *see* Corkren Mar. 10, 2022, R.D. Trial Tr. 61-62, the "Virtual Student Grade Verification Form" prepared by Carter represented that "The Ed-Op administration and our certified teachers/counselors assessed and confirmed" the awarded credits, Gov't Ex. 507B.

Instead of using this form, however, Corkren simply asked the private school headmasters and assistant headmasters to send him the students' report cards.  *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 64, 192-93.  Where the report cards contained the names of private schools or their instructors, Corkren or Carter edited them to include Ed-Op's name and information, as well as the numbered "EO" code for the private school.  *See id.* at 72-98.  For most private schools, Carter sent the report

cards to Athens district officials for entry into the district's database.  *See* Sallee Feb. 25, 2022, R.D. Trial Tr. 155-57.  With respect to Monroe Academy, Carter edited the report cards and sent them to the Limestone district.  *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 97-99.  Within the Athens district, administrators would assign the private school students to classes within the district that were "close" to their private school classes.  Sallee Feb. 25, 2022, R.D. Trial Tr. 156-60.  Carter supervised this process.  *See id.* at 185-87.  The process of modifying and inputing report cards for the private school students continued as Corkren received report cards from the private school administrators; many of the private schools were late in delivering the report cards.  *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 66.  When one Athens district official raised concerns about delays in receiving and inputing report cards for the "Ed-Op" students, Carter reassured her that Corkren was "finaliz[ing] report cards for all his EO's" and that

Ed-Op was responsible for "a couple of thousand" students at "other schools in Alabama." Gov't Ex. 655.

In early 2017, Holladay invited Tutt to assume responsibilities similar to those of Corkren. Like Corkren, Tutt formed a limited liability corporation, Tutt Educational Services, LLC, and agreed to recruit private schools to share their student information with the Athens district in the 2017-2018 school year. *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 170, 177. Holladay's wife also formed a limited liability corporation, Sage Professional Development, LLC, to receive a portion of Ed-Op's revenue for the Holladays' personal benefit. *See id.* at 217. During the 2017-2018 school year, the Athens district continued to make monthly payments to Ed-Op. The 2017-2018 agreement maintained the $ 45 payments for each newly enrolled student but more than tripled the rate to $ 150 for students who had been enrolled in the previous year. *See* Gov't Ex. 1648 at 4. However, in the invoices that Corkren submitted to Carter, he billed for all students

31

at the higher $ 150 rate. *See* Corkren Mar. 11, 2022, R.D. Trial Tr. 28-29, 31-33; *see also, e.g.*, Gov't Ex. 1151 (November 2017 invoice). Ed-Op contracted to pay tens of thousands of dollars to Tutt Educational Services each month, and Tutt Educational Services in turn contracted to pay Sage Professional Development $ 16,500 per month. *See* Gov't Ex. 868E (contract between Ed-Op and Tutt Educational Services); Gov't Ex. 868D (contract between Tutt Educational Services and Sage Professional Development). Sisk and the Limestone district did not continue to participate in the scheme during that school year. *See* Gov't Ex. 1703 (notice of termination).

Tutt negotiated an exchange of benefits--online curriculum, laptops, and internet access--for private school student information with Meadowview Christian School in Selma, Dallas County, Alabama, and Abbeville Christian Academy in Abbeville, Henry County, Alabama. *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 177, 225-26; Corkren Mar. 11, 2022, R.D. Trial Tr. 23-24. He also drafted agreements purporting to hire Meadowview

Christian School employees as independent contractors of Ed-Op. *See* Gov't Ex. 988B; Gov't Ex. 989B (batches of contracts). As Corkren testified, the purpose of these contracts was, "To act like I had teachers and to be able to use them with testing." Corkren Mar. 11, 2022, R.D. Trial Tr. 27; *see also* Corkren Mar. 10, 2022, R.D. Trial Tr. 210, 219-21. Holladay's wife obtained the Meadowview student information and sent it to Corkren, who forwarded it to Carter. *See* Gov't Ex. 1035A; Corkren Mar. 11, 2022, R.D. Trial Tr. 24. Because Corkren did not forward this information until November 2017, after the end of the period for calculating the Athens district's average daily membership, *see* Gov't Ex. 1141A, the district official who entered this information backdated the enrollments to August 2017. *See* Britney Carter Mar. 7, 2022, R.D. Trial Tr. 65-69, 72-74. She testified that she "would have been asked to do that" by Carter. *Id.* at 73-74. Ultimately, in July 2018, Carter directed the same official to withdraw the Meadowview students who had been enrolled. *See id.* at 74-76. She backdated the

33

withdrawals to the same enrollment dates in August 2017; again, she testified that she "wouldn't have chosen the date" and "assume[d]" that Carter told her to backdate the withdrawals. *Id.* at 76.

During the 2017–2018 school year, as previously, several private schools provided student report cards to Tutt or Corkren to be entered into the Athens district's student database. As previously, Corkren modified the report cards to omit any mention of the private schools or their instructors, pursuant to Carter's instructions. *See* Corkren Mar. 11, 2022, R.D. Trial Tr. 65-73.

D. Investigation by State Department of Education

In February 2017, officials from the Alabama State Department of Education initiated an audit of the Limestone County School District's virtual-student information, after discovering that the enrollment forms had been signed by a private school headmaster, rather than a parent or guardian. *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 104. In connection with the department's

audit, and because the undiscovered Athens district forms had also been signed by headmasters or assistant headmasters, Holladay directed Corkren to obtain enrollment forms that contained parent or guardian signatures, rather than the signatures of the private school officials. *See id.* at 105-07. Carter clarified which forms Corkren needed to obtain. *See id.* at 110. To accelerate the process, Corkren, at Holladay's direction, offered to pay the private schools for each signed enrollment form they collected. *See id.* at 107-08. Carter, aware that the private schools were being paid to complete these forms, approved reimbursements by the Athens district for these payments. *See id.* at 126, 133-34. Corkren delivered the new enrollment forms to Carter for placement in the district's files for the private school students. *See id.* at 120-26.

In March 2017, in response to growing concerns that the Athens district was continuing to enroll private school students as full-time virtual students, the State

Department of Education issued a memorandum proposing a statewide definition of a "full-time virtual student" as "one who is currently enrolled and participating in a number of virtual courses sufficient for matriculation from grade to grade ... and is not simultaneously enrolled in or attending another public or non-public K-12 school."  Gov't Ex. 1702; *see also* Craig Mar. 7, 2022, R.D. Trial Tr. 228-31.  This was not a new requirement for the Athens district; as one State Department of Education official testified, the Athens district had already agreed not to enroll private school students as full-time virtual students.  *See* Craig Mar. 7, 2022, R.D. Trial Tr. 231-32.  In April 2017, Holladay emailed a State Department of Education official to share that the Athens district would use an "[u]pdated enrollment form" to enroll new students "starting today" and that the district would "hav[e] all current virtual students re-enroll before continuing next year."  Gov't Ex. 707A.  The attached enrollment form, which Holladay forwarded from Carter, included the definition of

"full-time virtual student" from the State Department of Education memorandum, as well as language similar to the representation that the Athens district's attorney had made to the department back in March 2016.  Gov't Ex. 707B at 2.

