**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE**

**MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION NO.** |
| v. | ) | **2:21cr49-MHT** |
| | ) | **(WO)** |
| **WILLIAM RICHARD CARTER, JR.** | ) | |
| | ) | |

**OPINION AND ORDER ON FORFEITURE MONEY JUDGMENT**

This case comes before the court on the government's motion for a forfeiture money judgment against defendant William Richard Carter, Jr. in the amount of $ 21,000.00.

Following a jury trial, Carter was convicted of one count of conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371, four counts of wire fraud, in violation of 18 U.S.C. § 1343, and two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). The government asserts that $ 21,000.00 represents Carter's proceeds traceable to these offenses and seeks a forfeiture money judgment in this amount. Carter opposes the

motion and argues that the government has failed to prove that the requested amount is subject to forfeiture.  The court held a hearing on June 7, 2022. In light of the parties' arguments, and for the reasons that follow, the court finds that the government is entitled to a forfeiture money judgment in the amount of $ 21,000.00 and will grant the government's motion.

## I.   LEGAL STANDARD

If a defendant is convicted of an offense for which forfeiture of property is authorized by statute and noticed in the indictment, "the court shall order the forfeiture of the property as part of the sentence in the criminal case."  28 U.S.C. § 2461(c).  18 U.S.C. § 981(a)(1)(C) provides that, "Any property, real or personal, which constitutes or is derived from proceeds traceable to ... any offense constituting 'specified unlawful activity,' ... or a conspiracy to commit such

2

offense" is forfeitable to the United States.[1] Because "specified unlawful activity" includes wire fraud, 18 U.S.C. §§ 1956(c)(7)(A), 1961(1)(B), § 981(a)(1)(C) authorizes forfeiture of the "proceeds" of wire fraud and conspiracies to commit wire fraud. *See United States v. Vernon*, 593 F. App'x 883, 887 (11th Cir. 2014) (per curiam) ("Civil forfeiture and criminal forfeiture are authorized for proceeds traceable to general mail fraud and wire fraud.").[2] The court may consider acquitted or uncharged conduct "in support of"

---

1. Although this statute applies to civil forfeiture, "[c]riminal forfeiture is authorized in every case where civil forfeiture is authorized." *United States v. Vernon*, 593 F. App'x 883, 887 (11th Cir. 2014) (per curiam); *see also United States v. Padron*, 527 F.3d 1156, 1161-62 (11th Cir. 2008).

2. The court bases its decision on Carter's convictions of conspiracy to commit offenses against the United States and wire fraud. Because there may be some statutory questions not previously addressed by the Eleventh Circuit Court of Appeals regarding the forfeitability of proceeds of aggravated identity theft, the court does not reach the forfeitability of property based on Carter's convictions of aggravated identity theft.

the counts of conviction. *United States v. Hasson*, 333 F.3d 1264, 1279 & n.19 (11th Cir. 2003).

"In cases involving ... unlawful activities, ... the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). The government must prove this nexus between the offense and the property sought to be forfeited, like all elements of the forfeiture, by a preponderance of the evidence. *See Hasson*, 333 F.3d at 1277-78; *United States v. Elgersma*, 971 F.2d 690, 697 (11th Cir. 1992) (en banc) (applying this standard to comparable forfeiture provisions).

"As soon as practical" after a guilty verdict on one or more counts on which the government seeks criminal forfeiture, "the court must determine what property is subject to forfeiture under the applicable statute." Fed. R. Crim. P. 32.2(b)(1)(A). If, as

here, "the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." *Id.* This determination "may be based on evidence already in the record." Fed. R. Crim. P. 32.2(b)(1)(B).