Subsequently, in August 2017, the state superintendent of education sent a letter to Holladay indicating that the State Department of Education had information about the enrollment of private school students in the Renaissance School that "call[ed] into question the legitimacy of a significant portion of the 2017 funded [average daily membership] reported by ACS." Gov't Ex. 1592B at 3.  (Of course, ACS stood for Athens City Schools.)  The letter informed Holladay that the department would "need to consider, among other things, an extrapolation of disallowed [average daily membership] and corresponding consequences in funding."  *Id.*  State Department of Education officials met with Holladay and Carter and instructed them that the private school students needed to be removed immediately.  *See* Owsley

Mar. 14, 2022, R.D. Trial Tr. 201-06.  Holladay and Carter insisted that the Athens district had removed all private school students from the Renaissance School.  *See id.* at 207.  When Holladay learned, through these discussions, that the State Department of Education had confirmed that Lakeside School students had been enrolled at the Renaissance School, he directed Corkren to discontinue payments to that school and not to enroll any Lakeside School students during the 2017-2018 school year.  *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 242-43.

In response to the State Department of Education investigation, the Athens district placed Carter in charge of an audit of the Renaissance School's student enrollment.  *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 243.  Tutt notified the private school headmasters that Carter would be calling them for the audit and directed the headmasters to state that the private school students were not enrolled at the private schools.  *See id.* at 253-57.  In one instance, Carter asked a private school official whether the students were enrolled at the

private school and the official answered that they were. Carter then spoke to Tutt, and Tutt instructed the official that she was supposed to say the students were not enrolled at the private school. When Carter called the official back, however, the official reiterated that the students were enrolled. *See id.* at 258.

Related to this audit, Carter requested student records from Corkren and Ed-Op. First, from his private email address, Carter sent Corkren a spreadsheet of the audited students and their private schools. *See* Gov't Ex. 1044B. The next day, Carter sent Corkren an email from his official email address containing a subset of the previous list, this time omitting mention of the private schools. *See* Gov't Ex. 1046. This email asked Corkren to "provide verification of work completed" for the listed students. *Id.* To support the claim to the State Department of Education that all students purportedly enrolled at the Renaissance School were taking full-time course loads, Carter directed Corkren to prepare Athens City School District Odysseyware

39

course-completion reports for certain private school students.  *See* Gov't Ex. 1055A.  Because the students were not, in fact, taking full-time course loads through Odysseyware, Corkren informed Carter and Holladay that it would take time for him to "fabricate" the reports. Corkren Mar. 10, 2022, R.D. Trial Tr. 266; Corkren Mar. 11, 2022, R.D. Trial Tr. 6.  Carter replied, "Trey wants you to get it done.  We need you to get it done."  Corkren Mar. 11, 2022, R.D. Trial Tr. 6.  Holladay similarly told Corkren, "I need you to get it done some way, some how." *Id.*  Corkren then prepared falsified reports showing that the students had taken and completed full-time course loads.  *See id.* at 7-14.  He sent these reports to Carter, with the warning that he should deliver paper, rather than digital, copies to the State Department of Education or else "they'll know it's been edited."  *Id.* at 15. Carter delivered the reports to Holladay and informed Corkren that the reports would be sent to the State.  *See id.* at 15-16.  Carter emailed 20 of these falsified

reports to the interim state superintendent of education and other state officials. *See* Gov't Ex. 1181.

Subsequently, Holladay learned that the State Department of Education had requested enrollment records from private schools to determine whether private school students had been enrolled as full-time students in the Athens district. He directed Corkren and Tutt to tell the private school officials that they were under no legal obligation to provide the data to the department. *See* Corkren Mar. 11, 2022, R.D. Trial Tr. 86-87. Per Holladay's instructions, Corkren gave money to Tutt to bribe at least one private school headmaster not to answer the letter, although Corkren could not say whether the bribe actually occurred. *See id.* at 87-88.

### E. Flow of Money

As a result of the arrangements between the Athens City School District and the private schools, the district's average daily membership included over 750 full-time private school students in the 2016-2017 school

41

year and over 500 such students in 2017-2018. *See* Stringham Mar. 4, 2022, R.D. Trial Tr. 136-37, 148. Some of the students enrolled at the Renaissance School took no courses through the Odysseyware license provided by the Athens district. Others either took a small number of elective courses through Odysseyware, which were administered by private school employees, or took private school courses in which the teachers used Odysseyware assignments to supplement the traditional coursework. *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 14-15; Mickleboro Feb. 28, 2022, R.D. Trial Tr. 110-11. Most, if not all, of the students did not take, let alone complete, the minimum course load through Odysseyware that would allow them to be considered full-time virtual students under the Athens district's policy. *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 6, 58-59.

The inclusion of private school students significantly inflated the Athens district's average daily membership. In the fall of 2012, the district's average daily membership was 3,179.75. *See* Gov't Ex.

2472. By fall of 2014 two years later, it had increased by 186.4 to 3,366.15. *See* Gov't Ex. 2474. In the fall of 2015, when Holladay arranged for Marengo Academy students to be enrolled, the district's average daily membership increased by 449.2 to 3,815.35--a one-year increase more than double the combined increase of the preceding two years. *See* Gov't Ex. 2475. Then, in the fall of 2016, the district's average daily membership increased by more than double that amount, 930.46, up to a peak of 4,745.81. *See* Gov't Ex. 2476. Although private school students remained enrolled at the Renaissance School in the 2017-2018 school year, average daily membership dropped as private school students were withdrawn in light of the investigation by the State Department of Education.

The increase in the Athens district's average daily membership during this period increased the share of funding that the district received from the State through the Foundation Program. Between fiscal year 2014, based on the fall 2012 average daily membership, and fiscal

year 2018, based on the fall 2016 number, the district's annual Foundation Program allocation increased by nearly $ 10,000,000, from $ 17,086,943 to $ 26,931,273. *See* Gov't Ex. 2472; Gov't Ex. 2476.

Over the course of the 2016-2017 school year, Ed-Op received over $ 500,000 from the Athens City School District and over $ 120,000 from the Limestone County School District. *See* Gov't Ex. 2515 (Athens); Gov't Ex. 2516 (Limestone). In the 2017-2018 school year, the Athens district paid Ed-Op over $ 1,000,000. *See* Gov't Ex. 2515. Of the nearly $ 2,000,000 received between May 2016 and June 2018, Ed-Op paid over $ 600,000, either directly or through Tutt Educational Services, to private schools and private school employees. *See* Gov't Ex. 2539; Gov't Ex. 2552; *see also* Gill Mar. 15, 2022, R.D. Trial Tr. 35, 105-16 (disaggregating the payments to private school employees and to each private school).