## II. FACTUAL BACKGROUND

In this case, the parties agreed to rely solely on the factual record at trial to determine what property, if any, is subject to forfeiture. *See* Joint Statement of Forfeiture Procedure (Doc. 312) at 1 n.1. The court's prior opinion memorializing its decisions to admit any co-conspirator statements against Carter and to deny Carter's motion for a new trial contains a thorough discussion of the evidence and testimony at trial. *See United States v. Carter*, No. 2:21cr49-MHT, 2022 WL 2753161 (M.D. Ala. July 14, 2022) (Thompson, J.) (opinion on admissibility of co-conspirator statements and on motion for new trial (Doc. 392)). The court now adopts the findings in this prior opinion

5

and assumes familiarity with it.  This instant opinion presents only the facts directly relevant to the instant motion.

Between roughly the spring 2016 and the summer 2018, Carter, as an administrator within the Athens City School District, participated in a conspiracy to obtain the identifying information and educational records of private school students.  The conspiracy then used this information to enroll the private school students as full-time virtual students at the Athens Renaissance School, the Athens school district's virtual school, to inflate the district's enrollment numbers and increase the funding that the district received from the Alabama State Department of Education.

Within the conspiracy, Carter worked closely with codefendant Gregory Earl Corkren.  Corkren created a company, Educational Opportunities and Management, LLC, also known as Ed-Op, to serve as a conduit between the private schools and the Athens school district.  Carter

was one of Corkren's primary contacts within the Athens district. Carter and Corkren kept in frequent contact by phone and email to discuss the steps either or both of them took to further the conspiracy and to conceal it from detection. These steps included the acquisition of student information and grades, the preparation of forms purporting to unenroll private school students from their private schools and enroll them in the Athens school district, and the fabrication of addresses and course-completion reports for some of the private school students who were enrolled.

Over the course of the conspiracy, Ed-Op received nearly $ 2,000,000 from public school districts, primarily the Athens district, for facilitating the enrollment of private school students as full-time public school virtual students. *See* Gov't Ex. 2515; Gov't Ex. 2516. Corkren testified that he used portions of these Ed-Op funds to make monthly cash payments of $ 1,000 to Carter for 21 months of the conspiracy. *See* Corkren Mar. 11, 2022, R.D. Trial Tr.

7

91-92. According to Corkren, the payments began around September 2016, shortly after the death of Carter's father. *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 198-201. After that, Corkren began to pay Carter $ 1,000 per month from the "money out of the business," which Corkren intended as a "gift" for Carter's mother. *Id.* at 200-01. The payments continued "until the endeavor ended." Corkren Mar. 11, 2022, R.D. Trial Tr. 92; *see also id.* at 97-103 (describing the end of the conspiracy following the 2017-2018 school year).

Corkren discussed the specific details of several payments. On one occasion, Corkren testified that he met Carter in Double Springs, Alabama, to make the payment. *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 202-07. Phone records placed Carter in Double Springs on the day in question, *see* Gov't Ex. 2004 at 95, and a deposit slip from the next day reflected a cash deposit of $ 1,000 into Carter's personal bank account, *see* Gov't Ex. 2264 at 1. On another occasion, Corkren testified that he paid Carter in Troy, Alabama. *See*

8

Corkren Mar. 10, 2022, R.D. Trial Tr. 226-30. Corkren's bank records reflected two withdrawals of $ 500 on consecutive days, the second of which occurred in Troy.  See Gov't Ex. 2292 at 1.  Phone records placed Carter in Troy on that second day.  See Gov't Ex. 2004 at 157.

Between January 1, 2016, and April 30, 2020, Carter's personal bank account received $ 18,311 in the form of cash deposits.  See Gov't Ex. 2524; see also Gill Mar. 15, 2022, R.D. Trial Tr. 75 (noting the time period encompassed).  $ 16,311 of these funds were deposited between September 2016 and June 2018, generally corresponding with the time in which Corkren testified that he made monthly cash payments to Carter; no cash deposits were recorded after June 2018.  See Gov't Ex. 2524.  To the extent the records did not identify the source of the cash deposits, the government's forensic accountant testified that, "[u]nlike a check, cash doesn't tell you the source" of funds.  Gill Mar. 15, 2022, R.D. Trial Tr. 75.  In

9

fact, Corkren testified that he made the payments to Carter and another co-conspirator in cash because, "if you're going to do something illegal, you better do it in cash." Corkren Mar. 11, 2022, R.D. Trial Tr. 211.