Corkren transferred portions of Ed-Op's remaining funds directly into his personal bank account and, through Tutt Educational Services and Sage Professional

Development, into the personal bank accounts of Tutt and the Holladays.  *See* Gill Mar. 15, 2022, R.D. Trial Tr. 28, 59-60.  Corkren also used Ed-Op funds to make a donation to a charity of Sisk's choice, most of which was later wired into Sisk's personal bank account.  *See* Sisk Mar. 3, 2022, R.D. Trial Tr. 170-75; Gill Mar. 15, 2022, R.D. Trial Tr. 119-20.  Finally, Corkren testified that he withdrew money from his and Ed-Op's accounts in order to make cash payments to Holladay and Carter, including monthly payments of $ 1,000 to Carter.  *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 194-208; Corkren Mar. 11, 2022, R.D. Trial Tr. 88, 91-92.

Due to concerns about the investigation by the State Department of Education, the scheme concluded after the end of the 2017-2018 school year.  *See* Corkren Mar. 11, 2022, R.D. Trial Tr. 97.  Holladay and Corkren prepared a termination-of-services agreement, under which Ed-Op received over $ 300,000, included above, to be divided among private schools, private school employees, Corkren, the Holladays, and Tutt.  *See id.* at 99-103; *see also*

Owsley Mar. 14, 2022, R.D. Trial Tr. 263-72.  The Athens district paid roughly $ 220,000 of this amount based on an invoice for one quantity of "Digital Education Services," Gov't Ex. 1500B, which Carter approved because, according to Corkren, "he knew what it was." Corkren Mar. 11, 2022, R.D. Trial Tr. 102-03.

### III. CO-CONSPIRATOR STATEMENTS

The court first memorializes the reasons supporting the admission of any co-conspirator statements against Carter.  "A statement made by a coconspirator during the course and in furtherance of the conspiracy is admissible as nonhearsay under Federal Rule of Evidence 801(d)(2)(E)." *United States v. Byrom*, 910 F.2d 725, 734 (11th Cir. 1990).  In order to admit a co-conspirator statement under this rule, the existence of a conspiracy and the defendant's participation in it are preliminary questions of fact that must be resolved by the court pursuant to Federal Rule Evidence 104(a).  *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).  For each

46

statement, "the government must prove by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant against whom the statement is offered, and (3) the statement was made during the course of and in furtherance of the conspiracy." *United States v. Underwood*, 446 F.3d 1340, 1345-46 (11th Cir. 2006). "In determining the admissibility of co-conspirator statements, the trial court may consider both the co-conspirator's statements and independent external evidence." *United States v. Hasner*, 340 F.3d 1261, 1274 (11th Cir. 2003) (per curiam). In its discretion, the court may "admit the out-of-court statements on the condition that the government subsequently produce independent evidence" satisfying these three requirements. *United States v. McGregor*, 824 F. Supp. 2d 1339, 1343 (M.D. Ala. 2011) (Thompson, J.) (citing *United States v. Miller*, 664 F.2d 826, 827-28 (11th Cir. 1981) (per curiam)). In this case, the court, in its discretion, admitted any out-of-court statements of

co-conspirators before all evidence of the conspiracy had been received.


### A. Existence of Conspiracy

"A conspiracy is an agreement between two or more persons to accomplish an unlawful plan." *United States v. Chandler*, 388 F.3d 796, 805 (11th Cir. 2004). "[A]greement is the essential evil at which the crime ... is directed." *Id.* at 806 (quoting *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975)). "The agreement need not be shown to have been explicit" and "can instead be inferred from the facts and circumstances of the case." *Iannelli*, 420 U.S. at 777 n.10. The government may establish the existence of a conspiracy "through either direct or circumstantial evidence, such as inferences from the conduct of the alleged participants." *United States v. Farris*, 77 F.3d 391, 394 (11th Cir. 1996).

Carter conceded that the government proved the existence of a conspiracy by a preponderance of the evidence. *See* Def.'s Resp. to Gov't's Proposed Findings of Fact (Doc. 290) at 2-3. Specifically, he conceded that the government proved the existence of a conspiracy that included Holladay, Corkren, Tutt, and Sisk. *See id.* Based on the facts described above, the court agrees that the government met its burden to prove by a preponderance of the evidence the existence of a conspiracy including, at a minimum, these four codefendants.[4]

Overwhelming evidence proves the existence of an unlawful agreement to acquire student information from private schools and to use this information to inflate the enrollment numbers, and thus the state funding, of the Athens school district and the Limestone school

---

4. Carter contested whether the government proved by a preponderance of the evidence that Holladay's wife willfully joined the conspiracy. Because the court is unaware of any out-of-court statements by Holladay's wife offered against Carter at trial, it sees no need to reach the issue of her involvement.

district.  The conspiracy, often through Corkren and later Tutt, provided benefits, funded by the Athens district, to private schools and their administrators and employees to induce them to turn over student information and sign various consent forms, in most cases without the knowledge of students and their parents or guardians. Under Carter, Athens district officials used this information to enroll private school students as full-time students at the Renaissance School, in contravention of the directives of the State Department of Education and the Athens district's own policies. When necessary to facilitate this enrollment process or to obscure the scheme from detection by the State Department of Education, Holladay, Corkren, and Carter altered, fabricated, and conveyed records to create and maintain the façade that the students in question were not private school students but instead proper Athens district students completing full-time course loads at the Renaissance School.  In addition to the direct testimony of Corkren and various Athens district

employees involved in the registration process, testimony of students and parents reflects that the district created and maintained records for students who had sometimes never heard of the Renaissance School. Depending on the student, these records included teachers that the students did not know, courses that they did not take, grades that they did not receive, and addresses where they did not reside. The evidence amply supports that Holladay, Corkren, Tutt, and Sisk participated in a conspiracy.

## B. Carter's Involvement

Notwithstanding his concession regarding the existence of a conspiracy, Carter disputed that the government proved by a preponderance of the evidence that he was a willful participant in it. He argued that, at best, the evidence may have reflected that he "advanced [the] agreement" without "willfully and knowingly joining the conspiracy." Def. Carter's Resp. to Gov't's Proposed Findings of Fact (Doc. 290) at 4. The court disagrees.