### III. DISCUSSION

During the hearing on the government's motion, defense counsel explained that Carter's argument boils down to a factual argument about the sufficiency of the evidence, rather than a legal argument about the statutory authorization of forfeiture. First, he argues that the court should not credit Corkren's testimony that the monthly payments occurred, absent additional corroborating evidence. Secondarily, he argues that, even if the court finds that the payments occurred, Corkren's testimony that he intended the payments as gifts for Carter's mother, rather than inducements to continue to advance the conspiracy, defeats the government's contention that the money Carter received constitutes proceeds.

10

The court finds by a preponderance of the evidence that Carter received these 21 cash payments over the course of the conspiracy. The court credits Corkren's testimony, which is direct evidence that the cash payments occurred as he testified. Although Carter attacked Corkren's truthfulness in his motion for a new trial, the court rejected that any impeachments or inconsistencies undermined Corkren's credibility as a witness. *See Carter*, 2022 WL 2753161, at *16-*19. Moreover, some circumstantial evidence corroborates Corkren's account. Documentary evidence regarding the specific meetings at which Corkren claimed to have paid Carter circumstantially supports that the meetings actually occurred. And on at least one occasion, Carter's financial records reflect that he made a $ 1,000 cash deposit the day after one of these meetings, providing further circumstantial support that Carter actually received money. On the whole, Carter's financial records over a span of more than four years show substantial cash deposits exceeding $ 16,000

**during the period of the alleged payments, and only one cash deposit outside of this period. Because the court credits Corkren's direct testimony and because the documentary evidence is consistent with, and partially corroborates, his account, the court finds by a preponderance of the evidence that Carter received $ 21,000 from Corkren through these monthly cash payments.**

**Even if, as Corkren testified, the payments to Carter were gifts for Carter's mother, the amount of these payments is still forfeitable to the government as proceeds. The evidence reflects that the funds Corkren paid to Carter were obtained as a result of their conspiracy, as required by 18 U.S.C. § 981(a)(2)(A).**

**Ed-Op's revenue from the public school districts undoubtedly constitutes proceeds traceable to the conspiracy in this case. This revenue was directly tied to the number of private school students that Ed-Op was able to enroll as full-time public school**

students and to other services performed by Ed-Op to further the fraudulent scheme.  *See, e.g.*, Gov't Ex. 1648 at 4; Gov't Ex. 1657 at 4 (Ed-Op's contracts with the Athens school district providing for payments based on the number of students for which Ed-Op provided services).  Corkren kept these funds in both the Ed-Op bank account and his personal account.  In addition to receiving nearly $ 2,000,000 of public school payments directly into the Ed-Op account, Corkren transferred over $ 450,000 of the Ed-Op funds into his personal account.  *See* Gill Mar. 15, 2022, R.D. Trial Tr. 16-17, 22, 28.

Both Corkren's testimony and his financial records reflect that he withdrew the cash he used to make payments from these two bank accounts.  *See* Corkren Mar. 10, 2022, R.D. Trial Tr. 195-96; Gill Mar. 15, 2022, R.D. Trial Tr. 28, 47-53.  Indeed, Corkren described his payments to Carter as "money out of the business" and acknowledged that the funds came out of the money he received, via Ed-Op, from the public

13

school districts. Corkren Mar. 10, 2022, R.D. Trial Tr. 201. When "the endeavor ended," so too did the payments to Carter, further supporting that the payments stemmed from the conspiracy. Corkren Mar. 11, 2022, R.D. Trial Tr. 92.

The money that Carter received from Corkren was obtained as a result of his commission of the conspiracy offense for which he was convicted. Carter willfully advanced the scheme to misrepresent that private school students were full-time virtual students at the Athens Renaissance School. His participation facilitated the Athens school district's payment of funds to Ed-Op and Corkren, portions of which, as described above, Corkren withdrew and paid to him.