51

Proof of a defendant's involvement in a conspiracy requires "that the defendant knew about [the conspiracy] and that he voluntarily agreed to join it." *Chandler*, 388 F.3d at 806 (emphasis omitted). Like the existence of a conspiracy, a defendant's participation in a conspiracy "need not be proved by direct evidence" and "may be inferred from a development and collocation of circumstances." *United States v. Reeves*, 742 F.3d 487, 497 (11th Cir. 2014) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). "There is 'rarely any direct evidence of an agreement to join a criminal conspiracy, and thus the defendant's assent can be inferred from acts which furthered the conspiracy's purpose.'" *United States v. Miller*, 693 F.2d 1051, 1053 (11th Cir. 1982) (per curiam) (quoting *United States v. Middlebrooks*, 618 F.2d 273, 278 (5th Cir. 1980)). "The government need not prove that a defendant participated in every stage of the conspiracy or had direct contact with each of the other alleged co-conspirators," so long as the defendant "was

aware of [the conspiracy's] essential nature." *Reeves*,
742 F.3d at 497-98.

The evidence at trial proves by a preponderance of
the evidence that Carter, like his codefendants,
willfully joined the conspiracy. At a high level, Carter
was Corkren's immediate contact within the Athens City
School District and the Renaissance School in the
day-to-day operation of the conspiracy. *See* Corkren Mar.
9, 2022, R.D. Trial Tr. 61 ("[Carter] was the guy I had
to report to and work with to make it work."); Sallee
Feb. 25, 2022, R.D. Trial Tr. 113, 129-30. Carter and
Corkren frequently communicated about the private schools
and private school students by phone, through Carter's
official school email address, and, at Carter's
direction, through Carter's private email address. *See,
e.g.*, Corkren Mar. 11, 2022, R.D. Trial Tr. 215
(testifying that Carter and Corkren participated in over
900 calls with one another over the course of the
conspiracy). Corkren testified that he communicated with
Carter about many of his activities in furtherance of the

conspiracy, such as Ed-Op's payments to the private schools and private school teachers. *See* Corkren Mar. 9, 2022, R.D. Trial Tr. 125-26; Corkren Mar. 11, 2022, R.D. Trial Tr. 65. Within the Athens district, Carter instructed school officials that they were not to have any contact with Corkren or with the Ed-Op (that is, private school) students and their parents. *See* Sallee Feb. 25, 2022, R.D. Trial Tr. 135-36 ("[Carter] actually explicitly said, do not even say good morning to [Corkren]."); *id.* at 147 ("[Carter] said, you don't talk to Trey about Ed Op.  You talk to me."); Britney Carter Mar. 7, 2022, R.D. Trial Tr. 104-05.

In his role at the intersection between Ed-Op and the Athens district, Carter participated in and directed fraudulent conduct of the conspiracy.  Among other steps taken, he recruited private schools to share their student information with the district.  He prepared forms to collect this information and to create the appearance that the students had unenrolled from their private schools and enrolled in the Renaissance School.

Alongside Holladay, Carter instructed Corkren to create fake Alabama addresses for out-of-state private school students and told Athens district officials to use these addresses to enroll the students. Carter edited student report cards and transcripts to omit any mention of the students' private schools, and he instructed Corkren to do the same. Then, when the State Department of Education requested more detailed academic records as part of its investigation, Carter told Corkren that he needed to fabricate reports indicating that the private school students had taken and completed full course loads through Odysseyware.

The evidence also proves that Carter's participation in the conspiracy was knowing and voluntary. As described above, Carter's efforts to conceal the enrollment of private school students at the Renaissance School are considerable evidence of his intent to further the conspiracy's unlawful objective. *Cf. United States v. McNair*, 605 F.3d 1152, 1197 (11th Cir. 2010) (explaining that "the extent to which the parties went

to conceal their bribes is powerful evidence of their corrupt intent"). The fact that Carter continued to conceal the number of private school students enrolled in the Athens district after the State Department of Education had explicitly directed him and Holladay to disenroll all such students belies his argument that he lacked any fraudulent intent.

Carter's own statements further support his awareness of the conspiracy's unlawful objective. In instructing one Athens district official not to communicate with Holladay about Ed-Op, Carter said, "I was brought here to be the fall guy if this goes south, and that's why I make the big bucks." Sallee Feb. 25, 2022, R.D. Trial Tr. 147. In instructing another Athens district official not to deduct Marengo Academy students from Ed-Op's monthly invoices even after the August 2017 directive from the State Department of Education, he stated similarly, "[I]f this thing goes south, I may be the fall guy." Owsley Mar. 14, 2022, R.D. Trial Tr. 216-17. Carter clearly knew what was going on and clearly

was a participant in the illegal scheme for "the big bucks."

Nevertheless, Carter contended that the evidence fails to support that he agreed to participate in the conspiracy because he "never asked for any money," and, even if the court credits Corkren's testimony that he made cash payments to Carter totaling $ 21,000, Corkren also testified that the payments were "intended to be for Dr. Carter's mother as a gift." Def. Carter's Resp. to Govt's Proposed Findings of Fact (Doc. 290) at 4. To the extent personal gain is probative of Carter's intent to join the conspiracy, *but see United States v. Toll*, 804 F.3d 1344, 1357 (11th Cir. 2015) ("That [defendant] never directly received the proceeds of the fraud is immaterial."), direct and indirect evidence proves by a preponderance of the evidence that Carter benefitted and intended to benefit from his furtherance of the conspiracy.

First, as noted, Corkren testified that he paid Carter $ 21,000 over the course of the conspiracy.

Notwithstanding Corkren's testimony that the payments were "a gift to [Carter's] mother," Corkren Mar. 11, 2022, R.D. Trial Tr. 92, his testimony that the payments stopped when "the endeavor ended" is circumstantial evidence that Carter knew the payments were proceeds of the conspiracy, *id.* While Carter disputes that he ever received these payments, his bank statement partially corroborates Corkren's account. Between February 2016 and June 2018, a period that closely maps onto the duration of the conspiracy, $ 18,311 in cash was deposited into Carter's bank account. *See* Gov't Ex. 2524. After the end of the conspiracy, from June 2018 until at least April 2020, there were no cash deposits. *See* Gill Mar. 15, 2022, R.D. Trial Tr. 75.

Second, apart from any cash payments, Carter received numerous promotions and supplemental contracts, including salary increases, within the Athens district between October 2015 and July 2019. Holladay recommended each of these changes to Carter's job classification. *See* Gov't Ex. 1658 (coordinator of virtual school); Gov't

Ex. 1685 (director of innovative programs); Gov't Ex. 1713 (executive director of innovative programs); Gov't Ex. 1746 (interim principal of Athens Middle School); Gov't Ex. 1750 (principal of Athens High School); Gov't Ex. 1749 (executive director of innovation); *see also* Owsley Mar. 14, 2022, R.D. Trial Tr. 274-82 (discussing these promotions and corresponding pay increases). Consequently, between January 2016 and April 2020, Carter's monthly salary increased by 74.26 %, *see* Gill Mar. 15, 2022, R.D. Trial Tr. 72, making him the second highest paid employee in the school district, *see* Owsley Mar. 14, 2022, R.D. Trial Tr. 282. Many of Carter's promotions and pay raises occurred during the course of the conspiracy, from which it is undisputed that Holladay personally benefitted. Together with the extensive evidence of Carter's contributions to the conspiracy and Carter's own acknowledgment that he was paid "the big bucks" to be the "fall guy," Sallee Feb. 25, 2022, R.D. Trial Tr. 147, Carter's career advancement within the Athens district supports that he benefitted and intended

to benefit financially from his acts in furtherance of the conspiracy.  As the Eleventh Circuit Court of Appeals has explained, the fact that a defendant "was able to remain employed in a management position[] and received a respectable salary for allowing the fraud scheme to fester unabated" is evidence that said defendant "shared the 'conspiratorial goals.'"  *Toll*, 804 F.3d at 1357.