The question then is whether Corkren's intent in making these payments to Carter--an intent for Carter to pay the money to his mother--effectively severs the connection between Carter's unlawful conduct and his receipt of the fruits of that conduct. Carter cites no authority for this proposition, and the court is aware

14

of none. To the contrary, as several federal courts of appeals have held, a defendant's expenditure of proceeds does not preclude a forfeiture money judgment for the full amount of the proceeds. *See United States v. Grose*, 461 F. App'x 786, 807 (10th Cir. 2012) (per curiam); *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006); *cf. United States v. Crumpler*, 229 F. App'x 832, 840 (11th Cir. 2007) (in the RICO context, holding that a defendant could not "mitigate the value of property he must forfeit by squandering or poorly investing the illegally acquired proceeds"). Having accepted possession of a portion of the proceeds of his offenses, Carter may not shield these proceeds from forfeitability based on his or his co-conspirator's intended use of those funds.

Carter's citation to *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), is inapposite. In *Honeycutt*, the Supreme Court rejected the application of joint and several liability to criminal forfeiture judgments. Joint and several liability, the Court held, runs

15

contrary to the requirement that a defendant must have "obtained" the property to be forfeited. *Id.* at 1632-33. "Neither the dictionary definition nor the common usage of the word 'obtain' supports the conclusion that an individual 'obtains' property that was acquired by someone else." *Id.* at 1632.

As applied here, *Honeycutt* makes clear that Carter cannot be made to forfeit property acquired by Corkren or any other co-conspirator as a result of the conspiracy. But nothing in the holding of *Honeycutt* or its reasoning precludes a forfeiture money judgment in the amount of the proceeds that Carter personally obtained from his co-conspirator, whatever may have been his or his co-conspirator's intended use. In any event, the court is convinced from the evidence, and so finds, that Corkren intended the payments to be a reward for Carter's participation in and furtherance of the conspiracy and that Carter intended to, and did, accept the payments as such a reward. This is true regardless as to whether either or both of them also

contrary to the requirement that a defendant must have "obtained" the property to be forfeited. *Id.* at 1632-33. "Neither the dictionary definition nor the common usage of the word 'obtain' supports the conclusion that an individual 'obtains' property that was acquired by someone else." *Id.* at 1632.

As applied here, *Honeycutt* makes clear that Carter cannot be made to forfeit property acquired by Corkren or any other co-conspirator as a result of the conspiracy. But nothing in the holding of *Honeycutt* or its reasoning precludes a forfeiture money judgment in the amount of the proceeds that Carter personally obtained from his co-conspirator, whatever may have been his or his co-conspirator's intended use. In any event, the court is convinced from the evidence, and so finds, that Corkren intended the payments to be a reward for Carter's participation in and furtherance of the conspiracy and that Carter intended to, and did, accept the payments as such a reward. This is true regardless as to whether either or both of them also

intended for Carter's mother to be the ultimate recipient of some or all of the funds.

For the foregoing reasons, the court finds that Carter intentionally obtained, as payment for his involvement, at least $ 21,000.00 in proceeds from the conspiracy and wire fraud offenses for which he was found guilty.

\* \* \*

Accordingly, it is ORDERED:

(1) That the government's motion for a forfeiture money judgment (Doc. 330) is granted;

(2) That, pursuant to 18 U.S.C. § 982(a)(2) and Rule 32.2(b)(2) of the Federal Rules of Criminal Procedure, defendant William Richard Carter, Jr. shall be held liable for a forfeiture money judgment in the amount of $ 21,000.00;

(3) That, upon entry of this order, it shall become a final order of forfeiture as to the defendant; and

**(4)** That the court retains jurisdiction to address any third-party claim that may be asserted in these proceedings, to enter any further order necessary for the forfeiture and disposition of such property, and to order any substitute assets forfeited to the United States up to the amount of the forfeiture money judgment.

DONE, this the 15th day of July, 2022.

/s/ Myron H. Thompson
**UNITED STATES DISTRICT JUDGE**