Third, Carter created his own company, Phoenix Educational Services, LLC, in December 2017.  *See* Gov't Ex. 2437.  Carter dissolved it in December 2020 on the basis that it "[n]ever opened for business."  *Id.* at 10.  Corkren testified that the stated purpose of Carter's corporation, like those created by Corkren, Tutt, and Holladay's wife, was for Carter to "make money doing the work for [Corkren]."  Corkren Mar. 11, 2022, R.D. Trial Tr. 105-06.  While the evidence does not reflect that the company ever received any payments from Ed-Op, Corkren's testimony undermines Carter's argument that he lacked any intent to gain from participation in the conspiracy.

In sum, the evidence proves by at least a preponderance that Carter knowingly and voluntarily participated in the conspiracy with Holladay, Corkren, Tutt, and Sisk. The testimony of Corkren, corroborated by other witnesses and by documents created by Carter, establishes that Carter furthered and intended to further the conspiracy to commit fraud through the Athens City School District and Ed-Op, for the benefit of himself and his co-conspirators.

## C. Statements in Furtherance of Conspiracy

Carter has not identified any specific out-of-court statements by his codefendants that were offered against him at trial. He has not argued that any such statements fail to satisfy the third condition for admissibility under Federal Rule of Evidence 801(d)(2)(E), requiring that they were "made during the course of and in furtherance of the conspiracy." *Underwood*, 446 F.3d at 1345-46. And, even if any admitted statement did not meet this condition, it would still be admissible if it

was not offered for the truth of the matter asserted, and therefore not hearsay, or if it satisfied one of the hearsay exceptions enumerated in Federal Rule of Evidence 803.

For the foregoing reasons, the court reiterates its conclusion that the government proved by a preponderance of the evidence that Carter willfully joined the conspiracy outlined in the indictment and involving at least Holladay, Corkren, Tutt, and Sisk, and its conclusion that any co-conspirator statements entered into evidence against Carter were admissible.

## IV. NEW TRIAL

The court now turns to Carter's pending motion for a new trial. "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 states a "broad standard" for granting a new trial, and the decision whether to grant a new trial is entrusted to the "sound discretion of the trial court." *United*

*States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994)
(quoting *United States v. Wilson*, 894 F.2d 1245, 1252
(11th Cir. 1990)). The court "may weigh the evidence and
consider the credibility of the witnesses." *United
States v. Albury*, 782 F.3d 1285, 1295 (11th Cir. 2015)
(quoting *United States v. Hernandez*, 433 F.3d 1328, 1335
(11th Cir. 2005)). "If the court concludes that, despite
the abstract sufficiency of the evidence to sustain the
verdict, the evidence preponderates sufficiently heavily
against the verdict that a serious miscarriage of justice
may have occurred, it may set aside the verdict, grant a
new trial, and submit the issues for determination by
another jury." *Hernandez*, 433 F.3d at 1335 (quoting
*United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir.
1985)). However, the Eleventh Circuit has cautioned that
"[t]he court may not reweigh the evidence and set aside
the verdict simply because it feels some other result
would be more reasonable." *Martinez*, 763 F.2d at
1312-13; *see also United States v. Brown*, 934 F.3d 1278,
1298 (11th Cir. 2019) (explaining that, where the

evidence is sufficient, the grant of a new trial based on the weight of the evidence may be appropriate in the "'rare' 'case in which the evidence of guilt ... is thin and marked by uncertainties and discrepancies'" (quoting *Butcher v. United States*, 368 F.3d 1290, 1297 n.4 (11th Cir. 2004))).  So, a court may grant a new trial even where the evidence for conviction is sufficient, but only in the rare case where the very narrow constraints outlined above are satisfied.  Applying these constraints, the court concludes that this in not that case.

The court understands Carter's motion for a new trial to raise two primary arguments, both based on the weight of the evidence.  First, Carter argues that the codefendants who testified against him, Sisk and Corkren, could not reasonably be credited.  *See* Def.'s Mot. for New Trial (Doc. 309) at 14-15 (describing Sisk's testimony as "not believable by any standard" and arguing that, "It is hard to imagine a witness being subjected to more serious impeachment ... than Mr. Corkren"); *id.*

at 19 ("In order to deny this motion, ... the Court would have to ignore the significant credibility problems with the only two witnesses who link Dr. Carter to the conspiracy."). Second, he argues that the evidence at trial is at least as consistent with the innocent interpretation that Carter was an "unwitting pawn" who lacked "the specific intent to defraud" as with the guilty interpretation that he willfully joined and participated in the criminal conspiracy. *Id.* at 18; *see also id.* at 19 ("[T]here is no evidence that Dr. Carter knowingly, willfully and with the specific intent to defraud joined this conspiracy in order to gain financially for himself or so that Athens City Schools would have more money for capital projects, as charged in the Indictment."). Neither of these arguments, considered separately or together, warrants a new trial under the new-trial standard articulated above.

## A. Credibility of Codefendants

Carter highlights his impeachment of Sisk and Corkren at trial and argues that their "significant credibility problems," combined with their importance to the government's case, warrant a new trial. Def.'s Mot. for New Trial (Doc. 309) at 19. As an overarching matter, Carter asserts that Corkren and Sisk had incentives to lie based on their plea agreements and the government's discretion to recommend downward departures for substantial assistance in their sentencing hearings. In itself, this fact, which is present in many cases involving codefendant testimony, does not establish that a new trial is appropriate. It does, however, contextualize the court's assessment of the credibility of these witnesses. Even viewing the testimony through this lens, the court discerns no basis for a new trial.

## 1. Impeachment of Sisk

With respect to Sisk's testimony, Carter identifies two purported inconsistencies.

First, Carter argues that defense counsel "had to drag ... out of" Sisk an admission that a transfer of funds from Ed-Op to a charity of Sisk's choice and, ultimately, to Sisk personally was not "legitimate." Def.'s Mot. for New Trial (Doc. 309) at 14. Sisk testified that, after obtaining the approval of the Limestone County School District's board of education for a contract to pay Ed-Op $ 45 for each student that Ed-Op recruited into the district's virtual school program, he and Corkren, without approval, modified the contract to pay Ed-Op $ 55 per student instead. *See* Sisk Mar. 3, 2022, R.D. Trial Tr. 165-70. Sisk admitted that Corkren later gave him a check for $ 15,000--made out to Sisk's chosen charity--which Sisk forwarded to the charity's leadership. *See id.* at 170-74. Roughly two weeks later, $ 13,000 of this money was wired into Sisk's personal account, and he ultimately spent it for his "personal benefit." *Id.* at 174-75.

Notwithstanding this testimony, Sisk insisted that he initially intended that the funds be used for charity.

As he put it on direct examination, "My intent, of course, was to be able to start a high adventure youth program in the north of the state. That was the intent. That's not what happened." *Id.* at 175. He gave substantially similar testimony on cross-examination, adding that this was what he told a representative of the charity in order to have the $ 13,000 wired to his personal account. *See* Sisk Mar. 4, 2022, R.D. Trial Tr. 9-10, 14, 19.

Additionally, Carter argues that Sisk testified incorrectly about a purported meeting of Holladay, Corkren, Sisk, and Carter. On direct examination, Sisk testified that the four of them met in the Regions Bank building prior to the 2016-2017 school year--in December 2015, he thought--to discuss a "statewide recruitment plan" to "involv[e] more students in virtual learning." Sisk Mar. 3, 2022, R.D. Trial Tr. 162-64. On cross-examination, however, defense counsel asked whether Sisk was aware that the Athens district had not leased office space in the Regions Bank building until 2016. *See id.* at 217-18. Carter's motion for a new

trial does not identify affirmative support for this challenge to Sisk's recollection, but one Athens district official testified that she could not recall whether the Regions Bank lease "started before this [2016-2017] school year or whether it happened a little bit into the school year." Sallee Feb. 25, 2022, R.D. Trial Tr. 123-24.

Neither of Carter's challenges seriously undermines the credibility of Sisk's testimony or the ability of the jury reasonably to draw inferences from it. With respect to Sisk's receipt of money from the conspiracy, his testimony was generally consistent regarding his actual conduct. Sisk consistently testified both that he initially collaborated with Corkren to increase the Limestone school district's payments to Ed-Op without approval and that he ultimately appropriated most of these funds for himself. Even if, as Carter contends, Sisk's testimony overstates the extent to which Sisk ever intended to use the funds for charitable purposes, it does not considerably affect the court's assessment of

Sisk's credibility regarding the conspiracy and its specific actions.

Turning to the meeting that Carter asserts could not have occurred when and where Sisk described, the evidence regarding this meeting had minimal inculpatory value. Contrary to Carter's representation, the meeting at issue was not Sisk's "initial meeting" regarding the conspiracy. Def.'s Mot. for New Trial (Doc. 309) at 14. Rather, Sisk testified that the initial meeting regarding a plan to recruit virtual students for the Limestone school district occurred in his office and involved himself, Holladay, Corkren, and another Limestone district administrator; it did not include Carter.[5] *See* Sisk Mar. 3, 2022, R.D. Trial Tr. 155, 158-59, 215-16. By the time of the meeting purportedly involving Carter,

_____

5. At the start of cross-examination, defense counsel confirmed that Sisk had testified to two separate meetings, the first of which involved only Sisk, Holladay, and Corkren and the second of which also included Carter and purportedly took place at the Regions Bank building around December 2015. *See* Sisk Mar. 3, 2022, R.D. Trial Tr. 215.

Sisk had already decided to partner with the Athens district and Ed-Op. *See id.* at 163. As to the content of the meeting, Sisk testified that the purpose was mostly "breaking the ice" and discussion of a plan to "involv[e] more students in virtual learning." *Id.* at 163-64. To the extent Sisk discussed more specific information about the forms to be used in this plan, he clarified that he did not see the forms until "subsequent meetings." *Id.* at 164. Ultimately, the potential inconsistency in Sisk's testimony does not carry the weight that Carter asserts. If the court accepts as true that the meeting involving Carter could not have occurred at the time and place that Sisk identified, Sisk's testimony appears to reflect a mistaken recollection about when or where he first met Carter. Given Sisk's minimal testimony about the substance of this meeting, the court does not find that the inconsistency meaningfully supports Carter's argument that Sisk "attempt[ed] to impute knowledge of the scheme to Dr.

Carter and to ingratiate himself with the Government."
Def.'s Mot. for New Trial (Doc. 309) at 14.

More generally, the court finds that documentary evidence corroborates much of Sisk's testimony, including testimony that implicated Carter in the Limestone district's enrollment of private school students. One series of emails, for example, reflected that Carter and Corkren collaborated to edit the report cards received from Monroe Academy, the private school that was paired with the Limestone district. First, Corkren sent the unedited report cards to Carter's private email address. *See* Gov't Ex. 542A; Gov't Ex. 542B. Carter responded with two different versions of the edited report cards, both of which omitted the private school's name and added Ed-Op's logo and information. *See* Gov't Ex. 536A; Gov't Ex. 536B; Gov't Ex. 537A; Gov't Ex. 537B. At one point during a further exchange, Carter remarked that Corkren had sent him "the original with Monroe on it." Gov't Ex. 544. Finally, Corkren sent the edited report cards to Carter's official email address under the subject "LCS

report cards," with instructions to "take a quick look at these and send them along." Gov't Ex. 576A; Gov't Ex. 576B. (Of course, LCS stood for Limestone County Schools.) In another instance, Carter emailed Corkren to celebrate the finalization of a standardized testing schedule for the Monroe Academy students that had been enrolled as virtual students in the Limestone district. *See* Gov't Ex. 604A; Gov't Ex. 604B. As a result of this documentary evidence, any concerns regarding Sisk's credibility have minimal impact on the weight of evidence supporting Carter's guilt.

## 2. Impeachment of Corkren

Carter also assigns numerous inconsistencies or defects to Corkren's testimony. Unlike Sisk, Corkren was a central witness in the government's case against Carter, testifying extensively to Carter's knowledge about and participation in the conspiracy. Nonetheless, Carter's attacks on Corkren's credibility do not justify a new trial.

As an initial matter, Carter highlights the fact that Corkren "practiced questions and answers" in a "mock trial" with the government. Corkren Mar. 11, 2022, R.D. Trial Tr. 112. Corkren stated that the government attorneys wanted to "determine my demeanor" and "see how I reacted" and that he got a "heads up" about the sorts of questions he would be asked. *Id.* at 113-14. When asked whether anyone gave him advice, Corkren replied that his attorney advised him to "remain calm" during cross-examination. *Id.* at 114-15. Apart from his attorney's advice to remain calm, further cross-examination about Corkren's meetings with the government and government agents did not establish that anyone told Corkren what to say or how to say it.

"An attorney enjoys extensive leeway in preparing a witness to testify truthfully, but the attorney crosses a line when she influences the witness to alter testimony in a false or misleading way." *Ibarra v. Baker*, 338 F. App'x 457, 465 (5th Cir. 2009) (unpublished). The Eleventh Circuit has described impermissible "coaching"

74

as "directing a witness's testimony in such a way as to have it conform with, conflict with, or supplement the testimony of other witnesses." *Crutchfield v. Wainwright*, 803 F.2d 1103, 1110 (11th Cir. 1986) (en banc) (plurality opinion), *abrogated on other grounds by United States v. Cavallo*, 790 F.3d 1202, 1217-18 (11th Cir. 2015); *see also Crutchfield*, 803 F.2d at 1114 n.10 (Tjoflat, J., specially concurring) (defining "coaching" to include "improper attempts to influence or shape the testimony of the witness"). For example, in *United States v. Adams*, 785 F.2d 917 (11th Cir. 1986), a prosecutor informed a witness that he would seek funds for the witness's immediate relocation into witness protection. During an *ex parte* conference, the prosecutor then told the witness, "You understand, now, if they ask you have you been paid anything by the Government, I haven't paid you; I'm not paying you to testify. I'm helping you out, because you think you're in fear of your life. If they ask that question, then that's another issue, but I don't want it perceived that

I'm paying you." *Id.* at 919. The Eleventh Circuit held that the prosecutor's instruction amounted to "an attempt by the prosecutor to coach the witness on how to answer questions about inducements for his testimony" that "raise[d] an appearance of impropriety." *Id.* at 920–21; *but see id.* at 921 (concluding that there was no prejudice and thus no reversible error).

In contrast to coaching, witness preparation to at least some degree is widely, if not uniformly, accepted. The Third Restatement of the Law Governing Lawyers states the general rule that, "A lawyer may interview a witness for the purpose of preparing the witness to testify." Restatement (Third) of the Law Governing Lawyers § 116(1) (Am. Law Inst. 2000). The Restatement elaborates that permissible preparation may include, among other steps, "discussing the role of the witness and effective courtroom demeanor," "discussing the witness's recollection and probable testimony," "reviewing documents or other physical evidence that may be introduced," and "discussing probable lines of hostile

cross-examination that the witness should be prepared to meet." *Id.* cmt. b.

Defense counsel has not presented any evidence that the government's preparation of Corkren for trial crossed the line into impermissible coaching. Despite repeated questioning about his "practice" answering questions, Corkren's testimony does not reflect that he received any instructions to alter the substance of his testimony. To the contrary, the only record evidence that Corkren received any advice concerning his testimony is his remark that his attorney told him to remain calm, advice that is quintessentially related to demeanor. The evidence of Corkren's trial preparation does not detract from his credibility.

With respect to Corkren's testimony about the conspiracy, Carter contends that a meeting that Corkren discussed could not have happened as he described. Corkren testified that toward the end of the conspiracy--prior to the drafting of Ed-Op's termination-of-services agreement in May 2018--he,

Holladay, Holladay's wife, Carter, and Tutt met at a Cracker Barrel in Gardendale to discuss the "drawing down" of the conspiracy in light of the investigation by the State Department of Education. Corkren Mar. 11, 2022, R.D. Trial Tr. 97-98. Then, on cross-examination, defense counsel asked Corkren whether he told government agents about a meeting at the Gardendale Cracker Barrel on December 2, 2016, at which Holladay, Holladay's wife, Carter, and Corkren met to discuss a plan to include Tutt in the conspiracy. *See id.* at 197-98. Corkren responded, "It was then or one other time in Decatur," and reiterated, "One of those times. Either that one or that other time." *Id.* When defense counsel asked, "And that was December 2nd, 2016, which makes sense timing[ ]wise with Webb Tutt's involvement," Corkren replied, "Agreed." *Id.* at 198. Shortly afterward, however, Corkren stated that he could not remember the meeting. *See id.* Later during the trial, defense counsel offered cellphone evidence indicating that Carter was in Atlanta, Georgia, on December 2, 2016.

Based on this exchange, Carter asserts that Corkren's testimony was contradicted by documentary evidence. However, this is far from clear. Carter does not identify any evidence at odds with Corkren's account of the 2018 meeting on direct examination. And with respect to the meeting that defense counsel raised on cross-examination, Corkren thrice indicated uncertainty about the meeting, including two comments explicitly caveating that the meeting could have occurred at another time. Amid this testimony, Corkren's acquiescence that the meeting occurred on the date identified by defense counsel (or, conceivably, that the date identified by defense counsel "ma[de] sense timing[ ]wise with Webb Tutt's involvement," *id.*) does little to detract from Corkren's credibility with respect to other testimony about which he expressed no such uncertainty. To the extent Carter argues instead that Corkren gave a statement about this meeting prior to trial that was inconsistent with the evidence, Carter has not established the content of this statement in sufficient detail for the court to identify

whether or to what extent it adversely impacts the credibility of Corkren's in-court testimony.

Next, Carter argues that Corkren's testimony that he gave $ 1,000 in cash to Carter each month is uncorroborated by the testimony of the forensic accountant. This is no inconsistency, given the forensic accountant's testimony that cash payments are not traceable in the same way that checks are. *See* Gill Mar. 15, 2022, R.D. Trial Tr. 75. Moreover, contrary to Carter's representation, the temporal proximity between numerous cash withdrawals by Corkren and subsequent cash deposits by Carter in similar amounts is at least generally consistent with the payments that Corkren described. *See generally id.* at 84-104.

Lastly, Carter argues that Corkren's testimony implicating Carter in the conspiracy was inconsistent with a prior statement Corkren gave to government agents, in which he listed Holladay, Tutt, and Sisk in response to the question, "[W]ho was dirty?" Corkren Mar. 11, 2022, R.D. Trial Tr. 164. Undoubtedly, Carter could, and

did, argue that this omission supports an inference that Corkren subsequently changed his story to implicate Carter and thereby curry favor with the government. But, against the weight of the evidence corroborating Corkren's account of Carter's involvement in the conspiracy, the court finds that this piece of evidence fails to move the needle.

As with Sisk, documentary evidence and Carter's own statements corroborated key portions of Corkren's testimony. Emails from Carter to Corkren corroborated that Carter instructed Corkren to change--that is, falsify--addresses for the out-of-state private school students being enrolled in the Athens district. Other emails reflected that Carter and Corkren worked together to remove private school information from students' report cards. And, during the investigation by the State Department of Education, emails from Carter's private address listing students and their private schools paralleled emails from Carter's official school address asking Corkren to share grade information supposedly

confirming that those same students were full-time students in the Athens district.

In light of the corroborating evidence, the totality of Carter's arguments regarding the testimony of Sisk and Corkren does not lead the court to conclude that a new trial is warranted. In addition to the more specific observations above, the court is mindful that all of the impeachments of Sisk and Corkren discussed in Carter's motion were raised before the jury, often at great length. Faced with this information, the jury still found Carter guilty of numerous counts. Carter's attacks on the credibility of Sisk and Corkren do not "preponderate[]" so "heavily" against the jury's verdict as to justify "overturn[ing] the credibility choice made by the jury." *Martinez*, 763 F.2d at 1312, 1314.

## B. Evidence of Intent

Additionally, Carter argues that the evidence fails to establish that he "knowingly, willfully[,] and with the specific intent to defraud" joined the conspiracy

"for the purposes charged in the Indictment."  Def.'s

Mot. for New Trial (Doc. 309) at 17-18.  For many of the

same reasons stated with respect to the admissibility of

co-conspirators' statements, *see supra* Section III.B, the

court disagrees.  The evidence proves not merely by a

preponderance of the evidence but indeed beyond a

reasonable doubt that Carter joined the conspiracy

willfully and with fraudulent intent.

Carter suggests that the evidence is entirely

consistent with the possibility that Carter took the

steps he took under the belief that he was "simply

gathering legitimate data [from Corkren] and forwarding

it on."  *Id.* at 18.  But the evidence that Carter knew

that the Athens City School District's enrollment of

private school students was fraudulent is too great.  The

extensive steps that Carter took to conceal the fact that

the Ed-Op students were private school students is strong

evidence of his fraudulent intent.  *See McNair*, 605 F.3d

at 1197.  Within the Athens district, Carter instructed

officials to refer to the private school students by

numbered "EO" codes. In communications with Corkren, Carter routinely swapped between his private email address, when referring to private school information, and his school email address, after such information had been scrubbed. Corkren's testimony establishes in no uncertain terms that Carter knew that the information that he was sharing with Athens district officials and presenting to the State Department of Education had been fabricated. Among the conversations to which Corkren testified, he informed Carter that he had created fake in-state addresses for out-of-state students and later that he needed to fabricate completed Odysseyware records. Following each of these conversations, Carter sent the fake addresses to Athens district officials for use in enrollment and sent a subset of the fabricated Odysseyware records to Holladay and the State Department of Education. All the while, he received cash payments from Corkren and advanced his career within the Athens district on the recommendations of Holladay.

Even if this were not evidence enough that Carter understood the falsehood of his representations--though it is--by April 2017, Carter shared a template enrollment form with Holladay to be passed on to the State Department of Education, which affirmed that full-time Renaissance School students could not simultaneously be enrolled in "another public or non-public K-12 school" and must have "first withdraw[n] from that other school" prior to enrollment. Gov't Ex. 707B at 2. Yet despite this explicit recognition and representation to the department about the Athens district's future conduct, Carter continued to work with Corkren to facilitate the enrollment of full-time private school students and to conceal existing enrollments from the department.

The evidence of Carter's willful participation in the conspiracy and intent to defraud was not "depend[ent] upon inferences upon inferences drawn from uncorroborated testimony." *Martinez*, 763 F.2d at 1313 (citation omitted). Neither was it "marked by uncertainties and discrepancies" that undermine confidence in the jury's

verdict. *Id.* To the contrary, proof of Carter's unlawful intent was supported by varied and credible sources, including documentary evidence and records of Carter's own communications.

### V. CONCLUSION

For the foregoing reasons, the court finds that Carter participated in a conspiracy with his codefendants, and it concludes that any co-conspirator statements were properly admitted against him at trial. Additionally, for the foregoing reasons, the court properly denied Carter's motion for a new trial.[6]

_____

6. While not playing a role in the court's findings and conclusions as to the issues resolved above, the court feels obligated to make the following observation, from the evidence presented in open court, due to the fact that this case involves the use of public funds. Over the course of the conspiracy, money was paid from Alabama's Education Trust Fund, through the Athens district and Ed-Op, to private schools and their employees. Most of the private schools to enter the

agreements in this case were scattered throughout or near Alabama's Black Belt region--"a south-central region of the State named for its black soil," where "[m]any [B]lack Alabamans reside ... due to the region's history of agriculture and slavery." *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1036 (M.D. Ala. 2017) (Pryor, J.). The court heard testimony that described education in the Black Belt region as resembling "1965," with Black students going to public schools and white students going to private schools or being homeschooled. Thurman Mar. 2, 2022, R.D. Trial Tr. 234-35. Public schools in the Black Belt were described as some of the "poorest and lowest performing schools" in Alabama. *See* Sisk Mar. 3, 2022, R.D. Trial Tr. 195. The shortcomings of these schools were attributed in part to a lack of resources, including money. *See id.* at 195-97.

The co-conspirators' successful inflation of the average daily membership count of the Athens City School District and the Limestone County School District resulted in public schools within the Black Belt, and throughout the State, receiving less than their fair share of funding from the State's Education Trust Fund. Under the Education Trust Fund's Foundation Program, when one school district overstates its growth, all other school districts are harmed. *See* Craig Mar. 7, 2022, R.D. Trial Tr. 189. Here, both the Limestone County School District and the Athens City School District received more than their fair share of Foundation Program funding at the expense of even the most cash-strapped school district. However, the Education Trust Fund's money did not simply remain misappropriated within the public school districts that make up the Alabama state education system.

In connection with the agreements to acquire student information from the private schools, the co-conspirators

paid over $ 600,000 of the money the Athens district
received from the Education Trust Fund to the
participating private schools and their employees and
administrators.  As a result, the private schools
obtained funds from the State's Education Trust Fund that
they were not lawfully entitled to receive.  The court
is especially concerned because it appears these private
schools serve almost exclusively white students.  While
the court does not have before it the racial demographics
of each private school, it does have the relevant data
for the private school students that the Athens City
School District enrolled in the Renaissance School as
part of this scheme.  This information was submitted by
the Athens district to the State Department of Education.
*See* Stringham Mar. 4, 2022, R.D. Trial Tr. 110.  In both
the fall of 2016 and the fall of 2017, over 98 % of the
Ed-Op affiliated students that the Athens school district
used to inflate its average daily membership were
identified as white.  *See* Stringham Mar. 4, 2022, R.D.
Trial Tr. 137-39, 148; Gov't Ex. 1873 (the Athens City
School District's submission to the State Department of
Education).  These data suggest that nearly all of the
private school students utilized by the co-conspirators
to inflate the average daily membership of the Athens
City School District were white.  They also suggest that
the participating private schools collectively serve a
similar proportion of white students.  In light of these
demographic data and the testimony of school
administrators regarding the racialized divide between
public and private education in at least one region of
Alabama, the court is troubled by the lingering specter
that public funds may have been used to foster or support
racial segregation, albeit fraudulently, within
Alabama's system of education.

DONE, this the 14th day of July, 2022.

                    ___/s/ Myron H. Thompson___
                    UNITED STATES DISTRICT JUDGE